**THE ESTATE OF JASON THOMSON**;

       Plaintiff,

                                     **Case No:**

   v.

**CHRISTOPHER VAUBEL; BEN HARVATH;
KAREN PINEDA; MICHAEL O'DONNELL;
ALEX WANISH; THOMAS BEHN; SCOTT
DELSART;**
307 S. Adams Street,
Green Bay, Wisconsin 54301,
     And,
**ADAM SCHARTNER; REBECCA WARREN;
MATTHEW WEST; CLINT PELISCHEK; KAYLA
KUCHTA; BRYCE HAINES;**
3030 Curry Lane
Green Bay, WI 54311
     And
**THE CITY OF GREEN BAY**, a municipal corporation,
100 North Jefferson Street
Green Bay, WI 54301
     And,
**BROWN COUNTY**, a municipal corporation,
3030 Curry Lane
Green Bay, WI 54311
     And,
**ABC INSURANCE COMPANY**;
     And,
**XYZ INSURANCE COMPANY**;

       Defendants.

---

## COMPLAINT

---

NOW COMES the above-named Plaintiff, The Estate of Jason Thomson, by its attorneys,

**KATERS & GRANITZ, LLC**, and as for its claims for relief against the above-named Defendants, allege

and shows the Court as follows:

## I.  INTRODUCTION

1.     This case involves Brown County, the Brown County Sheriff's Office ("BCSO"), the City of Green Bay, the Green Bay Police Department ("GBPD"), and the individually named Defendants' methods of infringing on and violating the Constitutional, Civil, and/or Statutory Rights of the Estate of Jason Thomson ("Thomson") causing Thomson to suffer damages, injuries and ultimately Thomson's death.  While in joint custody of the GBPD and BCSO, Thomson died on the floor of the Brown County Sheriff's Jail ("BCJ").  The named Defendants used excessive force and acted objectively unreasonable and deliberately indifferent when they failed to provide medical care to Thomson despite his known, serious, acute, and obvious medical conditions.

2.     Shortly before midnight on February 9, 2020, Thomson suffered a seizure and was transported to St. Vincent Hospital. Thomson had a history of seizures and mental illness. After initial treatment, Thomson became uncooperative and began yelling at hospital staff. Green Bay Police officers arrived at the hospital responding to this disturbance. Officers approached Thomson and began to forcibly restrain him. While being restrained, Thomson told officers that he could not breathe. The officers ignored this statement and proceeded to place him in a "WRAP" restraint device. Thomson continued to express he could not breathe and that he was going to die. Defendants Ben Harvath, Karen Pineda, Christopher Vaubel, Michel O'Donnel, Alex Wanish, Thomas Behn, and Scott Delsart (collectively the "City Defendants") were all on scene and arrested Thomson, a seizure patient, exhibiting clear signs of mental and physical distress in a hospital, placed him in WRAP, and removed him from the hospital without additional medical clearance. The City Defendants transporting Thomson were not trained regarding the WRAP restraint, and laid Thomson on the floor of squad car instead of the seat while he was still constrained in the WRAP. On transport to the hospital Thomson begged the officers to remove the WRAP, restating that he could not breathe and that he was going to die unless helped. The transporting officers ignored his pleas.

3. Once the GBPD squad car transporting Thomson entered the BCJ Thomson became completely unresponsive, was drooling, and his face was turning white. Defendants Matthew West, Kayla Kuchta, and Bryce Haines, and Clint Pelischek asked Thomson questions while he was still in the back of the squad car, but he could not respond. Defendants Matthew West, Kayla Kuchta, and Bryce Haines, and Clint Pelischek then lifted Thomson out of the squad car while still in the WRAP and carried him into the BCJ arrest room. Thomson was placed on the ground of the arrest room still in the WRAP. Defendants Adam Schartner, Rebecca Warren, Matthew West, Clint Pelischek, Kayla Kuchta, and Bryce Haines, (collectively the "County Defendants") evaluated Thomson, still in the WRAP, to determine if they could accept him into the BCJ. County Defendants determined that they could not accept Thomson due to his serious, acute and critical medical condition and the lack of discharge paperwork provided by the City Defendants.

4. Both City and County Defendants stood around Thomson while he drooled on himself, turned pale white, failed to respond to questions or physical touch, and slipped in and out of consciousness. Despite these obvious signs of distress, each of the City and County Defendants failed to provide any medical treatment, remove the WRAP, or call for a medical emergency. Each of the named defendants ignored and directly violated WRAP training and policy for providing medical attention to arrestees in the WRAP. Instead, the County and City defendants argued whether Thomson was medically cleared at the hospital and moved Thomson out of the booking room, back into the squad car without providing medical care. Thomson sat in the back of the squad car dying for an additional three minutes while no care was provided to him, or the WRAP removed. Eventually, Thomson was checked for a pulse. When no pulse was found, Thomson was taken out of the vehicle and finally removed from the WRAP.

5. Efforts to revive Thomson on the floor of the BCJ sally port were predictively too late and unsuccessful. Tragically, Thomson died as a result of the Defendants' clear and obvious failures.

Thomson's autopsy ruled his manner of death to be a **homicide** caused by "**cardiac arrhythmia of undetermined etiology following police restraint.**" (emphasis added).

6.      Plaintiff brings this action under the United States Constitution, particularly under the provisions of the, *inter alia,* Fourth and/or Fourteenth Amendments; Title 42 of the United States Code Sections 1983 and 1985; Articles I, Sections One and Six of the Wisconsin Constitution; and, pursuant to Wis. Stat. §§ 895.03.

## II.  JURISDICTION

7.      That this Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and Laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of Plaintiff's civil rights.

8.      That this Court has supplemental jurisdiction over any state law claims which may arise out of the same facts common to Plaintiff's federal claims pursuant to 28 U.S.C. § 1367.

9.      That the amount in controversy exceeds Seventy-Five Thousand ($75,000) Dollars, exclusive of costs, interests, and attorneys' fees.

## III. VENUE

10.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because most Defendants reside in this district and because all the events and omissions giving rise to Plaintiff's claims occurred within this district.

## IV.  THE PARTIES

11.      Plaintiff, the Estate of Jason Thomson, represents the decedent, Jason Thomson, whose serious-acute-obvious medical needs were deliberately ignored and neglected while he was in the custody and under the care/control of the City of Green Bay, the GBPD, Brown County, and the BCSO, all of which the Plaintiff relied upon to provide adequate medical care. As a result, Thomson

died on the BCJ floor. At all times material hereto, Thomson was entitled to all rights, privileges, and immunities accorded by the Constitution of the United States. Thomson's stepmother, Cindy Thomson, has been appointed special administrator over the Estate.

12.     Defendant, Ben Harvath ("Harvath"), is an adult citizen of the United States and a resident of the State of Wisconsin.   At all times material hereto, Defendant Harvath was employed as a Green Bay police officer and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in his custody, including Thomson. Harvath was present at the Hospital during Thompson's arrest and placement into the WRAP. While Harvath heard Thompson state he could not breathe while being restrained in the hospital, Harvath failed to provide medical care to Thomson. Harvath was not trained in using the WRAP and while attempting to place Thomson in Harvath's squad car, Thomson kept falling off the seat. Harvath improperly wrapped the seatbelt around Thomson and left him on the floor of the squad car for transport. During transport to the BCJ, Thomson begged Harvath to let him out of the WRAP and that he could not breathe. Harvath failed to remove the WRAP, provide any medical care, or call for a medical emergency. Once at the BCJ Harvath witnessed Thomson become unresponsive, his skin turn pale, drool on himself, and struggle to breathe. For approximately 15 minutes at the BCJ Harvath witnessed Thomson in this state of acute distress and failed to remove the WRAP, provide any medical care, or call for a medical emergency. At all times material hereto, Defendant Harvath was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the GBPD and City of Green Bay's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

13.     Defendant, Karen Pineda ("Pineda"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Pineda was employed as a Green Bay police officer and was ultimately responsible for the health, safety, security, welfare and

humane treatment of all persons in her custody, including Thomson. Pineda was present at the Hospital during Thompson's arrest and actively participated in restraining Thomson prior to his placement into the WRAP. While Pineda heard Thompson state he could not breathe while being restrained in the hospital, Pineda failed to provide medical care to Thomson. Pineda was not trained in using the WRAP and while attempting to place Thomson in Pineda's squad car, Thomson kept falling off the seat. Pineda and her partner Harvath improperly wrapped the seatbelt around Thomson and left him on the floor of the squad car for transport. During transport to the BCJ, Thomson begged Pineda to let him out of the WRAP and that he could not breathe. Pineda failed to remove the WRAP, provide any medical care, or call for a medical emergency. Once at the BCJ Pineda witnessed Thomson become unresponsive, his skin turn pale, drool on himself, and struggle to breathe. For approximately 15 minutes at the BCJ Pineda witnessed Thomson in this state of acute distress and failed to remove the WRAP, provide any medical care, or call for a medical emergency. At all times material hereto, Defendant Pineda was acting under color of state law, within the scope of her employment and authority, and acting pursuant to the GBPD and City of Green Bay's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

14.     Defendant, Christopher Vaubel ("Vaubel"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Vaubel was employed as a Green Bay police officer and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in his custody, including Thomson. Defendant Vaubel was present at the Hospital during Thompson's arrest and actively participated in restraining Thomson. Despite Vaubel and other officers taking full control of Thomson, and Thomson telling Vaubel that he would calm down and that he couldn't breathe, Vaubel ordered a WRAP be placed on Thomson. Thomson started to comply with officer instructions but Vaubel and other officers placed Thomson into the

WRAP. Once at the BCJ Vaubel witnessed Thomson become unresponsive, his skin turn pale, drool on himself, and struggle to breathe. For approximately 15 minutes at the BCJ Vaubel witnessed Thomson in this state of acute distress and failed to remove the WRAP, provide any medical care, or call for a medical emergency. Additionally, Vaubel failed to provide the BCJ with complete discharge and medical clearance paperwork for Thomson. At all times material hereto, Defendant Vaubel was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the GBPD and City of Green Bay's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

15.     Defendant, Michael C. O'Donnell ("O'Donnell"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant O'Donnell was employed as a Green Bay police officer and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in his custody, including Thomson. O'Donnell was present at the Hospital during Thompson's arrest and actively participated in restraining Thomson and his placement into the WRAP. O'Donnell initially observed Thomson to be yelling incoherently when he arrived on the scene. Thomson walked slowly towards O'Donnell with his hands open. O'Donnell grabbed Thomson, turned Thomson around and forced Thomson into the hospital wall. O'Donnell then forced Thomson to the ground. O'Donnell noticed Thomson was sweating and incoherent then forced Thomson on to his stomach. Officers Vaubel and Wanish arrived on the scene and assisted in holding Thomson on the ground. O'Donnell then placed handcuffs on Thomson. Thomson told O'Donnell that he was going to die and that he couldn't breathe.  Instead of providing Thomson with medical care or calling for a medical emergency, O'Donnell placed his knee across Thomson's shoulders. A WRAP was then provided, and O'Donnell assisted in placing Thomson in the restraint device despite Thomson now complying with orders and his pleas for help. Officer O'Donnell completed Thomson's booking form at the BCJ which stated Thomson was medically

cleared by the hospital but failed to provide the BCJ with complete medical paperwork. Upon information and belief, Thomson was not examined by medical or hospital staff after being placed in the WRAP. At all times material hereto, Defendant O'Donnell was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the GBPD and City of Green Bay's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

16.     Defendant, Alex Wanish ("Wanish"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Wanish was employed as a Green Bay police officer and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in his custody, including Thomson. Wanish was present at the Hospital during Thompson's arrest and placement into the WRAP. While pinning Thomson to the ground with other officers, Wanish heard Thompson state he could not breathe. Instead of attempting to provide medical care or call for a medical emergency, Wanish responded to Thomson stating if he could talk, he could breathe. Wanish then assisted in placing Thomson in the WRAP. Wanish then assisted in carrying and placing Thomson in Pineda and Harvath's squad car. While attempting to place Thomson in Harvath's squad car, Thomson kept falling off the seat. The officers improperly wrapped the seatbelt around Thomson and left him on the floor of the squad car for transport. Thomson reiterated to Wanish that he was going to die but Wanish stated there was nothing he could do. Thomson would die within the next half-hour. At all times material hereto, Defendant Wanish was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the GBPD and City of Green Bay's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

17.     Defendant, Sgt. Thomas Behn ("Behn"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Behn was employed as a

Green Bay police Sargent and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in his custody, including Thomson. Behn was present at the Hospital during Thompson's arrest and actively participated in restraining Thomson prior to his placement into the WRAP. Behn forcibly secured Thomson's legs by placing his knees across Thomson's legs. Behn heard Thomson state he could not breathe but Behn failed to take any action regarding Thomson's pleas. Despite Behn and other officers gaining full control of Thomson, Thomson stating that he would calm down and that he couldn't breathe, Behn ordered Defendant Delsart to get a WRAP for Thomson. Thomson began complying with orders but was still placed in the WRAP. After the WRAP was placed, Thomson began to incoherently mumble and saliva was coming out of his mouth. Despite Thomson stating he could not breathe, mumbling incoherently and drooling, Behn failed to remove the WRAP, provide any medical care, or call for a medical emergency. After being placed in the WRAP, Thomson was not seen by medical staff and instead taken to a squad car for transport. Behn assisted in placing Thomson in Pineda and Harvath's squad car. Thomson kept falling off the seat and Behn witnessed Harvath wrap the seatbelt around Thomson while he was on the ground of the squad car. Harvath improperly wrapped the seatbelt around Thomson and left him on the floor of the squad car for transport. At all times material hereto, Defendant Behn was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the GBPD and City of Green Bay's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

18.     Defendant, Scott Delsart ("Delsart"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Delsart was employed as a Green Bay police officer and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in his custody, including Thomson.  Delsart was present at the hospital during Thompson's arrest and actively participated in restraining Thomson and placing him

into the WRAP. Despite the officers taking full control of Thomson, and Thomson stating that he would calm down and that he couldn't breathe, Delsart retrieved the WRAP and heard Thomson mumble incoherently while placing him in the WRAP. After the WRAP was placed, Thomson continued to incoherently mumble, and saliva was coming out of his mouth. Despite Thomson stating he could not breathe, mumbling incoherently and drooling, Delsart failed to remove the WRAP, provide any medical care, or call for a medical emergency. Delsart observed that Thomson seemed like an emotionally disturbed person and placed a helmet on Thomson's head. Later, during transport, the helmet placed on Thomson slide down Thomson's head fully covering his eyes and nose. Eventually the helmet would completely fall off Thomson's head by the time he arrived to the BCJ. At all times material hereto, Defendant Delsart was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the GBPD and City of Green Bay's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

19. Defendant, the City of Green Bay, with offices at 100 N Jefferson Street, Room 200, Green Bay, Wisconsin 54301 at all times material hereto, was a Municipal Corporation organized under the laws of the State of Wisconsin and was at all times responsible for training and supervising the employees of the GBPD, and for the creation and implementation of policy and procedures for the GBPD. The City of Green Bay is required to pay any judgments found against its officers and employees for actions within the scope of their employment pursuant to Wis. Stat. §895.46(1)(a).

20. Defendant, Lt. Adam Schartner ("Schartner"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Schartner was employed as a Lieutenant by the BCSO and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in his custody, including Thomson. Specifically, Schartner was assigned as Watch Commander at the BCJ on February 10, 2020, when Thomson was

brought into the BCJ. When Thomson was brought into the BCJ, Schartner was stationed at the intake officer's station and witnessed officers carry Thomson into the arrest area while still in a WRAP. Defendant Pelischek informed Schartner that Thomson did not look good and that Schartner should go out and assess him. Schartner saw Thomson restrained in the WRAP and noticed his skin was pale, he was hunched over, he was unresponsive and was drooling on himself. Despite the obvious, serious, and acute medical distress exhibited by Thomson, Schartner failed to remove Thomson from the WRAP, provide medical care, or call for a medical emergency. After consulting with Nurse Warren, Schartner informed the City Defendants that the BCJ would not accept Thomson and he would have to be medically cleared first. At all times material hereto, Defendant Schartner was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the BCSO and Brown County's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

21.     Defendant, R.N. Rebecca Warren ("Warren"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Warren was employed as a registered nurse by Brown County and the BCSO and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in the BCJ, including Thomson. Warren was present at the BCJ as a registered nurse on February 10, 2020, when Thompson was brought in. Warren first encountered Thomson in the arrest area while he was surrounded by officers and restrained in a WRAP. Warren was informed that Thomson was mentally ill, was at St. Vincent's hospital following a seizure, had a history of seizures and questionable compliance with his seizure medication. Warren observed Thomson to be unresponsive and could not say words. Warren further observed Thomson to be pale and drooling hon himself. Despite Thomson's acute and severe medical condition, Warren failed to order Thomson be taken out of the WRAP, provide any medical care, call for a medical emergency, or begin emergency lifesaving treatment. Instead, Warren and Schartner

determined that the BCJ would not accept Thomson and that he would need to be medically cleared before the BCJ would accept him. Thomson was lifted by officers back into the squad car and Warren followed and stood by the driver's side of the car. While in the car, Thomson predictively stopped breathing and the Defendants could not find his pulse. Only after Thomson had stopped breathing and had no pulse did Warren attempt to provide emergency medical care. At all times material hereto, Defendant Warren was acting under color of state law, within the scope of her employment and authority, and acting pursuant to the BCSO and Brown County's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

22.    Defendant, Corporal Matthew West ("West"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant West was employed as a Corporal by Brown County the BCSO and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in his custody, including Thomson. West was assigned as the Intake Corporal at the BCJ when Thomson was brought in. When Thomson was brought into the BCJ, West opened the squad car door and found Thomson on the ground of the car, his head slumped over resting on the seat belt which was secured around his elbow underneath him. Thomson could not even lift his head up when asked. While being taken out of the car, Thomson was unresponsive, drooling on himself, and pale. Despite Thomson's acute medical condition West failed to remove the WRAP, provide any medical care, or call for a medical emergency. West along with other officers, moved Thomson from the car into the arrest area. While on the floor, Thomson continued to be unresponsive to West's questions. West observed Thomson's legs shaking in a seizure like manner while on the floor. West observed Thomson drooling on himself while on the ground and Nurse Warren stated that Thomson was not medically cleared to be taken into the BCJ. Instead of taking Thomson out of the WRAP and providing medical care, West and other officers lifted

12

Thomson up and placed him back into the squad car. At all times material hereto, Defendant West was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the BCSO and Brown County's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

23.     Defendant, Cpl. Kayla Kuchta ("Kuchta"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Kuchta was employed as a Corporal by Brown County the BCSO and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in her custody, including Thomson. Kuchta was assigned as the Housing Corporal at the BCJ when Thomson was brought in. When Thomson was brought into the BCJ, Kuchta opened the squad car door and found Thomson on the ground of the car, his head slumped over resting on the seat belt which was secured around his elbow underneath him. While being taken out of the car, Thomson was unresponsive, drooling on himself, and pale. Thomson could not even lift his head up when asked by Kuchta. Despite Thomson's acute medical condition Kuchta failed to remove the WRAP, provide any medical care, or call for a medical emergency. Kuchta along with other officers, moved Thomson from the car into the arrest area. While on the floor, Thomson continued to be unresponsive to questions. Kuchta observed Thomson could not keep his eyes open, was not coherent and his hand was grey. Kuchta further observed Thomson drooling on himself while on the ground and Nurse Warren stated that Thomson was not medically cleared to be taken into the BCJ. Instead of taking Thomson out of the WRAP and providing medical care, Kuchta and other officers lifted Thomson up and placed him back into the squad car. At all times material hereto, Defendant Kuchta was acting under color of state law, within the scope of her employment and authority, and acting pursuant to the BCSO and Brown County's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

24.     Defendant, Officer Clint Pelischek ("Peleschek"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Pelischek was employed as an officer by Brown County and the BCSO and was ultimately responsible for the health, safety, security, welfare and humane treatment of all persons in custody, including Thomson. Pelischek was an officer at the BCJ when Thomson was brought in. When Thomson was brought into the BCJ, Pelischek was present when Kuchta opened the squad car door and found Thomson on the ground of the car, his head slumped over resting on the seat belt which was wrapped around his elbow underneath him. While being taken out of the car, Thomson was unresponsive, drooling on himself, and pale. Thomson could not even lift his head up when asked. Despite Thomson's acute medical condition Pelischek failed to remove the WRAP, provide any medical care, or call for a medical emergency.  Pelischek along with other officers, moved Thomson from the car into the arrest area. While on the floor, Pelischek attempted to give Thomas a Preliminary Breath Test but Thomson continued to be unresponsive. Pelischek observed Thomson could not keep his eyes open, was not coherent and his skin color was not normal. Pelischek further observed Thomson drooling on himself while on the ground and stated to other officers that the nurse would not medically clear Thomson to be taken into the BCJ. Instead of taking Thomson out of the WRAP and providing medical care, Pelischek left the intake area once the nurse arrived and in informed Lt. Schartner that Thomson was not well. At all times material hereto, Defendant Pelischek was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the BCSO and Brown County's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

25.     Defendant, Correctional Officer Bryce Haines ("Haines"), is an adult citizen of the United States and a resident of the State of Wisconsin. At all times material hereto, Defendant Haines was employed as a correctional officer by Brown County and the BCSO and was ultimately responsible

for the health, safety, security, welfare and humane treatment of all persons in custody, including Thomson. Haines was assigned as an intake officer at the BCJ when Thomson was brought in. When Thomson was brought into the BCJ, Haines was present when Kuchta opened the squad car door and found Thomson on the ground of the car, his head slumped over resting on the seat belt which was secured around his elbow underneath him. While being taken out of the car, Thomson was unresponsive, drooling on himself, and pale. Thomson could not even lift his head up when asked. Thomson was not resistive and could not respond to questions. Despite Thomson's acute medical condition Haines failed to remove the WRAP, provide any medical care, or call for a medical emergency. Haines along with other officers, moved Thomson from the car into the arrest area. While on the floor, Thomson continued to be unresponsive to questions. Haines observed Thomson could not keep his eyes open, was not coherent and was very pale. Haines further observed Thomson drooling on himself while on the ground. Once Nurse Warren arrived, she and Lt. Schartner found Thomson was not medically cleared to be taken into the BCJ. Despite Thompson's obvious and acute medical issues, Haines failed to take Thomson out of the WRAP or provide any medical care at this time. Officers then lifted Thomson up and placed him back into the squad car. Only after Thomson had stopped breathing and had no pulse did Haines attempt to provide emergency medical care. At all times material hereto, Defendant Haines was acting under color of state law, within the scope of his employment and authority, and acting pursuant to the BCSO and Brown County's policies, customs, and practices, written and unwritten, which were the moving force behind the constitutional violations asserted herein.

26. Defendant, Brown County, with offices at 100 N Jefferson Street, Room 200, Green Bay, Wisconsin 54301 at all times material hereto, was a Municipal Corporation organized under the laws of the State of Wisconsin and was at all times responsible for training and supervising the employees of the BCSD, BCJ and for the creation and implementation of policy and procedures for

the BCSD. Brown County is required to pay any judgments found against its officers and employees for actions within the scope of their employment pursuant to Wis. Stat. §895.46(1)(a).

27. Defendant ABC Insurance Company ("ABC") is a fictitiously named insurance corporation or corporations, authorized to conduct business in the State of Wisconsin and is engaged in the business of, among other things, issuing policies of insurance within the State of Wisconsin and said address is unknown at this time; upon information and belief, prior to and including all relevant times hereto, Defendant ABC issued a policy of liability insurance to the City of Green Bay and all other Defendants. By the terms of said policy, ABC agreed to pay any and all sums for which Defendant City of Green Bay and/or employees and agents thereof might be held legally liable for injuries or damages caused by Defendant City of Green Bay and/or employees and agents thereof. Upon information and belief, said policy was in full force and effect during the occurrences hereinafter stated. Pursuant to Wis. Stat. § 803.04, Defendant ABC is a proper party to this action.

28. Defendant XYZ Insurance Company ("XYZ") is a fictitiously named insurance corporation or corporations, authorized to conduct business in the State of Wisconsin and is engaged in the business of, among other things, issuing policies of insurance within the State of Wisconsin and said address is unknown at this time; upon information and belief, prior to and including all relevant times hereto, Defendant XYZ issued a policy of liability insurance to Brown County and all other Defendants. By the terms of said policy, XYZ agreed to pay any and all sums for which Defendant Brown County and/or employees and agents thereof might be held legally liable for injuries or damages caused by Defendant Brown County and/or employees and agents thereof. Upon information and belief, said policy was in full force and effect during the occurrences hereinafter stated. Pursuant to Wis. Stat. § 803.04, Defendant XYZ is a proper party to this action.

29. All of the Defendants are sued in their individual and official capacities. At all times material hereto, all Defendants were acting under the color of state law; pursuant to their authority as

officials, agents, contractors or employees of the City of Green Bay and/or Brown County; within the scope of their employment as representatives of public entities and were deliberately indifferent to the Constitutional and statutory rights of Thomson.

## V. FACTS

30.     That at all material times hereto, Thomson suffered from mental illness and seizures and was involuntarily detained by the GBPD and BCSO under the direct custody, supervision, and care of the City and County Defendants.

31.     That on February 9, 2020, a call was placed to the Green Bay Fire Department from the St. John's Shelter ("St. John's) located at 411 St. John St. Green Bay, WI, indicating that Thomson was having a seizure in-front of the building.

32.     Engine 421 was dispatched to St. John's where Thomson, a 47-year-old male was unconscious and was convulsing.

33.     Engine 421 arrived at St. John's at approximately 11:38pm and transported Thomson to St. Vincent Hospital ("St. Vincent") just before midnight where Thomson began receiving medical care for his loss of consciousness and seizures.

34.     At approximately 2:47am on February 10, 2020, a call from St. Vincent was placed to the GBPD stating that Thomson, who was being treated for a seizure was not cooperating and yelling at staff.

35.     Defendants O'Donnell and Vaubel were initially dispatched to the call. O'Donnell arrived first and observed Thomson with no shirt on and screaming incoherently. Defendant O'Donnell was aware that that Thomson was at St. Vincent's being treated for seizures he had suffered just hours ago. O'Donnell observed that Thomson was not making intelligible sentences.

36.     Defendant O'Donnell approached Thomson and grabbed Thomson's left wrist and turned Thomson around to control his body. O'Donnell then forced Thomson against the wall and

put his knee in the back of Thomson's left thigh so Thomson couldn't move. Thomson was observed to be sweating at this time. O'Donnell then forced Thomson to the ground on Thomson's stomach.

37.     Defendant Vaubel then arrived on the scene and saw O'Donnell on top of Thomson who was on the ground. Vaubel then began controlling Thomson's legs while O'Donnell controlled Thomson's upper body. Officer Vaubel was aware that that Thomson was at St. Vincent's being treated for seizures he had suffered just hours ago.

38.     Defendant Wanish then arrived on the scene and began to control Thomson's left side. The three officers, O'Donnell, Vaubel, and Wanish were able to place Thomson's hands behind his back and handcuff him.

39.     Defendants Sgt. Thomas Behn, Harvath, Delsart, and Pineda then arrived on scene.

40.     While handcuffed on the ground, being held by O'Donnell, Vaubel, and Wanish Thomson stated, "I'm going to die" and "I can't breathe." Defendant Wanish dismissed Thomson's pleas telling him, if he could talk, he could breathe.

41.     Despite Thomson informing the officers that he could not breathe and was going to die, O'Donnell placed his knee across Thomson's right shoulder blade.

42.     Defendant Vaubel and Behn instructed Defendant Delsart to retrieve the WRAP device from his squad car. Delsart retrieved the WRAP device and laid it on the ground for Thomson to be placed in.

43.     The WRAP device is a restraint system used by the GBPD in February of 2020, consisting of straps, buckles, and harnesses that immobilizes and fully restrains any subject placed into it, in a seated position.

44.     Defendants O'Donnell, Vaubel, Wanish, Behn, and Delsart all assisted in placing Thomson in the WRAP. Thomson was compliant with orders from Officer Vaubel to roll onto his back and sit up. The Defendants placed Thomson in the WRAP despite each Defendant having

18

knowledge and notice that: Thomson had suffered from seizures just hours before; Thomson was sweating and stated he could not breathe; that Thomson said that he was going to die; that Thomson was making unintelligible speech; Thomson was now complying with order; and that Thomson suffered from known mental illness. O'Donnell, Vaubel, Wanish, Behn, and Delsart did not seek medical attention for Thomson or take Thomson's vital signs before placing him in the WRAP.

45. Once Thomson was placed in the WRAP, a Delsart placed a helmet over Thomson's head.

46. Upon information and belief, after Thomson was forcefully restrained in the WRAP, mumbling incoherently, sweating and stating he could not breathe, Defendants O'Donnell, Vaubel, Wanish, Behn, and Delsart did not seek medical attention or take Thomson's vital signs. Thomson was not evaluated by medical staff after being placed in the WRAP.

47. Defendants Vaubel, Harvath, Wanish, and Behn, carried Thomson in the WRAP to Harvath and Pineda's squad car located in the St. Vincent's ER sally port.

48. Thomson continued to tell the Defendants, Vaubel, Harvath, Wanish, and Behn that he was going to die, as he was being placed in the squad car. Defendant Wanish replied to Thomson stating there was nothing he could do.

49. Defendant Harvath, who had not received training regarding the WRAP, attempted to place Thomson into his squad across the backseat. Thomson, while still confined in the WRAP and helmet, kept falling off the back seat of Harvath's squad car. Harvath, Pineda, and Behn then placed the lap portion of the seatbelt around Thomson while Thomson laid on the floor in the back of the squad car.

50. Defendant Pineda was in the driver's seat of the squad car with Harvath in the front passenger seat. Neither Pineda or Harvath were trained with the WRAP or when to provide medical

care for an arrestee restrained in the WRAP. Defendant Vaubel followed behind the squad car in route to the BCJ.

51.     During transport to the BCJ, Thomson struggled to keep the helmet from falling over his mouth and nose while on the floor of the squad car.

52.     During transport to the BCJ, the helmet placed on Thomson by Defendant Delsert fell off.

53.     During transport to the BCJ, Thomson begged to be let out of the WRAP stating multiple times that he could not breathe and was going to die.  Thomson then became unresponsive.

54.     When the squad car transporting Thomson arrived at the BCJ, Thomson was left in the back of the car, in the WRAP, unmonitored by Defendants Harvath and Pineda for over a minute despite pleading to the officers that he could not breathe and stating that he was going to die.

55.     While Thomson was in the back of the squad car, County Defendants secured the sally port doors. While in the car, Thomson was secured in WRAP in the BCJ, he was not physically capable of leaving the BCJ and was restrained by both County and City defendants.

56.     At all times material hereto, Thomson could not leave the BCJ without the permission and assistance of the County and City Defendants and was effectively seized by the City and County Defendants under the Fourth Amendment Standard.

57.      After leaving Thomson unmonitored in the back of the squad car, Defendants Harvath and Pineda, with the assistance of County Defendants West, and Kuchta, opened the back passenger side door.

58.     Thomson was still on the floor of the squad car and his head was slumped over, on top of the seatbelt buckle. Thomson was not responsive to the Defendants' questions while hunched over in the back of the car. Defendants Harvath, Pineda, Vaubel, West, Pelischek and Kuchta all observed Thomson to be unresponsive, drooling, and his skin looking pale, but did not offer any

medical assistance, attempt to remove the WRAP, or call for medical assistance or a medical emergency despite Thomson's obvious signs of distress.

59.     Defendants West, and Kuchta removed Thomson from the squad car, while he was still in the WRAP, carried and placed him on the floor of the BCJ booking area with assistance of other officers. The arrest area is located behind a locked door operated by BCSO.

60.     Defendant Schartner was stationed at the BCJ intake section to assist and oversee BCJ staff with the incoming Thomson.

61.     Defendants Harvath, Pineda, O'Donnell and Vaubel failed to provide the BCJ with any discharge paperwork or complete medical clearance paperwork from St. Vincent regarding Thomson.

62.     Defendants Harvath, Pineda, and Vaubel failed to provide complete medical clearance paperwork from St. Vincent regarding Thomson despite indicating on Thomson's booking form that they sought medical clearance.

63.     As a result, the County Defendants did not know if Thomson was medically cleared for jail by St. Vincent's. Upon information and belief, Thomson was not seen by St. Vincent's medical staff after he was forcibly restrained and placed in a WRAP.

64.     Defendants Harvath, Pineda, and Vaubel informed the County Defendants that Thomson had not been taking his seizure medications.

65.     Once in the BCJ booking area, Thomson remained on the floor unresponsive in the WRAP and began to lose consciousness.

66.     Defendant Pelischek informed Defendant Schartner that Thomson did not look good, which prompted Schartner to approach Thomson. Despite this observation of Thomson's clear distress neither Pelischek or Schartner provided any medical care or called for a medical emergency.

67.     Defendants Harvath, Pineda, Vaubel, West, Kuchta, Schartner, Pelischek, Warren, and Haines were all present in the arrest area observing Thomson still in the WRAP.

68.     Defendants Harvath, Pineda, Vaubel, West, Kuchta, Schartner, Pelischek, Warren, and Haines observed Thomson to be unresponsive to questions and physical stimuli, such as being touched, his skin was very pale, he could not speak, he was drooling, and his legs were shaking in a manner that appeared "seizure like."

69.     Despite observing these clear signs of medical distress, Harvath, Pineda, Vaubel, West, Kuchta, Schartner, Pelischek, Warren, and Haines failed to remove Thomson from the WRAP, provide any medical care whatsoever, or call for a medical emergency.

70.     While observing Thomson in the booking area, BCJ, Defendant Nurse Warren and Schartner told Defendants Harvath, Pineda, and Vaubel that BCJ could not accept Thomson into the BCJ due to his dire medical condition. Despite all Defendants having actual knowledge that Thomson was not medically cleared for admission into the BCJ, and observing Thomson's continued unresponsiveness, Thomson's drooling, Thomson's face turning white/pale, the Defendants did not offer any medical assistance, attempt to remove the WRAP, or call for a medical emergency.

71.     Thomson was then carried out of the booking area and placed back into Harvath's squad car while still in the WRAP. As Thomson was transported back to the squad car, he could not keep his head up, continued to drool, and remained unresponsive.

72.     Thomson remained restrained in the squad car for another 3-4 minutes before Harvath checked him for a pulse. Harvath could not find a pulse and only then was Thomson finally removed from the back seat of the squad car and placed on the floor of the BCJ sally port.

73.     After being placed on the floor of the BCJ sally port, Thomson was finally removed from the WRAP device and handcuffs. Thomson was laid on the ground unresponsive, not breathing and ultimately died.

74. Approximately 13-15 minutes passed from the time Defendants Harvath, Pineda, Vaubel, West, Kuchta, first witnessed the unresponsive, drooling, Thomson in the BCJ sally port to when they finally removed the WRAP and called for medical assistance.

75. Thomson was restrained in the WRAP for approximately 30-45 minutes while he pleaded and begged to be let out as he could not breathe before becoming completely unresponsive.

76. County Defendants controlled both the BCJ sally port entrance and the booking area door as well as physically restraining Thomson. At no time during Thomson's time in the BCJ was he free to leave the County facility or the custody of the County and City Defendants.

77. At all times materially hereto, Thomson was seized by and in the custody and control of the County and City Defendants jointly. Thomson was restrained by a WRAP device as well as multiple GBPD and BCSO officers physically holding him. At various points during the failed booking, Thomson was restrained both in a GBPD squad car and BCJ secured and locked facility. At no point during the City and County Defendants' custody of Thomson was he free to leave their custody or control.

78. From the time Thomson was placed in the WRAP until the time he died, he did not resist the officers or medical staff in any way.

79. A call to Green Bay Fire Department EMS was placed. Once EMS arrived, they attempted to revie Thomson but were unsuccessful. Thomson was pronounced dead upon transport to Aurora Hospital a 4:09 AM.

80. Thomson's autopsy concluded that the manner of death was ruled a **homicide** and cause of death was identified as "Cardiac arrhythmia of undetermined etiology **following police restraint**." (Emphasis added.)

81. The above acts and omissions of all Defendants, and each of them, constitute a course of conduct and failure to act amounting to objective unreasonableness and deliberate indifference to

the rights, health, safety, and welfare of Thomson and those similarly situated, resulting in the deprivation of his constitutional rights.

82.    Federal and state law, as well as accepted corrections and medical practices at the time of the incident provided "fair warning" to Defendants that their conduct was improper, incompetent, illegal, and in violation of Thomson's constitutional rights under the Fourth and/or Fourteenth Amendments.

83.    The acts and omissions of the Defendants, as set forth above, violated clearly established and well settled federal constitutional rights of the Plaintiff, i.e., due process of law under the Fourth and Fourteenth Amendments to the United States Constitution.

84.    The acts and omissions of the Defendants, as set forth above, violated clearly established and well settled Rights of the Plaintiff under Articles I, Sections One and Six of the Wisconsin Constitution.

85.    As a direct and proximate result of the acts and omissions of the Defendants as set forth above, Thomson suffered the following injuries and damages:

  a.  Emotional distress, psychological distress, and mental anguish;
  b.  Physical pain and suffering;
  c.  Loss of companionship;
  d.  Loss of future enjoyment of life;
  e.  Fright and shock;
  f.  Denial of social pleasure and enjoyment;
  g.  Embarrassment, humiliation, and mortification,
  h.  Constitutional violations; and,
  i.  Death.

## VI.  VIOLATIONS OF LAW

### COUNT I
**DEPRIVATION OF CIVIL RIGHTS FOR EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT (42 U.S.C. §1983); (By Plaintiff against DEFENDANTS BEN HARVATH; KAREN PINEDA; CHRISTOPHER VAUBEL; MICHAEL O'DONNELL; ALEX WANISH; SGT. THOMAS BEHN; and SCOTT DELSART**

86.     Plaintiff hereby reasserts and realleges each and every allegation contained in Paragraphs 1 through 85 as if fully set forth herein.

87.     The unjustified and improper restraint of Thomson by the Defendants deprived Thomson of his rights, privileges, and immunities secure by the Constitution and laws of the United States, including those secured by the Fourth Amendment to the Constitution by among other acts; seizing Thomson and subjecting him to excessive force and restraint by; forcing Thomson against a wall and the ground; use of 4-5 officers to pin Thomson against the ground while ignoring his pleas that he could not breathe and was going to die; unnecessarily restraining Thomson in the WRAP; applying the WRAP without necessary immediate medical attention; transporting Thomson on the floor of squad car while in the WRAP; and ultimately using deadly force where no force was necessary.

88.     At all relevant times, the risk of placing a mentally ill individual with a history of seizures into a WRAP was obvious and known, or should have been known to each of the above listed Defendants, which the Defendants deliberately chose to ignore.

89.     Thomson's injuries and death were a direct and proximate result of the aforementioned violation of rights conferred by the United States Constitution and the wrongful acts and omissions perpetrated by the Defendants while acting within the scope of their employment and under the color of law and pursuant to customs, policies, and/or procedures in violation of 42 U.S.C. §1983.

90.     This use of deadly force (restricted breathing and failure to provide medical care to a mentally ill seizure patient) was excessive and unreasonable under the circumstances. Defendants' actions thus deprived Thomson of his right to be free from unreasonable searches and seizures under the Fourth Amendment.

91.     The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Thomson and therefore warrants punitive damages as to the Defendants. Plaintiff also seeks attorney's fees under this claim.

**COUNT II**
**DEPRIVATION OF CIVIL RIGHTS FOR FAILURE TO PROVIDE MEDICAL CARE UNDER THE FOURTH AND/OR FOURTEENTH AMENDMENTS (42 U.S.C. §1983); (By Plaintiff against DEFENDANTS BEN HARVATH; KAREN PINEDA; CHRISTOPHER VAUBEL; MICHAEL C. O'DONNELL; ALEX WANISH; SGT. THOMAS BEHN; SCOTT DELSART; ADAM SCHARTNER; CLINT PELISCHEK; REBECCA WARREN; MATTHEW WEST; BRYCE HAINES; and KAYLA KUCHTA)**

92.     Plaintiff hereby reasserts and realleges each and every allegation contained in Paragraphs 1 through 91 as if fully set forth herein.

93.     The Defendants intentionally and recklessly (1) denied the medical treatment of Thomson necessary to prevent cardiac and respiratory compromise and brain damage from lack of oxygen; (2) caused Thomson's physical distress to worsen and deteriorate while Thomson struggled against the WRAP; (3) caused Thomson's physical distress to worsen and deteriorate while Thomson became unresponsive, drooled on himself, and lost color in his face while in the WRAP; (4) prevented Thomson's booking into the BCJ; and (5) caused Thomson's death.

94.     At all relevant times, the risk of placing a mentally ill individual with a history of seizures into a WRAP was obvious and known, or should have been known to each of the above listed Defendants, which the Defendants deliberately chose to ignore.

95.     At all relevant times, the risk of not providing any medical care to a mentally ill individual with a history of seizures stating that he was going to die and that he could not breathe while in a WRAP was obvious and known, or should have been known to each of the above listed Defendants, which the Defendants deliberately chose to ignore.

96.     At all relevant times, the risk of not providing any medical care to a mentally ill individual with a history of seizures becoming unresponsive in a WRAP was obvious and known, or

should have been known to each of the above listed Defendants, which the Defendants deliberately chose to ignore.

97.    Each of the Defendants knew that Thomson was suffering from serious medical conditions and needed immediate treatment but deliberately ignored the same by failing to provide proper medical care while Thomson was being placed in the WRAP; transported in the WRAP to the BCJ on the floor of a squad car; and remained in the WRAP for nearly 15 minutes at the BCJ where he lost consciousness, drooled on himself and was unresponsive.

98.    That the above-named Defendants, and each of them, acted objectively unreasonable and deliberately indifferent to Thomson's serious medical needs and intentionally deprived Thomson of the required medical care and treatment, and acted with reckless disregard of Thomson's obvious serious medical conditions, in violation of Thomson's rights, privileges, and immunities as guaranteed by the United States Constitution, the Fourth and/or Fourteenth Amendments, and Federal Statutes, including 42 U.S.C. § 1983.

99.    That the deliberately indifferent conduct of the Defendants, and each of them, shocks the conscious, was reckless, deliberately indifferent and demonstrates objectively unreasonably actions in their refusal to provide Thomson medical care or call for a medical emergency to obtain appropriate care and treatment at the BCJ.

100.    That the actions and omissions of all Defendants under the Fourth Amendment to the United States Constitution, as well as 42 U.S.C. § 1983, were all performed under the color of state law, within the scope of their City and County employment, and were unreasonable and performed knowingly, intentionally, maliciously, and deliberately indifferent to Thomson's safety, well-being and serious medical needs; with wanton intent for Thomson to suffer an unnecessary intentional infliction of pain and suffering by failing to obtain medical treatment.

101.     That the conduct of each Defendant, was committed pursuant to, and in execution and implementation of, the color of state law and officially sanctioned policies, practices, ordinances, regulations, and/or customs of the GBPD, and each of the named Defendants exhibited objectively unreasonable and deliberately indifferent actions in violation of the Fourth Amendment and/or the Fourteenth Amendments to the United States Constitution to Thomson's serious medical needs, and in violation of 42 U.S.C. 1983, causing the constitutional deprivation of Thomson's individual rights to-wit:

    a. Deliberately ignoring Thomson's immediate needs for medical treatment;
    b. Deliberately failing to immediately transport Thomson to an appropriate hospital for immediate medical care and treatment;
    c. Deliberately failing to seek appropriate medical attention for Thomson when he stated he could not breathe;
    d. Deliberately failing to seek appropriate medical attention for Thomson when became unresponsive, lost color in his face, and was observed drooling on himself;
    e. Deliberately failing to monitor Thomson while in the WRAP;
    f. Deliberately, willfully, and wantonly withholding required medical care to Thomson when they had actual knowledge of Thomson's serious medical conditions requiring immediate attention;

102.     That as a direct and proximate result of the deliberate, willful, wanton, and reckless violation of Thomson's Constitutional Rights, Plaintiff suffered injuries and damages including, but not limited to the following:

    a. Emotional distress, psychological distress, and mental anguish;
    b. Physical pain and suffering;
    c. Loss of companionship;
    d. Loss of future enjoyment of life;
    e. Fright and shock;
    f. Denial of social pleasure and enjoyment;
    g. Embarrassment, humiliation, and mortification,
    h. Reasonable expenses of necessary medical care, treatment and services;
    i. Constitutional violations;
    j. Death;
    k. Punitive damages for Defendants' willful conduct; and,
    l. Any and all other damages, including, but not limited to attorney fees recoverable under 42 U.S.C. §§ 1983 and 1988.

**COUNT III**

**MONELL LIABILITY – FAILURE TO TRAIN AND ADEQUATELY SUPERVISE; (By Plaintiff against DEFENDANTS CITY OF GREEN BAY and BROWN COUNTY)**

103.   Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 102 as if fully set forth herein.

104.   Defendants City of Green Bay and Brown County failed to train officers and employees in the Wrap restraint system or to follow precautions provided by the Wrap Basic Application Manual:

- Precaution 2 – Medical Attention:
  - ***If a restrained subject complains of or exhibits any medical concerns, seek immediate medical attention.*** Medical treatment can be provided while the subject is restrained in The WRAP. Examples of health concerns are:
  - ***Respiratory Distress (i.e. coughing, gasping, gagging, shortness of breath)***
  - ***Sudden quiet or inactivity (especially after a violent struggle)***
  - Chest pains, shooting pains down the arm
  - ***Change in facial color***
  - Elevated body temperature (I'm burning up!) Vomiting
  - Suspected drug behavior
  - ***Sweating profusely***
- General Precautions:
  - ***Subject should be monitored at all times***.
  - Caution should be taken to avoid any straps getting tangled around the subject's neck.
  - ***Emergency medical care or evaluation of the subject should be considered in order to reduce injuries and the possibility of in-custody death.***

105.   That the Defendants failed to adequately train officers and medical staff at all times material to this Complaint on how to care for mentally ill arrestees, persons in their custody suffering from serious-acute-obvious medical conditions, and individuals in their custody in need of immediate medical attention, how to perform life-saving procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies, when to uses the WRAP restraint, how to

apply the WRAP restraint, how to transport an arrestee in a WRAP, and when to provided medical care to arrestees restrained in the WRAP exhibiting clear signs of distress.

106.     That the failure of the Defendants City of Green Bay to adequately train and supervise their officers and concerning several key issues such as how to care for mentally ill arrestees, persons in their custody suffering from serious-acute-obvious medical conditions, and individuals in their custody in need of immediate medical attention, how to perform life-saving procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies, when to uses the WRAP restraint, how to apply the WRAP restraint, how to transport arrestees in the WRAP, and when to provided medical care to arrestees restrained in the WRAP exhibiting clear signs of distress, demonstrated objectively unreasonableness and deliberate indifference on the part of Defendant City of Green Bay as to whether the failure to adequately train and supervise their officers would result in the violation of the Constitutional, civil, and statutory rights of individuals in their custody, such as Thomson.

107.     That the failure of the Defendants Brown County to adequately train and supervise their officers and medical staff concerning several key issues such as how to care for mentally ill arrestees, persons in their custody suffering from serious-acute-obvious medical conditions, and individuals in their custody in need of immediate medical attention, how to perform life-saving procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies, when to uses the WRAP restraint, how to apply the WRAP restraint, and when to provided medical care to arrestees restrained in the WRAP exhibiting clear signs of distress, demonstrated objectively unreasonableness and deliberate indifference on the part of Defendant Brown County as to whether the failure to adequately train and supervise their officers and medical staff would result in the violation of the Constitutional, civil, and statutory rights of individuals in their custody, such as Thomson.

108. That the above-mentioned failures to adequately train and supervise officers, correctional staff, and medical staff was a direct and proximate cause of the violations of the Constitutional, civil, and statutory rights of Thomson.

109. That the above-mentioned failures to adequately train and supervise officers and BCJ staff, and the acts and omissions of these Defendants was a direct and proximate cause of Thomson's death and injuries.

110. That as a direct and proximate result of the negligent, careless, and reckless disregard for Thomson's safety and well-being, Thomson suffered injuries and damages including, but not limited to the following:

a. Emotional distress, psychological distress, and mental anguish;
b. Physical pain and suffering;
c. Loss of companionship;
d. Loss of future enjoyment of life;
e. Fright and shock;
f. Denial of social pleasure and enjoyment;
g. Embarrassment, humiliation, and mortification,
h. Reasonable expenses of necessary medical care, treatment and services;
i. Constitutional violations;
j. Death;
k. Punitive damages for Defendants' willful conduct; and,
l. Any and all other damages, including, but not limited to attorney fees recoverable under 42 U.S.C. §§ 1983 and 1988.

## VII. CONDITIONS PRECEDENT

111. Plaintiffs hereby reassert and reallege each and every allegation contained in Paragraphs 1 through 110 as if fully set forth herein.

112. All conditions precedent to this lawsuit have been performed or otherwise occurred.

## VIII. PRAYER FOR RELIEF

113. WHEREFORE, the Plaintiff respectfully demands judgment in favor of Plaintiff against each of the Defendants, jointly and severally, awarding Plaintiff:

a. Compensatory damages in an amount to be determined by the Jury;
b. Punitive damages in an amount to be determined by the Jury;

    c.  Reasonable costs and expenses associated with this action including attorneys' fees pursuant to 42 U.S.C. 1988; and,

    d.  Any other further relief as this Honorable Court deems just and fair.

114.    The City of Green Bay is liable pursuant to Wis. Stat. § 895.46(1)(a) for payment of any judgment entered against Defendants Ben Harvath, Karen Pineda, Christopher Vaubel, Michael O'Donnell, Alex Wanish, Thomas Behn, and Scott Delsart in this action because the Defendants were acting within the scope of their employment when they committed the above-mentioned unconstitutional actions.

115.    Brown County is liable pursuant to Wis. Stat. § 895.46(1)(a) for payment of any judgment entered against the Defendants Adam Schartner, Rebecca Warren, Matthew West, Clint Pelischek, Kayla Kuchta, and Bryce Haines in this action because the Defendants were acting within the scope of their employment when they committed the above-mentioned unconstitutional actions.

116.    Plaintiff hereby reserves the right to amend the Complaint as additional information becomes known through discovery.

## IX.   DEMAND FOR JURY TRIAL

116.    The Plaintiff demands trial by jury.

Dated at this 23rd day of January, 2023.

Respectfully Submitted,
Katers & Granitz, LLC

By:  s/Kevin G. Raasch
    Kevin G. Raasch (SBN: 1100196)
    Christopher P. Katers (SBN: 1067757)
    8112 W. Bluemound Road, Ste. 101
    Wauwatosa, WI 53213
    P: (414) 616-7042
    F: (414) 600-9551
    kraasch@katersgranitz.com
    ckaters@katersgranitz.com

    Attorneys for Plaintiff