# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF JASON THOMSON,

    Plaintiff,

    v.

Case No: 23-CV-00084-WCG

CHRISTOPHER VAUBEL, et al.,

    Defendants.

_____

**DEFENDANT REBECCA WARREN'S PROPOSED FINDINGS OF FACT FILED IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**
_____

NOW COMES the Defendant, REBECCA WARREN, R.N., by her attorneys, CASSIDAY SCHADE LLP, and pursuant to Fed. R. Civ. P. and Civil L. R. 56, proposes the following facts in support of her Motion for Summary Judgment:

*A. Introduction and Allegations*

1. Plaintiff, the Estate of Jason Thomson, filed this Federal Lawsuit alleging certain defendants from the Green Bay Police Department ("GBPD"), and other individually named defendants at the Brown County Jail ("BCJ") violated the decedent, Jason Thomson's 4th and 14th Amendment Rights and alleging a *Monell* claim against the City of Green Bay and Brown County. (Dkt 1, Compl.).

2. As it relates to this defendant, Registered Nurse Rebecca Warren, Plaintiff makes one allegation against her, alleging she violated Thomson's rights by failing to provide medical care under the 4th or 14th Amendment. (*Id.*, Count II).

3. On February 10, 2020, Nurse Warren was employed by Wellpath, LLC, and staffed at the Brown County Jail ("BCJ") to provide nursing services to the inmates confined there. (Decl. of Warren ¶ 4.)

4. Thomson was arrested after initiating a violent confrontation with GBPD officers after he attempted to assault staff at a local hospital. (Dkt 1, Compl.)

5. At the time of his passing, Thomson had been arrested without a warrant, and taken to the BCJ, but was never accepted into the custody of the BCJ, and he did not have a probable cause hearing. *Id.*

### B. Thomson's Medical Background and Prior Emergency Department Admissions

6. Thomson was diagnosed with a seizure disorder prior to January 2018 and was prescribed an anti-seizure medication, Phenytoin (brand name "Dilantin"). (Ex. W, St. Vincent Hospital Records, Bates stamped "CS 000214, 216").

7. During the approximately 1-year period, from December 30, 2018 to February 9, 2020, Thomson was admitted to St. Vincent's Emergency Department ("ED") in Green Bay, WI, at least 9 times, and at each of the admissions listed below Thomson either admitted to being non-compliant with his anti-seizure medication, Phenytoin, or subtherapeutic levels of the medication were found during labs and/or documented in the notes:

   a. January 24, 2020 (*id.,* CS 105-114)

   b. January 20, 2020 (*id.,* CS 115-121)

   c. January 14, 2020 (*id.,* CS 122-129)

   d. December 24, 2019 (*id.,* CS 130-138)

   e. August 17, 2019 (*id.,* CS 152-155)

   f. August 15, 2019 (*id.,* CS 157, 161-162)

g. August 13-14, 2019 (*id.,* CS 174).

h. June 21, 2019 (*id.,* CS 182-184)

i. January 5, 2019 (*id.,* CS 185-189)

j. December 30, 2018 (*id.,* CS 207-210)

8. Thomson treated at St. Vincent's ED for his seizure disorder on each of the admissions listed in 2(a)-(j), aside from the August 17, 2019 admission, (*id.,* CS 152), and the January 14, 2020 admissions (*id.,* CS 139), which were related solely to chest pain.

9. Prior to the aforementioned admissions, Thomson was admitted to St. Vincent's ED on January 30, 2018 for seizure related blackouts, and because he was out of his anti-seizure medication. (*id.,* CS 214-216).

10. Thomson suffered acute seizures just prior to arriving by EMS at the ED on January 20, 2020 (*id.,* CS 000115-121) and two seizures prior to the January 24, 2020 (*id.,* CS 109).

11. During his Emergency Department admissions on January 20, 2020, his Phenytoin level was 4.2 MCG/ML[1] and at his January 24, 2020 admission it was 4.0 MCG/ML which Dr. Kevin S. Dougherty noted were "subtherapeutic" as the therapeutic range is 10.0-20.0 MCG/ML. (*Id.,* CS 109-110).

12. Thomson's Phenytoin levels on his February 9, 2020 ED labs was less than 0.4 MCG/ML, which is considered "not detectible" and is even lower than the subtherapeutic Phenytoin levels when he had seizures requiring the two prior ED admissions in January 2020. (*Id.,* CS 100, 109-110).

13. Despite having been diagnosed with epilepsy, Thomson had not taken his Phenytoin for the two weeks prior to the February 9, 2020 admission. (*Id.,* CS 95-96).

---

[1] MCG/ML represents micrograms per milliliter. Mayo Clinic Laboratories list of commonly used units of measure. Last updated February 27, 2024. www.mayocliniclabs.com/testcatalog/appendix/measurement

3

14. Epileptic patients such as Thomson can have seizures, even when their anti-seizure medication is at therapeutic levels. (Ex. AA March 6, 2024 Dep. Trans of Plaintiff's expert Dr. Stein, 155:18-21).

*C. The February 9-10, 2020 St. Vincent Hospital Course and Altercation*

15. On February 9, 2020, just prior to midnight Jason Thomson was taken from his homeless shelter by EMS to St. Vincent Hospital's ED to be treated for a 2-to-3-minute seizure he had experienced. (Ex. W, St. Vincent Hospital Records, CS 95).

16. During this ED admission on February 9-10, 2020, Thomson initially told Dr. Christopher K. Gerwing he was compliant with his anti-seizure medication, Phenytoin, then later admitted he had taken it for the prior two weeks as he ran out of the medication. (*Id.*) (*See also* Ex. W, CS 99-100, 103 lab).

17. Labs were taken and Thomson was given a "loading dose" of the medication Fosphenytoin and it was determined he was stable enough to be discharged with a neurology referral. (*Id.,* CS 100).

18. The discharge paperwork was written up by Dr. Gerwing, but prior to Thomson being discharged he apparently needed to urinate, received a portable urinal from a medical technician, Kendra Owens, and during his interaction with Owens Thomson formed the belief she had had rolled her eyes at him. (*Id.*) (Video Ex. X, 20-952 – 4 East Hall Security.mp4 at video time stamp 2:33:30-2:35:00 and 2:39:35-2:43:35).

19. The alleged eye-rolling apparently caused Thomson to become irate and combative, pull an IV out of his arm and he ran toward Owens trying to punch her, and threatening other members of the nursing staff. *Id.*

20. Dr. Gerwing would eventually note in the medical record that Thomson had become combative and that he did not appear to be having delirium, and that Thomson was taken to jail. (Ex. W, St. Vincent Hospital Records, CS 100).

21. Thomson could not be calmed, continued to threaten the ED staff and would not comply with requests of hospital security officers, so the Green Bay Police Department ("GBPD"), was called and GBPD officers arrived shortly thereafter. *Id.*

*D. Thomson's Arrest and transport to the Brown County Jail*

22. Thomson continued to aggressively resist arrest, and a total of 7 GBPD officers responded to the ED and were required to restrain Thomson. (Video Ex. Y, 20-952 – 4 South Hall.mp4 at video time stamp 2:44:00 to 2:56:00).

23. Thomson and the officers engaged in a vigorous struggle which lasted approximately 12 minutes, during which Thomson was actively resisting, until he was eventually placed in a WRAP restraint. *Id.*

24. A WRAP restraint is a device used by some law enforcement agencies to secure a combative or resistive individual to prevent harm to the individual, officers, or others. (Ex. A, p. 11; Ex. F, pp. 12-13; Decl. of Mills, Ex. I.)[2]

25. When applied, a WRAP restraint wraps an individual's legs together with his/her handcuffed hands behind the back. (Ex. A, pp. 30-31; Ex. F, pp. 12-13; see also, generally, Ex. I.)

26. The WRAP restraint is not a positional asphyxiation device. (See Ex. I)

27. Lieutenant Adam Schartner was working as the watch commander at the Brown County Jail ("BCJ" or "the jail") in the early morning hours of February 10, 2020. (Decl. of Mills, Ex. A, p. 5.)

---

[2] Exhibits "A-V" refer to the exhibits being filed by the county defendants at Dkts 52-57.

28. Officers Christopher Vaubel, Karen Pineda, and Benjamin Harvath were on duty as police officers with GBPD in the early morning hours of February 10, 2020. (Decl. of Mills, Ex. G, p. 10; Decl. of Mills, Ex. H, p. 6; Decl. of Mills, Ex. J, pp. 6, 8.)

29. Corporal Matthew West was working at BCJ as the intake corporal on February 10, 2020 when he received a phone call from dispatch at the Brown County Communications Center at approximately 3:01 a.m. (Decl. of West, ¶ 3, Ex. S.)

30. Following his altercation with GBPD Thomson was transported to the BCJ by GBPD officers Pineda and Harvath. (Ex. G, p. 38; Ex. H, p. 32; *see also* Decl. of Michel, Ex. Q at 0:00 – 1:30.)

31. Corporal West was told by dispatch that the individual being brought to the jail by GBPD had fought with officers and had to be secured in GBPD's WRAP restraint. (Ex. F, p. 12; Decl. of Mills, Ex. G, pp. 55-56.)

32. At 3:10 a.m. on February 10, 2020, GBPD Officers Vaubel, Harvath, and Pineda pulled into the BCJ sallyport in two GBPD squad cars with Thomson in their custody in the back seat of Officer Harvath's and Officer Pineda's squad. (Ex. G, p. 38; Ex. H, p. 32; *see also* Decl. of Michel, Ex. Q at 0:00 – 1:30.)

33. BCJ has policies and procedures in place for processing and admitting arrestees brought to the BCJ for booking. (Decl. of Michel, ¶ 5, Ex. L.)

34. Pursuant to BCJ policy, an arrestee is not in the custody of the jail and is not the responsibility of the jail until several requirements are met during the admission process, including the requirement of medical clearance when necessary. (Decl. of Michel, ¶ 6; see also Ex. L, pp. 1-2.)

35. Pursuant to BCJ policy, an arrestee confined in the arrest area remains the responsibility of the arresting/transporting officer until all criteria for incarceration at BCJ are met. (Dec. of Michel, ¶ 6; Ex. L, p. 2.)

36. Ultimately, the transfer of custody does not occur until the arresting agency's/officer's restraints or handcuffs on the arrestee are removed or replaced with restraints from the correctional officers. (Ex. E, Warren Dep. Trans. 83:5-18)

37. The security and safety of the BCJ is the exclusive responsibility of the correctional officers/security staff. (Decl. of Warren ¶ 8.)

38. Contracted medical staff such as Nurse Warren, defer to the security staff for all decisions related to security, including restraints and custody determinations. (Decl. of Warren ¶¶ 8-11.)

39. Upon their arrival to the BCJ sallyport, GBPD Officer Vaubel told Corporal West that Thomson had been at the hospital and was uncooperative and fighting with hospital staff and GBPD officers, so GBPD put Thomson in a WRAP before transporting him to BCJ. (Ex. F, pp. 20, 26-27.)

40. At 3:14 a.m., Thomson was carried from the sallyport of the BCJ into the arrest area, still secured in GBPD's WRAP restraint. (Ex. B, p. 29; Ex. C, p. 20; Ex. F, p. 31; Decl. of Michel, Ex. P at 9:05-9:30; Decl. of Pelischek, ¶ 3, Ex. T.)

41. The arrest area is a room located between the jail's sallyport and the secure portion of the facility, specifically the intake/booking area. (Ex. A, p. 15; Ex. E, p. 23; Ex. F, p. 31.)

42. In the arrest area, BCJ officers perform a pat search of the arrestee, search the arrestee's property, and decide whether BCJ will take custody of the arrestee. (Ex. C, p. 20; Ex. E, p. 23; see generally, Ex. L.)

43. When arrestees arrive at the BCJ and there is a question about the arrestee's health or fitness for jail, or if the arrestee was taken to the hospital before arriving at the BCJ, it was standard practice for a nurse to be called to perform a physical assessment of the arrestee before security staff would make a determination as to whether the arrestee would be admitted into the BCJ. (Ex. A, pp. 29-40; Ex. C, p. 20; Ex. E, p. 15; Decl. of Michel, ¶ 11, Ex. O.) (Decl. of Warren ¶ 20.)

44. In such a case, the Nurse would be called away from their other duties and would respond to the arrest area to perform the assessment. (Decl. of Warren ¶ 21.)

45. Whenever an arrestee arrives at the BCJ from a hospital, it is standard practice for someone from the BCJ medical staff to come to the arrest area and review any documents from the hospital, and, if necessary, assess the arrestee in order to provide a recommendation to security staff attempting to determine if they can accept an arrestee. (Ex. A, pp. 29-40; Ex. C, p. 20; Ex. E, p. 15; Decl. of Michel, ¶ 11, Ex. O.)

46. GBPD Officers Vaubel, Harvath, and Pineda followed BCJ staff into the arrest area. (Ex. H, p. 53; Ex. P at 8:59.)

47. Corporal West was concerned that Thomson may still become resistive based on what he had been told about Thomson by GBPD officers and dispatch. (Ex. F, p. 32.)

48. Corporal West asked Thomson if he was alright, but Thomson generally responded to questions with a sound or grunt rather than with a "yes" or "no." (Ex. F, pp. 32, 34.)

49. Thomson did respond to a couple of Corporal West's initial inquiries with a verbal "no." (Ex. F, pp. 32, 34.)

50. Corporal West then asked Thomson again if he was suicidal, and Thomson responded "no" very quietly, twice. (Decl. of Kuchta, ¶ 3, Ex. U; Decl. of West, ¶ 4.)

51. Officer Haines called HSU via his radio at approximately 3:15 a.m. to come to the arrest area to complete an assessment of an arrestee. (Ex. D, p. 20; Ex. E, p. 15; see also Decl. of Haines, ¶ 3, Ex. V.)

### E. *Nurse Warren's Involvement and Assessment*

52. Nurse Warren first became involved in this matter when she was contacted by security staff on February 10, 2020 at approximately 3:15 a.m. and was asked to assess an arrestee in the arrest area. *Id.* (*See also* Decl. of Warren ¶¶ 22-23.)

53. Nurse Warren immediately reported to the arrest area, without delay. (Decl. of Warren ¶ 25.)

54. Nurse Warren was not provided any information about Thomson prior to arriving to the arrest area. (Decl. of Warren ¶ 24.)

55. At 3:16 a.m., Nurse Warren arrived in the arrest area to assess Thomson. (Decl. of Michel, Ex. P at 11:34.) (Decl. of Warren ¶ 25.)



*Red circle is Nurse Warren, green circle is Lt. Schartner, and yellow circle shows time of 3:16 a.m.; Ex. P at 11:35*[3]

---

[3] The screenshot above is from the County Defendants' Proposed Findings of Fact, and was taken from the video of the arrest area at the BCJ. (*See* Dec. of Michel, ¶ 15.) *See also* Fed. R. Evid. (901(b)(4).

9

56. Upon Nurse Warren's arrival into the arrest area, she observed a male, who was later identified as Thomson, sitting on the floor, cuffed and in a WRAP restraint. (Decl. of Warren ¶ 26.)

57. He had correctional and police officers surrounding him. (Decl. of Warren ¶ 28.)

58. Nurse Warren walked directly to Thomson and made her initial observations while attempting to obtain additional details on his condition and arrest. (Decl. of Warren ¶ 29.)

59. Nurse Warren wasted no time in donning her medical gloves and attempting to gather additional information. (Decl. of Warren ¶ 30.)

60. Nurse Warren was advised by law enforcement in the arrest area that Thomson had been cleared from the hospital prior to his arrival. (Decl. of Warren ¶ 31.)

61. Nurse Warren was shown the Law Enforcement Request for Medical Clearance Form, which was signed by a physician at St. Vincent Hospital about 20 minutes prior to her seeing it. (Decl. of Warren ¶ 32.) (Ex. BB Law Enforcement Request Form).

62. Nurse Warren was not familiar with this particular form, and it was not the discharge paperwork which would customarily accompany an arrestee arriving at the jail following discharge at the hospital. (Decl. of Warren ¶ 33.)

63. The form stated that Thomson had fought with officers and was uncooperative but was signed by a doctor about 20 minutes before Nurse Warren saw it, indicating the patient was not experiencing a medical emergency. (Decl. of Warren ¶ 34.)

64. The form accompanied a verbal report from one of the arresting officers that Thomson had been combative and belligerent with staff at St. Vincent's, and that he had a struggle with police officers leading to his restraint in the WRAP. (Decl. of Warren ¶ 35.)

65. Normally, when an arrestee is transported to BCJ from a hospital for booking, the jail receives a medical clearance form as well as the hospital discharge paperwork. (Ex. A, p. 39; Ex. H, p. 48.)

66. GBPD officers did not initially receive Thomson's hospital discharge paperwork. (Ex. G, p. 59.)

67. The GBPD officer also advised that Thomson has been hospitalized earlier at St. Vincent's following a seizure and had questionable compliance with medication. (Decl. of Warren ¶ 36.)

68. Nurse Warren never received the medical records or discharge paperwork from the hospital from which Thomson had been seen prior to his arrival at the BCJ. (Decl. of Warren ¶ 37.)

69. Hospital discharge records typically include information related to continuity of care instructions, including medication administered or which the patient was instructed to take, and other details concerning the reason he was in the hospital and any follow up care he required. (Decl. of Warren ¶ 38.)

70. Nurse Warren was hesitant to recommend accepting Thomson into the BCJ on this fact alone. (Decl. of Warren ¶ 39.)

71. If Mr. Thomson's overall health and condition had changed between the time he was arrested and the time when Nurse Warren first came into contact with him, nobody provided her that information. (Decl. of Warren ¶ 80.)

72. The first time Nurse Warren interacted with Thomson was when she arrived in the arrest area of the BCJ on February 10, 2020. (Decl. of Warren ¶ 40.)

73. After Nurse Warren gathered the initial information and verbal reports from the security staff and GBPD, she began her physical assessment. (Decl. of Warren ¶ 41.)

74. Nurse Warren obtained Mr. Thomson's vitals although she was unable to obtain a blood pressure reading from the blood pressure machine, likely because Mr. Thomson's handcuffs were inhibiting the machine from obtaining a reading. (Decl. of Warren ¶ 42.)

75. Nurse Warren then obtained Thomson's temperature from the thermometer placed at Thomson's temple. His temperature was within normal limits. (Decl. of Warren ¶ 43.)

76. Nurse Warren then assessed Thomson's respiratory rate by placing her hand on Thomson's back to determine how many breaths he was taking per minute, while watching the clock to time when one minute would elapse to obtain accurate information. (Decl. of Warren ¶ 44.) (Video Ex. P)

77. Thomson's breaths were unlabored, he was not wheezing, coughing, or gasping for air and his respiratory rate was within normal limits. There did not appear to be anything constricting his breathing and Nurse Warren could feel and see him breathing. (Decl. of Warren ¶ 45.)

78. Nurse Warren was never told anything about Mr. Thomson being unable to breathe or complaining about not being able to breathe after his arrest and prior to her interaction with Mr. Thomson, and her assessment confirmed his breaths were unlabored. (Decl. of Warren ¶ 79.)

79. Nurse Warren then checked Thomson's pulse, which was also within normal limits. (Decl. of Warren ¶ 46.)

80. While Nurse Warren was in the arrest area Thomson was responding to questions and communicating, both before she started her assessment and during it. (Decl. of Warren ¶ 47.) (Ex. F, pp. 32, 34.) (Decl. of Kuchta, ¶ 3, Ex. U; Dec. of West, ¶ 4.)

81. Nurse Warren asked Mr. Thomson if he was in pain, and he responded "no" by shaking head. (Decl. of Warren ¶ 49.)

82. Thomson was communicating by shaking his head or groaning at appropriate intervals following questions, and clearly was hearing and understanding what was being asked and was responding. (Decl. of Warren ¶ 49.)

83. Through her visual observation and physical assessment, Nurse Warren determined Thomson was somewhat lethargic, his skin was somewhat pale, and he was sweaty. But none of his vitals raised concerns or indicated he was experiencing an acute or emergent medical issue. (Decl. of Warren ¶ 50.)

84. Nurse Warren checked for and observed no cyanosis at Thomson's fingertips or lips (blueness) which indicated to he was appropriately oxygenated. (Decl. of Warren ¶ 51.)

85. Additionally, Thomson was breathing just fine. (Decl. of Warren ¶ 52.)

86. Thomson's overall condition, based on Nurse Warren assessment, was that he was medically stable to be safely transported back to the hospital. (Decl. of Warren ¶ 53.)

87. Around this time, Nurse Warren recalls a GBPD officer expressing some reluctance to return Thomson to the hospital as he apparently believed Thomson was properly discharged and cleared. (Decl. of Warren ¶ 58.)

88. Nurse Warren's assessment was thorough and performed as quickly as it could have been performed while still obtaining accurate information to make an appropriate recommendation to security staff. (Decl. of Warren ¶ 56.)

89. Nurse Warren advised correctional staff that she recommended Thomson not be admitted to the BCJ because he needed to be reevaluated at the hospital. (Decl. of Warren ¶ 57.)

90. Nurse Warren based her recommendation on the fact that Thomson appeared lethargic and pale, and because she did not have proper discharge paperwork explaining what had happened to Thomson at St. Vincent Hospital, whether he was given any medications, and if any follow up care was needed. (Decl. of Warren ¶¶ 57, 59.)

91. She and other medical staff at the BCJ would need the proper discharge paperwork from St. Vincent's for continuity of care purposes. *Id.*

92. As Nurse Warren did not have Thomson's medical records or discharge paperwork from the hospital, she didn't know if Thomson received medication or if there was specific follow-up which needed to occur. *Id.*

93. Nurse Warren's assessment, from the initial gathering of information, through the physical assessment and making her conclusions and recommendation, took approximately 4 minutes to complete. (Decl. of Warren ¶ 60.) (Video Ex. P)

94. By 3:21 a.m., Lieutenant Schartner and Corporal West told GBPD officers that BCJ would not accept custody of Thomson and that Thomson needed to be taken back to the hospital for further evaluation and medical clearance. (Ex. A, p. 38; Ex. E, p. 29; Ex. F, p. 47; Ex. G, p. 61; Ex. H, p. 58; Ex. P at 15:30.)

95. BCJ officers carried Thomson back to the GBPD squad car in the sallyport. (Ex. F, p. 59; Ex. H, p. 60; Ex. Q at 9:40 – 10:00.)

96. GBPD Officers Harvath and Pineda took over securing Thomson in their squad car in the sallyport. (Ex. B, p. 47; Ex. H, p. 62.)

14

97. Nurse Warren was trying to be helpful and so she went to the sallyport of the BCJ and was near the back seat of the GBPD squad car while near Thomson's feet while he was being secured for transport back to a hospital. (Decl. of Warren ¶ 61.)

98. Nurse Warren was on the back seat of the GBPD squad near Thomson's feet and was attempting to assist Officers Harvath and Pineda position Thomson in the squad. (Ex. E, pp. 35, 37; Ex. H, p. 62.)

99. A GBPD officer was trying to put a protective helmet onto Thomson's head and Nurse Warren observed Thomson was moving his head from side to side. (Ex. E, pp. 35-36.)

100. GBPD Officer Harvath noticed that Thomson's breathing had become shallower. (Ex. H, p. 63.)

101. Nurse Warren then noticed that Thomson had become still, and then he had a seizure. (Ex. E, pp. 35-36.) (Decl. of Warren ¶ 62.)

102. It was at this point that Officer Harvath observed Thomson had lost consciousness. (Ex. H, pp. 64-65.)

103. Nurse Warren communicated to the GBPD officers that Thomson had a seizure and she began attempting to get Thomson to respond with verbal and painful stimuli. (Ex. E, pp. 39-40; Ex. H, p. 64.)

104. Nurse Warren and the GBPD officers at the squad car attempted to verbally get Thomson to respond using both verbal and physical stimuli, but he didn't respond. (Ex. Q, R) (Decl. of Warren ¶ 62.)

105. At no time prior to this seizure did Warren need to use any verbal or physical stimuli to obtain Thomson's response, as he had been responding to her prior to this time. (Decl. of Warren ¶ 67.)

106. At no time prior to this seizure was Thomson suffering a medical emergency. (Decl. of Warren ¶ 64.) (Ex. A, p. 53; Decl. of Schartner, ¶ 3.) (Ex. B, pp. 62-63; Decl. of Kuchta, ¶¶ 4-5.) (Decl. of Pelischek, ¶¶ 4-5.) (Decl. of Haines, ¶¶ 4-5.)

107. Thomson's condition deteriorated rapidly following his seizure. (Decl. of Warren ¶ 65.)

108. GBPD Officer Vaubel heard Nurse Warren say that Thomson had a seizure and went to get his automated external defibrillator ("AED") out of the trunk of his squad. (Ex. G, pp. 65-66.)

109. Nurse Warren then went to the other side of the squad near Thomson's head and checked him for respirations and a pulse. (Ex. E, p. 40; see also Ex. Q at 13:40 – 13:55.)

110. Nurse Warren determined that Thomson was pulseless and not breathing. (Ex. E, p. 40.)

111. Officer Harvath also checked Thomson for a pulse and did not find one. (Ex. H, pp. 65-66.)

112. Thomson was removed from the GBPD squad car. (Ex. E, p. 40; Ex. H, p. 66.)

113. Once Thomson was removed from the squad car, Nurse Warren again checked for breathing and a pulse but found none. (Ex. E, p. 41; see also Dec. of Michel, Ex. R at 21:15-21:30.)

114. Upon hearing that Thomson was not breathing, GBPD Officer Vaubel called a medical emergency by advising dispatch via his portable radio that they had a pulseless, nonbreathing male in the sallyport of BCJ and needed EMS immediately. (Ex. G, pp. 67-68.)

115. Nurse Warren then asked GBPD officers to release Thomson from the WRAP restraint and handcuffs and to begin performing CPR. (Ex. E, p. 41; see also Ex. R at 23:40-24:00.)

116. Corporal West grabbed an Automated External Defibrillator (AED) and followed Lieutenant Schartner out to the sallyport. (Ex. F, p. 68; Ex. P at 21:30 – 22:10.)

117. Officer Haines was also called to bring a bag valve mask to the sallyport. (Ex. Q, R)

118. When Officer Haines arrived in the sallyport with a bag valve mask, Thomson was lying on his back, no longer in the WRAP restraint, and Nurse Warren was doing chest compressions. (sallyport 4 cc-jrt000975 at 17:49-)

119. AED pads were placed on Thomson's chest so the machine could advise whether Thomson had a shockable rhythm or whether they should begin CPR. (Ex. G, p. 66.)

120. The AED device never advised officers that Thomson had a shockable rhythm, so they began CPR. (Ex. G, pp. 69-70.)

121. Corporal West and Officer Haines assisted in performing CPR and operating the bag valve mask as everyone waited for EMS to arrive. (See, e.g., Ex. Q at 21:10 – 22:45; see also Ex. S and Ex. V.)

122. Once rescue medical personnel from Green Bay Fire and Rescue arrived, they took over performing lifesaving measures on Thomson from Corporal West and Officer Haines. (See, e.g., Ex. Q at 25:20-25:30 and 29:35-29:45.)

123. A medical chart was never created for Thomson at the BCJ because he was never accepted into the custody of the BCJ. (Decl. of Warren ¶ 74, 76.)

124. If Thomson had been accepted into the custody of the BCJ a medical chart would have been created for him. (Decl. of Warren ¶¶ 74, 76.)

125. There is no evidence suggesting Thomson was "mentally ill" as alleged in Plaintiff's Complaint. (Ex. Z, Plaintiff's Response to Warren's Written Discovery)

126. Thomson was never diagnosed with any mental or behavioral health issues. (*Id.,* response interrogatory 8).

Respectfully submitted May 15, 2024,

 /s/ Thomas C. Kallies
One of the Attorneys for Defendant,
REBECCA WARREN

John J. Reid – SBN 1057458
Thomas C. Kallies – SBN 1094253
CASSIDAY SCHADE LLP
330 East Kilbourn Avenue, Suite 575
Milwaukee, WI 53202
(414) 224-1086
jreid@cassiday.com
tkallies@cassiday.com

11848862