IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF JASON THOMSON,

        Plaintiff,

                                Case No: 23-CV-00084

v.

CHRISTOPHER VAUBEL, BEN
HARVATH, KAREN PINEDA, MICHAEL
O'DONNELL, ALEX WANISH, THOMAS
BEHN, SCOTT DELSART, ADAM
SCHARTNER, REBECCA WARREN;
MATTHEW WEST, CLINT PELISCHEK,
KAYLA KUCHTA, BRYCE HAINES, THE
CITY OF GREEN BAY, BROWN
COUNTY, ABC INSURANCE COMPANY
and XYZ INSURANCE COMPANY,

        Defendants.

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO REBECCA WARREN'S MOTION
## FOR SUMMARY JUDGMENT

---

      **NOW COMES** the Plaintiff, the Estate of Jason Thomson, by and through its attorneys

**KATERS & GRANITZ, LLC**, and hereby submit the following Brief in Opposition to Rebecca

Warren's Motion for Summary Judgment and supporting brief, (D.59-60) stating as follows:

### I.      <u>INTRODUCTION</u>

      Ten minutes. Brown County Jail Nurse Rebecca Warren ("Warren") watched Jason

Thomson ("Thomson") die at the Brown County Jail ("BCJ") for ten minutes without providing

necessary medical care before Thomson finally stopped breathing. Only after Thomson was

pulseless and had completely stopped breathing was a medical emergency called or Thomson removed from his restraints. By the time jail staff placed an AED on Thomson, he did not have a shockable heart rhythm. Warren failed to provide medical care, failed to call for emergency medical transport, and failed to properly evaluate Thomson while he was dying at the BCJ. The clear jail security footage along with the Defendants'[1] own dire observations of Thomson serious medical condition provide overwhelming evidence that Warren failed to provide Thomson with medical care violating his Fourth Amendment Constitutional Rights.

On February 9, 2020, Thomson was a 47-year-old homeless male with a history of seizures, anxiety, and depression. (Plaintiff's Proposed Findings of Additional Fact in Response to Warren's Motion for Summary Judgment "PPFAF" 1-2). Shortly before midnight on February 9, 2020, Thomson suffered a seizure at St. John's Homeless Shelter ("St. John's") in Green Bay, Wisconsin. (PPFAF 3-4). Thomson was transported by Green Bay EMS to St. Vincent Hospital ("St. Vincent") where he began receiving medical care for his loss of consciousness and seizures. (PPFAF 4-6). Around 2:47am on February 10, 2020, a call from St. Vincent was placed to the Green Bay Police Department ("GBPD") stating that Thomson, who was being treated for a seizure, was not cooperating and yelling at staff but had not hurt anyone. (PPFAF 7-9). Thomson was forcefully restrained by multiple GBPD officers, placed into a WRAP restraint and arrested. BCJ was then notified that GBPD was bringing an uncooperative male to the jail in a WRAP restraint. (PPFAF 10).

---

[1] The named Defendants that were present at the BCJ on February 10, 2020, with Thomson are as follows: Green Bay Police Officers Christopher Vaubel, Ben Harvath, Keren Pineda, Brown County Jail staff Adam Schartner, Matthew West, Clint Pelischek, Kayla Kuchta, Bryce Haines, and nurse Rebecca Warren. Their testimony, signed statements, and interview summaries have been included as exhibits and properly cited in Plaintiff's PPFAF and Response to Warren PFOF.

The GBPD squad car transporting Thomson entered the BCJ sallyport and, while Thomson was in the back of the squad car, jail staff secured the sallyport doors. (PPFAF 11). BCJ officers approached Thomson and observed that he was neither responsive nor resistive in any way. (PPFAF 12-13). Thomson was carried from the car into the locked arrest area floor, still restrained in a WRAP restraint. (PPFAF 14-16). Thomson was surrounded by various BCJ employees while on the BCJ arrest area floor. *Id*. The following are factual observations of Thomson made by the BCJ employees while he was dying on the arrest area floor at the BCJ for approximately five and a half minutes:

- Thomson's skin color was pale and "did not look normal." (PPFAF 17).

- Thomson's face was pale and his head was drooping. (PPFAF 18).

- Thomson's hand had turned gray, he was drooling on himself and did not appear coherent. (PPFAF 26).

- Thomson could not keep his eyes open, prompting an officer to attempt to get him to open them which did not work (PPFAF 28).

- Thomson was diaphoretic, pale, semi-responsive. (PPFAF 32).

- Thomson's blood pressure reading could not be obtained. (PPFAF 41).

- Thomson was drooling, his head was hunched over, chin touching his chest. (PPFAF 39).

- Thomson did not react when a BCJ officer shook Thomson's shoulder and flicked his ear to gage a reaction. (PPFAF 21, 23).

- Thomson was not able to form words. (PPFAF 27).

- Thomson was at all times confined in a WRAP restraint until he stopped breathing. (PPFAF 35, 45, 68).

- Ranking officer at BCJ, Lt. Adam Schartner ("Schartner") testified that while on the floor of the arrest area that Thomson needed medical care. (PPFAF 40).

- Thomson was not responsive to the jail nurse; he had saliva coming out of his mouth and his condition was not improving. (PPFAF 36).

Despite these clear signs of medical distress, Warren failed to provide any care to Thomson or call for a medical emergency and instead told GBPD that Thomson would not be accepted into the jail. (PPFAF 50-54). During Warren's entire interaction with Thomson on the arrest area floor, Warren was stationed behind Thomson and never even attempted to look at Thomson's face, eyes, or lips to properly evaluate him. (PPFAF 90). BCJ security footage shows Thomson's limp body being transferred back into the GBPD squad car. (PPFAF 14, 19, 57). After being placed in the squad car, Thomson did not have a pulse and stopped breathing. (PPFAF 66-70). Only then did Warren ask that Thomson be removed from the WRAP restraint and for a medical emergency to be called. *Id.* Thomson stopped breathing approximately 10 minutes after Warren first encountered him. Warren sat idly by and provided no required medical care or even called for a medical emergency. By the time she finally acted, it was too late. Thomson was not removed from the WRAP or properly assessed by Warren and, most egregiously, a medical emergency and ambulance was not called until after Thomson had predictably stopped breathing and did not have a pulse. (PPFAF 66, 68-69). Thomson's autopsy concluded that the manner of death was ruled a homicide and cause of death was identified as "Cardiac arrhythmia of undetermined etiology following police restraint." (PPFAF 72). Failing to respond to Thomson's clear medical needs is the antithesis of what a reasonable nurse would do.

Predictably, Warren blames Thomson for his own death while he was in Brown County and GBPD joint custody. (Warren Brief, p. 3). Plaintiff has not alleged any state law claims and Warren's comparative negligence defense is entirely inapplicable. Once in custody, Thomson was at the mercy of GBPD and BCJ employees. Thomson could not provide medical care for himself, he could not speak, he could not move, he could not keep his head up, he was drooling, and his body had turned pale and gray. (PPFAF 17-18, 26, 28, 32). Yet Warren, the only medical staff at

the BCJ, failed to provide Thomson with any medical care or react to the clearly displayed signs of medical distress. Instead, Warren informed the GBPD that due to Thomson's medical issues, he would not be accepted into the BCJ.

The only substantive case Warren cites in support of her motion for summary judgment, *Estate of Perry v. Wenzel*, 872 F.3d 439, 452 (7th Cir. 2017), **denied the correctional nurse defendants' motion for summary judgment on Fourth Amendment claims**. Warren cannot cite a single supportive case and instead asks this court to distinguish a case which directly undermines her argument. The clear video footage and factual observations of Warren and additional Defendants at the jail will unequivocally provide a jury, the ultimate finder of fact, with abundant support to find that Warren violated Thomson's Fourth Amendment rights. Warren's motion for summary judgment must be denied in its entirety.

## II.  STATEMENT OF ADDITIONAL FACTS

Plaintiff respectfully refers this Court to Plaintiffs' Proposed Findings of Additional Fact in Response to Rebecca Warren's Motion for Summary Judgment and Plaintiff's Responses to Rebecca Warren's Proposed Findings of Fact filed herewith and incorporated herein by reference.

## III.  STANDARD OF REVIEW

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The court's role when deciding a motion for summary judgment is not to evaluate evidence or determine the truth of the matter at issue, but only to determine whether there is a genuine issue of fact. *Moore v. Ford Motor Co*., 901 F.Supp. 1293, 1296 (N.D.Ill. 1995). Evidence presented by the responding party supported by affidavits or other evidentiary material

is to be taken as true. *Uskaw v. Blemker*, 548 F.2d 673 (7th Cir. 1976). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the factfinder could reasonably find in the nonmovant's favor, then summary judgment is improper. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1968).

Trial courts are continually cautioned that summary judgment should be denied if, viewing the evidence in a light most favorable to the party against whom the motion is directed, there is any doubt that a genuine issue of material fact exists. *See* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2727 (1983). Further, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255.

As set forth below and exhaustively detailed in Plaintiffs' Proposed Additional Findings of Fact as well as Plaintiffs' Responses to Rebecca Warren's Proposed Findings of Fact, there is overwhelming evidence from which a reasonable trier of fact will conclude that Warren violated Thomson's Constitutional and civil rights.

## IV. <u>ARGUMENT</u>

Any attempt to reconcile the competing facts set forth by Warren and the Plaintiff can only result in one conclusion, Warren's motion fails at every level. Warren has the burden on summary judgment and falls woefully short of meeting that burden.

### A. FOURTH AMENDMENT STANDARD

In order to sustain an action under 42 U.S.C. § 1983 a plaintiff must show that the conduct complained of was committed by a person acting under color of state law and that the conduct deprived the plaintiff of a federal constitutional or statutory right. *Lanigan v. Village of East Hazel*

*Crest*, 110 F.3d 467, 471 (7th Cir. 1997). It is well settled law that the Constitution requires government employees to provide adequate medical care to individuals in their custody, especially in emergency situations.

The Fourth Amendment to the U.S. Constitution provides that, "The right of the people to be secure in their persons against unreasonable seizures shall not be violated." U.S. Const. Amend. IV. It also governs the treatment of those confined between an arrest without a warrant and the preliminary judicial hearing where probable cause is reviewed. *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006); *see also*, *Ortiz v. City of Chicago*, 656 F. 3d 523, 530 (7th Cir. 2011) ("Because [arrestee] had not yet benefitted from a judicial determination of probable cause…the 4th Amendment applies.") The is no argument to the contrary. Thomson was an "arrestee" whose confinement is examined under the Fourth Amendment.

"[W]hen the State takes a person into custody and holds that person against their will, the Constitution imposes upon the State a corresponding duty to assume responsibility for the safety and well-being of that person." *DeShaney v. Winnebago Cnty Dep't of Soc. Serv.*, 489 U.S. 189, 199-200 (1989). "Each state actor who encounters a detainee must reasonably respond to medical complaints; a detainee cannot be treated like a hot potato, to be passed along as quickly as possible to the next holder. . . . The question on summary judgment is whether a jury could find that it was objectively unreasonable for [Nurse Warren] to take no action to seek medical care for [Thomson] based on what [s]he knew at the time." *Ortiz* 656 F.3d at 531-32.

Thomson's need for medical care is evaluated under the Fourth Amendment's "objectively unreasonable" standard. *Currie v. Chhabra*, 728 F.3d 626, 629-30 (7th Cir. 2013). In order to determine if Nurse Warren's actions were objectively reasonable in accord with the Fourth Amendment, the court considers the following: "(1) whether the officer has notice of the arrestee's

medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530-31 (citing *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)). Plaintiffs must also show that Warren's conduct caused harm. *Ortiz*, 656 F.3d at 530-531 (citing *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir.2010)).

## B. WARREN'S FAILURE TO PROVIDE OR SEEK MEDICAL CARE VIOLATED HIS CONSTITUTIONAL RIGHTS.

### 1. Thomson Was Under Arrest And In Joint Custody Of The GBPD And BCJ.

Warren concedes that the first element of Thomson's Fourth Amendment claim has been met as Thomson was arrested without a warrant. (See Warren Brief, pp. 4-5). Warren's brief does not dispute that Warren owed Thomson a constitutional duty of care while he was in BCJ. However, Warren incorrectly asserts that Thomson was never in custody of the BCJ. (D. 63, Warren Brief, p. 5). Any assertion that Thomson was not in Brown County custody is meritless and directly rejected by the only substantive case law cited in her brief:

> Here, no reasonable jury could conclude that Perry was not in the County's custody. County officers assisted in dragging Perry into the facility and placed him inside the facility, behind a door that could only be opened by a County officer. Further, while Nurse Virgo examined Perry, two County officers (not City officers) physically restrained him on the bench. A reasonable person in Perry's position would not have believed that he was free to leave the County facility. Further, a reasonable person would have believed that it was the County that was restricting his movement, based upon the fact that the County controlled the entrance and that County Correctional Officers were physically restraining him. Therefore, we hold that Perry was in the County's custody when he died even though the formal booking process was not completed.

*Perry*, 872 F.3d 439, 457 (7th Cir. 2017).

Here the factual circumstances are nearly identical. Thomson was transported to the BCJ by GBPD officers. (PPFAF 10-11). BCJ master control secured the sallyport door and BCJ officers

assessed Thomson while he was still in the car. (PPFAF 11-13; 15). BCJ officers then physically moved Thomson to the arrest area which is behind a locked door operated by BCSO master control. (PPFAF 14; 16). Warren and BCJ officers maintained physical control of Thomoson the entire time he was on the arrest area floor. (PPFAF 16, 25, 38, 41, 55). BCJ staff then moved Thomson back into the squad car while the sallyport door was still shut and secured. (PPFOF 55). Under the clear controlling precedent of *Perry*, Thomson was in the County's custody when he died even though the formal booking process was not completed.

## 2. Thomson Needed Medical Care And Warren Was On Notice

The upsetting security footage alone is enough for a jury to find that Thomson was clearly in need of immediate medical care, yet he remained confined in the WRAP restraint without any medical care until he stopped breathing approximately 15 minutes after entering the BCJ. The BCJ was equipped with multiple camera's in both the sallyport and the arrest area which depict the graphic final moments of Thomson's life.

The videos begin with the GBPD squad transporting Thomson entering the BCJ sallyport. (PPFAF 11). BCJ officers approach the vehicle and assess Thomson. (PPFAF 12). Officers move Thomson, whose body appears completely limp while his head was drooping down to his chest, to the arrest area. (PPFAF 14). Thomson is surrounded by BCJ and GBPD officers on the floor of the arrest area. *Id*. While on the floor, Thomson's feet were gray, his face was face and his head was drooping; by all accounts, he "did not look normal." (PPFAF 17-19). Thomson is observed gasping for air while on the arrest area floor. (PPFAF 22). Thomson was not able to understand directions when Commanding Officer Pelischek attempted to give him a Preliminary Breath Test. (Plaintiff's Response to Warren's Proposed Findings of Fact, "PL-Response to fact" 48). Cpl. Matthew West ("West") is seen flicking Thomson ear and shanking him, but Thomson does not

respond. (PPFAF 21-23). Thomson appears to shake his head twice prior to Warren entering the arrest area, possibly to respond to BCJ staff questions. (PL-Response to fact ¶¶48). Thomson does not voluntarily move his head after Warren enters the room. (PPFAF 38). Warren does not look at Thomson's face as she is positioned behind him for the entire interaction, even when briefly placing an electronic thermometer on his head. (PPFAF 47; 90); (PL-Response to Warren fact 81-82). Warren attempted to take Thomson's temperature and blood pressure but failed to obtain his blood pressure and did not document his temperature. (PPFAF 41-43, 47); (PL-Response to Warren fact 75). Warren had a conversation with BCJ and GBPD officers and Thomson's limp body was taken from the arrest area back into the squad car. (PPFAF 50, 55-58). Warren informed West that she was uncomfortable accepting Thomson into the jail. (PL-Response to fact ¶89). After five more crucial minutes passed, Thomson is removed from the squad car only after he stopped breathing and is laid out on the sallyport floor. (PPFAF 60; 65-68). Only then were Thomson's restraints removed and emergency medical care attempted. *Id*.

Notice of an arrestee's medical needs can be provided through words or through observation of physical symptoms. *Williams*, 509 F.3d at 403. Circumstantial evidence—such as visible symptoms or other detainees' complaints--can be used to establish such knowledge. *Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445, 452-53 (7th Cir. 2009). Knowledge can be inferred from circumstantial evidence and does not rest on the plaintiff's self-reported need or lack of need for medical treatment. *Paine v. Johnson*, 689 F. Supp. 2d 1027, 1066 (N.D. Ill. 2010), (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). While there is no audio on the BCJ security camera footage, the BCJ employees' own observations of Thomson's physical symptoms while he is confined in a WRAP restraint on the arrest area floor confirm his dire need for medical care:

- West observed that Thomson's skin color was pale and "did not look normal" While he was on the floor of the Arrest Area. (PPFAF 17).

- West observed that Thomson's face was pale and his head was drooping. (PPFAF 18).

- Thomson, while on the arrest area floor, was "hardly alert at all" and could not respond to any commands or questions that were asked of him. (PPFAF 20).

- West testified that Thomson did not react when he shook Thomson's shoulder and flicked his ear to gage a reaction. (PPFAF 21, 23).

- Kuchta testified that Thomson's hand had turned gray, he was drooling and did not appear coherent. (PPFAF 26).

- Harvath testified that Thomson wasn't able to form words and his responses were not lucid. (PPFAF 27).

- Thomson could not keep his eyes open prompting an officer to attempt to open them for him. (PPFAF 28).

- West observed that Thomson's legs were moving in a seizure like manner. (PPFAF 30).

- Warren testified that Thomson was diaphoretic, pale, semi-responsive. (PPFAF 32).

- Thomson was not responsive to Nurse Warren's questions. (PPFAF 36); (PL-Response to Fact ¶80).

- Both Warren and Schartner testified that Thomson never uttered an actual word. (PPFAF 36-37)

- Lt. Schartner observed that Thomson was drooling, with his head hunched over, causing his chin to touch his chest. (PPFAF 39).

- Warren could not obtain Thomson's blood pressure reading. (PPFAF 41).

- Warren could not observe if Thomson had the ability to move his extremities as he remained restrained in a WRAP restraint until he stopped breathing. (PPFAF 35, 45, 68).

- During Warren's entire interaction with Thomson on the arrest area floor, Warren was stationed behind Thomson and never even attempted to look at Thomson's face, eyes, or lips to properly evaluate him under Policy H6. (PPFAF 90).

The Defendants self-reported observations undisputedly support that Thomson had serious medical needs right before he stopped breathing and died in the BCJ sallyport just five minutes after being removed from the arrest area floor. (PPFAF 60). Even a non-medical defendant, Schartner, conceded that Thomson was in need of medical care. (PPFAF 40). Warren acknowledges Thomson was not medically fit to be accepted into the jail yet failed to provide him with any care or call for a medical emergency until after he stopped breathing. (PPFAF 50-54). Warren's revisionist and self-serving nine-page declaration in support of her motion cannot reconcile the video footage and documented physical distress Thomson suffered right before his death. (D. 60).

As set forth in *Scott v. Harris*, 550 U.S. 372, 380 (2007), "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." In *Harris*, the court held that the Court of Appeals "should have viewed the facts in the light depicted by the videotape." *Id.* That is precisely what this Court should do in light of the video and the Defendants' own admissions of Thomson's condition.

Warren's notion that Thomson was completely fine until seconds before he stopped breathing is ridiculous and requires ignoring the clear video evidence, and significantly the Defendants' own testimony. Thomson's hand was gray, he was pale, he was diaphoretic, he was drooling, he had just been at the hospital for a seizure, he could not verbalize words, he could not keep his eyes open, HE WAS DYING. (PPFAF 17-23, 26-32, 35, 39-41, 45, 68). At this stage, all inferences must be made in favor of the non-moving party and the Plaintiff has clearly established that Thomson needed medical care from the moment Warren first made contact with him and was on notice of this need. At the very least Warren's claimed ignorance of the facts has created

multiple disputes of material fact regarding Thomson's need for medical care which preclude granting summary judgment.

### 3. Warren's Failure To Take Action To Provide Thomson With Medical Care Was Objectively Unreasonable.

Despite Thomson's clearly exhibited need for immediate medical care, Warren failed to properly assess Thomson, failed to call for a medical emergency or emergency transport to a hospital, and failed to provide Thomson with any reasonable medical care. These failures were not what a reasonable nurse in Warren's situation would have done and Warren fails to support her motion with applicable case law inferring otherwise.

Warren has failed to cite to a single supportive case granting summary judgment for a jail nurse on Fourth Amendment claims. The only substantive case law Warren cites is *Estate of Perry v. Wenzel,* 872 F.3d 439 (7th Cir. 2017). Despite relying upon *Perry*, Warren perplexingly asks the court to distinguish the Seventh Circuit's ruling in *Perry*, that summarily denied the jail nurse's motions for summary judgment, and find that *Perry* somehow supports granting summary judgment here. This deficient motion practice alone requires a finding that Warren failed to meet her burden as the moving party on summary judgment. Nevertheless, the nurse defendants in *Perry* acted far quicker in declaring a medical emergency and calling for an ambulance and removing restraints than what Warren did here.

James Perry ("Perry") was arrested by police without a warrant and before he could have a probable cause hearing he had a seizure. *Perry*, 872 F.3d 439, 452 (7th Cir. 2017). While still in custody he was taken to a local hospital where he was treated, then discharged. *Id*., at 446. Approximately 10 minutes after Perry was returned, he began to spit and drool so an officer placed a spit mask on him and could no longer see his face. *Id*., 448. He was eventually transferred from the city jail to the county jail unable to walk, wearing soiled pants, and with the spit mask, which

was now seeping blood, covering his face. *Id*. at 446-449. While in the jail, Perry was observed by two nurses, Nicole Virgo ("Virgo") and Cheryl Wenzel ("Wenzel"). Wenzel stood behind the nurses' station observing Perry the entire time. *Id*. at 458. Virgo made contact with Perry at 8:45 p.m. and by 8:48 p.m. an ambulance was called to the jail. *Id*. at 450. The jail nurses' behavior in *Perry* is shockingly similar to Warren's with the exception that they acted far quicker:

> After arriving at the County's Criminal Justice Facility, the County nurses decided that Perry was medically unfit to be booked into the jail. Yet, they provided him with no medical care and failed to remove the spit mask, which was seeping blood. When a nurse finally removed the spit mask, it was clear that Perry was no longer breathing. Although emergency efforts were taken, they were unsuccessful and Perry died on the County facility's floor.

*Perry*, 872 F.3d 439, 445 (7th Cir. 2017).

Here Warren immediately noticed that Thomson was pale, diaphoretic, and could not respond to questions. (PPFAF 32). Warren then failed to have Thomson's handcuffs removed despite testifying that she could not obtain Thomson's blood pressure likely because his hands were handcuffed behind his back! (PPFAF 41-44). When asked at her deposition why she did not request the handcuffs be removed so she could properly assess Thomson, Warren testified "it was not my place to request handcuffs to be removed." *Id*. Defendant's brief irresponsibly argues that she could not have removed the WRAP even if she wanted to because she "didn't have the keys." (Warren Brief, p. 16). This argument is absurd. Both GBPD officers and BCJ officers were conversing with Warren the entire time, all with the ability to remove Thomson's handcuffs at her request. More damning is that once Thomson had stopped breathing, Warren herself instructed and assisted in removing Thomson's restraints. (Warren Proposed Finding of Fact 115). Clearly, she had the authority and capability to do so. Any insinuation that Warren was prevented from having Thomson's restraints removed so she could properly assess him is a misrepresentation that conflicts with her own proposed finding of fact. *Id*.

Warren failed to obtain Thomson's blood pressure, failed to document any alleged vital signs, failed to evaluate if he could move his extremities and even failed to look at Thomson's face for her unreasonable and constitutionally inadequate medical evaluation. (PPFAF 35, 41, 45, 68, 90). Just as in *Perry*, Warren, after an unreasonable delay, had Thomson's WRAP removed but by that time Thomson had stopped breathing and he died. (Warren Proposed finding of fact, 113-115); (PPFAF 70).

The *Perry* Court held that a mere three-minute delay in requesting an ambulance was enough that a jury could find that the jail nurse's actions were objective unreasonably:

> **And, while Nurse Virgo contends that she knew that Perry was medically unfit to be booked from her first interaction with him, she did not immediately call for help. Rather, three minutes passed before an ambulance was called.**

(emphasis added) *Perry*, 872 F.3d 439, 458 (7th Cir. 2017).

Here, Warren observed the dire state of Thomson for four minutes on the arrest area floor and five more minutes after he was transferred to the squad car. Thomson was too ill to be taken into jail, but not ill enough for Warren to call an ambulance, or even remove his restraints, or provide a proper medical assessment, or provide him any assistance at all. That is, until he had already stopped breathing. (PPFAF 70). While Warren contends that her behavior was less egregious than the nurses in *Perry*, her delay was much longer and the Seventh Circuit decision in no way provides supports that she did not commit a violation of Thomson's Fourth Amendment rights for failure to provide medical care. The case stands for the exact opposite of what Warren argues and overwhelmingly supports denial of Warren's motion. The issue is for a jury to decide.

Finally, to distract from Warren's obvious failures, she suggests that Thomson had a seizure in the back of the squad car. No doctor or medical records support that Thomson actually had a seizure in the back of the squad car. (Response to Warren PFOF 101). In fact, Thomson had

received a "loading dose" of the medication Fosphenytoin to treat his seizures just hours prior at St. Vincent. (Warren PFOF 17). Warren has no specific training on seizures and GBPD Officer Ben Harvath, who was physically touching Thomson, did not observe seizure movement and only observed that Thomson's condition was worsening. (Response to Warren PFOF 101). This alleged fact is disputed and a question of veracity for a jury to determine. Regardless, it does not alleviate Warren's failures to provided medical care to Thomson's acutely obvious medical condition.

### a. Warren's Failure To Properly Assess Thomson And Call For A Medical Emergency Violated Jail Policy And Was Unreasonable.

While violations of policy do not equate to constitutional violations, they are considered evidence for a jury to consider regarding constitutional claims. (Seventh Cir. Jur. Inst. 7.04). Despite the clear and obvious signs of medical distress, Warren failed to obtain Thomson's blood pressure, failed to document any alleged vital signs, failed to evaluate if he could move his extremities and even failed to look at Thomson's face for her unreasonable and constitutionally inadequate medical evaluation. (PPFAF 35, 41, 45, 68, 90).

Warren testified that she was required to be familiar with policy and procedures of the BCJ. (PPFAF (75). The BROWN COUNTY SHERIFF'S DEPARTMENT Jail Division policy - H6 EMERGENCY HEALTH CARE specifies, "*If any of the following signs or symptoms are present, conveyance to the Emergency Room and/or implementation of emergency first aid and treatment is in order*." (emphasis added) (PPFAF 88). The policy then identifies the following signs or symptoms that require conveyance to the Emergency room or emergency first aid include: *abnormal breathing signs such as gasping*, choking or irregular breathing, *unable to tell name, address or age*, *gradual progression to confusion*, abnormal pulse rate, *abnormal eyes*, *pale and sweaty*, *unable to move arms, hands, legs, or feet*, *limited use of any or all extremities, and seizures*. (emphasis added) (PPFAF 89).

Through Warren's own testimony and video evidence she must concede that she failed in multiple ways to properly assess Thomson or take action to address the acute medical issues she observed. Warren's initial observation of Thomson was that he was pale, diaphoretic and semi-responsive. (PPFAF 32). These observations alone required conveyance to the Emergency Room and implementation of emergency first aid pursuant to Policy H6. (PPFAF 88-89). Next, Warren testified that Thomson could not verbally respond to questions and does not recall if she even asked him his name, address or age.  (PPFAF 36,38, 79). These observations alone required conveyance to the Emergency Room and implementation of emergency first aid pursuant to Policy H6. (PPFAF 88-89). Warren never looked at Thomson's face and could not evaluate his eyes as required by policy. (PPFAF 90).

Warren had all of this information and yet she failed to act pursuant to policy. Just as egregious, Warren further failed to properly assess Thomson by requesting his restraints be removed. When asked if Thomson was able to move his extremities Warren testified, "There would be no way for Mr. Thomson to move his extremities considering he was in a WRAP from hip to ankle and handcuffed. (PPFAF 35). Yet Warren did not request Thomson's WRAP be removed so she could properly evaluate Thomson. (PPFAF 52). When asked why she was not able to get a blood pressure read for Thomson Warren stated it was likely because his hands were handcuffed behind his back. (PPFAF 41-44). Yet Warren did not request Thomson's handcuffs be removed so she could properly take his blood pressure. *Id*. Lastly, Warren was aware Thomson had been at the hospital just prior to the jail being treated for a seizure. (PPFAF 34). After an unreasonable delay and only after Thomson had stopped breathing did Warren have Thomson's restraints removed. (PPFAF 52; 68; 70).

The *Perry* Court held a jury could determine that a jail nurses' delay in removing restraints which concealed the emergent nature of a patents condition was objectively unreasonable:

> The same is true of the district court's conclusion regarding Nurse Wenzel's actions. Although she was not initially summoned to attend to Perry, she was present in the CJF and chose to stand at the nurses' station to observe Perry rather than render any treatment. Ultimately, she decided to remove Perry's mask, which revealed his dire condition. The County misses the point when it argues that it was only then that the nurses knew that Perry was experiencing a medical emergency. Rather, a jury could determine that it was this delay in removing the mask, which the County seems to assert concealed the emergent nature of Perry's condition, that was objectively unreasonable. On this record, summary judgment was inappropriate with regard to the two nurses.

*Perry,* 872 F.3d 439, 458 (7th Cir. 2017).

Warren committed the same failures to remove a restraint device, provide medical care, and delayed calling for emergency medical care for far longer than the nurses in *Perry*. Like Nurse Wenzel she chose to not render any treatment. Plaintiff's Expert Witness, R.N. Lloyd Biggs, opined in his expert report that "A complete and proper nursing assessment would have indicated that the Green Bay Fire/Rescue Department should have been called immediately for emergency care and transport to the hospital rather than waiting until he went into cardiac arrest." (PPFAF 92). Any reasonable nurse would have followed policy and immediately called a medical emergency, removed Thomson's restraints, and provided emergent medical care as the jail policy dictates.

### b. There Were No Exigent Factors Preventing Warren From Providing Treatment.

In *Ortiz*, the court properly narrowed the analysis by concluding that the third factor (the scope of the requested treatment) and the fourth factor (police interests, including administrative, penological, or investigatory concerns) were off the table because the defendants never asserted that taking the plaintiff to the hospital would have been burdensome or compromised any police

interests. *Ortiz*, 656 F.3d at 530-31. The same applies here. Warren argues that she instructed the GBPD Defendants to take Thomson back to a hospital for medical clearance and she had no further responsibility. Nothing could be farther from the truth. Warren observed Thomson drooling, sweating, pale and unresponsive in the BCJ. Rather than do something about this she chose to remove herself from the situation and recommend that Thomson be removed from the BCJ and go to a hospital. Even Nurse Wenzel in *Perry* ultimately provided care after an unreasonable delay. Here, Warren only acted after Thomson lay pulseless in the back of a squad car in BCJ's sallyport. (PPFAF 42-48; 51; 61; 65-66). Warren observed Thomson drooling, diaphoretic, Thomson could not respond to her, Warren failed to take or record any of Thomson's vital signs, Warren could not tell if Thomson could move his extremities, Warren could not take Thomson's blood pressure, Thomson was pale and gray. (PPFAF 26, 32, 35-36, 38, 41, 45-46). The only reasonable reaction when faced with these clear and obvious symptoms is to call for an ambulance and immediately provide medical care, consistent with Brown County Policy and Procedure to which Warren concedes she must abide.

*Ortiz's* third element focuses on scope of treatment readily available. That scope, when considered here, involved calling for an ambulance and removing the handcuffs and WRAP device from Thomson to properly assess why he was drooling, unresponsiveness, the paleness of his skin, his gray colored hand, and his sweating. Warren's failure to do so was a major contributing cause to Thomson's harm and death. (PPFAF 91).

The seriousness of the medical need not rise to the level of objective seriousness:

> … [t]he severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor— the scope of the requested treatment.

*Ortiz*, 656 F.3d at 531. "One should not fixate on factors, however: the intuitive, organizing principle is that police must do more to satisfy the reasonableness inquiry when the medical condition they confront is apparent and serious and the interests of law enforcement in delaying treatment are low. *Florek v. Vill. of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011). Such is the case at bar, as set forth below, Thomson's needs were apparent and serious and there were no barriers to providing treatment. Any safety concerns regarding Thomson are not supported by evidence or facts. Thomson was not resistive at any point in the BCJ and was barely conscious before he died on the BCJ sally port floor. (PPFAF 13, 81).

Warren argues, in essence, that because no one else in the BCJ intake area was concerned for Thomson's medical condition, that this confirms that his condition was not emergent. (Nurse Warren Br. p. 11). This is a reckless and callous argument that evinces the clear disinterest that Warren and the other Defendants had for Thomson's wellbeing. The question on summary judgment is whether as a matter of law a defendant's actions, or lack thereof, were objectively unreasonable under the Fourth Amendment as a matter of law drawing all factual inferences in favor of the non-moving party. With all reasonable inferences drawn in the Plaintiff's favor, Warren's actions were objectively unreasonable.

### 4. Thomson Suffered Harm As A Result Of Warren's Failure To Provide Him With Medical Care.

"Proximate cause is a question to be decided by a jury and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment granted on this issue of causation." *Gayton,* 593 F.3d at 624. Where an obviously ill detainee dies in custody and the defendants' failure to provide medical care is challenged, the causation inquiry is quite broad: "the constitutional violation in question here is

the failure to provide adequate medical care in response to a serious medical condition, not 'causing her death.'" *Id.* at 619; *see also Egebergh v. Nicholson,* 272 F.3d 925, 928 (7th Cir. 2001)(reversing summary judgment because a jury could infer that depriving arrestee of one insulin shot exposed him to substantial danger). A jury can infer based on medical records and witness testimony that a defendant caused harm. *Ortiz*, 656 F.3d at 534-35.

To satisfy the harm element, Thomson does not need to show Warren's actions caused his death only that her actions and delay caused harm. *Gayton,* 593 F.3d at 624. However, Plaintiff's causation expert, Dr. Kenneth Stein, opined just that in his Expert report: "Failure of Rebecca Warrant RN to recommend that The Wrap be immediately removed at the jail and her failure to call 911 for emergent transfer to the hospital was a major contributing cause of Mr. Thomson's death." (PPFAF 91). Most significantly, the Brown County Medical Examiner found that the WRAP itself likely contributed to Thomson's arrhythmia and likely contributed to his death. (PPFAF 93). With all reasonable inferences drawn in the Plaintiff's favor, Warren's failure to provide care caused Thomson harm.

Warren additionally requests a finding at summary judgment on punitive damages. (Warren Brief, p. 20). This request is improper and not supported by any case law. "Punitive damages are recoverable in §1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others." *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir. 2004). A jury will be free to determine and assess punitive damages against Nurse Warren if they find in the Plaintiff's favor. See Seventh Cir. Civ. Jury Instruction 7.28.

## **CONCLUSION**

For the reasons stated herein, the Plaintiff respectfully requests that Nurse Rebecca Warren's Motion for Summary Judgment be denied in its entirety.

Submitted this 14th day of June, 2024 by:

s/ Kevin G. Raasch
Kevin G. Raasch
Christopher Katers
Katers & Granitz, LLC
8112 W. Bluemound Rd. Ste. 101
Milwaukee, WI 53213
P: (414) 616-7042
F: (414) 600-9551
kraasch@katersgranitz.com
ckaters@katersgranitz.com
Attorneys for Plaintiff