Ex. 49

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - -

THE ESTATE OF JASON THOMSON,

        Plaintiff,

vs.          CASE NO: 23-CV-00084-WCG

CHRISTOPHER VAUBEL; BEN
HARVATH; KAREN PINEDA;
MICHAEL O'DONNELL; ALEX
WANISH; THOMAS BEHN; SCOTT
DELSART; ADAM SCHARTNER;
REBECCA WARREN; MATTHEW
WEST; CLINT PELISCHEK; KAYLA
KUCHTA; BRYCE HAINES; THE
CITY OF GREEN BAY; BROWN
COUNTY; ABC INSURANCE
COMPANY; and XYZ INSURANCE
COMPANY,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -

    Examination of CHRISTOPHER VAUBEL, taken at

the instance of the Plaintiff, under and pursuant to

Federal Rules of Civil Procedure, 30(b)(3)(A) and 804.05

of the Wisconsin Statutes, before LEAH R. MILLER, Notary

Public in and for the State of Wisconsin, at Green Bay

City Hall, 100 North Jefferson Street, Green Bay,

Wisconsin, on October 23, 2023, commencing at 10:07

a.m. and concluding at 1:21 p.m.

**Page 2**

A P P E A R A N C E S :

KATERS & GRANITZ, LLC, by
MR. KEVIN G. RAASCH,
8112 West Bluemound Road, Suite 101,
Wauwatosa, Wisconsin 53213,
kraasch@katersgranitz.com,
(414)616-7042,
appeared on behalf of the Plaintiff.

KATERS & GRANITZ, LLC, by
MR. CHRISTOPHER KATERS,
8112 West Bluemound Road, Suite 101,
Wauwatosa, Wisconsin 53213,
ckaters@katersgranitz.com,
(414)522-1667,
appeared on behalf of the Plaintiff.

CRIVELLO, NICHOLAS & HALL, S.C., by
MR. ZACHARY J. FLOOD,
710 North Plankinton Avenue, Suite 500,
Milwaukee, Wisconsin 53203,
zflood@crivellolaw.com,
(414)290-7588,
appeared on behalf of the Defendants, Adam Schartner,
Matthew West, Clint Pelischek, Kayla Kuchta, Bryce
Haines, and Brown County.

WIRTH + BAYNARD, by
MS. JASMYNE M. BAYNARD,
9898 West Bluemound Road, Suite 2,
Wauwatosa, Wisconsin 53226,
jmb@wbattys.com,
(414)291-7979,
appeared on behalf of the Defendants, Chris Vaubel, Ben
Harvath, Karen Pineda, Thomas Behn, Scott Delsart, and
the City of Green Bay.

CASSIDAY SCHADE, by
MR. THOMAS C. KALLIES,
330 East Kilbourn Avenue, Suite 575,
Milwaukee, Wisconsin 53202,
tkallies@cassiday.com,
(414)977-3892,
appeared on behalf of Defendant Rebecca Warren.

**Page 3**

A L S O   P R E S E N T :

Ms. Lindsay Belongea, City of Green Bay;
Ms. Victoria Wojcik, Intern, City of Green Bay.

I N D E X :

EXAMINATION BY:            PAGE

Mr. Katers........................................ 4
Mr. Kallies...................................... 97
Mr. Flood....................................... 107
Ms. Baynard..................................... 111
Mr. Katers...................................... 125
Ms. Baynard..................................... 126
Mr. Kallies..................................... 126

E X H I B I T S :

NO.                   PAGE

21 - Notice of Deposition....................... 9
22 - Mr. Vaubel's Statement.................... 9
23 - Medical Aid and Response Policy 434......... 18
24 - Handcuffing and Restraints Policy 302........ 27
25 - Medical Clearance Form.................... 72
26 - Use of Force Policy 300.................... 95

**Page 4**

P R O C E E D I N G S :

    THE COURT REPORTER:  Appearances.

    MS. BAYNARD:  Attorney Jasmyne Baynard, same

appearances as last time.

    MR. KALLIES:  Tom Kallies from Cassiday Schade

appearing on behalf of Defendant Rebecca Warren.

    MR. FLOOD:  Attorney Zach Flood on behalf of

the county defendants.

    MR. KATERS:  Attorney Christopher Katers and

Kevin Raasch on behalf of the plaintiffs.

    MS. BAYNARD:  I will say in addition I have

the law clerk for the City of Green Bay.  I don't think

anybody has any objections to that.

    CHRISTOPHER VAUBEL, having been called as a

witness herein and having been first duly sworn, was

examined and testified as follows:

            EXAMINATION

BY MR. KATERS:

Q    Sir, can you state your name and spell your last name

for the record, please?

A    **My name is a Christopher James Vaubel, V-A-U-B-E-L.**

Q    Okay.  Sir, I'm going to be asking you a series of

questions regarding your interaction with Jason Thomson

back in February of 2020.  If you don't understand my

question, please tell me so and I will attempt to make

1      it more clear, is that okay?

2   A    **Yeah.**

3   Q    If you answer my question, I will assume you understood

4      it, is that fair?

5   A    **Fair.**

6   Q    All of your answers must be -- first of all, have you

7      ever had your deposition taken before?

8   A    **No.**

9   Q    I'm sure your attorney discussed this with you a little

10     bit, but all of your answers must be verbal. The court

11     reporter can't take down nods of the head or shrugs of

12     the shoulders, and try to say "yes" or "no" as opposed

13     to "uh-huh" or "huh-uh." She can't take that down.

14     Don't worry, we all do it. You may get a few reminders.

15     That is what it is. And finally, allow me to ask my

16     entire question before you answer, and I will attempt to

17     afford you the same courtesy so we are not talking

18     over each other which, again, is going to make the court

19     reporter ask us to stop and slow down anyway. Any

20     questions about that?

21   A    **No.**

22   Q    What is your current place of employment?

23   A    **I am a police officer for the City of Green Bay.**

24   Q    And how long have been a police officer for the City of

25     Green Bay?

1   A    **Since November 26th of 2018.**

2   Q    In what capacity were you working in on the morning

3      hours of February 10th, 2020?

4   A    **I was working as a patrol officer on night shift.**

5   Q    Did you have any other roles with the Green Bay Police

6      Department prior to becoming an officer?

7   A    **No.**

8   Q    Can you describe your duties and responsibilities as an

9      officer on February 10th, 2020?

10   A    **General duties or just specifically that night?**

11   Q    I guess generally what are your duties as an officer

12     when you're on patrol?

13   A    **Our duties are to respond to police calls, calls for**

14     **service or any emergencies as well as maintain patrol in**

15     **the city looking for active situations or potential**

16     **crimes.**

17   Q    Were your duties and responsibilities any different on

18     the night of the February 10th, 2020?

19   A    **No.**

20   Q    Can you give me a thumbnail sketch of your educational

21     background?

22   A    **I attended -- I graduated from high school, I then**

23     **attended Fox Valley Technical College where I received**

24     **an associate's degree in criminal justice.**

25   Q    And when was that degree, if you recall?

1   A    **I graduated December of 2015 I believe.**

2   Q    Besides that -- I'm sorry, you said associate's degree?

3   A    **Yes.**

4   Q    Besides the associate's degree from Fox Valley Tech, do

5      you have any other professional degrees or certificates?

6   A    **No.**

7   Q    I apologize, I belive I just asked you this, but you

8      have never had your deposition taken before, correct?

9   A    **No, I have not.**

10   Q    What did you do to prepare for your deposition here

11     today?

12   A    **I spoke with the attorney, reviewed my report and I**

13     **watched a video from the jail sally port.**

14   Q    Putting aside your attorney, did you consult or discuss

15     with anyone else your deposition here today?

16   A    **No.**

17   Q    Pursuant to the deposition notice you were asked to

18     bring certain documents with you here today, did you do

19     that?

20   A    **I do not have any documents.**

21        MS. BAYNARD: Everything has already been

22     produced in discovery.

23        MR. KATERS: I understand that, but the

24     deposition notice asks that any document he reviewed in

25     preparation for discovery that he bring here today.

1        MS. BAYNARD: I understand. I'm letting you

2     know everything has already been produced.

3        MR. KATERS: I understand that. Any documents

4     he reviewed in preparation he was supposed to bring here

5     today.

6   BY MR. KATERS:

7   Q    You've told me that document is your report, correct?

8   A    **Yes.**

9   Q    Did you review any other documents?

10   A    **The medical release form, other than that, no.**

11        MR. KATERS: I don't believe the medical

12     release form has been produced.

13        MS. BAYNARD: We just got it from him, but I

14     have a copy of it. I was going to mark it. He has one

15     of these.

16        MR. KATERS: We can set it aside for now.

17   BY MR. KATERS:

18   Q    So you reviewed your report and reviewed the medical

19     release form, is that accurate?

20   A    **Yes.**

21   Q    Did you review anything else in preparation?

22   A    **No.**

23        (Exhibit No. 21 was marked.)

24   BY MR. KATERS:

25   Q    Sir, how did you become aware of this lawsuit?

1   A   **E-mail from the city's attorney's office.**

2               (Exhibit No. 22 was marked.)

3       BY MR. KATERS:

4   Q   Sir, I'm going to show you what we've marked as

5       Exhibit 22. You can take a moment to review that. I'm

6       not -- I'm not going to ask you any questions. I am

7       going ask you to identify it, but take whatever time you

8       need to look at it.

9               MR. KALLIES: What was this marked?

10              MR. KATERS: 22.

11              MS. BAYNARD: You're going to continue?

12              MR. KATERS: Yes, unless someone has an

13      objection, so the notice was 21.

14      BY MR. KATERS:

15  Q   Sir, can you identify Exhibit 22 for the record?

16  A   **This was my statement given to the Department of**

17      **Criminal Investigation, my report for this case.**

18  Q   Okay. And you gave this statement to Special Agents

19      Bradley Kust and Jed Roffers, is that correct?

20  A   **I believe so, yes.**

21  Q   And you gave this statement on February 12th, 2020, is

22      that correct?

23  A   **Yes.**

24  Q   And that was two days after the incident in question,

25      correct?

1   A   **Yes.**

2   Q   At the time you attempted to be as accurate and truthful

3       as possible, correct?

4   A   **Yes.**

5   Q   Sir, you understand this case involves Mr. Thomson's

6       estate alleging that his constitutional rights were

7       violated, correct?

8   A   **Yes.**

9   Q   When did your shift start on February 10th, 2020?

10  A   **I reported for rollcall at 10:15 p.m.**

11  Q   So then you were assigned to patrol?

12  A   **Yes.**

13  Q   Were you working alone that day? Strike that. Did you

14      have a partner with you in your patrol car?

15  A   **No, I had a ride along.**

16  Q   And who was the ride along?

17  A   **Tyler O'Connor (Phonetic), he was a potential employee**

18      **or prospective employee.**

19  Q   Is he employed with the Green Bay Police Department that

20      you know of?

21  A   **No, he is not.**

22  Q   And you received a dispatch call in regard to a

23      disturbance at St. Vincent, correct?

24  A   **Yes.**

25  Q   What time was that?

1   A   **I don't recall the exact time.**

2   Q   What information was provided during the dispatch call?

3   A   **I don't recall the exact information. I believe it was**

4       **a disturbance at the hospital, a male refusing to leave.**

5   Q   Was the name of the male provided?

6   A   **I believe so, but I would have to look at the exact**

7       **dispatch log to --**

8   Q   And it's -- well, we know the individual is Mr. Thomson,

9       correct?

10  A   **Yes.**

11  Q   And you had prior interactions with Mr. Thomson,

12      correct?

13  A   **Once prior, yes.**

14  Q   And when was that prior interaction?

15  A   **He was at the overflow shelter for St. John's, and he**

16      **was being asked to leave by staff for causing a**

17      **disturbance. He was are refusing. I went -- we**

18      **responded. He left of his own accord, and that was my**

19      **interaction.**

20  Q   When you were en route to the hospital, did you

21      understand that this was the same individual you had

22      previously dealt with at the homeless shelter?

23  A   **No, I didn't recognize the name.**

24  Q   When did you become aware of his name?

25  A   **When I saw him for the first time.**

1   Q   When you saw him, okay. What time did you arrive St.

2       Vincent?

3   A   **I don't remember the exact time.**

4   Q   Where did you originally go when you arrived?

5   A   **I pulled into the sally port of the hospital.**

6   Q   And is that -- strike that. How did you then get to

7       Mr. Thomson's location?

8   A   **I walked through the doors into the emergency room area.**

9   Q   Did you have to be let in by any security personnel?

10  A   **To the emergency room?**

11  Q   Correct.

12  A   **No, the doors open automatically.**

13  Q   Okay. And where did you first see Mr. Thomson?

14  A   **He was involved in an interaction with Officer O'Donnell**

15      **and the security staff.**

16  Q   Obviously Officer O'Donnell arrived before you?

17  A   **Yes.**

18  Q   And were you both responding to the call at the same

19      time?

20  A   **Yes.**

21  Q   Was either one of you the superior officer at the time?

22  A   **Superior officer as in?**

23  Q   Strike that. Was either one of you had a higher rank

24      than the other?

25  A   **No.**

1 Q    Was either one of you primary on the scene?

2 A    **I believe it was his call being 4Charlie1 which is the**

3      **district in which St. Vincent Hospital is assigned.**

4 Q    You were in another district, because of the nature of

5      the call you were asked to go as well?

6 A    **It's in the same district, different section. Our city**

7      **in divided up into districts and sections. So I was**

8      **assigned to a different section in the same district.**

9 Q    When the call comes through, did you automatically,

10     based on the system automatically respond, or did

11     someone have to instruct you to respond?

12 A   **I was dispatched to the call.**

13 Q   Meaning that dispatch instructed to go to the call?

14 A   **Yes.**

15 Q   When you first observed Mr. Thomson and Officer

16     O'Donnell, were they actively fighting with each other?

17 A   **It appeared so. I believe Mr. Thomson was on the ground**

18     **and Officer O'Donnell was trying to maintain control of**

19     **him.**

20 Q   Was Mr. Thomson saying anything at that point?

21 A   **I don't recall any specific statements at that point.**

22 Q   Was he screaming or yelling?

23 A   **He was being very verbal. I don't -- again, I can't**

24     **recall the exact statements he was making.**

25 Q   When you first observed Mr. Thomson, was he breathing

1      heavy?

2 A    **It didn't appear so initially.**

3 Q    Did you -- what did you observe about his color or how

4      he looked?

5 A    **He appeared normal.**

6 Q    So what did you do after you observed Mr. Thomson on the

7      ground with Officer O'Donnell trying to control him?

8 A    **I attempted to assist Officer O'Donnell in controlling**

9      **Mr. Thomson.**

10 Q   How did you do that?

11 A   **I initially attempted to assist in placing him into**

12     **handcuffs. We were unable to do that.**

13 Q   At that point was Mr. Thomson being arrested?

14 A   **It was my understanding, yes.**

15 Q   At some point additional officers arrived on the scene,

16     correct?

17 A   **Yes.**

18 Q   Who were those additional officers?

19 A   **Sergeant Behn and Officer Delsart as well as Officer**

20     **Wanish, I believe were the first few to arrive.**

21 Q   When Officer -- it's Lieutenant Behn, correct?

22 A   **No, he's a sergeant.**

23 Q   Sergeant Behn, I'm sorry. When Sergeant Behn got on the

24     scene, was he by matter of rank the controlling officer?

25 A   **Yes.**

1 Q    Once the additional officers -- strike that. You named

2      a series of additional officers. You did not name

3      Officer Harvath and Pineda. Did they show up a short

4      time later or contemporaneously with those individuals?

5 A    **They did show up a while later after those initial**

6      **three. I initially didn't even see them until we were**

7      **attempting to take Mr. Thomson into further custody.**

8 Q    What do you mean by take into further custody?

9 A    **We were attempting to get him into handcuffs and**

10     **eventually into the WRAP restraint. That is when I**

11     **noticed them.**

12 Q   And ultimately you were able to get the handcuffs on

13     Mr. Thomson, correct?

14 A   **Yes.**

15 Q   How many officers were present at that point?

16 A   **I don't recall. I belive it was myself, Officer**

17     **O'Donnell and Officer Wanish.**

18 Q   Did Mr. Thomson make any statements at that point, once

19     he was handcuffed?

20 A   **Not that I could hear. I was by his feet initially.**

21 Q   At some point Mr. Thomson stated to you that he could

22     not breathe, correct?

23          MS. BAYNARD: Objection, foundation. Go

24     ahead.

25          THE WITNESS: Yes. I moved to his head and

1      tried to calm him down, and he did make that statement

2      to me.

3      BY MR. KATERS:

4 Q    And this was while he was handcuffed?

5          MS. BAYNARD: While or why?

6      BY MR. KATERS:

7 Q    While.

8 A    **Yes.**

9 Q    And how did you respond to that statement?

10 A   **I tried to calm him down. I checked his breathing, and**

11     **I checked to make sure nobody was kneeling on him**

12     **or restrict his airflow in any way.**

13 Q   How did you check his breathing?

14 A   **I looked, listened to make sure he was still talking and**

15     **being able to communicate which is an indication that he**

16     **is still breathing, and again, I checked to make sure**

17     **nobody was restricting his airflow in any way.**

18 Q   Did you have any discussion with any of the other

19     officers when Mr. Thomson stated he could not breathe?

20 A   **I told Officer Wanish who was on his left side, and**

21     **said, hey, he said he can't breathe, just make sure**

22     **you're checking you're not restricting any airflow.**

23 Q   Okay. When Mr. Thomson was in handcuffs laying on the

24     floor and stating he couldn't breathe, was he gasping

25     for air at that point?

1  A  No.
2  Q  Was he hyperventilating?
3  A  No.
4  Q  Was he sweating?
5  A  Yes.
6  Q  Was he breathing heavily?
7        MR. KALLIES:  Objection, form.
8        MS. BAYNARD:  Join.
9        THE WITNESS:  I believe his breathing was
10  heavier, yes.
11  BY MR. KATERS:
12  Q  At this point nobody asked -- or, strike that.  Did you
13    ask that medical examine him at that point?
14  A  The nursing staff and the doctors were all around us.  I
15    didn't -- if they had felt that they needed examine him,
16    I believe they would have stepped in and examined him.
17  Q  Did you discuss that with them?
18  A  No.
19  Q  Did you ask them to examine him?
20  A  I did not.
21        (Exhibit No. 23 was marked.)
22  BY MR. KATERS:
23  Q  Sir, I'm handing you what we've marked as Exhibit 22 for
24    the record.
25        MS. BAYNARD:  I think it's 23.  I think this

1  one was 22.
2  BY MR. KATERS:
3  Q  You're right.  I apologize.  Sir, I have handed you what
4    we've marked as Exhibit No. 23 for the record.
5  A  Okay.
6  Q  Could you identify this document for the record?  And
7    feel free to take any time you need to review it.
8  A  This is the Medical Aid and Response Policy of the Green
9    Bay Police Department, Policy 434.
10  Q  And was this the policy that was in place on February
11    10th, 2020?
12  A  To the best of my knowledge, yes.
13  Q  Would you agree that all of the officers including
14    yourself were expected to follow this policy and
15    procedure?
16  A  Yes.
17  Q  I will direct your attention to the first page of the
18    exhibit under Purpose and Scope, is it true that the
19    purpose of "This policy is to recognize that members
20    often encounter persons who appear to be in need of
21    medical aid and establishes a law enforcement response
22    to such situations"?
23        MS. BAYNARD:  Objection, form.  Go ahead.
24        THE WITNESS:  Yes.
25  BY MR. KATERS:

1  Q  This is the policy that is used to train Green Bay, the
2    City of Green Bay police officers on how to deliver
3    emergency aid and to facilitate an emergency response,
4    correct?
5        MS. BAYNARD:  Form.  Go ahead.
6        THE WITNESS:  Yes.
7  BY MR. KATERS:
8  Q  So this policy is not discretionary, correct?
9  A  Yes, it's not discretionary.
10  Q  You're required to follow it, correct?
11  A  Yes.
12  Q  And is this the training you received in medical
13    emergencies?
14  A  Yes.
15  Q  If you could change to the -- sorry, if you could turn
16    to the second page which I believe is Bates stamped 975,
17    and under Sick or Injured Arrestees it states, "If an
18    arrestee appears ill on injured or claims illness or
19    injury, he/she should be medically cleared prior to
20    booking," did I read that correctly?
21  A  Yes.
22  Q  So in our situation Mr. Thomson was -- strike that.  Are
23    you aware of why Mr. Thomson was in the hospital to
24    begin with?
25  A  Initially no, I was not.

1  Q  So when you were on the scene were you aware that
2    Mr. Thomson had suffered seizures prior to your
3    interaction with him?
4  A  No.
5  Q  While Mr. Thomson was being restrained at the hospital
6    by several officers you heard him say he couldn't
7    breathe, correct?
8        MS. BAYNARD:  Objection, form.  Go ahead.
9        THE WITNESS:  Yes.
10  BY MR. KATERS:
11  Q  And he was claiming an injury, correct?
12        MS. BAYNARD:  Objection, form, go ahead, and
13    foundation.
14        THE WITNESS:  Yes.
15  BY MR. KATERS:
16  Q  Did you seek medical clearance for him at that time?
17  A  He was already medically cleared by hospital staff at
18    that point.
19  Q  He was medically cleared by hospital staff prior to
20    interaction with law enforcement, correct?
21  A  Yes.
22  Q  So after there was interaction with law enforcement and
23    he was claiming that he couldn't breathe, did you seek
24    medical clearance?
25        MS. BAYNARD:  Objection, form.  Go ahead.

1       THE WITNESS: Again, hospital staff was
2 present as well as the doctor who medically cleared him.
3 We confirmed that he was medically cleared and that he
4 did not need any further medical clearance from staff.
5 BY MR. KATERS:
6 Q  Who confirmed that?
7 A  **I asked staff as well as Sergeant Behn had asked medical**
8    **staff in he needed any further medical clearance.**
9 Q  What medical staff did you ask?
10 A  **The nursing staff, I believe her name is Chelsea, and**
11    **Dr. Gerwing was there as well.**
12 Q  And you had a conversation with both of them?
13 A  **I asked them as we were dealing with Mr. Thomson if he**
14    **needed any more medical clearance, and they both said**
15    **no.**
16 Q  Did either one of those medical professionals -- did you
17    share with either one of those medical professionals
18    that Mr. Thomson was expressing that he could not
19    breathe?
20 A  **Nurse and the doctor were standing next to him, and I**
21    **believe heard what he had said.**
22 Q  Did you discuss that at all with them?
23 A  **I did not.**
24 Q  Did you believe Mr. Thomson was having trouble breathing
25    at that time?

1 A  **I did not. He was communicating with me in a normal**
2    **tone. He was able to speak clearly, and it appeared as**
3    **though he had just been in an altercation, not that he**
4    **was in any medical distress.**
5 Q  So did you believe he was feigning injury when he was
6    claiming that he could not breathe?
7       MR. KALLIES: Objection, form.
8       MS. BAYNARD: Objection, form.
9       THE WITNESS: I believe that there was no
10    serious threat to his breathing and that he appeared to
11    be breathing heavy but normal.
12 BY MR. KATERS:
13 Q  Can you describe to me what you believe breathing heavy
14    but normal is?
15 A  **He was taking deep breaths, but he was still able to**
16    **communicate with us and answer questions and speak.**
17 Q  Was he gasping for breath at that point?
18       MR. KALLIES: Objection, asked and answered.
19       THE WITNESS: No.
20       MS. BAYNARD: You can answer the question.
21       THE WITNESS: No.
22 BY MR. KATERS:
23 Q  So at this point was it you who suggested that the WRAP
24    be used?
25       MS. BAYNARD: When you say at that point, you

1    said at this time, at this point, can you just clarify
2    at what point you're talking about?
3 BY MR. KATERS:
4 Q  Sure. After you arrived at the hospital and Mr. Thomson
5    was subdued by several officers and handcuffed,
6    complained that he could not breathe, you had a
7    conversation with medical staff where you don't remember
8    whether or not you shared with medical staff whether he
9    said he can't breathe, which you believe they knew it,
10    at that point was it your suggestion to get the WRAP?
11       MS. BAYNARD: Objection, form. Go ahead.
12       MR. KATERS: What's the objection? Why
13    don't --
14       MS. BAYNARD: You keep saying at this point,
15    at this point, and I'm wondering, at which one are you
16    talking about?
17       MR. KATERS: And I think I just described it,
18    and then you objected as to form.
19       MS. BAYNARD: The premise of your question was
20    suggesting things that he did not testify to.
21       MR. KATERS: I don't know that that is true.
22       MS. BAYNARD: I mean, we do not need to make
23    speaking objections. I think your question is
24    premising, is misstating his testimony. I understand
25    that you're summarizing so we know at which point in

1    time. That's my objection.
2 BY MR. KATERS:
3 Q  Okay. Sir, can you answer the question as stated?
4 A  **Can you repeat the question, please?**
5 Q  Sure. So after you arrived at the hospital and observed
6    Mr. Thomson and then assisted in subduing Mr. Thomson in
7    getting the handcuffs on and then had a conversation
8    with medical staff about whether he needed further
9    assessment, at this point in time was it your suggestion
10    that the WRAP be placed?
11 A  **I spoke with Sergeant Behn about it, yes, and asked him**
12    **if he wanted to use the WRAP in this situation.**
13 Q  What was his response?
14 A  **He said that we should.**
15 Q  Was there any discussion between you and Sergeant Behn
16    concerning using the WRAP on Mr. Thomson considering the
17    fact he was complaining of trouble breathing?
18 A  **Sergeant Behn was on scene when he had made the**
19    **statements, and we don't -- the WRAP does not cause any**
20    **difficulty with breathing so we did not -- he did not**
21    **see a problem with using it.**
22 Q  And that's a discussion you had with him?
23 A  **With Sergeant Behn, yes, I believe so.**
24 Q  So did you express concern to him or did he express
25    concern to you regarding the breathing and using the

1  WRAP?
2  MS. BAYNARD:  Objection to the form, misstates
3  his testimony regarding concern.  Go ahead.
4  MR. KALLIES:  Objection, foundation.
5  THE WITNESS:  We -- I believe that Sergeant
6  Behn heard him make these comments and was still under
7  the impression that the WRAP was the correct device to
8  use in this situation.
9  BY MR. KATERS:
10  Q  I appreciate that.  I believe the original -- the
11  question I was asking you is:  Did you have a
12  conversation with Sergeant Behn about the complaints of
13  not being able to the breathe and using a WRAP device on
14  Mr. Thomson?
15  A  **I don't recall having a specific conversation about it.**
16  Q  And earlier you stated that the WRAP does not cause
17  issues with breathing, how did you come to that
18  understanding?
19  A  **It's in our policy as well as I have been trained on the**
20  **WRAP, and I have had the WRAP placed on me.**
21  Q  The policy states that a WRAP doesn't cause breathing
22  problems?
23  A  **It doesn't cause positional asphyxiation, is what we**
24  **were trained on.**
25  Q  Were you trained it can't cause breathing problems at

1  all?
2  MR. KALLIES:  Object to form.
3  MS. BAYNARD:  Join.
4  MR. KALLIES:  Can he can we agree an objection
5  for one is an objection for all?
6  MR. KATERS:  Yes.
7  THE WITNESS:  I can't say that I was trained
8  on that specifically.
9  BY MR. KATERS:
10  Q  When were you trained -- strike that.  You've received
11  WRAP training, correct?
12  A  **Yes.**
13  Q  And you had used the WRAP before February 10th, 2020,
14  correct?
15  A  **Yes.**
16  Q  When did you receive WRAP training?
17  A  **In my initial mini-academy which would have been in**
18  **November of 2018.**
19  Q  Would you have any subsequent training on the WRAP after
20  the November of 2018 training?
21  A  **Prior to this incident, or post this incident?**
22  Q  Prior, thank you.
23  A  **No.**
24  (Exhibit No. 24 was marked.)
25  (Discussion had off record.)

1  MR. KATERS:  My understanding is, Kevin can
2  correct me if I'm wrong, the Bates stamps aren't in
3  order because the policies were produced -- the
4  attachments were produced separately.  I thought we
5  should address it now if anyone believes this isn't the
6  accurate attachment.  I'm pretty darn sure it is.
7  BY MR. KATERS:
8  Q  Okay.  Sir, we've handed you what is marked as
9  Exhibit 24.  Could you identify that document for the
10  record, please?
11  A  **Policy 302, Handcuffing and Restraints.**
12  Q  This policy also includes two attachments, is that
13  correct?
14  A  **Yes.**
15  Q  The handcuff restraint and transportation procedures and
16  the WRAP procedures, correct?
17  A  **Yes.**
18  Q  Could you, if do not mind paging towards the back --
19  well, about four pages in the WRAP procedure starts
20  after -- so this exhibit contains the WRAP procedure,
21  correct?
22  A  **Yes.**
23  Q  And is it your -- were these the policies and procedures
24  in -- I am sorry, strike that.  Were these the policies
25  and procedures in place on February 10th, 2020?

1  A  **To the best of my knowledge, yes.**
2  MR. KALLIES:  Do you mind me just stating for
3  the record that Exhibit No. 24 is Bates stamped GB924 to
4  926 and GB1294 to 1296 and GB1408 through 1411?  That is
5  the total exhibit.  Sorry.
6  BY MR. KATERS:
7  Q  Thank you.  Sir, if you could turn to GB1296, it's the
8  second full page of the WRAP procedures.  If I could
9  turn your attention to D. Precautions, No. 3, it states,
10  "If the restrained subject complains of or shows signs
11  of breathing distress (shortness of breath, sudden
12  calmness, a change in facial color, etc.), medical
13  attention should be provided immediately," did I state
14  that correctly?
15  A  **Yes.**
16  Q  How is that consistent with your understanding that you
17  were trained that the WRAP doesn't affect breathing?
18  MS. BAYNARD:  Objection to form.  Go ahead.
19  THE WITNESS:  This is indicating that after
20  the restraint is put on if there's any issues that
21  arise, we were trained that there is no cause of
22  positional asphyxiation, is what I meant.
23  BY MR. KATERS:
24  Q  Okay.  Well, were you trained to observe or be concerned
25  about someone's breathing when they are in a wrap?

1 A We are trained to continually observe them for any signs
2 of any issue.
3 Q Let's put this aside. So let's go back to, the decision
4 is made to put on the WRAP?
5 A Correct.
6 Q Who goes to retrieve the WRAP?
7 A I believe it was Officer Delsart.
8 Q And you stay with Mr. Thomson, correct?
9 A Yes.
10 Q And when the WRAP arrives, can you please describe the
11 process of placing it on Mr. Thomson?
12 A Initially we place on the leg restraints which get laid
13 out on the floor. He gets placed into those. They get
14 tightened, then he is rolled on his back, propped up,
15 the shoulder restraints are placed on, everything is
16 tightened in place, and then he is held in that
17 position. It's a seated position.
18 Q And when the WRAP arrived, what part of Mr. Thomson's
19 body were you positioned on?
20 A I believe I was near his head at this time.
21 Q And at one point you took control of his head, correct?
22 A I placed my hand on his head just to keep him from
23 thrashing. I didn't want him to hit his head at all.
24 Q Was that while the WRAP was being put on, was that after
25 the WRAP has been applied?

1 A I don't recall exactly when it was.
2 Q While the WRAP was being applied, was Mr. Thomson saying
3 anything?
4 A He was saying that he would -- he continued to say,
5 okay, I will calm down, but did not in fact calm down.
6 Q Was he cooperative with putting the WRAP on?
7 A In what sense?
8 Q Well, when you got there he was fighting with Officer
9 O'Donnell, correct?
10 A That was my understanding of the situation, yes.
11 Q And it took several officers to subdue him, correct?
12 A Yes.
13 Q And when the WRAP was being placed on him was he
14 actively fighting?
15 A He wasn't actively fighting but he was still continuing
16 to resist in attempt to get up or move away from
17 officers.
18 Q When he would -- when the WRAP was being placed, did
19 Mr. Thomson express any difficulty breathing at that
20 time?
21 A Not that I can recall.
22 Q Was he sweating?
23 A Yes.
24 Q Was he breathing heavily at that point?
25 A I believe he was taking deep breaths, yes.

1 Q Was he gasping for air?
2 A No.
3 Q Was he -- I apologize if I just asked you this, but was
4 he drooling?
5 A Not that I can recall.
6 Q At that point was he coherent?
7 A Yes.
8 Q Who placed the helmet on Mr. Thomson after the WRAP was
9 applied?
10 MS. BAYNARD: Objection, foundation. Go
11 ahead.
12 THE WITNESS: I don't recall.
13 BY MR. KATERS:
14 Q It wasn't you though?
15 A I don't believe so, no.
16 Q After Mr. Thomson was placed in the WRAP, was there any
17 discussions about providing him medical care?
18 A Nursing staff had already advised that he was medically
19 cleared and that they had nothing further for him and
20 that he could be taken to jail.
21 Q When did nurse nursing staff advise that, prior to the
22 WRAP being applied or after?
23 A Prior and after.
24 Q And after, it was the same two -- strike that. What
25 individual at the hospital informed you after that he

1 didn't need any medical attention?
2 A The nurse.
3 Q Do you recall her name?
4 A Her first name I believe is Chelsea, I don't recall her
5 last name.
6 Q Was this a conversation you had with her?
7 A No, I did not, no.
8 Q Who did?
9 A I was told of this, I do not know who had that
10 conversation.
11 Q And when were you told of this?
12 A When I was asked multiple times by Sergeant Behn if he
13 was medically cleared, I said, yes, I was told he was
14 medically cleared, and to my knowledge he then continued
15 to confirm he was medically cleared.
16 Q So Sergeant Behn asked you if he was medically cleared?
17 A Asked the individuals around him if he was medically
18 cleared, I don't know if the question was directed at me
19 but the officers in the area.
20 Q You affirmatively answered though that he had been?
21 A To my knowledge he had been. I had asked, and they told
22 me he was medically cleared.
23 Q You had asked the nurses and the doctors earlier?
24 A Yes.
25 Q After the WRAP was placed, did Mr. Thomson continue to

1 resist?

2 A **He continued to move and struggle, but his movement is**

3 **limited in the WRAP.**

4 Q And how long was Mr. Thomson detained on the floor of

5 the hospital in the WRAP before he was moved to the

6 squad car?

7 MS. BAYNARD: Objection, form. Go ahead.

8 THE WITNESS: No more than a few minutes.

9 BY MR. KATERS:

10 Q And during those few minutes, were you present?

11 A **Yes.**

12 Q Did Mr. Thomson say anything during those few minutes?

13 A **He continued to speak that if we would just take that**

14 **off he would calm down, or if we took that off he would**

15 **just go away, that he would leave. I tried to calm him**

16 **down.**

17 Q During those few minutes when he was sitting on the

18 floor, it's your testimony that he didn't complain about

19 breathing?

20 A **Not that I can recall.**

21 Q At some point after Mr. Thomson was on the floor for

22 several minutes he was transported to a police car,

23 correct?

24 A **Yes.**

25 Q Whose unit was that?

1 A **The patrol squad?**

2 Q Strike that. I mean, what officers were responsible for

3 that patrol unit on that night?

4 A **Officer Harvath and Pineda.**

5 Q And Officer Harvath and Pineda helped put Mr. Thomson in

6 the WRAP?

7 A **No, I don't -- I know that Officer Harvath did not. I**

8 **believe Officer Pineda may have tightened a strap, but I**

9 **don't recall her assisting in the entirety of placing**

10 **him in the WRAP.**

11 Q Was Officer Pineda trained on the WRAP that you're aware

12 of?

13 MS. BAYNARD: Objection, foundation. Go

14 ahead.

15 THE WITNESS: I wouldn't know. She was not in

16 my class, so I can't speak to what she was trained on.

17 BY MR. KATERS:

18 Q Did you take part in placing Mr. Thomson into the squad

19 car?

20 A **No.**

21 Q What were you doing while Mr. Thomson was being placed

22 in the squad car?

23 A **Standing by, I don't recall doing anything specifically.**

24 Q Ultimately -- strike that. Did you observe Mr. Thomson

25 in the back of the squad car?

1 MR. KALLIES: Objection, form.

2 MS. BAYNARD: You can still answer.

3 THE WITNESS: Yes.

4 BY MR. KATERS:

5 Q What time -- at what point in the scenario did you

6 observe him?

7 A **After he had been placed into the car and secured to the**

8 **best of my knowledge.**

9 Q Okay. What's your recollection of how he was secured in

10 the car?

11 A **I don't recall. I can't specifically recall how he was**

12 **in there, I just remember seeing him in the back of the**

13 **car.**

14 Q Did you check that he was appropriately secured?

15 A **No, I did not.**

16 Q Did you physically -- strike that. How far away were

17 you when you were observing?

18 A **A few feet. There was a lot of officers around. I**

19 **didn't feel that I needed to be involved. I felt that I**

20 **would be getting in the way. There was already multiple**

21 **officers handling, so I stepped back. I wasn't really**

22 **paying attention to him or what was going on. I was**

23 **standing by and letting them do their job.**

24 Q So you observed him in the car, but you didn't

25 physically go stick your head in the car?

1 A **Not that I can recall, no.**

2 Q As Mr. Thomson was being carried -- strike that.

3 Mr. Thomson was carried to the car, correct?

4 A **Yes.**

5 Q Did you take part in carrying Mr. Thomson?

6 A **I believe I did. I grabbed the shoulder straps, and I**

7 **passed them off to another officer when he was being**

8 **placed in the car.**

9 Q But you brought him over to the car, and at that point

10 you stepped back because there was other officers?

11 A **Yes.**

12 Q As he was being carried was Mr. Thomson saying anything?

13 A **Not that I can recall.**

14 Q Was he coherent?

15 A **Yes.**

16 Q How do you know he was coherent?

17 A **He was still being loud and yelling. Again, I can't**

18 **recall any specifics that he said.**

19 Q Do you know, was he drooling at that point?

20 A **Not to my knowledge, no.**

21 Q Was he breathing heavy at that point?

22 A **He appeared to be breathing normally that I could see.**

23 Q When he was being carried to the car at the hospital,

24 was he sweating?

25 A **I believe so.**

1 Q Was there any concern about the officers with placing
2 him in the car concerning his safety?
3     MS. BAYNARD: Objection, foundation.
4     MR. KALLIES: Objection, calls for
5 speculation.
6     MR. KATERS: Fair enough. I will strike the
7 question.
8 BY MR. KATERS:
9 Q Was there discussion amongst the officers about his
10 safety when he was placed in the car?
11 A **Not that I can recall.**
12 Q Did you receive the discharge paperwork from the
13 hospital?
14 A **Initially I did not.**
15 Q Who received it initially?
16 A **I believe I called and spoke with -- eventually called**
17 **and spoke with Officer O'Donnell who did receive it.**
18 Q And I think I asked you a bad question. Is there a
19 difference between the discharge paperwork and the
20 medical clearance form?
21 A **Yes.**
22 Q So you received the medical clearance form, correct?
23 A **Yes.**
24 Q You left the hospital with the medical clearance form?
25 A **Yes.**

1 Q Ultimately you followed the vehicle that was driven by
2 Officer Harvath -- I am sorry, I think it was driven by
3 Officer Pineda and Officer Harvath was in from the
4 hospital to the jail, correct?
5 A **Yes.**
6 Q And you were given the medical clearance form -- strike
7 that. Why were you given the medical clearance form?
8     MR. KALLIES: Object to form.
9     MS. BAYNARD: Foundation, go ahead.
10     THE WITNESS: Sergeant Behn had it. I was
11 going to the jail so I just grabbed it from him.
12 BY MR. KATERS:
13 Q Was there any discussion with Sergeant Behn over the
14 document when he gave it to you?
15 A **No, he just handed me the form.**
16 Q Then as you're following the car with Mr. Thomson in it,
17 correct?
18 A **I am, yes.**
19 Q And did anything eventful happen on that ride?
20     MR. FLOOD: Object to form.
21     THE WITNESS: No.
22 BY MR. KATERS:
23 Q Did you have any contact with any other officers during
24 the drive?
25 A **No, I don't believe so.**

1 Q Did you make contact with the jail during the drive?
2 A **No.**
3 Q How long do you believe that drive took?
4 A **Ten minutes.**
5 Q Is that normal for that distance?
6 A **I believe so, yes.**
7 Q If we could take Exhibit 24 again.
8 A **Okay.**
9 Q Yeah. If you don't mind turning to the second page.
10 A **From the beginning?**
11 Q Yes.
12 A **Okay.**
13 Q I might have got it out of order, but I think you have
14 it there. Yes, that's the correct page. I'm referring
15 to Bates stamped GB 000925, and I would direct your
16 attention to Notifications at the top of that page. It
17 reads, "Whenever an officer transports a person with the
18 use of restraints other than handcuffs, the officer
19 shall inform the jail staff upon arrival at the jail
20 that restraints were used," did I read that correctly?
21 A **Yes.**
22 Q At arrival at the jail did you or anyone else inform
23 jail staff as to why the restraints were being used?
24 A **I don't believe so. We normally notify dispatch who**
25 **then makes the call for us as we're driving, is how we**

1 handle that.
2 Q So are you aware of whether or not dispatch made that
3 call to the jail?
4 A **To the best of my knowledge they did.**
5 Q And do you know what information was transferred or was
6 provided to the jail?
7 A **I do not.**
8 Q That was not your responsibility?
9 A **No.**
10 Q When you arrived at the jail, you followed the car with
11 Mr. Thomson into the sally port, correct?
12 A **Yes.**
13 Q And then did you have to -- when you arrived at the jail
14 and got out of your car, did you go check on
15 Mr. Thomson?
16 A **I did not, no.**
17 Q Whose duty was it to be monitoring Mr. Thomson at that
18 time?
19 A **Officer Harvath and Officer Pineda.**
20 Q Were they doing that?
21     MS. BAYNARD: Calls for speculation. Go
22 ahead.
23     THE WITNESS: I would believe they were doing
24 their job, yes.
25 BY MR. KATERS:

1  Q  Well, I appreciate that. I'm not looking for
2     speculation. Do you have an independent recollection of
3     whether or not Officer Pineda and Harvath were
4     monitoring Mr. Thomson when they arrived at the jail?
5  A  I do not.
6  Q  What did you do when you arrived at the jail?
7  A  Stood by and waited for jail staff.
8  Q  And ultimately it was jail staff who removed Mr. Thomson
9     from the vehicle, correct?
10 A  Correct, when we arrive at the jail with a person who is
11    uncooperative or in a WRAP restraint, the jail handles
12    every portion of removing them, unsecuring them from
13    their devices, their restraints, that's all on the jail
14    staff.
15 Q  And is that policy and procedure I imagine?
16 A  That is our way of handling it. That's what the jail
17    has always asked for us to do, is to let them handle it.
18 Q  Do you have a responsibility to continue to monitor the
19    individual?
20 A  I'm standing by and letting jail staff do what they need
21    to do at that point.
22 Q  And Mr. Thomson was still in the custody of the Green
23    Bay Police Department, correct?
24       MS. BAYNARD: Objection to form. Go ahead.
25       THE WITNESS: At that point we were in the

1     process of transferring custody to the Brown County
2     Sheriff's Office, to the Brown County jail.
3  BY MR. KATERS:
4  Q  And the Brown County jail never took custody, correct?
5        MS. BAYNARD: Objection, foundation.
6        THE WITNESS: It is my belief at that point
7     that they were taking custody of him as they removed him
8     from the squad car, were communicating with him and
9     would ultimately be the ones to remove him from the
10    restraints if they decides to do so.
11 BY MR. KATERS:
12 Q  If there's a situation between -- well, strike that. In
13    this situation who had superiority?
14 A  Brown County jail staff.
15 Q  When you are in the Brown County jail, you have to
16    listen to their staff?
17 A  We defer to them. We can ask them for something or we
18    can speak with them about something. Ultimately they
19    have the final say and decision-making on anything that
20    happens in their facility.
21 Q  That is how you're trained, correct?
22 A  Yes.
23 Q  Does it matter what rank they are, or is it any jail
24    employee?
25 A  Normally the corporal will tell us, but we listen to all

1     jail employees. It's their facility, it is not ours.
2  Q  Did you speak to any jail staff when you arrived at the
3     jail with Mr. Thomson?
4  A  I don't recall any specific conversations with jail
5     staff. I informed them that I had his -- I do believe I
6     informed them I had his medical release form, but I
7     don't recall any specifics.
8  Q  Ultimately the jail staff removed Mr. Thomson from the
9     car, correct?
10 A  Yes.
11 Q  And how long did that process take?
12 A  I don't recall.
13 Q  During that process you and the other officers are
14    standing back, correct?
15 A  Correct.
16 Q  At that point was Mr. Thomson saying anything?
17 A  Not that I can recall, not to us.
18 Q  Was Mr. Thomson breathing heavily?
19 A  Not that I can recall.
20 Q  Was he gasping for air?
21 A  No, I don't believe so.
22 Q  Was he sweating?
23 A  Not that I could see.
24 Q  Do you know if he was responsive to the Brown County
25    officers?

1  A  I believe -- from what I could tell they were asking him
2     questions and he was giving them answers.
3  Q  When the Brown County officers decided to move
4     Mr. Thomson into the arrest area, you had no part in
5     actually physically moving him, correct?
6  A  No.
7  Q  The Brown County officers lifted him?
8  A  Correct.
9  Q  At that point was he cooperating?
10 A  I can't speak to his level of cooperation with their
11    staff.
12 Q  Was he actively resisting?
13       MS. BAYNARD: Objection, form, foundation. Go
14    ahead.
15       THE WITNESS: Not that I could see.
16 BY MR. KATERS:
17 Q  And had he gone limp? Was he supporting any of his own
18    body weight?
19 A  It appeared so.
20 Q  Did you inform jail staff of the previous struggle with
21    Mr. Thomson at the hospital?
22 A  I didn't personally.
23 Q  Did you observe anybody else provide that information to
24    jail staff?
25 A  I believe they received that information. I don't know

1   who provided it to them.

2   Q   Did you inform them that Mr. Thomson seemed agitated?

3      MS. BAYNARD: Objection, form. Go ahead.

4      THE WITNESS: I did not.

5   BY MR. KATERS:

6   Q   And you did not inform them that he had complained of

7   not being able to breathe, correct?

8   A   **I did not, no.**

9   Q   And you did not inform them that he had been breathing

10   heavier earlier, correct?

11   A   **I did not.**

12      MS. BAYNARD: Object to form.

13   BY MR. KATERS:

14   Q   So at this point, which is the point that the Brown

15   County jail staff has made a determination they are

16   going to move him into the arrest area, how many times

17   have you heard Mr. Thomson complaining that he can't

18   breathe?

19   A   **I can only recall the incidents at the hospital which I**

20   **believe was once or twice, and again, I checked on him**

21   **and confirmed that he was in fact breathing.**

22   Q   So it's your testimony that you only observed

23   Mr. Thomson -- strike that. It's your testimony that

24   you only heard Mr. Thomson state he can't breathe once

25   or twice at the hospital prior to the WRAP being placed?

1   A   **From my recollection.**

2   Q   If you would have brought Mr. Thomson in a nonrestraint

3   situation, would the Brown County staff still have come

4   out to take him out of the car?

5      MS. BAYNARD: Objection, form, foundation. Go

6   ahead.

7   BY MR. KATERS:

8   Q   Strike that. If you normally bring in an arrestee who

9   is cooperative, fair, you following me?

10   A   **Yes.**

11   Q   Are the Brown County officers, do they come out to the

12   sally port to get that individual, or is that an

13   individual that you would usually walk into the arrest

14   area? We're talking about a fully cooperative

15   individual.

16   A   **At that time, prior to COVID, we would normally have**

17   **walked them in. The process is different now due to**

18   **COVID procedures, but prior if they were completely**

19   **cooperative we would walk them to the door, press the**

20   **button and have to be let in by jail staff.**

21   Q   Are you aware if any of the jail staff had WRAP

22   training?

23      MS. BAYNARD: Objection, form, foundation. Go

24   ahead.

25   THE WITNESS: I am not. I don't know their

1   training procedure.

2   BY MR. KATERS:

3   Q   Did you have any conversations with Officer Harvath or

4   Pineda as you sat in the sally port? Strike that. Did

5   you have any conversations with Officer Harvath and

6   Pineda as you stood in the sally port?

7   A   **Not that I can recall.**

8   Q   You said you could -- is it fair to say you could see

9   jail staff interacting with Thomson but you weren't

10   close enough to observe any conversations, is that fair?

11   A   **Correct.**

12      MR. KALLIES: Objection, form. Could we

13   define the sally port and whatever else, the areas?

14      MR. KATERS: Fair enough.

15   BY MR. KATERS:

16   Q   So when the vehicle carrying Mr. Thomson and the vehicle

17   you were driving pulled into the sally port, correct?

18   A   **Yes.**

19   Q   And is it fair to say the sally port is an area where

20   cars, mostly law enforcement vehicles, can park that is

21   within the jail facility but there's a door separating

22   that and arrest area, is that correct?

23   A   **Yes, there's a secure entrance that can only be operated**

24   **by master control to let us into it. For lack of a**

25   **better term, it's a garage. And then, yes, all entries**

1   **in and out of it are secured and controlled by the Brown**

2   **County jail staff.**

3   Q   And from the sally port ultimately prisoners, arrestees

4   are brought into the arrest area, correct?

5      MS. BAYNARD: Objection, form. Go ahead.

6      THE WITNESS: Yes.

7   BY MR. KATERS:

8   Q   In the arrest area there is another door that master

9   control has to let you through, correct?

10   A   **Correct.**

11   Q   And for instance, the reason you all put your guns in

12   your trunks when you got there is you can't take your

13   weapons into the actual jail, correct?

14   A   **Correct, anything live or illegal has to stay in the**

15   **squad car or in a secure box.**

16   Q   So there are two separate doors, you have access --

17   strike that. Do you have access to the sally port

18   without someone employed by Brown County letting you

19   into the sally port?

20   A   **We do not.**

21   Q   So you pull up and have to indicate to someone we would

22   have to be allowed in, is that fair?

23   A   **We have to be allowed in, yes. We have to indicate why**

24   **we're there, and they have to let us in.**

25   Q   Once you're in the sally port to actually -- to get past

1 the next set of doors into the arrest area, somebody
2 also has to let you through, correct?
3 A **Yes.**
4 Q And during your time at the sally port area you had no
5 physical contact with Mr. Thomson, correct?
6 A **Correct.**
7 Q If you could turn to what is Exhibit 24, if we could
8 turn towards the back, it is Bates stamped 1409. So I
9 will direct your attention to what is Bates stamped,
10 Exhibit 24, Bates stamped GB1409 under D, No. 2 which
11 states, "Officers have the custodial responsibility for
12 the subject's health and welfare," did I read that
13 correctly?
14 A **Yes.**
15 Q So when Mr. Thomson is in the sally port and he's
16 being -- he's interacting with Brown County employees,
17 do you believe you still had a custodial responsibility
18 for his health and welfare?
19 A **I believe at that point we are attempting to turn over**
20 **custody to the Brown County jail staff and they are**
21 **monitoring his health and welfare, if there's an issue I**
22 **believe they would let us know.**
23 Q But do you believe that you in that situation still had
24 custodial responsibility for Mr. Thomson's health and
25 welfare?

1 A **I believe at that point we were, again, attempting to**
2 **turn over our custodial responsibility to the Brown**
3 **County jail staff.**
4 Q And until that custodial responsibility was turned over
5 you were still responsible for Mr. Thomson's health and
6 welfare, correct?
7 MS. BAYNARD: Objection, form. Go ahead.
8 THE WITNESS: Yes.
9 BY MR. KATERS:
10 Q What did you do in the sally port to assure that
11 Mr. Thomson's health and welfare was being, I guess,
12 treated?
13 A **I was not having in-person contact with him, jail staff**
14 **was, and he was in Officer Pineda and Harvath's squad.**
15 **I believe at that point they are monitoring him.**
16 Q Between yourself, Officer Harvath and Officer Pineda,
17 was anyone the ranking officer at that time?
18 A **No, we are all patrol officers.**
19 Q And then seniority or -- nothing else comes into play at
20 that point, you're all the same rank?
21 A **Correct, Officer Harvath has the seniority over myself**
22 **and Officer Pineda, but we are all patrol officers.**
23 Q It doesn't mean you necessarily have to follow his
24 commands?
25 A **No, but I would respect and listen to him as a fellow**

1 officer, yes.
2 Q Understood, but you're not --
3 A **Not obligated.**
4 Q Yeah. If you could turn, I believe it's two finals what
5 is Bates stamped 1411, it's going to be under H,
6 Turnover and Release, so we're looking at Exhibit 24,
7 Bates Stamp No. GB001411, H, under Turnover and Release
8 states that "Officers will conform to the policies and
9 procedures of a facility to where they are transporting
10 the person in custody," did I read that correctly?
11 A **Yes.**
12 Q And how did you conform to the policies and procedures
13 of the Brown County facility when you arrived?
14 MS. BAYNARD: Objection, form. Go ahead.
15 THE WITNESS: We allowed them to take over
16 control of Mr. Thomson, communicating with him and being
17 ultimately uninvolved in his transporting to the
18 facility from that point forward.
19 BY MR. KATERS:
20 Q So that is Brown County's policy and procedure, that you
21 should be uninvolved in transporting him into the
22 facility?
23 A **In this case when he is uncooperative we do not have any**
24 **contact with him. We allow the facility, we allow Brown**
25 **County staff to.**

1 Q If you became concerned for someone's health and welfare
2 while Brown County was transporting them inside the
3 facility, what, if anything, would you be required to
4 do?
5 A **I would advise other officers that it appears that**
6 **something is wrong and take action from that point**
7 **depending on what is necessary.**
8 Q No. 3 on the same page, GB001411 of Exhibit 24 under H3
9 it says, "Officers will fill out a subject/arrestee form
10 when transporting a subject to the jail," is that
11 something that you filled out?
12 A **No.**
13 Q Do you know if that was filled out here -- strike that.
14 Do you know if that was filled out in Mr. Thomson's
15 case?
16 A **Yes, there -- before we transport anybody to jail we do**
17 **what is referred to as a booking form. That gets sent**
18 **to jail staff. It gets e-mailed to them.**
19 Q And that is not something you did here?
20 A **I did not, no. The person transporting them generally**
21 **takes care of it.**
22 Q So here generally it would have been Officer Pineda and
23 Harvath?
24 A **Generally speaking.**
25 Q Do you know if that occurred here?

1 A I believe it occurred.

2 Q You have know personal knowledge if it did or did not?

3 A Yes, I have no personal knowledge.

4 Q Fair enough. Policy and procedure on the same page,
5 again GB 001411 of Exhibit 24 under H, Turnover and
6 Release states, "Officers will maintain custody of the
7 prisoner until the holding facility personnel order
8 removal of the handcuffs," did I read that correctly?

9 A Yes.

10 Q This did not occur with Mr. Thomson, correct?

11 MS. BAYNARD: Objection, form. Go ahead.

12 THE WITNESS: In this case, again, we believed
13 we were turning over his custody to jail staff, and in
14 cases of when somebody is uncooperative we let them
15 handle everything once we enter into the sally port.

16 BY MR. KATERS:

17 Q I appreciate that response, but the question is: In
18 this particular case did -- well, did you maintain
19 custody of the prisoner until Brown County jail
20 personnel ordered the removal of the handcuffs?

21 A I did not. I believe that we, again, turned over the
22 custody to the jail staff.

23 Q The policy requires until they order the removal of
24 handcuffs that Green Bay police officers will maintain
25 custody of the prisoner, correct?

1 A Correct.

2 Q And that did not occur here, correct?

3 A In a situation where somebody is uncooperative, jail
4 staff takes the handcuffs off, they take the restraints
5 off, all without our knowledge. It's up to them, so --

6 Q So is it fair to say this policy was not followed on the
7 night in question then?

8 MS. BAYNARD: Objection, form.

9 THE WITNESS: I believe that we maintained
10 custody until we turned him over to jail staff.

11 BY MR. KATERS:

12 Q But you did not maintain custody until jail staff
13 ordered the removal of the handcuffs, correct?

14 A They do not order the removal in this situation. They
15 do it themselves. They don't ask us to remove the
16 handcuffs for them. I am not sure that applies in
17 this case.

18 Q But nevertheless, I mean, the officers, yourself,
19 Officer Harvath and Officer Pineda did not maintain
20 custody of him until the Brown County jail asked for the
21 removal of the handcuffs?

22 MR. FLOOD: Objection, form.

23 MS. BAYNARD: Asked and answered.

24 MR. KATERS: I understand that it has asked
25 and answered, and I have been told the policy doesn't

1 apply or whatnot. The question is the question. I will
2 restate it.

3 BY MR. KATERS:

4 Q On the night in question did you maintain custody of the
5 prisoner until the Brown County personnel ordered the
6 removal of the handcuffs?

7 A I personally did not.

8 Q Did you observe any other Green Bay Police Department
9 officers maintain custody of Mr. Thomson until the Brown
10 County personnel ordered the removal of the handcuffs?

11 MS. BAYNARD: Foundation. Go ahead.

12 THE WITNESS: Again, I don't believe that that
13 specifically applies, but I -- we were not involved in
14 his transferring the custody into the jail. We did not
15 maintain physical custody of him, if that is what you're
16 asking.

17 BY MR. KATERS:

18 Q That is what I'm asking.

19 A Yes, we didn't have any physical custody of him.

20 Q The WRAP that was obtained from -- strike that. Where
21 was the WRAP obtained from, do you know?

22 A All supervisors carry them in their squads. I believe
23 that it was in Sergeant Behn's squad when it was
24 acquired.

25 Q So Sergeant Behn's WRAP was still on Mr. Thomson when

1 Mr. Thomson was brought into the sally port at the
2 county jail, correct?

3 A Yes.

4 Q And Sergeant Behn's or the Green Bay Police Department's
5 WRAP was still on Mr. Thomson when he was taken from the
6 sally port to the arrest area, correct?

7 A Yes.

8 Q And as we sit here today you don't know one way or the
9 other if the jail staff has any training on a WRAP,
10 correct?

11 MS. BAYNARD: Asked and answered. Go ahead.

12 THE WITNESS: I do not know their training.

13 BY MR. KATERS:

14 Q Thomson was moved to the arrest area by Brown County
15 jail staff, correct?

16 MS. BAYNARD: Asked and answered. Go ahead.

17 THE WITNESS: Correct.

18 BY MR. KATERS:

19 Q What were you doing while they were moving Mr. Thomson?

20 A Standing by, observing and being completely uninvolved
21 in the situation.

22 Q When Mr. Thomson was -- strike that. Mr. Thomson was
23 brought into the arrest area, correct?

24 A Correct.

25 Q What did the Brown County jail staff do with Mr. Thomson

1    at that point?

2  A  Began their evaluation and booking process, I believe.

3  Q  What does that evaluation and booking process entail?

4       MS. BAYNARD: Objection, foundation. Go

5    ahead.

6       THE WITNESS: I don't have the specific policy

7    and procedure as to what they do. They ask questions,

8    and they determine whether they are going to take him

9    into the facility. They also contacted the jail nurse.

10  BY MR. KATERS:

11 Q  Did you have any discussions with the Brown County jail

12   staff in the arrest area?

13 A  I had one conversation I believe with Corporal West who

14   asked for his medical discharge paperwork, and I handed

15   him the medical release form.

16 Q  And that's the only conversation you recall having?

17 A  Yes.

18 Q  When you were speaking to Corporal West, did you give

19   him any additional history as to what had gone on with

20   Mr. Thomson over the last 30 minutes or so?

21 A  I believe he was provided a brief synopsis. I don't

22   know that I was the one to give it to him. I don't

23   recall being the one to directly give him that

24   information.

25 Q  You testified earlier that jail staff would ask

1    questions and make decisions. What did you observe jail

2    staff doing in regard to Mr. Thomson on the night in

3    question after he was brought into the arrest area?

4  A  They were asking him questions.

5  Q  What did you observe about Mr. Thomson?

6  A  He was answering their questions to what I could see.

7  Q  Could you hear Mr. Thomson saying anything?

8  A  I heard him communicating with staff.

9  Q  What did you observe about Mr. Thomson's breathing at

10   that point?

11      MS. BAYNARD: Objection, form. Go ahead.

12  BY MR. KATERS:

13 Q  Strike that. What, if anything, did you observe about

14   Mr. Thomson's breathing as he was on the floor of the

15   arrest area interacting with jail staff?

16 A  There were multiple officers crowded around him. I

17   couldn't really see him. I didn't observe anything out

18   of the ordinary.

19 Q  Was he sweating at that point?

20 A  I --

21      MS. BAYNARD: Objection, form.

22      THE WITNESS: Again, I -- there was multiple

23   officers around him, I couldn't -- and I wasn't close

24   enough to see.

25  BY MR. KATERS:

1  Q  Were you able to observe any of the actions of the jail

2    nurse?

3  A  No.

4  Q  Did you have any interaction with the jail nurse?

5  A  She asked me about the medical paperwork. Again, this

6    was what I had provided with to Corporal West, and she

7    asked for the discharge paperwork which we had not

8    received initially. At that point I contacted Officer

9    O'Donnell via phone call and asked him to send out, or

10   to have somebody bring us the full medical discharge

11   paperwork.

12 Q  Why wasn't the full medical discharge paperwork sent

13   with you initially?

14 A  I do not know.

15 Q  Is it typical or standard procedure to take the

16   discharge paperwork with you when you're transporting

17   someone from the hospital to the jail?

18 A  Generally we are handed that information by nursing

19   staff. In this case they may have forgotten. I'm not

20   sure.

21 Q  But generally speaking you would have both forms, one

22   being the discharge paperwork and one being the medical

23   clearance form, correct?

24 A  Yes.

25 Q  Generally there's two separate forms, is that fair?

1  A  The medical release form and generally they have a

2    discharge packet of information, yes.

3  Q  Sitting here today you have no idea why those two things

4    were separated, is that fair?

5  A  Correct.

6  Q  And you were tasked with taking the medical clearance

7    form, correct?

8  A  Correct, and that is the form that is required by jail

9    staff.

10 Q  When you were speaking to the jail nurse, did you inform

11   her that Thomson had earlier stated he could not

12   breathe?

13 A  I did not.

14 Q  Did you inform her that he had earlier suffered

15   seizures?

16 A  I did not know that at that time.

17 Q  When you arrived at the emergency room or earlier, did

18   you ask anyone why Mr. Thomson was in the hospital to

19   begin with?

20 A  No.

21 Q  When you were speaking to the jail nurse, did you inform

22   her that Thomson was not seen by medical staff after the

23   WRAP was placed on him?

24      MS. BAYNARD: Objection, form.

25      THE WITNESS: I --

1    MS. BAYNARD:  I think it misstates his prior
2  testimony.  Go ahead.
3    THE WITNESS:  I did not inform her of that.
4    MR. KATERS:  I think I am probably halfway
5  done or so. If you want to take a break, it is probably
6  not a bad time.
7    (A recess was taken.)
8  BY MR. KATERS:
9  Q  I just want to be clear, it's your testimony that you
10    spoke to Corporal West and the jail nurse while at the
11    Brown County jail, correct?
12  A  **I believe I had a conversation with them, yes.**
13  Q  Do you recall having conversations with anyone else?
14  A  **Not that I can recall.**
15  Q  At some point Mr. Thomson was removed from the arrest
16    area and taken back out to the sally port, correct?
17  A  **Yes.**
18  Q  What's your understanding of why that occurred?
19  A  **My understanding was the nurse said he needed further**
20    **medical treatment or she wasn't going to accept him into**
21    **their facility.**
22  Q  Is that something she told you directly?
23  A  **She advised Corporal West, and I believe Corporal West**
24    **advised us, "us" being the officers.**
25  Q  What did you do upon receiving that information?

1  A  **I called -- I made phone calls to Sergeant Behn, I**
2    **believe was one of the phone calls I made, just advising**
3    **him that this was the update on the situation, we're**
4    **being asked to return to a different medical facility**
5    **for further clearance.**
6  Q  What did Sergeant Behn say to you?
7  A  **Okay.  He just advised that he understood what I was**
8    **saying and that was -- I don't remember anything**
9    **specifically of what he said, just was comprehending**
10    **what I was talking about.**
11  Q  Did you discuss Mr. Thomson's condition with Sergeant
12    Behn?
13  A  **I don't believe so, no.**
14  Q  Who else did you make phone calls to?
15  A  **I would have to -- I believe it's in my details.  I**
16    **would have to check to see specifically, but initially I**
17    **called Officer O'Donnell just to see where the discharge**
18    **paperwork was, and then I made a phone call to Sergeant**
19    **Behn while I was in the sally port.  I don't remember**
20    **any further phone calls at this time.**
21  Q  Were you present when Mr. Thomson was removed from the
22    arrest area back to the sally port area?
23  A  **Yes.**
24  Q  What did you observe about Mr. Thomson prior to him
25    being removed from the arrest area and back to the sally

1    port area?
2  A  **I didn't observe anything of concern, he seemed to be**
3    **communicating with staff, and they wanted more**
4    **clearance, so I was also on the phone at the time so I**
5    **wasn't directly observing him.**
6  Q  Are you aware of whether he was having trouble breathing
7    at that point?
8  A  **I was not made aware of that, no.**
9  Q  Did you see any officers, the Brown County officers
10    physically carry Mr. Thomson from the arrest area to the
11    sally port?
12    MR. KALLIES:  Objection, foundation.
13    MS. BAYNARD:  You can answer the question.
14    THE WITNESS:  I did.
15  BY MR. KATERS:
16  Q  What did you observe about that process?
17  A  **Appeared to be normal, they carried him and put him into**
18    **the back of the squad car.**
19  Q  Was Mr. Thomson supporting any of his own weight at that
20    point?
21    MS. BAYNARD:  Objection, foundation, calls for
22  speculation also.  Go ahead.
23    THE WITNESS:  I couldn't tell.  I wasn't
24  carrying him, so I don't know.
25  BY MR. KATERS:

1  Q  At this point were you monitoring Mr. Thomson?
2  A  **Again, I was on the phone.  I was not monitoring him**
3    **directly.**
4  Q  What were Officers Pineda and Harvath doing at this
5    point?
6  A  **I don't recall.**
7  Q  When Mr. Thomson was brought into the sally port, was he
8    placed on the ground, was he placed in the car?
9  A  **Which time?**
10  Q  Fair enough.  When Mr. Thomson was removed from the
11    arrest area into the sally port to be taken out of the
12    jail, was he placed into the car at that point?
13  A  **I believe so, yes.**
14  Q  Who placed him into the car?
15  A  **Brown County staff.**
16  Q  Was either Officer Pineda or Harvath involved with
17    placing him into the car?
18  A  **I don't recall, again, I was on the phone.**
19  Q  So when you were on the phone, did you make any
20    observation of Mr. Thomson at that point?
21  A  **I did not.  I was not looking at him or observing what**
22    **was going on.  It was my peripheral.  Again, I was on**
23    **the phone communicating with Sergeant Behn.**
24  Q  How long do you think those phone calls took?
25  A  **A few minutes.**

1 Q Ultimately it was determined that Mr. Thomson was not
2 breathing, correct?
3 MS. BAYNARD: Objection, foundation.
4 THE WITNESS: I overheard the jail nurse
5 making a statement that she believed he was possibly
6 having another seizure. At this point I walked over to
7 try and figure out what was going on. He was removed
8 from the squad car. I went to get my AED device and
9 began medical treatment.
10 BY MR. KATERS:
11 Q Did you assist in removing Mr. Thomson from the squad
12 car?
13 A I can't recall.
14 Q Did any other Green Bay Police Department officers
15 assist with removing Mr. Thomson from the car?
16 A Again, I can't recall.
17 Q At this point was it the county jail officers'
18 responsibilities to be handling Mr. Thomson?
19 MR. FLOOD: Object to form.
20 THE WITNESS: At this point I don't know whose
21 responsibility it would have been. I know that we
22 needed to start providing some medical aid, so that is
23 what we did.
24 BY MR. KATERS:
25 Q And how did you provide medical aid?

1 A **Again, I grabbed the AED out of the trunk of my vehicle.**
2 **He was removed from the WRAP device, and we began**
3 **placing the AED pads on him and waiting for it to advise**
4 **whether or not it needed a shock and then CPR began.**
5 Q What did you observe about Mr. Thomson when he was
6 removed from the vehicle?
7 A **At that point I observed that he appeared to be having a**
8 **medical emergency.**
9 Q Was he breathing?
10 A **I couldn't tell.**
11 Q Was he talking?
12 A **No.**
13 Q Was he sweating profusely?
14 A **Again, I don't recall.**
15 Q What did his color look like at that point?
16 A **He appeared to be very pale.**
17 Q Did he have saliva coming out of his mouth?
18 A **I don't know.**
19 Q When was the last time prior to the time when
20 Mr. Thomson was taken out of the car you observed him to
21 be very pale? When was the last time prior to that you
22 were able to observe Mr. Thomson unobstructed?
23 MR. KALLIES: Objection, form.
24 MS. BAYNARD: Same.
25 THE WITNESS: I observed him in the jail

1 booking area. He appeared to be normal, and he was
2 carried to the squad, and again, to the best of my
3 knowledge that I could see he appeared normal.
4 BY MR. KATERS:
5 Q Ultimately somebody called a medical emergency, correct?
6 A **I did.**
7 Q And you called a medical emergency after observing
8 Mr. Thomson not talking, correct?
9 A **Correct.**
10 Q And after you observed Mr. Thomson not breathing,
11 correct?
12 A **Correct.**
13 Q And after you observed him being, I believe you said,
14 very pale?
15 A **Correct.**
16 Q Did you do make the determination to call a medical
17 emergency?
18 A **The jail nurse stated that she didn't believe he was**
19 **breathing, and at that point I felt it was necessary**
20 **that we get further EMS personnel on the scene, yes.**
21 Q So you did make the call?
22 A **Yes.**
23 Q My question was more along the lines, I am not trying to
24 trick you, did somebody instruct you to, or did you say,
25 hey, I need to call a medical emergency?

1 A **No, I contacted emergency medical personnel.**
2 Q When you say you contacted emergency medical personnel,
3 can you walk me through that process? I'm not trying to
4 trick you. Do you contact your dispatch who then does
5 it? Do you call 919? I'm just trying to understand
6 that process.
7 A **We don't call 911. I have my portable radio, and I got**
8 **on my radio and advised dispatch that we had a male in**
9 **the sally port who was PNB, so pulseless, nonbreathing,**
10 **and that we needed emergency EMS personnel 33, which**
11 **just means in an emergency fashion, so as soon as they**
12 **can possibly be there we need them.**
13 Q And then they contact --
14 A **They in turn tell the fire EMS dispatcher, and then that**
15 **dispatcher dispatches EMS personnel. They're a separate**
16 **entity.**
17 Q And when are you trained that you are required to call a
18 medical emergency?
19 A **Anytime that we observe a medical emergency. I observed**
20 **this medical emergency, and I contacted to get further**
21 **EMS personnel.**
22 Q Is there any restrictions on contacting EMS?
23 A **Such as?**
24 Q That is what I'm asking you. Is there any prohibitions
25 against calling for an emergency medical situation?

1 A Not that I'm aware of, no.

2 Q Any officer can do --

3 A Yes.

4 Q In any situation they feel appropriate?

5 A Yes.

6 MS. BAYNARD: Objection, foundation.

7 BY MR. KATERS:

8 Q So your training is in any situation that you feel it's

9 appropriate you can call a medical emergency, correct?

10 A Correct.

11 Q And from the time that the medical emergency was

12 initiated until the time that EMS arrived on the scene,

13 who was attempting to provide Mr. Thomson care?

14 MS. BAYNARD: Objection, form.

15 MR. KALLIES: Foundation. Go ahead.

16 THE WITNESS: It was -- to the best of my

17 recollection it was myself, Officer Pineda, Corporal

18 West and the jail nurse, were the main ones involved in

19 providing the medical care I believe.

20 BY MR. KATERS:

21 Q And I apologize if you testified earlier, but you said

22 at this point you were essentially waiting for the AED

23 to show a shock or not shock?

24 A That is the first step in the process. We -- I took the

25 AED out, applied the pads to his chest and turned the

1 machine -- sorry, Officer Pineda applied the pads to his

2 chest. I turned the machine on. It advises us whether

3 or not a shock is going to be taking place or required.

4 It didn't, and CPR began.

5 Q Did you initiate CPR?

6 A I don't recall who initiated CPR. I don't believe I

7 ever did CPR on him.

8 Q And ultimately EMS arrived and took over the situation,

9 correct?

10 A Yes.

11 Q So is it fair to say the only time you provided any

12 medical care or attempted to provide medical care to

13 Mr. Thomson was after he was removed from the car in the

14 sally port at the jail for the second time, is that

15 fair?

16 A When I was --

17 MR. KALLIES: Objection, form.

18 THE WITNESS: When I was advised of a medical

19 emergency, I began to provide medical care.

20 BY MR. KATERS:

21 Q At no time prior thereto did you attempt to provide any

22 medical care, correct?

23 A Correct.

24 Q At any time prior to calling a medical emergency at the

25 jail, did you attempt to assess Mr. Thomson for a

1 medical emergency?

2 MS. BAYNARD: Objection to the form of the

3 question.

4 THE WITNESS: There was a registered nurse on

5 scene. She was providing all the medical attention. I

6 did not.

7 MS. BAYNARD: Sorry, you're saying when you

8 called for a medical emergency, do you mean when you

9 called EMS?

10 MR. KATERS: Sure.

11 MS. BAYNARD: Okay.

12 BY MR. KATERS:

13 Q Did you see a distinction in my questioning between

14 calling EMS and calling a medical emergency?

15 A I assumed those two were ambiguous in the sense that

16 that is what we do in that situation, we call for

17 emergency medical personnel.

18 MS. BAYNARD: I'm picturing calling out,

19 medical emergency.

20 BY MR. KATERS:

21 Q I'm equating those two things, and you're okay with

22 that, correct? I'm not trying to confuse you.

23 A No, that is how I equate those two. That's what I'm

24 understanding.

25 (Discussion had off record.)

1 MR. KALLIES: Leave it on the record for a

2 second. I'm not sure what we're calling that document.

3 MS. BAYNARD: I think it's a medical clearance

4 form.

5 MR. KALLIES: Medical clearance form from

6 Aurora BayCare records, those Aurora BayCare records

7 were received by us. These are going to qualify as 2681

8 disclosures which was, I guess, I thought the best way

9 to do it. We were all kind of sharing with the other

10 parties I think. The e-mail would also be a prior

11 written authorization, so I thought that is how those

12 documents came about.

13 (Discussion had off record.)

14 (Exhibit No. 25 was marked.)

15 BY MR. KATERS:

16 Q Sir, we've marked Exhibit No. 25 for the record. Can

17 you identify Exhibit 25, please?

18 A It is -- I'm not sure what they title it, we call it a

19 medical clearance form. I believe it is entitled Law

20 Enforcement Request for Medical Clearance Form from, and

21 it is from HSHS, which includes St. Vincent, St. Mary's

22 for today's purposes.

23 Q Just to be clear for the record, we were talking earlier

24 about the medical clearance form, this is the form you

25 had with you, correct?

1  A  This is the form I was given by Sergeant Behn and
2     brought to the jail, yes.
3  Q  And provided to jail staff?
4  A  Correct.
5  Q  And there's a separate document, the discharge
6     instructions that you did not have with you, correct?
7  A  Generally it's a packet of paperwork, but correct, I did
8     not have it with me.
9  Q  It is separate and distinct from this document?
10 A  They are two completely separate things.
11 Q  I believe we marked the report as 22. I will show you
12    what we previously marked and discussed briefly as
13    Exhibit 22. I apologize, you did earlier, but could you
14    identify this document for the record again, please?
15 A  This is my interview with the department or Division of
16    Criminal Investigations which acts as my report in this
17    case.
18 Q  Is this the only interview or report that was done that
19    you're aware of?
20        MR. KALLIES: Objection, form.
21    BY MR. KATERS:
22 Q  Fair enough. Did you give interviews to anybody else
23    except on this particular occasion on February 12th at
24    12:33 p.m.?
25 A  No, this is my only interview that I did, my only

1     report.
2  Q  Did you ever have any discussions with higher ranking
3     officers concerning the incident, the occurrences on
4     February 10th, 2020 -- strike that. I'm not going to
5     confuse you. After this -- go ahead and answer if you
6     want.
7  A  I'm just trying to, in what sense, like the sergeants,
8     lieutenants, I mean, who, like, are you talking about
9     specifically as far as like conversations?
10 Q  I guess any -- the events of the evening or the morning
11    of February 10th, 2020 concluded, correct?
12 A  Yes.
13 Q  And then you had a meeting or an interview with Special
14    Agents Kust and Roffers, correct?
15 A  Correct.
16 Q  Did you have any other meetings with any other employees
17    of the Green Bay Police Department discussing this
18    incident?
19 A  No, not to my knowledge, no.
20 Q  After you had a meeting with Agents Kust and Roffers,
21    were the events of that night ever -- strike that. So
22    after this particular meeting with Agents Kust and
23    Roffers, did you ever have any discussions with
24    anyone at the Green Bay Police Department about this
25    incident?

1  A  Not that I can recall.
2  Q  So from February 12th -- and I will preface this with
3     saying I don't want to know any conversations you talked
4     about with your attorney, but from February 12th, 2020
5     until today, you have only spoken within Agents Kust and
6     Roffers your attorney regarding these events, is
7     that fair?
8  A  Regarding the specifics of the event, yes.
9  Q  When you say the specifics, have you spoken generally to
10    anybody else about it?
11 A  This incident I'm sure has been mentioned in passing,
12    you know, as every -- you know, what happened, oh, I
13    can't really talk about it. Again, it's been brought up
14    or mentioned, but nothing about the specifics, no
15    details that I can recall have ever been shared.
16 Q  And is it fair to say you have received no discipline in
17    regard to the events of the night in question?
18 A  I have not.
19 Q  I'm looking about the third full paragraph here.
20 A  On which page?
21 Q  I'm sorry, on the first page, the second page of the
22    document, the first page of writing. I think you got it
23    there. I'm about, so the third paragraph about halfway
24    down where it states, "PO Vaubel," I'm sorry, am I
25    pronouncing that wrong?

1  A  It's Vaubel.
2  Q  Vaubel, I will do my best, I apologize. "PO Vaubel
3     entered the emergency room and saw PO O'Donnell at St.
4     Vincent and security personnel struggling with Thomson
5     who was on the floor," did I read that correctly?
6  A  Correct.
7  Q  That's an accurate reflection of your memory, correct?
8  A  Yes.
9  Q  Was security staff actively involved in the struggle
10    when you arrived?
11 A  It appeared that they were attempting to assist Officer
12    O'Donnell to the best of my recollection.
13 Q  It goes on to state, "PO Vaubel moved to Thomson's
14    location and advised security personnel to move back
15    which they did," did I read that correctly?
16 A  Yes.
17 Q  And that is correct as well, right?
18 A  To the best of my knowledge, yes.
19 Q  It goes on to state, "PO Vaubel attempted to place
20    handcuffs on Thomson, who was lying face-down," is that
21    correct?
22 A  Yes.
23 Q  It goes on to state that you were aware additional
24    squads were responding so you radio for them to "step it
25    up," did I read that correctly?

1  A   Yes.

2  Q   Why did you want the other units to step it up?

3  A   **As it notes in the next sentence, the more officers we**

4      **have on scene the less force we need to use to maintain**

5      **control of Mr. Thomson, so I wanted officers to get**

6      **there sooner rather than later so that we could, again,**

7      **maintain control of him with as little force as**

8      **possible.**

9  Q   When you were attempting to place the handcuffs on

10     Mr. Thomson before the other officers arrived, was he

11     making any statements at this point?

12         MS. BAYNARD:  Objection, asked and answered.

13     Go ahead.

14         THE WITNESS:  None that I can recall.

15     BY MR. KATERS:

16 Q   Was he breathing heavily at this point?

17 A   **Yes.**

18 Q   Was he sweating at this point?

19 A   **I believe so, yes.**

20 Q   What, if any, conversations did you have with Officer

21     O'Donnell at this point?

22 A   **I don't recall any specific conversations.**

23 Q   It goes on to state, "GB Police Department police

24     officer Alex Wanish arrived and assisted by controlling

25     Thomson's left arm."  It goes on to read, "PO Vaubel

1      took control of Thomson's legs and the officers were

2      able to place handcuffs on Thomson," did I read that

3      correctly?

4  A   **Yes.**

5  Q   And is that an accurate resuscitation of what happened?

6  A   **Yes.**

7  Q   After the handcuffs were placed it states, "Thomson

8      continued to resist and was yelling, 'okay, I will calm

9      down,'" correct?

10 A   **Yes.**

11 Q   Did Mr. Thomson calm down after the handcuffs were

12     placed?

13 A   **No.**

14 Q   And once the handcuffs were placed, what actions of

15     resistance was Mr. Thomson displaying?

16 A   **His body was very tense.  He kept trying to move and get**

17     **up off the ground.  I believe he was attempting to kick**

18     **or flail his legs, which later in the details you can**

19     **see that I attempted to take control of the legs so that**

20     **he could not kick or flail and potentially hurt officers**

21     **or himself.**

22 Q   Then according to the report Sergeant Behn arrived at

23     the scene and you asked Sergeant Behn to help you

24     control Thomson's legs, is that accurate?

25 A   **Correct.**

1  Q   And Sergeant Behn and you crossed Thomson's legs, and

2      then when Thomson's legs were controlled you moved to

3      control Thomson's head, is that correct?

4  A   **Correct.**

5  Q   Why was it important to you to control Thomson's head?

6  A   **So that he didn't hurt himself.  If he's flailing**

7      **around, I don't want him to hit his head on the ground**

8      **or cause himself any pain.**

9  Q   Is there any particular reason you placed your hand over

10     his left ear as opposed to his right?

11 A   **Based on how he was laying on the floor, his face was**

12     **facing that way.**

13 Q   And at this point you attempted to talk to Thomson to

14     calm him?

15 A   **Correct.**

16 Q   So what types of things were you saying to Mr. Thomson?

17 A   **I was telling him that it's okay, to calm down, relax,**

18     **take some deep breaths, you know, to try and just have a**

19     **conversation with him and get a personal connection**

20     **going to attempt to, again, try and get him to calm down**

21     **and stop resisting, stop, you know, trying to fight with**

22     **us.**

23 Q   And it's at this point that Mr. Thomson told you he

24     couldn't breathe, correct?

25 A   **Yes.**

1  Q   Were Officers Behn and Wanish able to hear Mr. Thomson

2      saying he could not breathe?

3          MS. BAYNARD:  Calls for speculation.  Go

4      ahead.

5          THE WITNESS:  I don't recall.  Again, Officer

6      Wanish was there with me and so was Officer O'Donnell

7      and Officer Behn.  I don't know what they heard or

8      didn't hear.

9      BY MR. KATERS:

10 Q   Did you have any discussions with those officers at the

11     time about Mr. Thomson's statement that he couldn't

12     breathe?

13 A   **Not that I can recall.**

14 Q   Your report goes on to say that then Officer Pineda,

15     Officer Harvath and Officer Delsart arrived, correct?

16 A   **Yes.**

17 Q   How much time passed between the time that Mr. Thomson

18     was handcuffed and expressed that he couldn't breathe

19     until the time that Officer Pineda, Harvath and Officer

20     Delsart came on the scene?

21         MS. BAYNARD:  Objection, form.  Go ahead.

22         THE WITNESS:  I don't recall the exact amount

23     of time.

24     BY MR. KATERS:

25 Q   It goes on to state that you suggested using the WRAP

1 and Sergeant Behn agreed?
2 A Correct.
3 Q That's accurate?
4 A Yes.
5 Q At this point when you made the suggestion to use the
6 WRAP, you were not aware of what Mr. Thomson had been
7 hospitalized for, correct?
8 A Correct. Are we turning to the next page?
9 Q Yes. When you and Officer Behn were --
10 MS. BAYNARD: It's Behn.
11 BY MR. KATERS:
12 Q Behn, I'm sorry. When you and Officer Behn were
13 discussing the WRAP, was there any discussion of
14 Mr. Thomson's statement that he could not breathe?
15 A When I was discussing with Sergeant Behn, not that I can
16 recall.
17 Q Who took the lead on applying the WRAP?
18 A I believe it was myself.
19 Q And how many times prior to February 10th, 2020 had you
20 applied a WRAP?
21 A I don't know a specific number. I would say a handful,
22 three, four times.
23 Can I -- on the last question, the three or
24 four times being in the field. Obviously using it in
25 training, there was multiple other training

1 applications, but three or four times in the field.
2 Q I believe I asked you this question, just so we're both
3 on the same page, this is prior to February 10th, 2020,
4 correct?
5 A Correct.
6 Q That you used it three or four times?
7 A Yes.
8 Q It indicates here that you told Thomson to roll onto his
9 back and sit up, is that correct?
10 A I'm just trying to read -- I apologize. Correct.
11 Q And Thomson complied with this request, correct?
12 A Yes, with the assistance of officers we were able to
13 roll him over and put him up into a seated position.
14 Q Had Mr. Thomson's level of compliance improved at this
15 point?
16 A Temporarily.
17 Q He was cooperating with putting on the WRAP at this
18 point, correct?
19 MS. BAYNARD: Objection, form.
20 THE WITNESS: At that point, yes, just prior
21 he had still been trying to kick at officers.
22 BY MR. KATERS:
23 Q It goes on to say, "Once the top portion was in place,
24 Police Officer Pineda clipped the front strap of the top
25 portion of the bottom of the WRAP," is that correct?

1 A Yes.
2 Q And you state at this point Thomson was talking to the
3 officers and his breathing was heavy but unrestricted,
4 is that true?
5 A Correct.
6 Q When the WRAP was clipped and Mr. Thomson was breathing
7 heavy but unrestricted, was he complaining of not being
8 able to breathe at this point?
9 A Not that I recall.
10 Q Was he sweating profusely at this point?
11 A I believe so.
12 Q The next paragraph goes on to state that you assisted
13 with the shoulder straps and assisted taking Mr. Thomson
14 to the squad car, but essentially you didn't participate
15 in actually putting him in the squad car, correct?
16 A Yes.
17 Q And you didn't observe the process of putting him in the
18 squad car, correct?
19 A I was not paying attention to it.
20 Q And you didn't actually observe him in the squad car
21 before the squad left to go to the jail, correct?
22 A I did not.
23 Q It states here that "PO Vaubel told PO Harvath he would
24 follow POs Harvath and Pineda to the jail because
25 Thomson was an uncooperative subject," did I read that

1 correctly?
2 A Yes.
3 Q Was that a determination that you made?
4 A It's an agreement that we came to, but yes, generally
5 when we have somebody who is uncooperative we usually
6 send more than one squad just in case something happens
7 on the way to the jail, there's multiple officers there
8 to be able to deal with whatever that is.
9 Q My question is more along the lines of, and I think you
10 answered it, but Behn didn't order you to go. It was
11 just a determination that you and Officers Pineda and
12 Harvath made that another officer would make sense?
13 A As an officer in that district I felt it was my
14 responsibility to follow them in case they needed
15 assistance.
16 Q We can skip the -- I'm sorry, at the beginning of the
17 next paragraph it states, "The drive to the jail was
18 uneventful and both squads pulled into the sally port,"
19 did I read that correctly?
20 A Correct.
21 Q And it was uneventful, but Mr. Thomson was not in your
22 car, correct?
23 A That is my meaning of it. It was uneventful for me as I
24 had no contact with him. I was just simply following
25 the car in front of me.

1  Q  Fair enough.  It goes on to state, "The officers secured
2     their weapons in the rear of their squads and jail staff
3     took control of moving Thomson, including removing him
4     from the squad," did I read that correctly?
5  A  **Correct.**
6  Q  And that is what occurred, correct?
7  A  **Yes.**
8  Q  And yourself and Officer Harvath and Officer Pineda took
9     a step back and allowed them to do that, correct?
10 A  **Correct.**
11 Q  It goes on to state, "The jail staff moved Thomson to
12    the booking area and one of the jail staff called the
13    jail nurse because Thomson came from a hospital," did I
14    read that correctly?
15 A  **Yes.**
16 Q  Do you know which member of the jail staff called the
17    jail nurse?
18 A  **I do not.**
19 Q  Did one of the members of the jail staff tell you that
20    night the reason they called the jail nurse was because
21    he came from the hospital?
22 A  **Every time we receive or bring somebody who has been**
23    **medically cleared from a hospital they contact the jail**
24    **nurse.**
25 Q  So that statement is an assumption based on?

1  A  **Standard operating procedure.**
2  Q  Okay.  Is goes on to state, "The nurse asked for the
3     documents from St. Vincent and checked Thomson's
4     vitals," did I read that correctly?
5  A  **Yes.**
6  Q  Did she ask for the documentation?
7  A  **I believe she asked Corporal West, and I had already**
8     **previously given him that paperwork or I told him I had**
9     **it.**
10 Q  It goes on to say, "The nurse also checked Thomson's
11    vital signs," is that accurate?
12 A  **I believe so, yes.**
13    MR. KALLIES:  Objection, calls for
14    speculation.
15    BY MR. KATERS:
16 Q  Did you observe the nurse check Mr. Thomson's vital
17    signs?
18 A  **I observed the nurse doing what appeared to be an**
19    **initial medical evaluation of him which includes**
20    **checking vital signs.**
21 Q  It also indicates here that you called the St. Vincent
22    charge nurse, Sue Allen?
23 A  **Correct, I had called her as I didn't have the full**
24    **discharge paperwork.  That was the phone call I had been**
25    **forgetting earlier.  I contacted her and then**

1     subsequently Officer O'Donnell.
2  Q  It goes on to state that, "Allen said St. Vincent
3     treated Thomson for seizures because Thomson had not
4     taken his medication," did I read that correctly?
5  A  **Correct.**
6  Q  Was that the first time you became aware that Thomson
7     was at the hospital originally because he was suffering
8     from seizures?
9  A  **Correct.**
10 Q  Was Mr. Thomson's medical diagnosis or medical condition
11    something that was to be considered before placing him
12    into a WRAP?
13    MS. BAYNARD:  Objection, form.  Go ahead.
14    THE WITNESS:  Medical treatment can be
15    provided to somebody who is in the WRAP, so no, it was
16    not considered because he could still be in the WRAP and
17    receive medical care.
18    BY MR. KATERS:
19 Q  I understand that.  My question is:  Is it one of the
20    considerations when you're determining whether to place
21    him into a WRAP, is one of those considerations their
22    recent medical history?
23 A  **I believe it could be one of those, but he was**
24    **uncooperative at the time and we wanted to get him fully**
25    **restrained so that he could not hurt himself or anyone**

1     **else.  That was our main concern.**
2  Q  So it looks like you also spoke to police officer -- oh,
3     I apologize.  I don't mean to skip ahead.  It goes on to
4     state, "The jail nurse and jail staff were not satisfied
5     and asked that officers return Thomson to a hospital and
6     have him re-cleared," did I read that correctly?
7  A  **Yes.**
8  Q  I believe you testified earlier that jail staff and the
9     jail nurse communicated that to you and the other
10    officers generally, correct?
11 A  **Yes.**
12 Q  You don't recall if they said it specifically to you or
13    as a group?
14 A  **No, I was just -- I believe it was a general**
15    **conversation of, this is what they wanted to happen.**
16 Q  Were you permitted at this point -- strike that.  Was
17    there anything stopping you at the point where the jail
18    staff and the jail nurse wanted Mr. Thomson removed and
19    taken to a hospital from calling in a medical emergency
20    at that point?
21    MS. BAYNARD:  Objection to form of the
22    question, foundation.  Go ahead.
23    THE WITNESS:  At no point did I or did anyone
24    tell us he was having a medical emergency, nor did I see
25    him having a medical emergency.

BY MR. KATERS:

1 Q It goes on to state, "The jail staff lifted Thomson, who
2 will was still in the WRAP and handcuffed by the straps
3 and placed Thomson back into PO Harvath's squad,"
4 correct?
5 A Correct.
6 Q And at this point -- well, strike that. The report goes
7 on to state that you "called Police Officer O'Donnell
8 and said they needed the discharge form because they
9 were taking Thomson to Aurora Bay Medical Center," did I
10 read that correctly?
11 A Correct.
12 Q Why did you need the discharge form if you were taking
13 Mr. Thomson to Aurora Bay Medical Center?
14 A Well, we were taking Mr. Thomson to a separate medical
15 facility. The discharge paperwork to my knowledge has
16 information about what medical procedures were performed
17 at St. Vincent. I believe it would be good information
18 for Aurora to have, this is what St. Vincent did or
19 provided for this person, so I would assume that they
20 would want that.
21 Q Are you required to provide Aurora that information
22 prior to them treating Mr. Thomson?
23 A I don't believe we were -- I don't believe we were
24 required. I think it's just a courtesy to say, hey,

1 this is what he was seen for at this other hospital.
2 Q And it goes on to state that you "called Sergeant Behn
3 and updated him regarding Thomson's anticipated
4 conveyance to ABC," did I read that correctly?
5 A Yes.
6 Q What do you recall about that conversation with Sergeant
7 Behn?
8 A I recall that I advised him the jail staff and the nurse
9 was requesting that he be taken to a different hospital
10 for further evaluation and that we were going to be
11 transporting him to Aurora.
12 Q What is your estimate of how long those phone calls
13 took -- strike that. Did you make those phone calls to
14 Police Officer O'Donnell and to Sergeant Behn in the
15 sally port area?
16 A I believe so, yes.
17 Q Approximately how long did those phone calls take?
18 A A few minutes.
19 Q It goes on to state, "When PO Vaubel disconnected, he
20 noticed the doors of PO Harvath's squad were still open
21 and he heard the jail nurse say she thought Thomson was
22 having another seizure," how long was Mr. Thomson in the
23 back of the squad car in the sally port after being
24 removed from the arrest area before the nurse said she
25 thought Thomson was having another seizure?

1 A I don't know the exact time.
2 Q Do you know who was monitoring Mr. Thomson during that
3 time period?
4 A I believe it was the jail nurse as well as Officer
5 Pineda and potentially jail staff as well.
6 Q And you had no contact with Mr. Thomson because you were
7 making phone calls, correct?
8 A Correct, I was a significant distance away making phone
9 calls.
10 Q It goes on to state, "The staff removed Thomson from the
11 squad and placed him on the floor," is that something
12 you observed.
13 A Yes, as I stated, I noticed the doors were still open
14 and that she made a statement, they removed him from the
15 squad car.
16 Q What did you -- what, if anything, did you notice about
17 Mr. Thomson's demeanor when he was removed from the
18 squad car and placed on the floor?
19 A As I previously stated, he appeared to be pale and
20 possibly having a medical emergency.
21 Q Was he speaking at that point?
22 A Not that I can recall.
23 Q Was he sweating at that point?
24 MS. BAYNARD: Objection, asked and answered.
25 Go ahead.

1 THE WITNESS: Again, not that I can recall at
2 that point.
3 BY MR. KATERS:
4 Q So at that point when you're assisting moving -- or,
5 strike that. At that point when Mr. Thomson is being
6 removed from the car, how long prior to that had it been
7 since you heard Mr. Thomson verbalize any words?
8 A Personally I only heard him speaking in the booking
9 area, but through peripherals it appeared he was having
10 a conversation with the nurse in the back of the squad
11 car.
12 Q It goes on to state, "PO Vaubel removed the straps of
13 the upper portion of the WRAP and noticed Thomson was
14 not saying anything," did I read that correctly?
15 A Yes.
16 Q And that was the first time you noticed Mr. Thomson
17 couldn't verbalize his words, correct?
18 MS. BAYNARD: Objection, form, foundation. Go
19 ahead.
20 THE WITNESS: Correct.
21 BY MR. KATERS:
22 Q Why was the WRAP removed at this point?
23 A So that we could provide emergency medical care with the
24 AED as well as potentially CPR.
25 Q Whose decision was it to remove the WRAP?

1  A  I think it was a group decision.  It was just -- I don't
2     think anybody said we need to remove this.  I think it
3     was just a collective, we're going to get this off.
4  Q  And who was that collection of people at that point?
5  A  Again, I believe it was myself, Officer Harvath and
6     Officer Pineda, a member of jail staff and the RN.
7  Q  If skip down to paragraph it goes on to state, "PO
8     Vaubel radioed that Thomson was not breathing and called
9     for an ambulance," did I read that correctly?
10  A  Correct.
11  Q  And that was after you observed that he was not saying
12     anything, correct?
13  A  That was after we applied the AED and began CPR.
14  Q  You observed he was not saying anything, then you
15     applied the AED and got the no shock and then you called
16     for an emergency, correct?
17  A  Yes.
18  Q  You said -- it goes on to state, "Rescue arrived within
19     minutes," is that accurate?
20  A  Yes.
21  Q  When the rescue unit arrived, what did you do?
22  A  I stood by.  I got out of their way and let them do what
23     they needed to do.
24  Q  And then it goes on to state that -- strike that.  I
25     apologize.  Where is the rescue crew from, if that makes

1     sense to you?
2  A  If you are asking who they're employed by, the City of
3     Green Bay, Green Bay Fire and EMS services.
4  Q  And you were directed or ordered to follow the ambulance
5     to ABC, correct?
6  A  Yes.
7  Q  It states in your report by the time you arrived at ABC,
8     the hospital staff had pronounced Thomson deceased, is
9     that correct?
10  A  Correct.
11  Q  Were you following the ambulance directly behind it?
12  A  I was within -- I was within close proximity.
13  Q  So did you arrive contemporaneously with the ambulance?
14  A  I arrived shortly after they did.  I wouldn't say I was
15     directly with them.  It was a short period of time
16     afterwards, and they moved him inside and I was still
17     out in the ambulance bay, sally port.
18  Q  By the time you walked inside and gathered information,
19     he was pronounced deceased?
20  A  Correct, by the time I had walked into the actual
21     emergency room.
22        (Exhibit No. 26 was marked.)
23  BY MR. KATERS:
24  Q  Sir, I want to show you what's been marked as
25     Exhibit 26.  Take a minute to review it or peruse it and

1     identify it for the record, please.
2  A  This is Policy 300, Use of Force.
3  Q  Was this the policy -- was this policy in place on
4     February 10th, 2020?
5  A  To the best of my knowledge, yes.
6  Q  If I can call your attention to what is Bates stamped
7     GB922, it's the second-from-the-last page under Medical
8     Considerations, the last full paragraph states, "Persons
9     who exhibit extreme agitation, violent irrational
10     behavior accompanied by profuse sweating, extraordinary
11     strength beyond their physical characteristics and
12     imperviousness to pain, or who require a protracted
13     physical encounter with multiple officers to be brought
14     under control, may be at an increased risk of sudden
15     death," did I read that correctly?
16  A  Correct.
17  Q  Is it true that Mr. Thomson had a protracted physical
18     encounter with multiple officers?
19  A  Correct.
20        MS. BAYNARD:  Objection, form.
21  BY MR. KATERS:
22  Q  It goes on to state, "Calls involving these persons
23     should be considered medical emergencies," did I read
24     that correctly?
25  A  Correct.

1  Q  Was the call with Mr. Thomson considered a medical
2     emergency?
3  A  To our knowledge he had already received medical
4     clearance from the hospital, and they said there was
5     nothing else they could do for him.
6  Q  So was the call considered a medical emergency?
7        MS. BAYNARD:  Asked and answered.  Go ahead.
8        THE WITNESS:  Again, in this -- per the
9     policy, he was already seen by medical staff and they
10     stated they had no further care for him, so I don't
11     believe it was considered a medical emergency.
12  BY MR. KATERS:
13  Q  It's your testimony that the medical staff observed the
14     entire interaction with Mr. Thomson?
15  A  Yes, they did.
16  Q  So the medical staff determined that there was no
17     further need to provide any medical care?
18  A  Correct.
19  Q  And you didn't request they provide any medical care,
20     correct?
21  A  I did not.
22        MR. KATERS:  Why don't you give us four or
23     five minutes?
24        (A recess was taken.)
25        EXAMINATION

BY MR. KALLIES:

1 Q So I'm not going to, you know, rehash any of the stuff
2 that has already been asked to you. I am just going to
3 try to feed off of some of the questions that were
4 already asked and maybe ask some follow-ups. Is it your
5 understanding that from the time that Mr. Thomson was
6 placed into the WRAP device until he was removed from
7 the WRAP device in the sally port at the Brown County
8 jail, that at any point throughout then, was he ever
9 left unattended by either a member of the Green Bay --
10 well, was he ever left unattended by a member of the
11 Green Bay Police Department?
12 A **Not that I recall.**
13 Q You were asked I think a series of questions kind of
14 chronologically following throughout the night about
15 Mr. Thomson saying either I can't breathe or he was
16 complaining that he couldn't breathe, do you recall
17 those questions?
18 A **Yes.**
19 Q Based on your recollection and sitting here today, do
20 you think that those comments were consistent with
21 someone who would have been saying that as a negotiating
22 tool to be removed from the WRAP as opposed to someone
23 who was legitimately having trouble breathing?
24 MR. KATERS: Objection, calls for speculation.

1 Go ahead.
2 THE WITNESS: I believe so in the situation,
3 but still took it seriously and confirmed that there was
4 no visible restrictions on his breathing.
5 BY MR. KALLIES:
6 Q Right. And is it fair to say that that is, you know,
7 I'm not going to say one of the primary purposes, but
8 that the WRAP device specifically is meant to not cause
9 restrictions to breathing, is that true?
10 MR. KATERS: Object to foundation. Go ahead
11 and answer.
12 THE WITNESS: Based on my training, yes.
13 BY MR. KALLIES:
14 Q Do you have any insight into when that medical clearance
15 form that was signed off I believe by Dr. Gerwing,
16 G-E-R-W-I-N-G for the record, Christopher K. Gerwing,
17 M.D., do you have any recollection or understanding as
18 to when kind of throughout the process or the course of
19 the night, when this was obtain understand?
20 A **I do not. I had no involvement in obtaining it.**
21 Q Okay. And who obtained this?
22 A **Based on what I can see it was Sergeant Behn.**
23 Q Okay. And then earlier you discussed I think some
24 documents that Officer O'Donnell had acquired as well,
25 is that true?

1 A **Yes.**
2 Q What documents were those?
3 A **To my knowledge he had acquired after we left the**
4 **discharge paperwork from the hospital which generally**
5 **includes personal information and some of the tests and**
6 **things that they run at the hospital. It's not my -- I**
7 **don't have a great understanding of what is all in**
8 **there.**
9 Q You don't have a great understanding of what was in the
10 document that O'Donnell obtained, or just generally?
11 That's my question.
12 A **Generally speaking I am not a medical professional.**
13 **That paperwork is given to everyone who is discharged**
14 **from the hospital. It is a basic summary, is my**
15 **understanding of the care that was provided.**
16 Q Okay. Have you on occasion obtained that document for
17 an arrestee you were taking to the Brown County jail?
18 A **On occasion, yes.**
19 Q I'm referring not to the Law Enforcement Request for
20 Medical Clearance, but whatever the discharge packet, is
21 the way we're referring to it, you've obtained those
22 before?
23 A **Yes.**
24 Q Am I understanding correctly that it's not like this,
25 it's not a pre-prepared form that is filled out, true?

1 A **Correct.**
2 Q It's essentially just the documentation that would have
3 been generated by the hospital throughout the arrestee's
4 hospital course, true?
5 MR. KATERS: Objection to foundation.
6 MS. BAYNARD: Objection. Go ahead and answer.
7 THE WITNESS: I believe so, yes.
8 BY MR. KALLIES:
9 Q Do you know what is specifically included in the
10 discharge paperwork?
11 MS. BAYNARD: Same objection. Go ahead.
12 THE WITNESS: I generally don't look at them.
13 The first page I see has some basic vitals and height
14 and weight. That is generally as far as I look into it.
15 BY MR. KALLIES:
16 Q Okay. Do you understand that, or do you understand that
17 it's the policy of the Green Bay Police Department to
18 obtain the Law Enforcement Request for Medical Clearance
19 as well as discharge paperwork before you would take an
20 arrestee to the Brown County jail?
21 MS. BAYNARD: Objection to the form of the
22 question. Go ahead.
23 THE WITNESS: That is the general operating
24 procedure, to have both the clearance form and the
25 discharge paperwork to provide to the nursing staff.

BY MR. KALLIES:

Q   And do you know what purpose the discharge paperwork
would serve for the personnel at the Brown County jail?

        MS. BAYNARD:  Foundation.  Go ahead.

        THE WITNESS:  I do not, I'm not a medical
professional.

BY MR. KALLIES:

Q   Is it true that in the usual kind of, you know, course
of arresting someone to the extent these medical
clearance forms would be -- either the medical clearance
forms or discharge paperwork would be required, is the
series of events usually that you would go attempt to
arrest someone or for whatever reason have an
altercation with someone who is being arrested and then
after that you would take them to the hospital and then
to the jail?

A   **That is the general course of action.**

Q   Okay.  What I'm getting at it is, it is probably
somewhat unique that Mr. Thomson was actually arrested
at the hospital, true?

A   **Correct, that is a very unique situation.**

Q   Is it your understanding as you sit here today that the
medical providers who actually provided medical care to
Mr. Thomson in fact witnessed him in the altercation
with the Green Bay Police Department?

A   **Yes.**

Q   And throughout the course of your dealings with
Mr. Thomson physically within the St. Vincent facility,
within the building, did any of those medical providers
ever express to you any concern about Mr. Thomson
undergoing a medical emergency?

A   **No.**

Q   Did they express to you anything, did they express any
of their concerns to you about his medical condition, I
will say, prior to him being taken to the squad cars
after being placed in the WRAP?

A   **No.**

Q   Okay.  And to be clear, I'm talking about while he was
at St. Vincent, right?

A   **Correct.**

Q   Do you know, is the Brown County jail obligated to
accept any arrestee that the Green Bay Police Department
brings into their facility?

        MS. BAYNARD:  Objection, foundation.  Go
ahead.

        THE WITNESS:  It's their discretion as far as
I'm aware.

BY MR. KALLIES:

Q   You acknowledge that there is a process by which an
arresting agency brings in the arrestee to the jail and

then there's, you know, an evaluation, a booking process
that then occurs, true?

A   **Correct.**

Q   In other words, you don't just pull up the door, open
your door, push the arrestee out and then drive away,
right?

A   **Correct.**

Q   You've I think cumulatively already responded to this,
but I'm going to ask the question just more
straightforward because I just want a clean answer for
the record hopefully, throughout your course of dealing
with Mr. Thomson on February 9th, morning I guess of
February 10th, at what point do you believe, I guess if
it did occur, at what point do you believe a medical
emergency occurred with Mr. Thomson?

A   **I believe it occurred in the rear of the patrol squad
the second time he was in the sally port when jail staff
had brought him back from the booking area into the
squad car.**

Q   Not before that?

A   **Correct.**

Q   If you would have witnessed something that would qualify
as a medical emergency prior to that time, would you
have done anything?

        MR. KATERS:  Objection, form.

        MS. BAYNARD:  You can answer.

        THE WITNESS:  Yes.

BY MR. KALLIES:

Q   What would you have done?

A   **Provided emergency medical attention, it would depend on
the situation.**

Q   At some point throughout the testimony you were kind of
reading through your statement I believe.  I just want
to get a couple clarifications here.

        MS. BAYNARD:  Exhibit 22.

BY MR. KALLIES:

Q   So Exhibit 22, and I think specifically -- I'm not
seeing it in here, maybe you can point me to it.  I
thought at some point we read from here that the jail
nurse said that she had witnessed Mr. Thomson having a
seizure while he was in the back of the squad car.

A   **I believe it's on the last -- the last paragraph of the
second-to-last page, GB00060, again, on the last
paragraph there.**

Q   Okay.

        MS. BAYNARD:  The last paragraph, second
sentence.

BY MR. KALLIES:

Q   All right.  So your statement is basically that, I'm
reading the first person, you heard the jail nurse say

1 that she thought Thomson was having another seizure, and
2 again, this was when he was placed back into the squad
3 car to get re-cleared. So I guess my only question is
4 just, because I'm here representing that nurse, do you
5 know verbatim is that what she said?
6 A **I can't tell you verbatim. What I recall is hearing her**
7 **say, I believe or I think he's having another seizure,**
8 **something to that effect.**
9 Q Okay. And so taking a step back now, going back to when
10 he's removed from the intake area to the sally port and
11 placed in the back of a squad car, do you recall where
12 the jail nurse was, if you do -- well, take a step back.
13 When Mr. Thomson is taken from the intake area and
14 placed back into the squad car to be re-cleared, do you
15 have eyes on the sally port or the squad car he was
16 being loaded into?
17 A **From a general perspective, yes.**
18 Q Can you hear what is going on by the squad car?
19 A **No.**
20 Q Do you know where the jail nurse would have been located
21 at that point?
22 A **To my recollection she was still in close proximity to**
23 **Mr. Thomson.**
24 Q Okay. But you don't recall if -- strike that. Do you
25 know, was she having a conversation with Mr. Thomson?

1 MS. BAYNARD: Foundation, go ahead.
2 THE WITNESS: It appeared so. At one point I
3 recall that it appeared she was like almost halfway into
4 the squad having a conversation with him, but I again
5 cannot hear or see what the interaction is.
6 BY MR. KALLIES:
7 Q Okay. While they were still in the intake area, did you
8 witness the nurse communicating with Mr. Thomson?
9 A **Yes.**
10 Q Did it appear as though when Mr. Thomson was then
11 removed from the intake area and taken back to the
12 squad, did it appeared the nurse was continuing on
13 with a course of communication with Mr. Thomson
14 throughout this time?
15 A **It appeared she was in close proximity to him. Again,**
16 **it did appear she was talking to him, but I can't tell**
17 **you what was said or what was happening.**
18 Q Okay. You couldn't tell me if Mr. Thomson was
19 communicating with her at that point?
20 A **I couldn't. I was on the phone.**
21 Q Okay.
22 MR. KALLIES: That is all the questions I
23 have.
24 EXAMINATION
25 BY MR. FLOOD:

1 Q I just have a couple of follow-up questions on some of
2 your earlier testimony. Earlier I believe you testified
3 something to the effect of when the Green Bay officers
4 were bringing Mr. Thomson to the Brown County jail they
5 were attempting to turn over custody of Mr. Thomson to
6 Brown County, is that accurate?
7 A **Correct.**
8 Q Is it also your testimony that Brown County jail
9 accepted custody of Mr. Thomson?
10 A **They were in the process of accepting. I believed at**
11 **that point they took custody of him when they brought**
12 **him out of the car and brought him into the jail booking**
13 **area with no assistance from the Green Bay Police**
14 **Department.**
15 Q At that time was Mr. Thomson still in the WRAP?
16 A **Yes.**
17 Q And that was the WRAP that belonged to Green Bay?
18 A **Correct.**
19 Q That was put on by Green Bay officers?
20 MS. BAYNARD: Asked and answered. Go ahead.
21 THE WITNESS: Correct.
22 BY MR. FLOOD:
23 Q Was Mr. Thomson in handcuffs at that point?
24 A **Yes.**
25 Q And those handcuffs were City of Green Bay police

1 handcuffs?
2 A **Yes.**
3 Q Were they the handcuffs that were assigned to you?
4 A **I don't believe so.**
5 Q Do you know, did Brown County have any keys for those
6 handcuffs?
7 A **Handcuff keys are ubiquitous, they're able to be used**
8 **interchangeably. They have their own cuff keys that**
9 **work on all of their handcuffs.**
10 Q So they could have taken off the handcuffs if they
11 wanted to?
12 A **Yes.**
13 MS. BAYNARD: We should keep that portion of
14 the deposition sealed if we file this.
15 (Discussion had off record.)
16 BY MR. FLOOD:
17 Q As far as the Brown County's process of taking custody
18 of an arrestee, is that a process that you were trained
19 on?
20 A **No.**
21 Q Are you aware if it's contained in any Brown County
22 policy?
23 A **Am I aware of Brown County policy, I am not.**
24 Q Okay. So are you aware if that process involves an
25 evaluation of the arrestee and whether Brown County is

1 willing to actually accept custody?
2     MS. BAYNARD: Objection, form and asked and
3 answered.
4     THE WITNESS: Again, I have no ability to look
5 or review their policy, nor do I have obligation to be
6 familiar with their policy. I don't know what it says
7 specifically regarding their intake process. I can only
8 speak to what I have seen.
9 BY MR. FLOOD:
10 Q So with respect to Mr. Thomson, without that background,
11 foundational knowledge of Brown County's intake process
12 and evaluation, is it fair to say that the only way that
13 you would have known that Brown County accepted custody
14 of Mr. Thomson is one of the Brown County staff informed
15 you of the same?
16     MS. BAYNARD: Objection, form, compound. Go
17 ahead.
18     THE WITNESS: When we bring somebody in who is
19 uncooperative and we enter into the sally port we don't
20 have any contact with them whatsoever. From the point
21 they enter into the jail, it is the Brown County jail
22 staff's entire process. They come out. They deal with
23 them. They bring them in. They remove them from all of
24 their restraints, and ultimately they have the final
25 decision on whether or not they're accepting custody.

1 Q Prior to that final decision as to custody, if that
2 decision hadn't been made, how could Brown County have
3 custody of somebody?
4     MR. KATERS: Objection, calls for a legal
5 conclusion.
6     MS. BAYNARD: You can answer.
7     THE WITNESS: Again, I can't speak to their
8 decision-making process, but in this unique situation
9 when it is dealing with somebody who is uncooperative,
10 the second we enter into that, we have all hands off.
11 They make the final decision, and again, they control
12 the entire situation. We have no say in what happens
13 after that point.
14 BY MR. FLOOD:
15 Q At some point Corporal West told you and other Green Bay
16 officers that Brown County was not accepting custody,
17 correct?
18 A **We were being told that they were requiring further**
19 **medical clearance, yes.**
20 Q Before they would accept custody?
21 A Correct.
22 Q You have answered this a bunch of times, I'm not trying
23 re-ask you it, but you've given a specific time as to
24 when you considered Mr. Thomson's condition to be a
25 medical emergency, do you remember answering those

1 questions?
2 A **I do.**
3 Q Was that after Corporal West had told you that Brown
4 County would not accept custody?
5 A **Yes.**
6     MR. FLOOD: That's all the questions I have.
7     EXAMINATION
8 BY MS. BAYNARD:
9 Q I have a few. I believe you answered the question of,
10 you were asked whether or not the WRAP restricts
11 breathing, and you answered that it did not restrict
12 breathing, do you recall that testimony?
13 A **Yes.**
14 Q What is that based on? What is your understanding of
15 where you're getting that information that being placed
16 in the WRAP does not are restrict somebody's breathing?
17 A **I have used it in the field several times as well as I**
18 **have had it placed on myself. In training I have been**
19 **put into the WRAP multiple times, and at no point does**
20 **it ever restrict any of my breathing when I have been**
21 **put into it, as well as training we receive specifically**
22 **talks about how it does not restrict breathing.**
23 Q Okay. And you've had the WRAP applied to you in
24 training, correct?
25 A **Correct.**

1 Q Okay. Did you watch the WRAP as it was applied to
2 Mr. Thomson during the incident in question?
3 A **Yes.**
4 Q Based on your training, do you believe the WRAP was
5 applied correctly?
6 A **Yes.**
7 Q We've have talked about this medical clearance form. So
8 are you familiar with this form, not this specific form
9 that is in Exhibit 25, but have you on occasion had a
10 chance to obtain medical clearance for an arrestee
11 before?
12 A **Yes.**
13 Q Okay. And if you look at this, it was signed by
14 Dr. Gerwing, have you on occasion had a chance to have
15 Dr. Gerwing sign off to medically clear a person that
16 you will be transporting?
17 A **Yes.**
18 Q If you look under Provider Medical Stability Exam, and
19 you see there is kind of three boxes with three options,
20 do you see where I'm directing you to?
21 A **Yes.**
22 Q Which box is checked?
23 A **The second box.**
24 Q What does the second box, can you read it out loud?
25 A **Patient Uncooperative. To the best of my knowledge a**

1     medical emergency does not exist."

2 Q   What did that -- and I don't know if you know whose

3     signature that is, but do you believe that it was

4     Dr. Gerwing who signed that understand provider

5     signature?

6 A   **To the best of my knowledge I believe so, yes.**

7 Q   And he would have checked that box, "Patient

8     Uncooperative. To the best of my knowledge a medical

9     emergency does not exist," do you agree?

10 A   **Yes, I believe so.**

11 Q   What does the phrase, To the best of my knowledge a

12     medical emergency does not exist," what did that

13     indicate to you specific to Mr. Thomson's situation?

14 A   **That he had been seen by a medical professional, a**

15     **doctor, and that the doctor stated there was no medical**

16     **emergency in this case.**

17 Q   Okay. And this is prior to transporting Mr. Thomson

18     from the hospital, correct?

19 A   **Yes.**

20 Q   And Christopher Gerwing is an M.D., are you an M.D.?

21 A   **No.**

22 Q   And beyond the doctor affirming that Mr. Thomson was not

23     experiencing a medical emergency, based off of your

24     observations and interactions Mr. Thomson specifically

25     at the time he's cleared and ready to go, was there any

1     indication that the doctor was wrong?

2 A   **No.**

3 Q   Okay. Did you observe anything from Mr. Thomson that

4     made you think, I should tell the doctor, no, check him

5     again?

6 A   **No.**

7 Q   Okay. And if the doctor would have said as you guys

8     were escorting Mr. Thomson out the door, hey, actually

9     bring him back, take the WRAP off, let me check him one

10     more time, would you have listened to the doctor?

11     MR. KATERS: Objection as to leading, but go

12     ahead and answer.

13     BY MS. BAYNARD:

14 Q   You can answer.

15 A   **Yes, we would have.**

16 Q   And not only did you, I believe you testified that you

17     confirmed that Mr. Thomson was medically cleared prior

18     to the WRAP being on, but after the WRAP was placed you

19     were in consistent dialogue with Dr. Gerwing, and did

20     you say a nurse named Chelsea?

21 A   **Yes.**

22 Q   They were around when this was going on, okay.

23     MR. KATERS: I am going to -- sorry, I didn't

24     mean to interrupt your question.

25     BY MS. BAYNARD:

1 Q   So at that specific time period did either of them say,

2     we think he's experiencing a medical emergency, don't

3     transport him, he's not safe to be transported?

4     MR. KATERS: Object to the form of the

5     question, misstates his prior testimony and it's

6     leading. Go ahead.

7     BY MS. BAYNARD:

8 Q   You can answer.

9 A   **No.**

10 Q   Is it your understanding that, and I'm going to ask more

11     general and then we'll go specific, if somebody has a

12     medical clearance form, is it your understanding that

13     prior to this medical clearance they've been evaluated

14     by staff? This is a form for St. Vincent, so that St.

15     Vincent staff, medical staff has evaluated them?

16 A   **Yes.**

17 Q   And in this specific situation was it your understanding

18     that St. Vincent's medical staff had monitored,

19     evaluated Mr. Thomson for a period before Green Bay

20     Police Department was dispatched?

21 A   **Yes.**

22 Q   Do you know how long he was at the hospital before you

23     guys were dispatched?

24 A   **I do not.**

25 Q   Now, you're dispatched, and I'm not going to -- we've

1     already talked about your statement. One of the things

2     you testified about was when you arrived and you radioed

3     to step it up, correct, at some point you radioed that

4     you want additional officers to step it up?

5 A   **Correct.**

6 Q   At that time was it just you and Officer O'Donnell at

7     the hospital?

8 A   **Yes.**

9 Q   Okay. And you testified that you radioed to step it up

10     because you wanted additional officers on scene so less

11     force would be necessary to control Thomson, do you

12     recall that testimony?

13 A   **Yes.**

14 Q   When you're at the hospital with just you and Officer

15     O'Donnell and you radioed step it up, at that time did

16     you believe just and Officer O'Donnell could control

17     Thomson?

18 A   **No.**

19 Q   Okay. While Mr. Thomson is -- you're attempting to take

20     him, I think you said attempting to take him into

21     custody, you used -- did you use precautions to make

22     sure that Mr. Thomson was safe?

23 A   **Yes.**

24 Q   I believe you testified that you put your hand over his

25     left ear to make sure his head, to hold his head steady,

1  do you recall testifying to that?

2  A  **Correct.**

3  Q  Did you take action so that Mr. Thomson wouldn't injure

4  himself?

5  A  **Yes.**

6  Q  And at some point the decision was made to place

7  Mr. Thomson in the WRAP device, why, why was the

8  decision made to place Mr. Thomson in the WRAP device?

9  A  **The device allows us to maintain control of the subject**

10  **and to keep them from hurting themselves or anyone else.**

11  Q  Okay. So it's not just to the keep him from kicking

12  officers, it's to keep Mr. Thomson from hitting his head

13  on the linoleum floor?

14       MR. KATERS: Objection, leading. Go ahead.

15  BY MS. BAYNARD:

16  Q  You can answer.

17  A  **Correct.**

18  Q  Sorry. In your statement you indicated you bring him,

19  the jail nurse says, we're not satisfied, he needs to

20  get re-cleared. You then are going to take him to

21  Aurora BayCare Medical Center. I'm just curious, why

22  would he go to Aurora BayCare Medical Center and not

23  back to St. Vincent?

24  A  **It's our understanding in cases like this that the jail**

25  **nurse would like further medical clearance, it doesn't**

1  **really make sense to bring them back to the facility**

2  **they were already at, instead to bring them to a new**

3  **facility that can do a new medical evaluation to the**

4  **complete and best of their ability.**

5  Q  Okay. In this circumstance were you -- I guess when

6  you're dispatched, are you aware that, I think you said

7  for a disturbance, when you arrive on scene, do you

8  learn at any point, I guess, anymore details relating to

9  what this disturbance was?

10  A  **Not that I can recall specifically.**

11  Q  Okay. And I guess to tie my question up, I meant, is

12  there a reason not to take -- is one of the, I guess,

13  considerations into where to take Mr. Thomson, or not

14  even Mr. Thomson, anybody who has been kicked out of a

15  hospital, to not bring them back to the same hospital

16  they've been kicked out of?

17  A  **That would make sense, yes.**

18  Q  Okay. We've already -- you've already testified about

19  the time, I am going to break up this up to two time

20  periods, the time at the hospital, he's medically

21  cleared, now, when you get to the Brown County jail, you

22  made it clear when there was a medical emergency, but

23  when you're in the booking room did any of the Brown

24  County staff or the jail nurse say, I think Mr. Thomson

25  is experiencing, or he's experiencing a medical

1  emergency?

2  A  **No.**

3  Q  Did anyone ever look at you and say, call 911 right now?

4  A  **No.**

5  Q  And I believe your testimony was that you were not,

6  like, hands-on during this process, right, they were

7  evaluating him. You weren't responsible for evaluating

8  him?

9  A  **Correct.**

10  Q  And you've had some observations of Mr. Thomson although

11  you weren't, like, the person hands-on with him,

12  correct?

13       MR. KATERS: I'm going to object to leading.

14  BY MS. BAYNARD:

15  Q  You have to answer yes or no, you can't shake your head.

16       MR. KATERS: At some point you have to stop

17  testifying for him, but --

18       THE WITNESS: Yes.

19       MR. KATERS: I am going to object to the whole

20  line as leading at this point.

21  BY MS. BAYNARD:

22  Q  Did you based on your observations up until the point

23  you've already testified that you believed it was a

24  medical emergency, I think I should call -- I'm saying

25  911, emergency medical response?

1  A  **No.**

2  Q  Okay. Would you agree that Mr. Thomson was fighting

3  with officers at the hospital?

4  A  **Yes.**

5  Q  Have you in your experience as a police officer been in

6  a position to have struggles to restrain noncooperative

7  individuals?

8  A  **Yes.**

9  Q  Is it exhausting?

10  A  **Yes.**

11  Q  Have you had on occasion an experience where you and

12  multiple officers are attempting to take someone into

13  custody?

14  A  **Yes.**

15  Q  And a situation where that individual is resisting being

16  taken into custody?

17  A  **Yes.**

18  Q  And it's exhausting for you?

19  A  **Yes.**

20  Q  Have you ever gotten sweaty during one of these

21  interactions?

22  A  **Yes.**

23  Q  Has your breathing ever changed as your heart rate

24  increases during one of these interactions?

1  Q   And so you've already testified about Mr. Thomson, I
2      believe you said something about his breath and
3      sweating.  Did it appear out of the ordinary of somebody
4      who had just had -- who had just fought with police?
5  A   **No, it appeared to be normal based on the circumstances.**
6  Q   Okay.  You talked about the booking process for Brown
7      County, the taking someone into custody, is there a
8      different -- I mean, what you understand, and so Green
9      Bay standard operating procedure, is that process
10     different for somebody who is cooperative versus
11     somebody that is uncooperative?
12 A   **Yes.**
13 Q   What is the distinction?
14 A   **If they are cooperative we have a much more hands-on**
15     **approach where we would bring them in, do a pat down**
16     **search, they would do their search, and then we would**
17     **remove them from restraints.  If it's an uncooperative**
18     **the second we enter into the jail we are all -- from**
19     **Green Bay's perspective are hands-off and Brown County**
20     **jail staff takes it from that point and makes the**
21     **determination of how they're going to handle the**
22     **situation.**
23 Q   I think you were asked if you as a police officer, if
24     there's any prohibitions on your calling for emergency
25     medical services, do you recall that question?

1  A   **Yes.**
2  Q   Would you call emergency medical services if you didn't
3      think it was necessary?
4  A   **I would not.**
5  Q   I'm going to hand you what has been previously marked as
6      Exhibit 26 and have you go the page that is GB000922, I
7      think it's the second-to-last page, and we're looking at
8      the second-to-last paragraph that you were previously
9      asked about.  Plaintiff's counsel read this beginning
10     part of the paragraph, do you recall being asked about
11     this paragraph?
12 A   **Yes.**
13         MR. KATERS:  Object to form at this point.
14     BY MS. BAYNARD:
15 Q   I will reread the paragraph if you want.  I was trying
16     to get through this quicker, but as plaintiff's counsel
17     read, the policy reads, "Persons who exhibit extreme
18     agitation, violent, irrational behavior accompanied by
19     profuse sweating, extraordinary strength beyond their
20     physical characteristics and imperviousness to pain
21     (sometimes called 'excited delirium'), or who require a
22     protracted physical encounter with multiple officers to
23     be brought under control, may be at increased risk of
24     sudden death.  Calls involving these persons should be
25     considered medical emergencies," did I read that

1      correctly?
2  A   **Yes.**
3  Q   The part that wasn't read before is, "Officers who
4      reasonably suspect a medical emergency should request
5      medical assistance as soon as practicable and have
6      medical personnel stage away if appropriate."  Now, in
7      this situation did you call medical assistance as soon
8      as you believed Mr. Thomson was experiencing a medical
9      emergency?
10 A   **Yes.**
11 Q   Do you believe this portion of the policy, this last
12     paragraph that I read is applicable to Mr. Thomson's
13     situation?
14         MR. KATERS:  Object to form and foundation.
15     BY MS. BAYNARD:
16 Q   You can answer.
17 A   **I don't believe it was necessary in this due to the**
18     **altercation being had at the hospital where medical**
19     **staff was present.  The second that I believed there was**
20     **a medical emergency I contacted for medical personnel.**
21 Q   Okay.  This kind of goes along with the question the
22     attorney for Nurse Warren asked, but this was not a
23     common, I guess, situation where you're having somebody
24     who has already been medically cleared then having a
25     medical emergency, correct?

1          MR. KATERS:  Object to form, leading.  Go
2      ahead.
3      BY MS. BAYNARD:
4  Q   You can answer.
5  A   **I can't recall a situation other than this where this**
6      **has happened.**
7  Q   If you would have -- let's say Mr. Thomson was at the
8      homeless shelter and you would have gotten a call that
9      he or anybody was being arrested at the homeless shelter
10     for any reason, and then you had -- so take out the fact
11     that he was at the hospital, say all of the incident
12     that happened at the hospital happened at the homeless
13     shelter, what would have been your next step after you
14     finally got him in the WRAP at the homeless shelter?
15         MR. KATERS:  Object to form and compound.  Go
16     ahead.
17     BY MS. BAYNARD:
18 Q   You can answer.
19 A   **If this had happened not at the hospital, our next step**
20     **after getting him into the WRAP and into custody would**
21     **have been taking him for medical clearance or having him**
22     **medically cleared by EMS personnel.**
23 Q   Okay.  And so at any point in your encounter with
24     Mr. Thomson from the time that you're at the hospital to
25     the time he's taken away from the sally port -- strike

1  that.  At any point from the time you were at the
2  hospital to the point where you've testified multiple
3  times you believed he had a medical emergency, were you
4  ever concerned that Mr. Thomson was in immediate need of
5  medical attention?
6  A  No.
7          MS. BAYNARD:  Okay.  I'm done.
8              EXAMINATION
9  BY MR. KATERS:
10  Q  Sir, can I ask you to take one final look at what was
11  marked as Exhibit 25?  It's the Request for Medical
12  Clearance Form.
13  A  Yes.
14  Q  Under No. 1 at the top it states, "Reason for Medical
15  Clearance Request," correct?
16  A  Yes.
17  Q  And the box "Other" is checked, correct?
18  A  Correct.
19  Q  It says, "Please Explain," correct?
20  A  Yes.
21  Q  It says -- to be honest I don't know what it says, but
22  it says, make care to hospital for a seizure," is that
23  fair?
24          MS. BAYNARD:  I think it says, "male came."
25  BY MR. KATERS:

1  Q  "Male came to hospital for a seizure," would you agree
2  with that?
3  A  I believe that is what it says, yeah.
4  Q  Under Reason for Medical Clearance, does it list
5  altercation with officers?
6  A  No.
7          MR. KATERS:  Thank you.
8          MS. BAYNARD:  Are you done?  I have one more
9  follow up.
10              EXAMINATION
11  BY MS. BAYNARD:
12  Q  You're looking at exact same form, so we just talked
13  about under Reason for Medical Clearance Request, now if
14  you go down to No. 2 where it asked, has the patient
15  recently been involved in any altercation or sustained
16  trauma," can you indicate what the answer is?
17  A  It's checked "Yes," it says, "If yes, please explain,"
18  and I believe it says, "fought with officers."
19          MS. BAYNARD:  I don't have anything else.
20          MR. KALLIES:  I have a real quick
21  clarification here.
22              EXAMINATION
23  BY MR. KALLIES:
24  Q  At some point during your testimony you were asked about
25  Mr. Thomson's condition when he was being removed from

1  the Green Bay squad into the intake area, and I just
2  want to clarify for the record, you don't believe that
3  Mr. Thomson had "gone limp" at the time that he was
4  taken from the Green Bay squad car and placed into the
5  Brown County jail intake area, true?
6          MR. KATERS:  Object to form.  Go ahead.
7          MS. BAYNARD:  You can answer.
8          THE WITNESS:  I don't believe so.
9  BY MR. KALLIES:
10  Q  One final question is, we talked about the discharge
11  paperwork from St. Vincent, and is it your understanding
12  as you sit here today it was Officer O'Donnell who would
13  have obtained that, the discharge paperwork?
14  A  He was still at the hospital while we were at the jail.
15  I believe he obtained it.
16  Q  Okay.  That answers my next question, which is, do you
17  know if the nurse at the Brown County jail, Nurse
18  Warren, she ever received the discharge paperwork?
19  A  I have no idea.
20          MR. KALLIES:  That's all I have.  Thanks.
21          (Proceedings concluded at 1:21 p.m.)
22
23
24
25

1  STATE OF WISCONSIN  )
                       )  SS:
2  COUNTY OF MILWAUKEE  )
3
4
5          I, LEAH R. MILLER, a Notary Public in
6  and for the State of Wisconsin, do hereby certify that
7  the above examination under oath of CHRISTOPHER VAUBEL
8  was recorded by me on October 23, 2023, and reduced to
9  writing under my personal direction.
10          I further certify that I am not a
11  relative or employee or attorney or counsel of any of
12  the parties, or a relative or employee of such attorney
13  or counsel, or financially interested directly or
14  indirectly in this action.
15          In witness whereof I have hereunder
16  set my hand and affixed my seal of office at Milwaukee,
17  Wisconsin, this 16th day of November, 2023.
18
19
20
21
22          _____
                    Notary Public
23          In and for the State of Wisconsin
24
25  My Commission Expires:  August 18, 2026

**'**

**'excited** [1] - 122:21
**'okay** [1] - 78:8

**0**

**000925** [1] - 39:15
**001411** [1] - 53:5

**1**

**1** [1] - 125:14
**100** [1] - 1:20
**101** [2] - 2:3, 2:7
**107** [1] - 3:7
**10:07** [1] - 1:21
**10:15** [1] - 10:10
**10th** [13] - 6:3, 6:9, 6:18, 10:9, 18:11, 26:13, 27:25, 74:4, 74:11, 81:19, 82:3, 95:4, 103:13
**111** [1] - 3:7
**125** [1] - 3:8
**126** [2] - 3:8, 3:9
**1296** [1] - 28:4
**12:33** [1] - 73:24
**12th** [4] - 9:21, 73:23, 75:2, 75:4
**1409** [1] - 49:8
**1411** [2] - 28:4, 51:5
**16th** [1] - 128:17
**18** [2] - 3:13, 128:24
**1:21** [1] - 1:22, 127:21

**2**

**2** [3] - 2:16, 49:10, 126:14
**2015** [1] - 7:1
**2018** [3] - 6:1, 26:18, 26:20
**2020** [15] - 4:24, 6:3, 6:9, 6:18, 9:21, 10:9, 18:11, 26:13, 27:25, 74:4, 74:11, 75:4, 81:19, 82:3, 95:4
**2023** [3] - 1:21, 128:8, 128:17
**2026** [1] - 128:24
**21** [3] - 3:12, 8:23, 9:13
**22** [11] - 3:13, 9:2, 9:5, 9:10, 9:15, 17:23, 18:1, 73:11, 73:13, 104:10, 104:12
**23** [6] - 1:21, 3:13, 17:21, 17:25, 18:4,

**128:8**
**23-CV-00084-WCG**
[1] - 1:5
**24** [10] - 3:14, 26:24, 27:9, 28:3, 39:7, 49:7, 49:10, 51:6, 52:8, 53:5
**25** [6] - 3:14, 72:14, 72:16, 72:17, 112:9, 125:11
**26** [4] - 3:15, 94:22, 94:25, 122:6
**2681** [1] - 72:7
**26th** [1] - 6:1
**27** [1] - 3:14

**3**

**3** [2] - 28:9, 52:8
**30** [1] - 57:20
**30(b)(3)(A** [1] - 1:17
**300** [1] - 95:2
**300.....................** [1]
- 3:15
**302** [1] - 27:11
**302.......** [1] - 3:14
**33** [1] - 68:10
**330** [1] - 2:21

**4**

**4** [1] - 3:6
**414)290-7588** [1] -
2:12
**414)291-7979** [1] -
2:17
**414)522-1667** [1] -
2:8
**414)616-7042** [1] -
2:4
**414)977-3892** [1] -
2:22
**434** [1] - 18:9
**434.........** [1] - 3:13
**4Charlie1** [1] - 13:2

**5**

**500** [1] - 2:11
**53202** [1] - 2:21
**53203** [1] - 2:11
**53213** [2] - 2:3, 2:7
**53226** [1] - 2:16
**575** [1] - 2:21

**7**

**710** [1] - 2:11
**72** [1] - 3:14

**8**

**804.05** [1] - 1:17
**8112** [2] - 2:3, 2:7

**9**

**9** [2] - 3:12, 3:13
**911** [3] - 68:7, 119:3, 119:25
**919** [1] - 68:5
**926** [1] - 28:4
**95** [1] - 3:15
**97** [1] - 3:6
**975** [1] - 19:16
**9898** [1] - 2:16
**9th** [1] - 103:12

**A**

**a.m** [1] - 1:22
**ABC** [4] - 1:11, 90:4, 94:5, 94:7
**ability** [2] - 109:4, 118:4
**able** [14] - 15:12, 16:15, 22:2, 22:15, 25:13, 45:7, 59:1, 66:22, 78:2, 80:1, 82:12, 83:8, 84:8, 108:7
**academy** [1] - 26:17
**accept** [5] - 61:20, 102:17, 109:1, 110:20, 111:4
**accepted** [2] - 107:9, 109:13
**accepting** [3] - 107:10, 109:25, 110:16
**access** [2] - 48:16, 48:17
**accompanied** [2] - 95:10, 122:18
**accord** [1] - 11:18
**according** [1] - 78:22
**accurate** [10] - 8:19, 10:2, 27:6, 76:7, 78:5, 78:24, 81:3, 86:11, 93:19, 107:6
**acknowledge** [1] - 102:24
**acquired** [2] - 55:24, 98:24, 99:3
**action** [4] - 52:6, 101:17, 117:3, 128:14
**actions** [2] - 59:1, 78:14
**active** [1] - 6:15
**actively** [5] - 13:16,

30:14, 30:15, 44:12, 76:9
**acts** [1] - 73:16
**actual** [2] - 48:13, 94:20
**Adam** [1] - 2:13
**ADAM** [1] - 1:8
**addition** [1] - 4:11
**additional** [8] -
14:15, 14:18, 15:1, 15:2, 57:19, 76:23, 116:4, 116:10
**address** [1] - 27:5
**advise** [3] - 31:21, 52:5, 66:3
**advised** [8] - 31:18, 61:23, 61:24, 62:7, 68:8, 70:18, 76:14, 90:8
**advises** [1] - 70:2
**advising** [1] - 62:2
**AED** [8] - 65:8, 66:1, 66:3, 69:22, 69:25, 92:24, 93:13, 93:15
**affect** [1] - 28:17
**affirmatively** [1] -
32:20
**affirming** [1] -
113:22
**affixed** [1] - 128:16
**afford** [1] - 5:17
**afterwards** [1] -
94:16
**agency** [1] - 102:25
**Agents** [5] - 9:18, 74:14, 74:20, 74:22, 75:5
**agitated** [1] - 45:2
**agitation** [2] - 95:9, 122:18
**agree** [5] - 18:13, 26:4, 113:9, 120:2, 126:1
**agreed** [1] - 81:1
**agreement** [1] - 84:4
**ahead** [57] - 15:24, 18:23, 19:5, 20:8, 20:12, 20:25, 23:11, 25:3, 28:18, 31:11, 33:7, 34:14, 38:9, 40:22, 41:24, 44:14, 45:3, 46:6, 46:24, 48:5, 50:7, 51:14, 53:11, 55:11, 56:11, 56:16, 57:5, 58:11, 61:2, 63:22, 69:15, 74:5, 77:13, 80:4, 80:21, 87:13, 88:3, 88:22, 91:25, 92:19, 96:7, 98:1, 98:10,

100:6, 100:11, 100:22, 101:4, 102:20, 106:1, 107:20, 109:17, 114:12, 115:6, 117:14, 124:2, 124:16, 127:6
**Aid** [2] - 3:13, 18:8
**aid** [4] - 18:21, 19:3, 65:22, 65:25
**air** [3] - 16:25, 31:1, 43:20
**airflow** [3] - 16:12, 16:17, 16:22
**ALEX** [1] - 1:7
**Alex** [1] - 77:24
**alleging** [1] - 10:6
**Allen** [2] - 86:22, 87:2
**allow** [3] - 5:15, 51:24
**allowed** [2] - 48:23, 51:15, 85:9
**allows** [1] - 117:9
**almost** [1] - 106:3
**alone** [1] - 10:13
**altercation** [6] - 22:3, 101:14, 101:24, 123:18, 126:5, 126:15
**ambiguous** [1] -
71:15
**ambulance** [5] -
93:9, 94:4, 94:11, 94:13, 94:17
**amount** [1] - 80:22
**answer** [23] - 5:3, 5:16, 22:16, 22:20, 24:3, 35:2, 63:13, 74:5, 98:11, 100:6, 103:10, 104:1, 110:6, 114:12, 114:14, 115:8, 117:16, 119:15, 123:16, 124:4, 124:18, 126:16, 127:7
**answered** [15] -
22:18, 32:20, 54:23, 54:25, 56:11, 56:16, 77:12, 84:10, 91:24, 96:7, 107:20, 109:3, 110:22, 111:9, 111:11
**answering** [2] - 58:6, 110:25
**answers** [4] - 5:6, 5:10, 44:2, 127:16
**anticipated** [1] - 90:3
**anytime** [1] - 68:19
**anyway** [1] - 5:19
**apologize** [9] - 7:7, 18:3, 31:3, 69:21,

73:13, 76:2, 82:10, 88:3, 93:25

**appear** [5] - 14:2, 18:20, 106:10, 106:16, 121:3

**appearances** [2] - 4:2, 4:4

**appeared** [25] - 2:5, 2:9, 2:13, 2:18, 2:23, 13:17, 14:5, 22:2, 22:10, 36:22, 44:19, 63:17, 66:7, 66:16, 67:1, 67:3, 76:11, 86:18, 91:19, 92:9, 106:2, 106:3, 106:12, 106:15, 121:5

**appearing** [1] - 4:6

**applicable** [1] - 123:12

**applications** [1] - 82:1

**applied** [12] - 29:25, 30:2, 31:9, 31:22, 69:25, 70:1, 81:20, 93:13, 93:15, 111:23, 112:1, 112:5

**applies** [2] - 54:16, 55:13

**apply** [1] - 55:1

**applying** [1] - 81:17

**appreciate** [3] - 25:10, 41:1, 53:17

**approach** [1] - 121:15

**appropriate** [3] - 69:4, 69:9, 123:6

**appropriately** [1] - 35:14

**area** [37] - 12:8, 32:19, 44:4, 45:16, 46:14, 47:19, 47:22, 48:4, 48:8, 49:1, 49:4, 56:6, 56:14, 56:23, 57:12, 58:3, 58:15, 61:16, 62:22, 62:25, 63:1, 63:10, 64:11, 67:1, 85:12, 90:15, 90:24, 92:9, 103:18, 105:10, 105:13, 106:7, 106:11, 107:13, 127:1, 127:5

**areas** [2] - 47:13, 48:16

**arise** [1] - 28:21

**arm** [1] - 77:25

**arrest** [20] - 44:4, 45:16, 46:13, 47:22, 48:4, 48:8, 49:1, 56:6, 56:14, 56:23, 57:12, 58:3, 58:15, 61:15,

62:22, 62:25, 63:10, 64:11, 90:24, 101:13

**arrested** [4] - 14:13, 101:14, 101:19, 124:9

**arrestee** [10] - 19:18, 46:8, 99:17, 100:20, 102:17, 102:25, 103:5, 108:18, 108:25, 112:10

**arrestee's** [1] - 100:3

**arrestees** [1] - 48:3

**Arrestees** [1] - 19:17

**arresting** [2] - 101:9, 102:25

**arrival** [2] - 39:19, 39:22

**arrive** [5] - 12:1, 14:20, 41:10, 94:13, 118:7

**arrived** [25] - 12:4, 12:16, 14:15, 23:4, 24:5, 29:18, 40:10, 40:13, 41:4, 41:6, 43:2, 51:13, 60:17, 69:12, 70:8, 76:10, 77:10, 77:24, 78:22, 80:15, 93:18, 93:21, 94:7, 94:14, 116:2

**arrives** [1] - 29:10

**aside** [3] - 7:14, 8:16, 29:3

**asphyxiation** [2] - 25:23, 28:22

**assess** [1] - 70:25

**assessment** [1] - 24:9

**assigned** [4] - 10:11, 13:3, 13:8, 108:3

**assist** [5] - 14:8, 14:11, 65:11, 65:15, 76:11

**assistance** [5] - 82:12, 84:15, 107:13, 123:5, 123:7

**assisted** [4] - 24:6, 77:24, 83:12, 83:13

**assisting** [2] - 34:9, 92:4

**associate's** [3] - 6:24, 7:2, 7:4

**assume** [2] - 5:3, 89:20

**assumed** [1] - 71:15

**assumption** [1] - 85:25

**assure** [1] - 50:10

**attachment** [1] - 27:6

**attachments** [2] - 27:4, 27:12

**attempt** [7] - 4:25,

5:16, 30:16, 70:21, 70:25, 79:20, 101:12

**attempted** [7] - 10:2, 14:8, 14:11, 70:12, 76:19, 78:19, 79:13

**attempting** [12] - 15:7, 15:9, 49:19, 50:1, 69:13, 76:11, 77:9, 78:17, 107:5, 116:19, 116:20, 120:12

**attended** [2] - 6:22, 6:23

**attention** [12] - 18:17, 28:9, 28:13, 32:1, 35:22, 39:16, 49:9, 71:5, 83:19, 95:6, 104:5, 125:5

**Attorney** [1] - 4:3

**attorney** [10] - 4:7, 4:9, 5:9, 7:12, 7:14, 75:4, 75:6, 123:22, 128:11, 128:12

**attorney's** [1] - 9:1

**August** [1] - 128:24

**Aurora** [9] - 72:6, 89:10, 89:14, 89:19, 89:22, 90:11, 117:21, 117:22

**authorization** [1] - 72:11

**automatically** [3] - 12:12, 13:9, 13:10

**Avenue** [2] - 2:11, 2:21

**aware** [19] - 8:25, 11:24, 19:23, 20:1, 34:11, 40:2, 46:21, 63:6, 63:8, 69:1, 73:19, 76:23, 81:6, 87:6, 102:22, 108:21, 108:23, 108:24, 118:6

## B

**background** [2] - 6:21, 109:10

**bad** [2] - 37:18, 61:6

**based** [11] - 13:10, 79:11, 85:25, 97:20, 98:12, 98:22, 111:14, 112:4, 113:23, 119:22, 121:5

**basic** [2] - 99:14, 100:13

**Bates** [10] - 19:16, 27:2, 28:3, 39:15, 49:8, 49:9, 49:10, 51:5, 51:7, 95:6

**BAY** [1] - 1:10

**bay** [1] - 94:17

**Bay** [39] - 1:19, 1:20, 2:19, 3:2, 3:2, 4:12, 5:23, 5:25, 6:5, 10:19, 18:9, 19:1, 19:2, 41:23, 53:24, 55:8, 56:4, 65:14, 74:17, 74:24, 89:10, 89:14, 94:3, 97:10, 97:12, 100:17, 101:25, 102:17, 107:3, 107:13, 107:17, 107:19, 107:25, 110:15, 115:19, 121:9, 127:1, 127:4

**Bay's** [1] - 121:19

**BayCare** [4] - 72:6, 117:21, 117:22

**BAYNARD** [108] - 2:15, 2:15, 4:3, 4:11, 7:21, 8:1, 8:13, 9:11, 15:23, 16:5, 17:8, 17:25, 18:23, 19:5, 20:8, 20:12, 20:25, 22:8, 22:20, 22:25, 23:11, 23:14, 23:19, 23:22, 25:2, 26:3, 28:18, 31:10, 33:7, 34:13, 35:2, 37:3, 38:9, 40:21, 41:24, 42:5, 44:13, 45:3, 45:12, 46:5, 46:23, 48:5, 50:7, 51:14, 53:11, 54:8, 54:23, 55:11, 56:11, 56:16, 57:4, 58:11, 58:21, 60:24, 61:1, 63:13, 63:21, 65:3, 66:24, 69:6, 69:14, 71:2, 71:7, 71:11, 71:18, 72:3, 77:12, 80:3, 80:21, 81:10, 82:19, 87:13, 88:21, 91:24, 92:18, 95:20, 96:7, 100:6, 100:11, 100:21, 101:4, 102:19, 104:1, 104:10, 104:21, 106:1, 107:20, 108:13, 109:2, 109:16, 110:6, 111:8, 114:13, 114:25, 115:7, 117:15, 119:14, 119:21, 122:14, 123:15, 124:3, 124:17, 125:7, 125:24, 126:8, 126:11, 126:19, 127:7

**Baynard** [1] - 4:3

**Baynard**.................

.................... [2] - 3:7, 3:8

**became** [2] - 52:1, 87:6

**become** [2] - 8:25, 11:24

**becoming** [1] - 6:6

**began** [7] - 57:2, 65:9, 66:2, 66:4, 70:4, 70:19, 93:13

**begin** [2] - 19:24, 60:19

**beginning** [3] - 39:10, 84:16, 122:9

**behalf** [8] - 2:5, 2:9, 2:13, 2:18, 2:23, 4:6, 4:7, 4:10

**behavior** [2] - 95:10, 122:18

**behind** [1] - 94:11

**Behn** [37] - 2:18, 14:19, 14:21, 14:23, 21:7, 24:11, 24:15, 24:18, 24:23, 25:6, 25:12, 32:12, 32:16, 38:10, 38:13, 62:1, 62:6, 62:12, 62:19, 64:23, 73:1, 78:22, 78:23, 79:1, 80:1, 80:7, 81:1, 81:9, 81:10, 81:12, 81:15, 84:10, 90:2, 90:7, 90:14, 98:22

**behn** [1] - 81:12

**BEHN** [1] - 1:8

**Behn's** [3] - 55:23, 55:25, 56:4

**belief** [1] - 42:6

**believes** [1] - 27:5

**belive** [2] - 7:7, 15:16

**Belongea** [1] - 3:2

**belonged** [1] - 107:17

**BEN** [1] - 1:6

**Ben** [1] - 2:18

**best** [16] - 18:12, 28:1, 35:8, 40:4, 67:2, 69:16, 72:8, 76:2, 76:12, 76:18, 95:5, 112:25, 113:6, 113:8, 113:11, 118:4

**better** [1] - 47:25

**between** [6] - 24:15, 37:19, 42:12, 50:16, 71:13, 80:17

**beyond** [3] - 95:11, 113:22, 122:19

**bit** [1] - 5:10

**Bluemound** [3] - 2:3, 2:7, 2:16

**body** [3] - 29:19, 44:18, 78:16
**booking** [12] - 19:20, 52:17, 57:2, 57:3, 67:1, 85:12, 92:8, 103:1, 103:18, 107:12, 118:23, 121:6
**bottom** [1] - 82:25
**box** [6] - 48:15, 112:22, 112:23, 112:24, 113:7, 125:17
**boxes** [1] - 112:19
**Bradley** [1] - 9:19
**break** [2] - 61:5, 118:19
**breath** [3] - 22:17, 28:11, 121:2
**breathe** [23] - 15:22, 16:19, 16:21, 16:24, 20:7, 20:23, 21:19, 22:6, 23:6, 23:9, 25:13, 45:7, 45:18, 45:24, 60:12, 79:24, 80:2, 80:12, 80:18, 81:14, 83:8, 97:16, 97:17
**breathing** [47] - 13:25, 16:10, 16:13, 16:16, 17:6, 17:9, 21:24, 22:10, 22:11, 22:13, 24:17, 24:20, 24:25, 25:17, 25:21, 25:25, 28:11, 28:17, 28:25, 30:19, 30:24, 33:19, 36:21, 36:22, 43:18, 45:9, 45:21, 58:9, 58:14, 63:6, 65:2, 66:9, 67:10, 67:19, 77:16, 83:3, 83:6, 93:8, 97:24, 98:4, 98:9, 111:11, 111:12, 111:16, 111:20, 111:22, 120:23
**breaths** [3] - 22:15, 30:25, 79:18
**brief** [1] - 57:21
**briefly** [1] - 73:12
**bring** [14] - 7:18, 7:25, 8:4, 46:8, 59:10, 85:22, 109:18, 109:23, 114:9, 117:18, 118:1, 118:2, 118:15, 121:15
**bringing** [1] - 107:4
**brings** [2] - 102:18, 102:25
**brought** [14] - 36:9, 46:2, 48:4, 56:1, 56:23, 58:3, 64:7,

73:2, 75:13, 95:13, 103:18, 107:11, 107:12, 122:23
**Brown** [56] - 2:14, 42:1, 42:2, 42:4, 42:15, 43:24, 44:3, 44:7, 45:14, 46:3, 46:11, 48:1, 48:18, 49:16, 49:20, 50:2, 51:13, 51:20, 51:24, 52:2, 53:19, 54:20, 55:5, 55:9, 56:14, 56:25, 57:11, 61:11, 63:9, 64:15, 97:8, 99:17, 100:20, 101:3, 102:16, 107:4, 107:6, 107:8, 108:5, 108:17, 108:21, 108:23, 108:25, 109:11, 109:13, 109:14, 109:21, 110:2, 110:16, 111:3, 118:21, 118:23, 121:6, 121:19, 127:5, 127:17
**brown** [1] - 42:14
**BROWN** [1] - 1:10
**Bryce** [2] - 2:13
**BRYCE** [1] - 1:10
**building** [1] - 102:4
**bunch** [1] - 110:22
**button** [1] - 46:20
**BY** [113] - 3:5, 4:18, 8:6, 8:17, 8:24, 9:3, 9:14, 16:3, 16:6, 17:11, 17:22, 18:2, 18:25, 19:7, 20:10, 20:15, 21:5, 22:12, 22:22, 23:3, 24:2, 25:9, 26:9, 27:7, 28:6, 28:23, 31:13, 33:9, 34:17, 35:4, 37:8, 38:12, 38:22, 40:25, 42:3, 42:11, 44:16, 45:5, 45:13, 46:7, 47:2, 47:15, 48:7, 50:9, 51:19, 53:16, 54:11, 55:3, 55:17, 56:13, 56:18, 57:10, 58:12, 58:25, 61:8, 63:15, 63:25, 65:10, 65:24, 67:4, 69:7, 69:20, 70:20, 71:12, 71:20, 72:15, 73:21, 77:15, 80:9, 80:24, 81:11, 82:22, 86:15, 87:18, 89:1, 92:3, 92:21, 94:23, 95:21, 96:12, 97:1, 98:5, 98:13, 100:8, 100:15,

101:1, 101:7, 102:23, 104:3, 104:11, 104:23, 106:6, 106:25, 107:22, 108:16, 109:9, 110:14, 111:8, 114:13, 114:25, 115:7, 117:15, 119:14, 119:21, 122:14, 123:15, 124:3, 124:17, 125:9, 125:25, 126:11, 126:23, 127:9

## C

**calm** [11] - 16:1, 16:10, 30:5, 33:14, 33:15, 78:8, 78:11, 79:14, 79:17, 79:20
**calmness** [1] - 28:12
**cannot** [1] - 106:5
**capacity** [1] - 6:2
**car** [54] - 10:14, 33:6, 33:22, 34:19, 34:22, 34:25, 35:7, 35:10, 35:13, 35:24, 35:25, 36:3, 36:8, 36:9, 36:23, 37:2, 37:10, 38:16, 40:10, 40:14, 48:15, 63:18, 64:8, 64:12, 64:14, 64:17, 65:8, 65:12, 65:15, 66:20, 70:13, 83:14, 83:15, 83:18, 83:20, 84:22, 84:25, 90:23, 91:15, 91:18, 92:6, 92:11, 103:19, 104:16, 105:3, 105:11, 105:14, 105:15, 105:18, 107:12, 127:4
**care** [16] - 31:17, 52:21, 69:13, 69:19, 70:12, 70:19, 70:22, 87:17, 92:23, 96:10, 96:17, 96:19, 99:15, 101:23, 125:22
**carried** [6] - 36:2, 36:3, 36:12, 36:23, 63:17, 67:2
**carry** [2] - 55:22, 63:10
**carrying** [3] - 36:5, 47:16, 63:24
**cars** [2] - 47:20, 102:10
**CASE** [1] - 1:5
**case** [12] - 9:17,

10:5, 51:23, 52:15, 53:12, 53:18, 54:17, 59:19, 73:17, 84:6, 84:14, 113:16
**cases** [2] - 53:14, 117:24
**Cassiday** [1] - 4:5
**CASSIDAY** [1] - 2:20
**causing** [1] - 11:16
**Center** [4] - 89:10, 89:14, 117:21, 117:22
**certain** [1] - 7:18
**certificates** [1] - 7:5
**certify** [2] - 128:6, 128:10
**chance** [2] - 112:10, 112:14
**change** [2] - 19:15, 28:12
**changed** [1] - 120:23
**characteristics** [2] - 95:11, 122:20
**charge** [1] - 86:22
**check** [7] - 16:13, 35:14, 40:14, 62:16, 86:16, 114:4, 114:9
**checked** [10] - 16:10, 16:11, 16:16, 45:20, 86:3, 86:10, 112:22, 113:7, 125:17, 126:17
**checking** [2] - 16:22, 86:20
**Chelsea** [3] - 21:10, 32:4, 114:20
**chest** [2] - 69:25, 70:2
**Chris** [1] - 2:18
**CHRISTOPHER** [5] - 1:6, 1:15, 2:6, 4:14, 128:7
**Christopher** [4] - 4:9, 4:21, 98:16, 113:20
**chronologically** [1] - 97:15
**circumstance** [1] - 118:5
**circumstances** [1] - 121:5
**City** [10] - 1:20, 2:19, 3:2, 3:2, 4:12, 5:23, 5:24, 19:2, 94:2, 107:25
**city** [2] - 6:15, 13:6
**CITY** [1] - 1:10
**city's** [1] - 9:1
**Civil** [1] - 1:17
**ckaters@katersgranitz.com** [1] - 2:8

**claiming** [3] - 20:11, 20:23, 22:6
**claims** [1] - 19:18
**clarification** [1] - 126:21
**clarifications** [1] - 104:9
**clarify** [2] - 23:1, 127:2
**class** [1] - 34:16
**clean** [1] - 103:10
**clear** [6] - 5:1, 61:9, 72:23, 102:13, 112:15, 118:22
**Clearance** [8] - 3:14, 72:20, 99:20, 100:18, 125:12, 125:15, 126:4, 126:13
**clearance** [30] - 20:16, 20:24, 21:4, 21:8, 21:14, 37:20, 37:22, 37:24, 38:6, 38:7, 59:23, 60:6, 62:5, 63:4, 72:3, 72:5, 72:19, 72:24, 96:4, 98:14, 100:24, 101:10, 110:19, 112:7, 112:10, 115:12, 115:13, 117:25, 124:21
**cleared** [22] - 19:19, 20:17, 20:19, 21:2, 21:3, 31:19, 32:13, 32:14, 32:15, 32:16, 32:18, 32:22, 85:23, 88:6, 105:3, 105:14, 113:25, 114:17, 117:20, 118:21, 123:24, 124:22
**clearly** [1] - 22:2
**clerk** [1] - 4:12
**Clint** [1] - 2:13
**CLINT** [1] - 1:9
**clipped** [2] - 82:24, 83:6
**close** [5] - 47:10, 58:23, 94:12, 105:22, 106:15
**coherent** [3] - 31:6, 36:14, 36:16
**collection** [1] - 93:4
**collective** [1] - 93:3
**College** [1] - 6:23
**color** [3] - 14:3, 28:12, 66:15
**coming** [1] - 66:17
**commands** [1] - 50:24
**commencing** [1] - 1:21

comments [2] - 25:6, 97:21
Commission [1] - 128:24
common [1] - 123:23
communicate [2] - 16:15, 22:16
communicated [1] - 88:9
communicating [8] - 22:1, 42:8, 51:16, 58:8, 63:3, 64:23, 106:8, 106:19
communication [1] - 106:13
COMPANY [2] - 1:11, 1:12
complain [1] - 33:18
complained [2] - 23:6, 45:6
complaining [4] - 24:17, 45:17, 83:7, 97:17
complains [1] - 28:10
complaints [1] - 25:12
complete [1] - 118:4
completely [3] - 46:18, 56:20, 73:10
compliance [1] - 82:14
complied [1] - 82:11
compound [2] - 109:16, 124:15
comprehending [1] - 62:9
concern [7] - 24:24, 24:25, 25:3, 37:1, 63:2, 88:1, 102:5
concerned [3] - 28:24, 52:1, 125:4
concerning [3] - 24:16, 37:2, 74:3
concerns [1] - 102:9
concluded [2] - 74:11, 127:21
concluding [1] - 1:22
conclusion [1] - 110:5
condition [5] - 62:11, 87:10, 102:9, 110:24, 126:25
confirm [1] - 32:15
confirmed [5] - 21:3, 21:6, 45:21, 98:3, 114:17
conform [2] - 51:8, 51:12
confuse [2] - 71:22,

74:5
connection [1] - 79:19
Considerations [1] - 95:8
considerations [3] - 87:20, 87:21, 118:13
considered [8] - 87:11, 87:16, 95:23, 96:1, 96:6, 96:11, 110:24, 122:25
considering [1] - 24:16
consistent [3] - 28:16, 97:21, 114:19
constitutional [1] - 10:6
consult [1] - 7:14
contact [11] - 38:23, 39:1, 49:5, 50:13, 51:24, 68:4, 68:13, 84:24, 85:23, 91:6, 109:20
contacted [7] - 57:9, 59:8, 68:1, 68:2, 68:20, 86:25, 123:20
contacting [1] - 68:22
contained [1] - 108:21
contains [1] - 17:20
contemporaneousl y [2] - 15:4, 94:13
continually [1] - 29:1
continue [3] - 9:11, 32:25, 41:18
continued [5] - 30:4, 32:14, 33:2, 33:13, 78:8
continuing [2] - 30:15, 106:12
control [20] - 13:18, 14:7, 29:21, 47:24, 48:9, 51:16, 77:5, 77:7, 78:1, 78:19, 78:24, 79:3, 79:5, 85:3, 95:14, 110:11, 116:11, 116:16, 117:9, 122:23
controlled [2] - 48:1, 79:2
controlling [3] - 14:8, 14:24, 77:24
conversation [16] - 21:12, 23:7, 24:7, 25:12, 25:15, 32:6, 32:10, 57:13, 57:16, 61:12, 79:19, 88:15, 90:6, 92:10, 105:25, 106:4

conversations [9] - 43:4, 47:3, 47:5, 47:10, 61:13, 74:9, 75:3, 77:20, 77:22
conveyance [1] - 90:4
cooperating [2] - 44:9, 82:17
cooperation [1] - 44:10
cooperative [6] - 30:6, 46:9, 46:14, 46:19, 121:10, 121:14
copy [1] - 8:14
Corporal [10] - 57:13, 57:18, 59:6, 61:10, 61:23, 69:17, 86:7, 110:15, 111:3
corporal [1] - 42:25
correct [182] - 7:8, 8:7, 9:19, 9:22, 9:25, 10:3, 10:7, 10:23, 11:9, 11:12, 12:11, 14:16, 14:21, 15:13, 15:22, 19:4, 19:8, 19:10, 20:7, 20:11, 20:20, 25:7, 26:11, 26:14, 27:2, 27:13, 27:16, 27:21, 29:5, 29:8, 29:21, 30:9, 30:11, 33:23, 36:3, 37:22, 38:4, 38:17, 39:14, 40:11, 41:9, 41:10, 41:23, 42:4, 42:21, 43:9, 43:14, 43:15, 44:5, 44:8, 45:7, 45:10, 47:11, 47:17, 47:22, 48:4, 48:9, 48:10, 48:13, 48:14, 49:2, 49:5, 49:6, 50:6, 50:21, 53:10, 53:25, 54:1, 54:2, 54:13, 56:2, 56:6, 56:10, 56:15, 56:17, 56:23, 56:24, 59:23, 60:5, 60:7, 60:8, 61:11, 61:16, 65:2, 67:5, 67:8, 67:9, 67:11, 67:12, 67:15, 69:9, 69:10, 70:9, 70:22, 70:23, 71:22, 72:25, 73:4, 73:6, 73:7, 74:11, 74:14, 74:15, 76:6, 76:7, 76:17, 76:21, 78:9, 78:25, 79:3, 79:4, 79:15, 79:24, 80:15, 81:2, 81:7, 81:8, 82:4, 82:5, 82:9, 82:10, 82:11, 82:18, 82:25,

83:5, 83:15, 83:18, 83:21, 84:20, 84:22, 85:5, 85:6, 85:9, 85:10, 86:23, 87:5, 87:9, 88:10, 89:5, 89:6, 89:12, 91:7, 91:8, 92:17, 92:20, 93:10, 93:12, 93:16, 94:5, 94:9, 94:10, 94:20, 95:16, 95:19, 95:25, 96:18, 96:20, 100:1, 101:21, 102:15, 103:3, 103:7, 103:21, 107:7, 107:18, 107:21, 110:17, 110:21, 111:24, 111:25, 113:18, 116:3, 116:5, 117:2, 117:17, 119:9, 119:12, 123:25, 125:15, 125:17, 125:18, 125:19
correctly [26] - 19:20, 28:14, 39:20, 49:13, 51:10, 53:8, 76:5, 76:15, 76:25, 78:3, 84:1, 84:19, 85:4, 85:14, 86:4, 87:4, 88:6, 89:11, 90:4, 92:14, 93:9, 95:15, 95:24, 99:24, 112:5, 123:1
counsel [4] - 122:9, 122:16, 128:11, 128:13
County [54] - 2:14, 42:1, 42:2, 42:4, 42:14, 42:15, 43:24, 44:3, 44:7, 45:15, 46:3, 46:11, 48:2, 48:18, 49:16, 49:20, 50:3, 51:13, 51:25, 52:2, 53:19, 54:20, 55:5, 55:10, 56:14, 56:25, 57:11, 61:11, 63:9, 64:15, 97:8, 99:17, 100:20, 101:3, 102:16, 107:4, 107:6, 107:8, 108:5, 108:21, 108:23, 108:25, 109:13, 109:14, 109:21, 110:2, 110:16, 111:4, 118:21, 118:24, 121:7, 121:19, 127:5, 127:17
county [3] - 4:8, 56:2, 65:17
COUNTY [2] - 1:11, 128:2

County's [3] - 51:20, 108:17, 109:11
couple [2] - 104:9, 107:1
course [7] - 98:18, 100:4, 101:8, 101:17, 102:2, 103:11, 106:13
court [2] - 5:10, 5:18
COURT [2] - 1:1, 4:2
courtesy [2] - 5:17, 89:25
COVID [2] - 46:16, 46:18
CPR [7] - 66:4, 70:4, 70:5, 70:6, 70:7, 92:24, 93:13
crew [1] - 93:25
crimes [1] - 6:16
Criminal [2] - 9:17, 73:16
criminal [1] - 6:24
CRIVELLO [1] - 2:10
crossed [1] - 79:1
crowded [1] - 58:16
cuff [1] - 108:8
cumulatively [1] - 103:8
curious [1] - 117:21
current [1] - 5:22
custodial [5] - 49:11, 49:17, 49:24, 50:2, 50:4
custody [38] - 15:7, 15:8, 41:22, 42:1, 42:4, 42:7, 49:20, 51:10, 53:6, 53:13, 53:19, 53:22, 53:25, 54:10, 54:12, 54:20, 55:4, 55:9, 55:14, 55:15, 55:19, 107:5, 107:9, 107:11, 108:17, 109:1, 109:13, 109:25, 110:1, 110:3, 110:16, 110:20, 111:4, 116:21, 120:13, 120:16, 121:7, 124:20

D

darn [1] - 27:6
days [1] - 9:24
deal [2] - 84:8, 109:22
dealing [3] - 21:13, 103:11, 110:9
dealings [1] - 102:2
dealt [1] - 11:22
death [2] - 95:15, 122:24

**deceased** [2] - 94:8, 94:19
**December** [1] - 7:1
**decided** [1] - 44:3
**decides** [1] - 42:10
**decision** [11] - 29:3, 42:19, 92:25, 93:1, 109:25, 110:1, 110:2, 110:8, 110:11, 117:6, 117:8
**decision-making** [2] - 42:19, 110:8
**decisions** [1] - 58:1
**deep** [3] - 22:15, 30:25, 79:18
**Defendant** [2] - 2:23, 4:6
**defendants** [1] - 4:8
**Defendants** [3] - 1:13, 2:13, 2:18
**defer** [1] - 42:17
**define** [1] - 47:13
**degree** [4] - 6:24, 6:25, 7:2, 7:4
**degrees** [1] - 7:5
**delirium'** [1] - 122:21
**deliver** [1] - 19:2
**DELSART** [1] - 1:8
**Delsart** [5] - 2:18, 14:19, 29:7, 80:15, 80:20
**demeanor** [1] - 91:17
**Department** [16] - 6:6, 9:16, 10:19, 18:9, 41:23, 55:8, 65:14, 74:17, 74:24, 77:23, 97:12, 100:17, 101:25, 102:17, 107:14, 115:20
**department** [1] - 73:15
**Department's** [1] - 56:4
**deposition** [7] - 5:7, 7:8, 7:10, 7:15, 7:17, 7:24, 108:14
**Deposition..............
..........** [1] - 3:12
**describe** [3] - 6:8, 22:13, 29:10
**described** [1] - 23:17
**details** [4] - 62:15, 75:15, 78:18, 118:8
**detained** [1] - 33:4
**determination** [5] - 45:15, 67:16, 84:3, 84:11, 121:21
**determine** [1] - 57:8
**determined** [2] - 65:1, 96:16

**determining** [1] - 87:20
**device** [10] - 25:7, 25:13, 65:8, 66:2, 97:7, 97:8, 98:8, 117:7, 117:8, 117:9
**devices** [1] - 41:13
**diagnosis** [1] - 87:10
**dialogue** [1] - 114:19
**difference** [1] - 37:19
**different** [8] - 6:17, 13:6, 13:8, 46:17, 62:4, 90:9, 121:8, 121:10
**difficulty** [2] - 24:20, 30:19
**direct** [3] - 18:17, 39:15, 49:9
**directed** [2] - 32:18, 94:4
**directing** [1] - 112:20
**direction** [1] - 128:9
**directly** [7] - 57:23, 61:22, 63:5, 64:3, 94:11, 94:15, 128:13
**discharge** [25] - 37:12, 37:19, 57:14, 59:7, 59:10, 59:12, 59:16, 59:22, 60:2, 62:17, 73:5, 86:24, 89:9, 89:13, 89:16, 99:4, 99:20, 100:10, 100:19, 100:25, 101:2, 101:11, 127:10, 127:13, 127:18
**discharged** [1] - 99:13
**discipline** [1] - 75:16
**disclosures** [1] - 72:8
**disconnected** [1] - 90:19
**discovery** [2] - 7:22, 7:25
**discretion** [1] - 102:21
**discretionary** [2] - 19:8, 19:9
**discuss** [4] - 7:14, 17:17, 21:22, 62:11
**discussed** [3] - 5:9, 73:12, 98:23
**discussing** [3] - 74:17, 81:13, 81:15
**discussion** [6] - 16:18, 24:15, 24:22, 37:9, 38:13, 81:13
**Discussion** [4] - 26:25, 71:25, 72:13,

108:15
**discussions** [5] - 31:17, 57:11, 74:2, 74:23, 80:10
**dispatch** [8] - 10:22, 11:2, 11:7, 13:13, 39:24, 40:2, 68:4, 68:8
**dispatched** [5] - 13:12, 115:20, 115:23, 115:25, 118:6
**dispatcher** [2] - 68:14, 68:15
**dispatches** [1] - 68:15
**displaying** [1] - 78:15
**distance** [2] - 39:5, 91:8
**distinct** [1] - 73:9
**distinction** [2] - 71:13, 121:13
**distress** [2] - 22:4, 28:11
**district** [5] - 13:3, 13:4, 13:6, 13:8, 84:13
**DISTRICT** [2] - 1:1, 1:1
**districts** [1] - 13:7
**disturbance** [5] - 10:23, 11:4, 11:17, 118:7, 118:9
**divided** [1] - 13:7
**Division** [1] - 73:15
**doctor** [9] - 21:2, 21:20, 113:15, 113:22, 114:1, 114:4, 114:7, 114:10
**doctors** [2] - 17:14, 32:23
**document** [12] - 7:24, 8:7, 18:6, 27:9, 38:14, 72:2, 73:5, 73:9, 73:14, 75:22, 99:10, 99:16
**documentation** [2] - 86:6, 100:2
**documents** [8] - 7:18, 7:20, 8:3, 8:9, 72:12, 86:3, 98:24, 99:2
**done** [6] - 61:5, 73:18, 103:24, 104:4, 125:7, 126:8
**door** [6] - 46:19, 47:21, 48:8, 103:4, 103:5, 114:8
**doors** [5] - 12:8, 12:12, 49:1, 90:20,

91:13
**down** [18] - 5:11, 5:13, 5:19, 16:1, 16:10, 30:5, 33:14, 33:16, 75:24, 76:20, 78:9, 78:11, 79:17, 79:20, 93:7, 121:15, 126:14
**Dr** [6] - 21:11, 98:15, 112:14, 112:15, 113:4, 114:19
**drive** [3] - 38:24, 39:1, 39:3, 84:17, 103:5
**driven** [2] - 38:1, 38:2
**driving** [2] - 39:25, 47:17
**drooling** [2] - 31:4, 36:19
**due** [2] - 46:17, 123:17
**duly** [1] - 4:15
**during** [14] - 11:2, 33:10, 33:12, 33:17, 38:23, 39:1, 43:13, 49:4, 91:2, 112:2, 119:6, 120:20, 120:24, 126:24
**duties** [5] - 6:8, 6:10, 6:11, 6:13, 6:17
**duty** [1] - 40:17

---

**E**

**e-mail** [2] - 9:1, 72:10
**e-mailed** [1] - 52:18
**ear** [2] - 79:10, 116:25
**East** [1] - 2:21
**EASTERN** [1] - 1:1
**educational** [1] - 6:20
**effect** [2] - 105:8, 107:3
**either** [10] - 12:21, 12:23, 13:1, 21:16, 21:17, 64:16, 97:10, 97:16, 101:10, 115:1
**emergencies** [4] - 6:14, 19:13, 95:23, 122:25
**emergency** [60] - 12:8, 12:10, 19:3, 60:17, 66:8, 67:5, 67:7, 67:17, 67:25, 68:1, 68:2, 68:10, 68:11, 68:18, 68:19, 68:20, 68:25, 69:9,

69:11, 70:19, 70:24, 71:1, 71:8, 71:14, 71:17, 71:19, 76:3, 88:19, 88:24, 88:25, 91:20, 92:23, 93:16, 94:21, 96:2, 96:6, 96:11, 102:6, 103:15, 103:23, 104:5, 110:25, 113:1, 113:9, 113:12, 113:16, 113:23, 115:2, 118:22, 119:1, 119:24, 119:25, 121:24, 122:2, 123:4, 123:9, 123:20, 123:25, 125:3
**employed** [3] - 10:19, 48:18, 94:2
**employee** [5] - 10:17, 10:18, 42:24, 128:11, 128:12
**employees** [2] - 43:1, 49:16, 74:16
**employment** [1] - 5:22
**EMS** [12] - 67:20, 68:10, 68:14, 68:15, 68:21, 68:22, 69:12, 70:8, 71:9, 71:14, 94:3, 124:22
**en** [1] - 11:20
**encounter** [5] - 18:20, 95:13, 95:18, 122:22, 124:23
**Enforcement** [3] - 72:20, 99:19, 100:18
**enforcement** [4] - 18:21, 20:20, 20:22, 47:20
**entail** [1] - 57:3
**enter** [5] - 53:15, 109:19, 109:21, 110:10, 121:18
**entered** [1] - 76:3
**entire** [4] - 5:16, 96:14, 109:22, 110:12
**entirety** [1] - 34:9
**entitled** [1] - 72:19
**entity** [1] - 68:16
**entrance** [1] - 47:23
**entries** [1] - 47:25
**equate** [1] - 71:23
**equating** [1] - 71:21
**escorting** [1] - 114:8
**essentially** [3] - 69:22, 83:14, 100:2
**establishes** [1] - 18:21
**ESTATE** [1] - 1:3
**estate** [1] - 10:6

**estimate** [1] - 90:12
**etc** [1] - 28:12
**evaluated** [3] - 115:13, 115:15, 115:19
**evaluating** [2] - 119:7
**evaluation** [8] - 57:2, 57:3, 86:19, 90:10, 103:1, 108:25, 109:12, 118:3
**evening** [1] - 74:10
**event** [1] - 75:8
**eventful** [1] - 38:19
**events** [5] - 74:10, 74:21, 75:6, 75:17, 101:12
**eventually** [2] - 15:10, 37:16
**exact** [8] - 11:1, 11:3, 11:6, 12:3, 13:24, 80:22, 91:1, 126:12
**exactly** [1] - 30:1
**Exam** [1] - 112:18
**Examination** [1] - 1:15
**examination** [1] - 128:7
**EXAMINATION** [8] - 3:5, 4:17, 96:25, 106:24, 111:7, 125:8, 126:10, 126:22
**examine** [3] - 17:13, 17:15, 17:19
**examined** [2] - 4:16, 17:16
**except** [1] - 73:23
**exhausting** [2] - 120:9, 120:18
**Exhibit** [27] - 8:23, 9:2, 9:5, 9:15, 17:21, 17:23, 18:4, 26:24, 27:9, 28:3, 39:7, 49:7, 49:10, 51:6, 52:8, 53:5, 72:14, 72:16, 72:17, 73:13, 94:22, 94:25, 104:10, 104:12, 112:9, 122:6, 125:11
**exhibit** [5] - 18:18, 27:20, 28:5, 95:9, 122:17
**exist** [3] - 113:1, 113:9, 113:12
**expected** [1] - 18:14
**experience** [2] - 120:5, 120:11
**experiencing** [5] - 113:23, 115:2, 118:25, 123:8

**Expires** [1] - 128:24
**Explain** [1] - 125:19
**explain** [1] - 126:17
**express** [6] - 24:24, 30:19, 102:5, 102:8
**expressed** [1] - 80:18
**expressing** [1] - 21:18
**extent** [1] - 101:9
**extraordinary** [2] - 95:10, 122:19
**extreme** [2] - 95:9, 122:17
**eyes** [1] - 105:15

### F

**face** [2] - 76:20, 79:11
**face-down** [1] - 76:20
**facial** [1] - 28:12
**facilitate** [1] - 19:3
**facility** [18] - 42:20, 43:1, 47:21, 51:9, 51:13, 51:18, 51:22, 51:24, 52:3, 53:7, 57:9, 61:21, 62:4, 89:16, 102:3, 102:18, 118:1, 118:3
**facing** [1] - 79:12
**fact** [5] - 24:17, 30:5, 45:21, 101:24, 124:10
**fair** [23] - 5:4, 5:5, 37:6, 46:9, 47:8, 47:10, 47:14, 47:19, 48:22, 53:4, 54:6, 59:25, 60:4, 64:10, 70:11, 70:15, 73:22, 75:7, 75:16, 85:1, 98:6, 109:12, 125:23
**familiar** [2] - 109:6, 112:8
**far** [5] - 35:16, 74:9, 100:14, 102:21, 108:17
**fashion** [1] - 68:11
**February** [19] - 4:24, 6:3, 6:9, 6:18, 9:21, 10:9, 18:10, 26:13, 27:25, 73:23, 74:4, 74:11, 75:2, 75:4, 81:19, 82:3, 95:4, 103:12, 103:13
**Federal** [1] - 1:17
**feed** [1] - 97:4
**feet** [2] - 15:20, 35:18
**feigning** [1] - 22:5

**fellow** [1] - 50:25
**felt** [4] - 17:15, 35:19, 67:19, 84:13
**few** [10] - 5:14, 14:20, 33:8, 33:10, 33:12, 33:17, 35:18, 64:25, 90:18, 111:9
**field** [3] - 81:24, 82:1, 111:17
**fight** [1] - 79:21
**fighting** [5] - 13:16, 30:8, 30:14, 30:15, 120:2
**figure** [1] - 65:7
**file** [1] - 108:14
**fill** [1] - 52:9
**filled** [4] - 52:11, 52:13, 52:14, 99:25
**final** [6] - 42:19, 109:24, 110:1, 110:11, 125:10, 127:10
**finally** [2] - 5:15, 124:14
**finals** [1] - 51:4
**financially** [1] - 128:13
**fire** [1] - 68:14
**Fire** [1] - 94:3
**first** [16] - 4:15, 5:6, 11:25, 12:13, 13:15, 13:25, 14:20, 18:17, 32:4, 69:24, 75:21, 75:22, 87:6, 92:16, 100:13, 104:25
**five** [1] - 96:23
**flail** [2] - 78:18, 78:20
**flailing** [1] - 79:6
**FLOOD** [11] - 2:10, 4:7, 38:20, 54:22, 65:19, 106:25, 107:22, 108:16, 109:9, 110:14, 111:6
**Flood** [1] - 4:7
**Flood....................
..................** [1] - 3:7
**floor** [11] - 16:24, 29:13, 33:4, 33:18, 33:21, 58:14, 76:5, 79:11, 91:11, 91:18, 117:13
**follow** [9] - 18:14, 19:10, 50:23, 83:24, 84:14, 94:4, 97:5, 107:1, 126:9
**follow-up** [1] - 107:1
**follow-ups** [1] - 97:5
**followed** [3] - 38:1, 40:10, 54:6
**following** [5] - 38:16,

46:9, 84:24, 94:11, 97:15
**follows** [1] - 4:16
**FOR** [1] - 1:1
**force** [3] - 77:4, 77:7, 116:11
**Force** [2] - 3:15, 95:2
**forgetting** [1] - 86:25
**forgotten** [1] - 59:19
**form** [89] - 8:10, 8:12, 8:19, 17:7, 18:23, 19:5, 20:8, 20:12, 20:25, 22:7, 22:8, 23:11, 23:18, 25:2, 26:2, 28:18, 33:7, 35:1, 37:20, 37:22, 37:24, 38:6, 38:7, 38:8, 38:15, 38:20, 41:24, 43:6, 44:13, 45:3, 45:12, 46:5, 46:23, 47:12, 48:5, 50:7, 51:14, 52:9, 52:17, 53:11, 54:8, 54:22, 57:15, 58:11, 58:21, 59:23, 60:1, 60:7, 60:8, 60:24, 65:19, 66:23, 69:14, 70:17, 71:2, 72:4, 72:5, 72:19, 72:24, 73:1, 73:20, 80:21, 82:19, 87:13, 88:21, 89:9, 89:13, 92:18, 95:20, 98:15, 99:25, 100:21, 100:24, 103:25, 109:2, 109:16, 112:7, 112:8, 115:4, 115:12, 115:14, 122:13, 123:14, 124:1, 124:15, 126:12, 127:6
**Form** [2] - 72:20, 125:12
**Form...................
....** [1] - 3:14
**forms** [4] - 59:21, 59:25, 101:10, 101:11
**forward** [1] - 51:18
**fought** [2] - 121:4, 126:18
**foundation** [26] - 15:23, 20:13, 25:4, 31:10, 34:13, 37:3, 38:9, 42:5, 44:13, 46:5, 46:23, 55:11, 57:4, 63:12, 63:21, 65:3, 69:6, 69:15, 88:22, 92:18, 98:10, 100:5, 101:4, 102:19, 106:1, 123:14
**foundational** [1] -

109:11
**four** [6] - 27:19, 81:22, 81:24, 82:1, 82:6, 96:22
**Fox** [2] - 6:23, 7:4
**free** [1] - 18:7
**front** [2] - 82:24, 84:25
**full** [6] - 28:8, 59:10, 59:12, 75:19, 86:23, 95:8
**fully** [2] - 46:14, 87:24

### G

**garage** [1] - 47:25
**gasping** [4] - 16:24, 22:17, 31:1, 43:20
**gathered** [1] - 94:18
**GB** [3] - 39:15, 53:5, 77:23
**GB00060** [1] - 104:18
**GB000922** [1] - 122:6
**GB001411** [2] - 51:7, 52:8
**GB1294** [1] - 28:4
**GB1296** [1] - 28:7
**GB1408** [1] - 28:4
**GB1409** [1] - 49:10
**GB922** [1] - 95:7
**GB924** [1] - 28:3
**general** [6] - 6:10, 88:14, 100:23, 101:17, 105:17, 115:11
**generally** [17] - 6:11, 52:20, 52:22, 52:24, 59:18, 59:21, 59:25, 60:1, 73:7, 75:9, 84:4, 88:10, 99:4, 99:10, 99:12, 100:12, 100:14
**generated** [1] - 100:3
**Gerwing** [7] - 21:11, 98:16, 112:14, 112:15, 113:4, 113:20, 114:19
**gerwing** [1] - 98:15
**GERWING** [1] - 98:16
**given** [7] - 9:16, 38:6, 38:7, 73:1, 86:8, 99:13, 110:23
**grabbed** [3] - 36:6, 38:11, 66:1
**graduated** [2] - 6:22, 7:1
**GRANITZ** [2] - 2:2,

2:6
**great** [2] - 99:7, 99:9
**GREEN** [1] - 1:10
**Green** [38] - 1:19, 1:20, 2:19, 3:2, 3:2, 4:12, 5:23, 5:25, 6:5, 10:19, 18:8, 19:1, 19:2, 41:22, 53:24, 55:8, 56:4, 65:14, 74:17, 74:24, 94:3, 97:10, 97:12, 100:17, 101:25, 102:17, 107:3, 107:13, 107:17, 107:19, 107:25, 110:15, 115:19, 121:8, 121:19, 127:1, 127:4
**ground** [5] - 13:17, 14:7, 64:8, 78:17, 79:7
**group** [2] - 88:13, 93:1
**guess** [12] - 6:11, 50:11, 72:8, 74:10, 103:12, 103:13, 105:3, 118:5, 118:8, 118:11, 118:12, 123:21
**guns** [1] - 48:11
**guys** [2] - 114:7, 115:23

## H

**H3** [1] - 52:8
**Haines** [1] - 2:14
**HAINES** [1] - 1:10
**halfway** [3] - 61:4, 75:23, 106:3
**Hall** [1] - 1:20
**HALL** [1] - 2:10
**hand** [5] - 29:22, 79:9, 116:24, 122:5, 128:16
**handcuff** [2] - 27:15, 108:7
**handcuffed** [5] - 15:19, 16:4, 23:5, 80:18, 89:3
**Handcuffing** [2] - 3:14, 27:11
**handcuffs** [28] - 14:12, 15:9, 15:12, 16:23, 24:7, 39:18, 53:8, 53:20, 53:24, 54:4, 54:13, 54:16, 54:21, 55:6, 55:10, 76:20, 77:9, 78:2, 78:7, 78:11, 78:14, 107:23, 107:25,

108:1, 108:3, 108:6, 108:9, 108:10
**handed** [5] - 18:3, 27:8, 38:15, 57:14, 59:18
**handful** [1] - 81:21
**handing** [1] - 17:23
**handle** [4] - 40:1, 41:17, 53:15, 121:21
**handles** [1] - 41:11
**handling** [3] - 35:21, 41:16, 65:18
**hands** [5] - 110:10, 119:6, 119:11, 121:14, 121:19
**hands-off** [1] - 121:19
**hands-on** [3] - 119:6, 119:11, 121:14
**Harvath** [24] - 2:18, 15:3, 34:4, 34:5, 34:7, 38:2, 38:3, 40:19, 41:3, 47:3, 47:5, 50:16, 50:21, 52:23, 54:19, 64:4, 64:16, 80:15, 80:19, 83:23, 83:24, 84:12, 85:8, 93:5
**HARVATH** [1] - 1:7
**Harvath's** [3] - 50:14, 89:4, 90:20
**he/she** [1] - 19:19
**head** [14] - 5:11, 15:25, 29:20, 29:21, 29:22, 29:23, 35:25, 79:3, 79:5, 79:7, 116:25, 117:12, 119:15
**health** [7] - 49:12, 49:18, 49:21, 49:24, 50:5, 50:11, 52:1
**hear** [6] - 15:20, 58:7, 80:1, 80:8, 105:18, 106:5
**heard** [11] - 20:6, 21:21, 25:6, 45:17, 45:24, 58:8, 80:7, 90:21, 92:7, 92:8, 104:25
**hearing** [1] - 105:6
**heart** [1] - 120:23
**heavier** [2] - 17:10, 45:10
**heavily** [4] - 17:6, 30:24, 43:18, 77:16
**heavy** [6] - 14:1, 22:11, 22:13, 36:21, 83:3, 83:7
**height** [1] - 100:13
**held** [1] - 29:16

**helmet** [1] - 31:8
**help** [1] - 78:23
**helped** [1] - 34:5
**hereby** [1] - 73:14, 95:1
**herein** [1] - 4:15
**hereunder** [1] - 128:15
**high** [1] - 6:22
**higher** [2] - 12:23, 74:2
**himself** [5] - 78:21, 79:6, 79:8, 87:25, 117:4
**history** [2] - 57:19, 87:22
**hit** [1] - 29:23, 79:7
**hitting** [1] - 117:12
**hold** [1] - 116:25
**holding** [1] - 53:7
**homeless** [5] - 11:22, 124:8, 124:9, 124:12, 124:14
**honest** [1] - 125:21
**hopefully** [1] - 103:11
**hospital** [55] - 11:4, 11:20, 12:5, 19:23, 20:5, 20:17, 20:19, 21:1, 23:4, 24:5, 31:25, 33:5, 36:23, 37:13, 37:24, 38:4, 44:21, 45:19, 45:25, 59:17, 60:18, 85:13, 85:21, 85:23, 87:7, 88:5, 88:19, 90:1, 90:9, 94:8, 96:4, 99:4, 99:6, 99:14, 100:3, 100:4, 101:15, 101:20, 113:18, 115:22, 116:7, 116:14, 118:15, 118:20, 120:3, 123:18, 124:11, 124:12, 124:19, 124:24, 125:2, 125:22, 126:1, 127:14
**Hospital** [1] - 13:3
**hospitalized** [1] - 81:7
**hours** [1] - 6:3
**HSHS** [1] - 72:21
**hurt** [3] - 78:20, 79:6, 87:25
**hurting** [1] - 117:10
**hyperventilating** [1] - 17:2

## I

**idea** [2] - 60:3,

127:19
**identify** [7] - 9:7, 9:15, 18:6, 27:9, 72:17, 73:14, 95:1
**ill** [1] - 19:18
**illegal** [1] - 48:14
**illness** [1] - 19:18
**imagine** [1] - 41:15
**immediate** [1] - 125:4
**immediately** [1] - 28:13
**imperviousness** [2] - 95:12, 122:20
**important** [1] - 79:5
**impression** [1] - 25:7
**improved** [1] - 82:14
**in-person** [1] - 50:13
**incident** [9] - 9:24, 26:21, 74:3, 74:18, 74:25, 75:11, 112:2, 124:11
**incidents** [1] - 45:19
**included** [1] - 100:9
**includes** [4] - 27:12, 72:21, 86:19, 99:5
**including** [2] - 18:13, 85:3
**increased** [2] - 95:14, 122:23
**increases** [1] - 120:24
**independent** [1] - 41:2
**indicate** [4] - 48:21, 48:23, 113:13, 126:16
**indicated** [1] - 117:18
**indicates** [2] - 82:8, 86:21
**indicating** [1] - 28:19
**indication** [2] - 16:15, 114:1
**indirectly** [1] - 128:14
**individual** [8] - 11:8, 11:21, 31:25, 41:19, 46:12, 46:13, 46:15, 120:15
**individuals** [3] - 15:4, 32:17, 120:7
**inform** [10] - 39:19, 39:22, 44:20, 45:2, 45:6, 45:9, 60:10, 60:14, 60:21, 61:3
**information** [15] - 11:2, 11:3, 40:5, 44:23, 44:25, 57:24, 59:18, 60:2, 61:25, 89:17, 89:18, 89:22

94:18, 99:5, 111:15
**informed** [4] - 31:25, 43:5, 43:6, 109:14
**initial** [3] - 15:5, 26:17, 86:19
**initiate** [1] - 70:5
**initiated** [2] - 69:12, 70:6
**injure** [1] - 117:3
**Injured** [1] - 19:17
**injured** [1] - 19:18
**injury** [3] - 19:19, 20:11, 22:5
**inside** [3] - 52:2, 94:16, 94:18
**insight** [1] - 98:14
**instance** [2] - 1:16, 48:11
**instead** [1] - 118:2
**instruct** [2] - 13:11, 67:24
**instructed** [1] - 13:13
**instructions** [1] - 73:6
**INSURANCE** [2] - 1:11, 1:11
**intake** [8] - 105:10, 105:13, 106:7, 106:11, 109:7, 109:11, 127:1, 127:5
**interacting** [3] - 47:9, 49:16, 58:15
**interaction** [10] - 4:23, 11:14, 11:19, 12:14, 20:3, 20:20, 20:22, 59:4, 96:14, 106:5
**interactions** [4] - 11:11, 113:24, 120:21, 120:24
**interchangeably** [1] - 108:8
**interested** [1] - 128:13
**Intern** [1] - 3:2
**interrupt** [1] - 114:24
**interview** [4] - 73:15, 73:18, 73:25, 74:13
**interviews** [1] - 73:22
**Investigation** [1] - 9:17
**Investigations** [1] - 73:16
**involved** [7] - 12:14, 35:19, 55:13, 64:16, 69:18, 76:9, 126:15
**involvement** [1] - 98:20

**involves** [2] - 10:5, 108:24
**involving** [2] - 95:22, 122:24
**irrational** [1] - 95:9, 122:18
**issue** [2] - 29:2, 49:21
**issues** [2] - 25:17, 28:20

## J

**jail** [133] - 7:13, 31:20, 38:4, 38:11, 39:1, 39:19, 39:22, 39:23, 40:3, 40:6, 40:10, 40:13, 41:4, 41:6, 41:7, 41:8, 41:10, 41:11, 41:13, 41:16, 41:20, 42:2, 42:4, 42:14, 42:15, 42:23, 43:1, 43:2, 43:3, 43:4, 43:8, 44:20, 44:24, 45:15, 46:20, 46:21, 47:9, 47:21, 48:2, 48:13, 49:20, 50:3, 50:13, 52:10, 52:16, 52:18, 53:13, 53:19, 53:22, 54:3, 54:10, 54:12, 54:20, 55:14, 56:2, 56:9, 56:15, 56:25, 57:9, 57:11, 57:25, 58:1, 58:15, 59:1, 59:4, 59:17, 60:8, 60:10, 60:21, 61:10, 61:11, 64:12, 65:4, 65:17, 66:25, 67:18, 69:18, 70:14, 70:25, 73:2, 73:3, 83:21, 83:24, 84:7, 84:17, 85:2, 85:11, 85:12, 85:13, 85:16, 85:17, 85:19, 85:20, 85:23, 88:4, 88:8, 88:9, 88:17, 88:18, 89:2, 90:8, 90:21, 91:4, 91:5, 93:6, 97:9, 99:17, 100:20, 101:3, 101:16, 102:16, 102:25, 103:17, 104:14, 104:25, 105:12, 105:20, 107:4, 107:8, 107:12, 109:21, 117:19, 117:24, 118:21, 118:24, 121:18, 121:20, 127:5, 127:14, 127:17
**James** [1] - 4:21

**JASMYNE** [1] - 2:15
**Jasmyne** [1] - 4:3
**JASON** [1] - 1:3
**Jason** [1] - 4:23
**Jed** [1] - 9:19
**Jefferson** [1] - 1:20
**jmb@wbattys.com** [1] - 2:17
**job** [2] - 35:23, 40:24
**John's** [1] - 11:15
**join** [2] - 17:8, 26:3
**justice** [1] - 6:24

## K

**Kallies** [1] - 4:5
**KALLIES** [39] - 2:20, 4:5, 9:9, 17:7, 22:7, 22:18, 25:4, 26:2, 26:4, 28:2, 35:1, 37:4, 38:8, 47:12, 63:12, 66:23, 69:15, 70:17, 72:1, 72:5, 73:20, 86:13, 97:1, 98:5, 98:13, 100:8, 100:15, 101:1, 101:7, 102:23, 104:3, 104:11, 104:23, 106:6, 106:22, 126:20, 126:23, 127:9, 127:20
**Kallies...................
.................** [2] - 3:6, 3:9
**KAREN** [1] - 1:7
**Karen** [1] - 2:18
**KATERS** [120] - 2:2, 2:6, 2:6, 4:9, 4:18, 7:23, 8:3, 8:6, 8:11, 8:16, 8:17, 8:24, 9:3, 9:10, 9:12, 9:14, 16:3, 16:6, 17:11, 17:22, 18:2, 18:25, 19:7, 20:10, 20:15, 21:5, 22:12, 22:22, 23:3, 23:12, 23:17, 23:21, 24:2, 25:9, 26:6, 26:9, 27:1, 27:7, 28:6, 28:23, 31:13, 33:9, 34:17, 35:4, 37:6, 37:8, 38:12, 38:22, 40:25, 42:3, 42:11, 44:16, 45:5, 45:13, 46:7, 47:2, 47:14, 47:15, 48:7, 50:9, 51:19, 53:16, 54:11, 54:24, 55:3, 55:17, 56:13, 56:18, 57:10, 58:12, 58:25, 61:4, 61:8, 63:15, 63:25, 65:10, 65:24, 67:4,

69:7, 69:20, 70:20, 71:10, 71:12, 71:20, 72:15, 73:21, 77:15, 80:9, 80:24, 81:11, 82:22, 86:15, 87:18, 89:1, 92:3, 92:21, 94:23, 95:21, 96:12, 96:22, 97:25, 98:10, 100:5, 103:25, 110:4, 114:11, 114:23, 115:4, 117:14, 119:13, 119:16, 119:19, 122:13, 123:14, 124:1, 124:15, 125:9, 125:25, 126:7, 127:6
**Katers** [1] - 4:9
**Katers.....................
.................** [2] - 3:6, 3:8
**KAYLA** [1] - 1:9
**Kayla** [1] - 2:13
**keep** [6] - 23:14, 29:22, 108:13, 117:10, 117:11, 117:12
**kept** [1] - 78:16
**Kevin** [2] - 4:10, 27:1
**KEVIN** [1] - 2:2
**keys** [3] - 108:5, 108:7, 108:8
**kick** [3] - 78:17, 78:20, 82:21
**kicked** [2] - 118:14, 118:16
**kicking** [1] - 117:11
**Kilbourn** [1] - 2:21
**kind** [7] - 72:9, 97:14, 98:18, 101:8, 104:7, 112:19, 123:21
**kneeling** [1] - 16:11
**knowledge** [22] - 18:12, 28:1, 32:14, 32:21, 35:8, 36:20, 40:4, 53:2, 53:3, 54:5, 67:3, 74:19, 76:18, 89:16, 95:5, 96:3, 99:3, 109:11, 112:25, 113:6, 113:8, 113:11
**known** [1] - 109:13
**kraasch@
katersgranitz.com** [1] - 2:4
**KUCHTA** [1] - 1:10
**Kuchta** [1] - 2:13
**Kust** [5] - 9:19, 74:14, 74:20, 74:22, 75:5

## L

**lack** [1] - 47:24
**laid** [1] - 29:12
**last** [17] - 4:4, 4:19, 32:5, 57:20, 66:19, 66:21, 81:23, 95:7, 95:8, 104:17, 104:18, 104:21, 122:7, 122:8, 123:11
**Law** [3] - 72:19, 99:19, 100:18
**law** [5] - 4:12, 18:21, 20:20, 20:22, 47:20
**lawsuit** [1] - 8:25
**laying** [2] - 16:23, 79:11
**lead** [1] - 81:17
**leading** [6] - 114:11, 115:6, 117:14, 119:13, 119:20, 124:1
**LEAH** [1] - 1:18, 128:5
**learn** [1] - 118:8
**leave** [4] - 11:4, 11:16, 33:15, 72:1
**left** [10] - 11:18, 16:20, 37:24, 77:25, 79:10, 83:21, 97:10, 97:11, 99:3, 116:25
**leg** [1] - 29:12
**legal** [1] - 110:4
**legitimately** [1] - 97:24
**legs** [6] - 78:1, 78:18, 78:19, 78:24, 79:1, 79:2
**less** [2] - 77:4, 116:10
**letting** [4] - 8:1, 35:23, 41:20, 48:18
**level** [2] - 44:10, 82:14
**Lieutenant** [1] - 14:21
**lieutenants** [1] - 74:8
**lifted** [2] - 44:7, 89:2
**limited** [1] - 33:3
**limp** [2] - 44:17, 127:3
**Lindsay** [1] - 3:2
**line** [1] - 119:20
**lines** [2] - 67:23, 84:9
**linoleum** [1] - 117:13
**list** [1] - 126:4
**listen** [3] - 42:16, 42:25, 50:25
**listened** [2] - 16:14, 114:10
**live** [1] - 48:14

**LLC** [2] - 2:2, 2:6
**loaded** [1] - 105:16
**located** [1] - 105:20
**location** [2] - 12:7, 76:14
**log** [1] - 11:7
**look** [10] - 9:8, 11:6, 66:15, 100:12, 100:14, 109:4, 112:13, 112:18, 119:3, 125:10
**looked** [2] - 14:4, 16:14
**looking** [7] - 6:15, 41:1, 51:6, 64:21, 75:19, 122:7, 126:12
**looks** [1] - 88:2
**loud** [2] - 36:17, 112:24
**lying** [1] - 76:20

## M

**M.D** [3] - 98:17, 113:20
**machine** [2] - 70:1, 70:2
**mail** [2] - 9:1, 72:10
**mailed** [1] - 52:18
**main** [2] - 69:18, 88:1
**maintain** [13] - 6:14, 13:18, 53:6, 53:18, 53:24, 54:12, 54:19, 55:4, 55:9, 55:15, 77:4, 77:7, 117:9
**maintained** [1] - 54:9
**male** [5] - 11:4, 11:5, 68:8, 125:24, 126:1
**mark** [1] - 8:14
**marked** [17] - 8:23, 9:2, 9:4, 9:9, 17:21, 17:23, 18:4, 26:24, 27:8, 72:14, 72:16, 73:11, 73:12, 94:22, 94:24, 122:5, 125:11
**Mary's** [1] - 72:21
**master** [2] - 47:24, 48:8
**matter** [2] - 14:24, 42:23
**Matthew** [1] - 2:13
**MATTHEW** [1] - 1:9
**mean** [10] - 15:8, 23:22, 34:2, 50:23, 54:18, 71:8, 74:8, 88:3, 114:24, 121:8
**meaning** [2] - 13:13, 84:23
**means** [1] - 68:11

**meant** [3] - 28:22, 98:8, 118:11
**medical** [144] - 8:10, 8:11, 8:18, 17:13, 18:21, 19:12, 20:16, 20:24, 21:4, 21:7, 21:8, 21:9, 21:14, 21:16, 21:17, 22:4, 23:7, 23:8, 24:8, 28:12, 31:17, 32:1, 37:20, 37:22, 37:24, 38:6, 38:7, 43:6, 57:14, 57:15, 59:5, 59:10, 59:12, 59:22, 60:1, 60:6, 60:22, 61:20, 62:4, 65:9, 65:22, 65:25, 66:8, 67:5, 67:7, 67:16, 67:25, 68:1, 68:2, 68:18, 68:19, 68:20, 68:25, 69:9, 69:11, 69:19, 70:12, 70:18, 70:19, 70:22, 70:24, 71:1, 71:5, 71:8, 71:14, 71:17, 71:19, 72:3, 72:5, 72:19, 72:24, 86:19, 87:10, 87:14, 87:17, 87:22, 88:19, 88:24, 88:25, 89:15, 89:17, 91:20, 92:23, 95:23, 96:1, 96:3, 96:6, 96:9, 96:11, 96:13, 96:16, 96:17, 96:19, 98:14, 99:12, 101:5, 101:9, 101:10, 101:23, 102:4, 102:6, 102:9, 103:14, 103:23, 104:5, 110:19, 110:25, 112:7, 112:10, 113:1, 113:8, 113:12, 113:14, 113:15, 113:23, 115:2, 115:12, 115:13, 115:15, 115:18, 117:25, 118:3, 118:22, 118:25, 119:24, 119:25, 121:25, 122:2, 122:25, 123:4, 123:5, 123:6, 123:7, 123:8, 123:18, 123:20, 123:25, 124:21, 125:3, 125:5
**Medical** [16] - 3:13, 3:14, 18:8, 72:20, 89:10, 89:14, 95:7, 99:20, 100:18, 112:18, 117:21, 117:22, 125:11, 125:14, 126:4, 126:13

**medically** [18] - 19:19, 20:17, 20:19, 21:2, 21:3, 31:18, 32:13, 32:14, 32:15, 32:16, 32:17, 32:22, 85:23, 112:15, 114:17, 118:20, 123:24, 124:22
**medication** [1] - 87:4
**meeting** [3] - 74:13, 74:20, 74:22
**meetings** [1] - 74:16
**member** [4] - 85:16, 93:6, 97:10, 97:11
**members** [2] - 18:19, 85:19
**memory** [1] - 76:7
**mentioned** [2] - 75:11, 75:14
**MICHAEL** [1] - 1:7
**might** [1] - 39:13
**mILLER** [1] - 128:5
**MILLER** [1] - 1:18
**MILWAUKEE** [1] - 128:2
**Milwaukee** [3] - 2:11, 2:21, 128:16
**mind** [3] - 27:18, 28:2, 39:9
**mini** [1] - 26:17
**mini-academy** [1] - 26:17
**minute** [1] - 94:25
**minutes** [11] - 33:8, 33:10, 33:12, 33:17, 33:22, 39:4, 57:20, 64:25, 90:18, 93:19, 96:23
**misstates** [3] - 25:2, 61:1, 115:5
**misstating** [1] - 23:24
**moment** [1] - 9:5
**monitor** [1] - 41:18
**monitored** [1] - 115:18
**monitoring** [7] - 40:17, 41:4, 49:21, 50:15, 64:1, 64:2, 91:2
**morning** [3] - 6:2, 74:10, 103:12
**mostly** [1] - 47:20
**mouth** [1] - 66:17
**move** [6] - 30:16, 33:2, 44:3, 45:16, 76:14, 78:16
**moved** [7] - 15:25, 33:5, 56:14, 76:13, 79:2, 85:11, 94:16

**movement** [1] - 33:2
**moving** [4] - 44:5, 56:19, 85:3, 92:4
**MR** [169] - 2:2, 2:6, 2:10, 2:20, 4:5, 4:7, 4:9, 4:18, 7:23, 8:3, 8:6, 8:11, 8:16, 8:17, 8:24, 9:3, 9:9, 9:10, 9:12, 9:14, 16:3, 16:6, 17:7, 17:11, 17:22, 18:2, 18:25, 19:7, 20:10, 20:15, 21:5, 22:7, 22:12, 22:18, 22:22, 23:3, 23:12, 23:17, 23:21, 24:2, 25:4, 25:9, 26:2, 26:4, 26:6, 26:9, 27:1, 27:7, 28:2, 28:6, 28:23, 31:13, 33:9, 34:17, 35:1, 35:4, 37:4, 37:6, 37:8, 38:8, 38:12, 38:20, 38:22, 40:25, 42:3, 42:11, 44:16, 45:5, 45:13, 46:7, 47:2, 47:12, 47:14, 47:15, 48:7, 50:9, 51:19, 53:16, 54:11, 54:22, 54:24, 55:3, 55:17, 56:13, 56:18, 57:10, 58:12, 58:25, 61:4, 61:8, 63:12, 63:15, 63:25, 65:10, 65:19, 65:24, 66:23, 67:4, 69:7, 69:15, 69:20, 70:17, 70:20, 71:10, 71:12, 71:20, 72:1, 72:5, 72:15, 73:20, 73:21, 77:15, 80:9, 80:24, 81:11, 82:22, 86:13, 86:15, 87:18, 89:1, 92:3, 92:21, 94:23, 95:21, 96:12, 96:22, 97:1, 97:25, 98:5, 98:10, 98:13, 100:5, 100:8, 100:15, 101:1, 101:7, 102:23, 103:25, 104:3, 104:11, 104:23, 106:6, 106:22, 106:25, 107:22, 108:16, 109:9, 110:4, 110:14, 111:6, 114:11, 114:23, 115:4, 117:14, 119:13, 119:16, 119:19, 122:13, 123:14, 124:1, 124:15, 125:9, 125:25, 126:7, 126:20, 126:23, 127:6, 127:9, 127:20

**MS** [107] - 2:15, 4:3, 4:11, 7:21, 8:1, 8:13, 9:11, 15:23, 16:5, 17:8, 17:25, 18:23, 19:5, 20:8, 20:12, 20:25, 22:8, 22:20, 22:25, 23:11, 23:14, 23:19, 23:22, 25:2, 26:3, 28:18, 31:10, 33:7, 34:13, 35:2, 37:3, 38:9, 40:21, 41:24, 42:5, 44:13, 45:3, 45:12, 46:5, 46:23, 48:5, 50:7, 51:14, 53:11, 54:8, 54:23, 55:11, 56:11, 56:16, 57:4, 58:11, 58:21, 60:24, 61:1, 63:13, 63:21, 65:3, 66:24, 69:6, 69:14, 71:2, 71:7, 71:11, 71:18, 72:3, 77:12, 80:3, 80:21, 81:10, 82:19, 87:13, 88:21, 91:24, 92:18, 95:20, 96:7, 100:6, 100:11, 100:21, 101:4, 102:19, 104:1, 104:10, 104:21, 106:1, 107:20, 108:13, 109:2, 109:16, 110:6, 111:8, 114:13, 114:25, 115:7, 117:15, 119:14, 119:21, 122:14, 123:15, 124:3, 124:17, 125:7, 125:24, 126:8, 126:11, 126:19, 127:7
**multiple** [12] - 32:12, 35:20, 58:16, 58:22, 81:25, 84:7, 95:13, 95:18, 111:19, 120:12, 122:22, 125:2
**must** [2] - 5:6, 5:10

**N**

**name** [11] - 4:19, 4:21, 11:5, 11:23, 11:24, 15:2, 21:10, 32:3, 32:4, 32:5
**named** [2] - 15:1, 114:20
**nature** [1] - 13:4
**near** [1] - 29:20
**necessarily** [1] - 50:23
**necessary** [5] - 52:7, 67:19, 116:11, 122:3,

123:17
**need** [14] - 9:8, 18:7, 18:20, 21:4, 23:22, 32:1, 41:20, 67:25, 68:12, 77:4, 89:13, 93:2, 96:17, 125:4
**needed** [12] - 17:15, 21:8, 21:14, 24:8, 35:19, 61:19, 65:22, 66:4, 68:10, 84:14, 89:9, 93:23
**needs** [1] - 117:19
**negotiating** [1] - 97:22
**never** [2] - 7:8, 42:4
**nevertheless** [1] - 54:18
**new** [2] - 118:2, 118:3
**next** [9] - 21:20, 49:1, 77:3, 81:8, 83:12, 84:17, 124:13, 124:19, 127:16
**NICHOLAS** [1] - 2:10
**night** [12] - 6:4, 6:10, 6:18, 34:3, 54:7, 55:4, 58:2, 74:21, 75:17, 85:20, 97:15, 98:19
**NO** [2] - 1:5, 3:11
**nobody** [3] - 16:11, 16:17, 17:12
**nonbreathing** [1] - 68:9
**noncooperative** [1] - 120:6
**none** [1] - 77:14
**nonrestraint** [1] - 46:2
**normal** [9] - 14:5, 22:1, 22:11, 22:14, 39:5, 63:17, 67:1, 67:3, 121:5
**normally** [5] - 36:22, 39:24, 42:25, 46:8, 46:16
**North** [2] - 1:20, 2:11
**Notary** [3] - 1:18, 128:5, 128:22
**notes** [1] - 77:3
**nothing** [4] - 31:19, 50:19, 75:14, 96:5
**Notice** [1] - 3:12
**notice** [4] - 7:17, 7:24, 9:13, 91:16
**noticed** [5] - 15:11, 90:20, 91:13, 92:13, 92:16
**Notifications** [1] - 39:16
**notify** [1] - 39:24

**November** [4] - 6:1, 26:18, 26:20, 128:17
**number** [1] - 81:21
**nurse** [43] - 21:20, 31:21, 32:2, 57:9, 59:2, 59:4, 60:10, 60:21, 61:10, 61:19, 65:4, 67:18, 69:18, 71:4, 85:13, 85:17, 85:20, 85:24, 86:2, 86:10, 86:16, 86:18, 86:22, 88:4, 88:9, 88:18, 90:8, 90:21, 90:24, 91:4, 92:10, 104:15, 104:25, 105:4, 105:12, 105:20, 106:8, 106:12, 114:20, 117:19, 117:25, 118:24, 127:17
**Nurse** [2] - 123:22, 127:17
**nurses** [1] - 32:23
**nursing** [6] - 17:14, 21:10, 31:18, 31:21, 59:18, 100:25

## O

**O'Connor** [1] - 10:17
**O'DONNELL** [1] - 1:7
**O'Donnell** [24] - 12:14, 12:16, 13:16, 13:18, 14:7, 14:8, 15:17, 30:9, 37:17, 59:9, 62:17, 76:3, 76:12, 77:21, 80:6, 87:1, 89:8, 90:14, 98:24, 99:10, 116:6, 116:15, 116:16, 127:12
**oath** [1] - 128:7
**object** [14] - 26:2, 38:8, 38:20, 45:12, 65:19, 98:10, 115:4, 119:13, 119:19, 122:13, 123:14, 124:1, 124:15, 127:6
**objected** [1] - 23:18
**Objection** [1] - 20:12
**objection** [70] - 9:13, 15:23, 17:7, 18:23, 20:8, 20:25, 22:7, 22:8, 22:18, 23:11, 23:12, 24:1, 25:2, 25:4, 26:4, 26:5, 28:18, 31:10, 33:7, 34:13, 35:1, 37:3, 37:4, 41:24, 42:5, 44:13, 45:3, 46:5,

46:23, 47:12, 48:5, 50:7, 51:14, 53:11, 54:8, 54:22, 57:4, 58:11, 58:21, 60:24, 63:12, 63:21, 65:3, 66:23, 69:6, 69:14, 70:17, 71:2, 73:20, 77:12, 80:21, 82:19, 86:13, 87:13, 88:21, 91:24, 92:18, 95:20, 97:25, 100:5, 100:6, 100:11, 100:21, 102:19, 103:25, 109:2, 109:16, 110:4, 114:11, 117:14
**objections** [2] - 4:13, 23:23
**obligated** [2] - 51:3, 102:16
**obligation** [1] - 109:5
**observation** [1] - 64:20
**observations** [3] - 113:24, 119:10, 119:22
**observe** [24] - 14:3, 28:24, 29:1, 34:24, 35:6, 44:23, 47:10, 55:8, 58:1, 58:5, 58:9, 58:13, 58:17, 59:1, 62:24, 63:2, 63:16, 66:5, 66:22, 68:19, 83:17, 83:20, 86:16, 114:3
**observed** [17] - 13:15, 13:25, 14:6, 24:5, 35:24, 45:22, 66:7, 66:20, 66:25, 67:10, 67:13, 68:19, 86:18, 91:12, 93:11, 93:14, 96:13
**observing** [5] - 35:17, 56:20, 63:5, 64:21, 67:7
**obtain** [3] - 98:19, 100:18, 112:10
**obtained** [8] - 55:20, 55:21, 98:21, 99:10, 99:16, 99:21, 127:13, 127:15
**obtaining** [1] - 98:20
**obviously** [2] - 12:16, 81:24
**occasion** [6] - 73:23, 99:16, 99:18, 112:9, 112:14, 120:11
**occur** [3] - 53:10, 54:2, 103:14
**occurred** [6] - 52:25, 53:1, 61:18, 85:6,

103:15, 103:16
**occurrences** [1] - 74:3
**occurs** [1] - 103:2
**October** [2] - 1:21, 128:8
**OF** [5] - 1:1, 1:3, 1:10, 128:1, 128:2
**office** [2] - 9:1, 128:16
**Office** [1] - 42:2
**Officer** [66] - 12:14, 12:16, 13:15, 13:18, 14:7, 14:8, 14:19, 14:21, 15:3, 15:16, 15:17, 16:20, 29:7, 30:8, 34:5, 34:7, 34:8, 34:11, 37:17, 38:2, 38:3, 40:19, 41:3, 47:3, 47:5, 50:14, 50:16, 50:21, 50:22, 52:22, 54:19, 59:8, 62:17, 64:16, 69:17, 70:1, 76:11, 77:20, 80:5, 80:6, 80:7, 80:14, 80:15, 80:19, 81:9, 81:12, 82:24, 85:8, 87:1, 89:8, 90:14, 91:4, 93:5, 93:6, 98:24, 116:6, 116:14, 116:16, 127:12
**officer** [23] - 5:23, 5:24, 6:4, 6:6, 6:9, 6:11, 12:21, 12:22, 14:24, 34:4, 36:7, 39:17, 39:18, 40:19, 50:17, 51:1, 69:2, 77:24, 84:12, 84:13, 88:2, 120:5, 121:23
**officers** [64] - 14:15, 14:18, 15:1, 15:2, 15:15, 16:19, 18:13, 19:2, 20:6, 23:5, 30:11, 30:17, 32:19, 34:2, 35:18, 35:21, 36:10, 37:1, 37:9, 38:23, 43:13, 43:25, 44:3, 44:7, 46:11, 50:18, 50:22, 52:5, 53:24, 54:18, 55:9, 58:16, 58:23, 61:24, 63:9, 65:14, 74:3, 77:3, 77:5, 77:10, 78:1, 78:20, 80:10, 82:12, 82:21, 83:3, 84:7, 85:1, 88:5, 88:10, 95:13, 95:18, 107:3, 107:19, 110:16, 116:4,

116:10, 117:12, 120:3, 120:12, 122:22, 126:5, 126:18
**Officers** [8] - 49:11, 51:8, 52:9, 53:6, 64:4, 80:1, 84:11, 123:3
**officers'** [1] - 65:17
**often** [1] - 18:20
**Once** [1] - 82:23
**once** [8] - 11:13, 15:1, 15:18, 45:20, 45:24, 48:25, 53:15, 78:14
**one** [34] - 8:14, 12:21, 12:23, 13:1, 18:1, 21:16, 21:17, 23:15, 26:5, 29:21, 56:8, 57:13, 57:22, 57:23, 59:21, 59:22, 62:2, 84:6, 85:12, 85:19, 87:19, 87:21, 87:23, 98:7, 106:2, 109:14, 114:9, 116:1, 118:12, 120:20, 120:24, 125:10, 126:8, 127:10
**ones** [2] - 42:9, 69:18
**open** [4] - 12:12, 90:20, 91:13, 103:4
**operated** [1] - 47:23
**operating** [3] - 86:1, 100:23, 121:9
**opposed** [3] - 5:12, 79:10, 97:23
**options** [1] - 112:19
**order** [6] - 27:3, 39:13, 53:7, 53:23, 54:14, 84:10
**ordered** [5] - 53:20, 54:13, 55:5, 55:10, 94:4
**ordinary** [2] - 58:18, 121:3
**original** [1] - 25:10
**originally** [2] - 12:4, 87:7
**overflow** [1] - 11:15
**overheard** [1] - 65:4
**own** [4] - 11:18, 44:17, 63:19, 108:8

## P

**p.m** [4] - 1:22, 10:10, 73:24, 127:21
**packet** [3] - 60:2, 73:7, 99:20
**pads** [2] - 66:3, 69:25, 70:1

**PAGE** [2] - 3:5, 3:11
**page** [19] - 18:17, 19:16, 28:8, 39:9, 39:14, 39:16, 52:8, 53:4, 75:20, 75:21, 75:22, 81:8, 82:3, 95:7, 100:13, 104:18, 122:6, 122:7
**pages** [1] - 27:19
**paging** [1] - 27:18
**pain** [3] - 79:8, 95:12, 122:20
**pale** [4] - 66:16, 66:21, 67:14, 91:19
**paperwork** [24] - 37:12, 37:19, 57:14, 59:5, 59:7, 59:11, 59:12, 59:16, 59:22, 62:18, 73:7, 86:8, 86:24, 89:16, 99:4, 99:13, 100:10, 100:19, 100:25, 101:2, 101:11, 127:11, 127:13, 127:18
**paragraph** [14] - 75:19, 75:23, 83:12, 84:17, 93:7, 95:8, 104:17, 104:19, 104:21, 122:8, 122:10, 122:11, 122:15, 123:12
**park** [1] - 47:20
**part** [6] - 29:18, 34:18, 36:5, 44:4, 122:10, 123:3
**participate** [1] - 83:14
**particular** [4] - 53:18, 73:23, 74:22, 79:9
**parties** [2] - 72:10, 128:12
**partner** [1] - 10:14
**passed** [2] - 36:7, 80:17
**passing** [1] - 75:11
**past** [1] - 48:25
**pat** [1] - 121:15
**patient** [2] - 112:25, 126:14
**Patient** [1] - 113:7
**patrol** [10] - 6:4, 6:12, 6:14, 10:11, 10:14, 34:1, 34:3, 50:18, 50:22, 103:16
**paying** [2] - 35:22, 83:19
**Pelischek** [1] - 2:13
**PELISCHEK** [1] - 1:9

**people** [1] - 93:4
**per** [1] - 96:8
**performed** [1] - 89:17
**period** [4] - 91:3, 94:15, 115:1, 115:19
**periods** [1] - 118:20
**peripheral** [1] - 64:22
**peripherals** [1] - 92:9
**permitted** [1] - 88:16
**person** [9] - 39:17, 41:10, 50:13, 51:10, 52:20, 89:20, 104:25, 112:15, 119:11
**personal** [5] - 53:2, 53:3, 79:19, 99:5, 128:9
**personally** [3] - 44:22, 55:7, 92:8
**personnel** [18] - 12:9, 53:7, 53:20, 55:5, 55:10, 67:20, 68:1, 68:2, 68:10, 68:15, 68:21, 71:17, 76:4, 76:14, 101:3, 123:6, 123:20, 124:22
**persons** [3] - 18:20, 95:22, 122:24
**Persons** [2] - 95:8, 122:17
**perspective** [2] - 105:17, 121:19
**peruse** [1] - 94:25
**phone** [19] - 59:9, 62:1, 62:2, 62:14, 62:18, 62:20, 63:4, 64:2, 64:18, 64:19, 64:23, 64:24, 86:24, 90:12, 90:13, 90:17, 91:7, 91:8, 106:20
**Phonetic** [1] - 10:17
**phrase** [1] - 113:11
**physical** [8] - 49:5, 55:15, 55:19, 95:11, 95:13, 95:17, 122:20, 122:22
**physically** [5] - 35:16, 35:25, 44:5, 63:10, 102:3
**picturing** [1] - 71:18
**Pineda** [28] - 2:18, 15:3, 34:4, 34:5, 34:8, 34:11, 38:3, 40:19, 41:3, 47:4, 47:6, 50:14, 50:16, 50:22, 52:22, 54:19, 64:4, 64:16, 69:17, 70:1, 80:14, 80:19, 82:24,

83:24, 84:11, 85:8, 91:5, 93:6
**PINEDA** [1] - 1:7
**place** [14] - 5:22, 18:10, 27:25, 29:12, 29:16, 70:3, 76:19, 77:9, 78:2, 82:23, 87:20, 95:3, 117:6, 117:8
**placed** [36] - 24:10, 25:20, 29:13, 29:15, 29:22, 30:13, 30:18, 31:8, 31:16, 32:25, 34:21, 35:7, 36:8, 37:10, 45:25, 60:23, 64:8, 64:12, 64:14, 78:7, 78:12, 78:14, 79:9, 89:4, 91:11, 91:18, 97:7, 102:11, 105:2, 105:11, 105:14, 111:15, 111:18, 114:18, 127:4
**placing** [8] - 14:11, 29:11, 34:9, 34:18, 37:1, 64:17, 66:3, 87:11
**Plaintiff** [4] - 1:4, 1:16, 2:5, 2:9
**plaintiff's** [2] - 122:9, 122:16
**plaintiffs** [1] - 4:10
**Plankinton** [1] - 2:11
**play** [1] - 50:19
**PNB** [1] - 68:9
**PO** [13] - 75:24, 76:2, 76:3, 76:13, 76:19, 77:25, 83:23, 89:4, 90:19, 90:20, 92:12, 93:7
**point** [112] - 13:20, 13:21, 14:13, 14:15, 15:15, 15:18, 15:21, 16:25, 17:12, 17:13, 20:18, 22:17, 22:23, 22:25, 23:1, 23:2, 23:10, 23:14, 23:15, 23:25, 24:9, 29:21, 30:24, 31:6, 33:21, 35:5, 36:9, 36:19, 36:21, 41:21, 41:25, 42:6, 43:16, 44:9, 45:14, 49:19, 50:1, 50:15, 50:20, 51:18, 52:6, 57:1, 58:10, 58:19, 59:8, 61:15, 63:7, 63:20, 64:1, 64:5, 64:12, 64:20, 65:6, 65:17, 65:20, 66:7, 66:15, 67:19, 69:22, 77:11, 77:16,

77:18, 77:21, 79:13, 79:23, 81:5, 82:15, 82:18, 82:20, 83:2, 83:8, 83:10, 88:16, 88:17, 88:20, 88:23, 89:7, 91:21, 91:23, 92:2, 92:4, 92:5, 92:22, 93:4, 97:9, 103:13, 103:14, 104:7, 104:13, 104:14, 105:21, 106:2, 106:19, 107:11, 107:23, 109:20, 110:13, 110:15, 111:19, 116:3, 117:6, 118:8, 119:16, 119:20, 119:22, 121:20, 122:13, 124:23, 125:1, 125:2, 126:24
**police** [12] - 5:23, 5:24, 6:13, 19:2, 33:22, 53:24, 77:23, 88:2, 107:25, 120:5, 121:4, 121:23
**Police** [19] - 6:5, 10:19, 18:9, 41:23, 55:8, 56:4, 65:14, 74:17, 74:24, 77:23, 82:24, 89:8, 90:14, 97:12, 100:17, 101:25, 102:17, 107:13, 115:20
**policies** [5] - 27:3, 27:23, 27:24, 51:8, 51:12
**policy** [26] - 18:10, 18:14, 18:19, 19:1, 19:8, 25:19, 25:21, 27:11, 27:12, 41:15, 51:20, 53:4, 53:23, 54:6, 54:25, 57:6, 95:3, 96:9, 100:17, 108:22, 108:23, 109:5, 109:6, 122:17, 123:11
**Policy** [6] - 3:13, 3:14, 3:15, 18:8, 18:9, 95:2
**port** [38] - 7:13, 12:5, 40:11, 46:12, 47:4, 47:6, 47:13, 47:17, 47:19, 48:3, 48:17, 48:19, 48:25, 49:4, 49:15, 50:10, 53:15, 56:1, 56:6, 61:16, 62:19, 62:22, 63:1, 63:11, 64:7, 64:11, 68:9, 70:14, 84:18, 90:15, 90:23, 94:17,

97:8, 103:17, 105:10, 105:15, 109:19, 124:25
**portable** [1] - 68:7
**portion** [6] - 41:12, 82:23, 82:25, 92:13, 108:13, 123:11
**POs** [1] - 83:24
**position** [4] - 29:17, 82:13, 120:6
**positional** [2] - 25:23, 28:22
**positioned** [1] - 29:19
**possible** [2] - 10:3, 77:8
**possibly** [3] - 65:5, 68:12, 91:20
**post** [1] - 26:21
**potential** [2] - 6:15, 10:17
**potentially** [3] - 78:20, 91:5, 92:24
**practicable** [1] - 123:5
**pre** [1] - 99:25
**pre-prepared** [1] - 99:25
**precautions** [1] - 116:21
**Precautions** [1] - 28:9
**preface** [1] - 75:2
**premise** [1] - 23:19
**premising** [1] - 23:24
**preparation** [3] - 7:25, 8:4, 8:21
**prepare** [1] - 7:10
**prepared** [1] - 99:25
**present** [5] - 15:15, 21:2, 33:10, 62:21, 123:19
**press** [1] - 46:19
**pretty** [1] - 27:6
**previous** [1] - 44:20
**previously** [6] - 11:22, 73:12, 86:8, 91:19, 122:5, 122:8
**primary** [2] - 13:1, 98:7
**prisoner** [4] - 53:7, 53:19, 53:25, 55:5
**prisoners** [1] - 48:3
**problem** [1] - 24:21
**problems** [2] - 25:22, 25:25
**procedure** [12] - 18:15, 27:19, 27:20, 41:15, 47:1, 51:20, 53:4, 57:7, 59:15,

86:1, 100:24, 121:9
**Procedure** [1] - 1:17
**procedures** [9] - 27:15, 27:16, 27:23, 27:25, 28:8, 46:18, 51:9, 51:12, 89:17
**Proceedings** [1] - 127:21
**process** [26] - 29:11, 42:1, 43:11, 43:13, 46:17, 57:2, 57:3, 63:16, 68:3, 68:6, 69:24, 83:17, 98:18, 102:24, 103:1, 107:10, 108:17, 108:18, 108:24, 109:7, 109:11, 109:22, 110:8, 119:6, 121:6, 121:9
**produced** [5] - 7:22, 8:2, 8:12, 27:3, 27:4
**professional** [4] - 7:5, 99:12, 101:6, 113:14
**professionals** [2] - 21:16, 21:17
**profuse** [2] - 95:10, 122:19
**profusely** [2] - 66:13, 83:10
**prohibitions** [2] - 68:24, 121:24
**pronounced** [2] - 94:8, 94:19
**pronouncing** [1] - 75:25
**propped** [1] - 29:14
**prospective** [1] - 10:18
**protracted** [3] - 95:12, 95:17, 122:22
**provide** [11] - 44:23, 65:25, 69:13, 70:12, 70:19, 70:21, 89:22, 92:23, 96:17, 96:19, 100:25
**provided** [14] - 11:2, 11:5, 28:13, 40:6, 45:1, 57:21, 59:6, 70:11, 73:3, 87:15, 89:20, 99:15, 101:23, 104:5
**Provider** [1] - 112:18
**provider** [1] - 113:4
**providers** [2] - 101:23, 102:4
**providing** [4] - 31:17, 65:22, 69:19, 71:5
**proximity** [3] - 94:12,

105:22, 106:15
**Public** [3] - 1:19, 128:5, 128:22
**pull** [3] - 48:21, 48:22, 103:4
**pulled** [3] - 12:5, 47:17, 84:18
**pulseless** [1] - 68:9
**Purpose** [1] - 18:18
**purpose** [2] - 18:19, 101:2
**purposes** [2] - 72:22, 98:7
**pursuant** [1] - 1:16, 7:17
**push** [1] - 103:5
**put** [12] - 28:20, 29:3, 29:4, 29:24, 34:5, 48:11, 63:17, 82:13, 107:19, 111:19, 111:21, 116:24
**putting** [5] - 7:14, 30:6, 82:17, 83:15, 83:17

## Q

**qualify** [2] - 72:7, 103:22
**questioning** [1] - 71:13
**questions** [16] - 4:23, 5:20, 9:6, 22:16, 44:2, 57:7, 58:1, 58:4, 58:6, 97:4, 97:14, 97:18, 106:22, 107:1, 111:1, 111:6
**quick** [1] - 126:20
**quicker** [1] - 122:16

## R

**RAASCH** [1] - 2:2
**Raasch** [1] - 4:10
**radio** [3] - 68:7, 68:8, 76:24
**radioed** [5] - 93:8, 116:2, 116:3, 116:9, 116:15
**rank** [4] - 12:23, 14:24, 42:23, 50:20
**ranking** [2] - 50:17, 74:2
**rate** [1] - 120:23
**rather** [1] - 77:6
**re** [5] - 88:6, 105:3, 105:14, 110:23, 117:20
**re-ask** [1] - 110:23
**re-cleared** [4] - 88:6,

105:3, 105:14, 117:20
**read** [31] - 19:20, 39:20, 49:12, 51:10, 53:8, 76:5, 76:15, 76:25, 77:25, 78:2, 82:10, 83:25, 84:19, 85:4, 85:14, 86:4, 87:4, 88:6, 89:11, 90:4, 92:14, 93:9, 95:15, 95:23, 104:14, 112:24, 122:9, 122:17, 122:25, 123:3, 123:12
**reading** [2] - 104:8, 104:25
**reads** [2] - 39:17, 122:17
**ready** [1] - 113:25
**real** [1] - 126:20
**really** [4] - 35:21, 58:17, 75:13, 118:1
**rear** [2] - 85:2, 103:16
**reason** [6] - 48:11, 79:9, 85:20, 101:13, 118:12, 124:10
**Reason** [3] - 125:14, 126:4, 126:13
**reasonably** [1] - 123:4
**REBECCA** [1] - 1:9
**Rebecca** [2] - 2:23, 4:6
**receive** [6] - 26:16, 37:12, 37:17, 85:22, 87:17, 111:21
**received** [12] - 6:23, 10:22, 19:12, 26:10, 37:15, 37:22, 44:25, 59:8, 72:7, 75:16, 96:3, 127:18
**receiving** [1] - 61:25
**recent** [1] - 87:22
**recently** [1] - 126:15
**recess** [2] - 61:7, 96:24
**recognize** [2] - 11:23, 18:19
**recollection** [8] - 35:9, 41:2, 46:1, 69:17, 76:12, 97:20, 98:17, 105:22
**record** [19] - 4:20, 9:15, 17:24, 18:4, 18:6, 26:25, 27:10, 28:3, 71:25, 72:1, 72:13, 72:16, 72:23, 73:14, 95:1, 98:16, 103:11, 108:15, 127:2
**recorded** [1] - 128:8

**records** [2] - 72:6
**reduced** [1] - 128:8
**referred** [1] - 52:17
**referring** [3] - 39:14, 99:19, 99:21
**reflection** [1] - 76:7
**refusing** [2] - 11:4, 11:17
**regard** [3] - 10:22, 58:2, 75:17
**regarding** [7] - 4:23, 24:25, 25:3, 75:6, 75:8, 90:3, 109:7
**registered** [1] - 71:4
**rehash** [1] - 97:2
**relating** [1] - 118:8
**relative** [2] - 128:11, 128:12
**relax** [1] - 79:17
**Release** [3] - 51:6, 51:7, 53:6
**release** [6] - 8:10, 8:12, 8:19, 43:6, 57:15, 60:1
**remember** [6] - 12:3, 23:7, 35:12, 62:8, 62:19, 110:25
**reminders** [1] - 5:14
**removal** [8] - 53:8, 53:20, 53:23, 54:13, 54:14, 54:21, 55:6, 55:10
**remove** [6] - 42:9, 54:15, 92:25, 93:2, 109:23, 121:17
**removed** [24] - 41:8, 42:7, 43:8, 61:15, 62:21, 62:25, 64:10, 65:7, 66:2, 66:6, 70:13, 88:18, 90:24, 91:10, 91:14, 91:17, 92:6, 92:12, 92:22, 97:7, 97:23, 105:10, 106:11, 126:25
**removing** [4] - 41:12, 65:11, 65:15, 85:3
**repeat** [1] - 24:4
**report** [12] - 7:12, 8:7, 8:18, 9:17, 73:11, 73:16, 73:18, 74:1, 78:22, 80:14, 89:7, 94:7
**reported** [1] - 10:10
**REPORTER** [1] - 4:2
**reporter** [2] - 5:11, 5:19
**representing** [1] - 105:4
**Request** [6] - 72:20, 99:19, 100:18,

125:11, 125:15, 126:13
**request** [3] - 82:11, 96:19, 123:4
**requesting** [1] - 90:9
**require** [2] - 95:12, 122:21
**required** [8] - 19:10, 52:3, 60:8, 68:17, 70:3, 89:22, 89:25, 101:11
**requires** [1] - 53:23
**requiring** [1] - 110:18
**reread** [1] - 122:15
**Rescue** [1] - 93:18
**rescue** [2] - 93:21, 93:25
**resist** [3] - 30:16, 33:1, 78:8
**resistance** [1] - 78:15
**resisting** [3] - 44:12, 79:21, 120:15
**respect** [2] - 50:25, 109:10
**respond** [4] - 6:13, 13:10, 13:11, 16:9
**responded** [2] - 11:18, 103:8
**responding** [2] - 12:18, 76:24
**response** [5] - 18:21, 19:3, 24:13, 53:17, 119:25
**Response** [2] - 3:13, 18:8
**responsibilities** [3] - 6:8, 6:17, 65:18
**responsibility** [9] - 40:8, 41:18, 49:11, 49:17, 49:24, 50:2, 50:4, 65:21, 84:14
**responsible** [3] - 34:2, 50:5, 119:7
**responsive** [1] - 43:24
**restate** [1] - 55:2
**restrain** [1] - 120:6
**restrained** [3] - 20:5, 28:10, 87:25
**restraint** [4] - 15:10, 27:15, 28:20, 41:11
**restraints** [10] - 29:12, 29:15, 39:18, 39:20, 39:23, 41:13, 42:10, 54:4, 109:24, 121:17
**Restraints** [2] - 3:14, 27:11

**restrict** [5] - 16:12, 111:11, 111:16, 111:20, 111:22
**restricting** [2] - 16:17, 16:22
**restrictions** [3] - 68:22, 98:4, 98:9
**restricts** [1] - 111:10
**resuscitation** [1] - 78:5
**retrieve** [1] - 29:6
**return** [2] - 62:4, 88:5
**review** [6] - 8:9, 8:21, 9:5, 18:7, 94:25, 109:5
**reviewed** [5] - 7:12, 7:24, 8:4, 8:18
**ride** [3] - 10:15, 10:16, 38:19
**rights** [1] - 10:6
**risk** [2] - 95:14, 122:23
**RN** [1] - 93:6
**Road** [3] - 2:3, 2:7, 2:16
**Roffers** [5] - 9:19, 74:14, 74:20, 74:23, 75:6
**roles** [1] - 6:5
**roll** [2] - 82:8, 82:13
**rollcall** [1] - 10:10
**rolled** [1] - 29:14
**room** [6] - 12:8, 12:10, 60:17, 76:3, 94:21, 118:23
**route** [1] - 11:20
**Rules** [1] - 1:17
**run** [1] - 99:6

## S

**S.C** [1] - 2:10
**safe** [2] - 115:3, 116:22
**safety** [2] - 37:2, 37:10
**saliva** [1] - 66:17
**sally** [38] - 7:13, 12:5, 40:11, 46:12, 47:4, 47:6, 47:13, 47:17, 47:19, 48:3, 48:17, 48:19, 48:25, 49:4, 49:15, 50:10, 53:15, 56:1, 56:6, 61:16, 62:19, 62:22, 62:25, 63:11, 64:7, 64:11, 68:9, 70:14, 84:18, 90:15, 90:23, 94:17, 97:8, 103:17,

105:10, 105:15, 109:19, 124:25
**sat** [1] - 47:4
**satisfied** [2] - 88:4, 117:19
**saw** [3] - 11:25, 12:1, 76:3
**scenario** [1] - 35:5
**scene** [13] - 13:1, 14:15, 14:24, 20:1, 24:18, 67:20, 69:12, 71:5, 77:4, 78:23, 80:20, 116:10, 118:7
**SCHADE** [1] - 2:20
**Schade** [1] - 4:5
**SCHARTNER** [1] - 1:8
**Schartner** [1] - 2:13
**school** [1] - 6:22
**Scope** [1] - 18:18
**SCOTT** [1] - 1:8
**Scott** [1] - 2:18
**screaming** [1] - 13:22
**seal** [1] - 128:16
**sealed** [1] - 108:14
**search** [2] - 121:16
**seated** [2] - 29:17, 82:13
**second** [17] - 19:16, 28:8, 39:9, 70:14, 72:2, 75:21, 95:7, 103:17, 104:18, 104:21, 110:10, 112:23, 112:24, 121:18, 122:7, 122:8, 123:19
**second-from-the-last** [1] - 95:7
**second-to-last** [3] - 104:18, 122:7, 122:8
**section** [2] - 13:6, 13:8
**sections** [1] - 13:7
**secure** [2] - 47:23, 48:15
**secured** [5] - 35:7, 35:9, 35:14, 48:1, 85:1
**security** [5] - 12:9, 12:15, 76:4, 76:9, 76:14
**see** [22] - 12:13, 15:6, 24:21, 36:22, 43:23, 44:15, 47:8, 58:6, 58:17, 58:24, 62:16, 62:17, 63:9, 67:3, 71:13, 78:19, 88:24, 98:22, 100:13, 106:5, 112:19, 112:20

**seeing** [2] - 35:12, 104:13
**seek** [2] - 20:16, 20:23
**seizure** [8] - 65:6, 90:22, 90:25, 104:16, 105:1, 105:7, 125:22, 126:1
**seizures** [4] - 20:2, 60:15, 87:3, 87:8
**send** [2] - 59:9, 84:6
**seniority** [2] - 50:19, 50:21
**sense** [7] - 30:7, 71:15, 74:7, 84:12, 94:1, 118:1, 118:17
**sent** [2] - 52:17, 59:12
**sentence** [2] - 77:3, 104:22
**separate** [7] - 48:16, 59:25, 68:15, 73:5, 73:9, 73:10, 89:15
**separated** [1] - 60:4
**separately** [1] - 27:4
**separating** [1] - 47:21
**sergeant** [5] - 14:19, 14:22, 14:23, 24:18, 38:10
**Sergeant** [28] - 14:23, 21:7, 24:11, 24:15, 24:23, 25:5, 25:12, 32:12, 32:16, 38:13, 55:23, 55:25, 56:4, 62:1, 62:6, 62:11, 62:18, 64:23, 73:1, 78:22, 78:23, 79:1, 81:1, 81:15, 90:2, 90:6, 90:14, 98:22
**sergeants** [1] - 74:7
**series** [4] - 4:22, 15:2, 97:14, 101:12
**serious** [1] - 22:10
**seriously** [1] - 98:3
**serve** [1] - 101:3
**service** [1] - 6:14
**services** [3] - 94:3, 121:25, 122:2
**set** [3] - 8:16, 49:1, 128:16
**several** [5] - 20:6, 23:5, 30:11, 33:22, 111:17
**shake** [1] - 119:15
**shall** [1] - 39:19
**share** [1] - 21:17
**shared** [2] - 23:8, 75:15

**sharing** [1] - 72:9
**shelter** [6] - 11:15, 11:22, 124:8, 124:9, 124:13, 124:14
**Sheriff's** [1] - 42:2
**shift** [2] - 6:4, 10:9
**shock** [5] - 66:4, 69:23, 70:3, 93:15
**short** [2] - 15:3, 94:15
**shortly** [1] - 94:14
**shortness** [1] - 28:11
**shoulder** [3] - 29:15, 36:6, 83:13
**shoulders** [1] - 5:12
**show** [6] - 9:4, 15:3, 15:5, 69:23, 73:11, 94:24
**shows** [1] - 28:10
**shrugs** [1] - 5:11
**Sick** [1] - 19:17
**side** [1] - 16:20
**sign** [1] - 112:15
**signature** [2] - 113:3, 113:5
**signed** [3] - 98:15, 112:13, 113:4
**significant** [1] - 91:8
**signs** [5] - 28:10, 29:1, 86:11, 86:17, 86:20
**simply** [1] - 84:24
**sit** [4] - 56:8, 82:9, 101:22, 127:12
**sitting** [3] - 33:17, 60:3, 97:20
**situation** [30] - 19:22, 24:12, 25:8, 30:10, 42:12, 42:13, 46:3, 49:23, 54:3, 54:14, 56:21, 62:3, 68:25, 69:4, 69:8, 70:8, 71:16, 98:2, 101:21, 104:6, 110:8, 110:12, 113:13, 115:17, 120:15, 121:22, 123:7, 123:13, 123:23, 124:5
**situations** [2] - 6:15, 18:22
**sketch** [1] - 6:20
**skip** [3] - 84:16, 88:3, 93:7
**slow** [1] - 5:19
**someone** [12] - 9:12, 13:11, 48:18, 48:21, 59:17, 97:22, 97:23, 101:9, 101:13, 101:14, 120:12, 121:7
**sometimes** [1] -

122:21
**somewhat** [1] - 101:19
**soon** [3] - 68:11, 123:5, 123:7
**sooner** [1] - 77:6
**sorry** [14] - 7:2, 14:23, 19:15, 27:24, 28:5, 38:2, 70:1, 71:7, 75:21, 75:24, 81:12, 84:16, 114:23, 117:18
**speaking** [9] - 23:23, 52:24, 57:18, 59:21, 60:10, 60:21, 91:21, 92:8, 99:12
**Special** [2] - 9:18, 74:13
**specific** [12] - 13:21, 25:15, 43:4, 57:6, 77:22, 81:21, 110:23, 112:8, 113:13, 115:1, 115:11, 115:17
**specifically** [16] - 6:10, 26:8, 34:23, 35:11, 55:13, 62:9, 62:16, 74:9, 88:12, 98:8, 100:9, 104:12, 109:7, 111:21, 113:24, 118:10
**specifics** [5] - 36:18, 43:7, 75:8, 75:9, 75:14
**speculation** [7] - 37:5, 40:21, 41:2, 63:22, 80:3, 86:14, 97:25
**spell** [1] - 4:19
**spoken** [2] - 75:5, 75:9
**squad** [40] - 33:6, 34:1, 34:18, 34:22, 34:25, 42:8, 48:15, 50:14, 55:23, 63:18, 65:8, 65:11, 67:2, 83:14, 83:15, 83:18, 83:20, 83:21, 84:6, 85:4, 89:4, 90:20, 90:23, 91:11, 91:15, 91:18, 92:10, 102:10, 103:16, 103:19, 104:16, 105:2, 105:11, 105:14, 105:15, 105:18, 106:4, 106:12, 127:1, 127:4
**squads** [4] - 55:22, 76:24, 84:18, 85:2
**SS** [1] - 128:1
**St** [19] - 10:23, 11:15, 12:1, 13:3, 72:21,

76:3, 86:3, 86:21, 87:2, 89:18, 89:19, 102:3, 102:14, 115:14, 115:18, 117:23, 127:11
**Stability** [1] - 112:18
**staff** [88] - 11:16, 12:15, 17:14, 20:17, 20:19, 21:1, 21:4, 21:7, 21:8, 21:9, 21:10, 23:7, 23:8, 24:8, 31:18, 31:21, 39:19, 39:23, 41:7, 41:8, 41:14, 41:20, 42:14, 42:16, 43:2, 43:5, 43:8, 44:11, 44:20, 44:24, 45:15, 46:3, 46:20, 46:21, 47:9, 48:2, 49:20, 50:3, 50:13, 51:25, 52:18, 53:13, 53:22, 54:4, 54:10, 54:12, 56:9, 56:15, 56:25, 57:12, 57:25, 58:2, 58:8, 58:15, 59:19, 60:9, 60:22, 63:3, 64:15, 73:3, 76:9, 85:2, 85:11, 85:12, 85:16, 85:19, 88:4, 88:8, 88:18, 89:2, 90:8, 91:5, 91:10, 93:6, 94:8, 96:9, 96:13, 96:16, 100:25, 103:17, 109:14, 115:14, 115:15, 115:18, 118:24, 121:20, 123:19
**staff's** [1] - 109:22
**stage** [1] - 123:6
**Stamp** [1] - 51:7
**stamped** [8] - 19:16, 28:3, 39:15, 49:8, 49:9, 49:10, 51:5, 95:6
**stamps** [1] - 27:2
**standard** [3] - 59:15, 86:1, 121:9
**standing** [6] - 21:20, 34:23, 35:23, 41:20, 43:14, 56:20
**start** [2] - 10:9, 65:22
**starts** [1] - 27:19
**state** [25] - 4:19, 28:13, 45:24, 76:13, 76:19, 76:23, 77:23, 80:25, 83:2, 83:12, 85:1, 85:11, 86:2, 87:2, 88:4, 89:2, 89:8, 90:2, 90:19, 91:10, 92:12, 93:7, 93:18,

93:24, 95:22
**STATE** [1] - 128:1
**State** [3] - 1:19, 128:6, 128:22
**statement** [14] - 9:16, 9:18, 9:21, 16:1, 16:9, 65:5, 80:11, 81:14, 85:25, 91:14, 104:8, 104:24, 116:1, 117:18
**Statement...............**
**.......** [1] - 3:13
**statements** [5] - 13:21, 13:24, 15:18, 24:19, 77:11
**states** [13] - 19:17, 25:21, 28:9, 49:11, 51:8, 53:6, 75:24, 78:7, 83:23, 84:17, 94:7, 95:8, 125:14
**STATES** [1] - 1:1
**stating** [2] - 16:24, 28:2
**Statutes** [1] - 1:18
**stay** [2] - 29:8, 48:14
**steady** [1] - 116:25
**step** [12] - 69:24, 76:24, 77:2, 85:9, 105:9, 105:12, 116:3, 116:4, 116:9, 116:15, 124:13, 124:19
**stepped** [3] - 17:16, 35:21, 36:10
**stick** [1] - 35:25
**still** [25] - 16:14, 16:16, 22:15, 25:6, 30:15, 35:2, 36:17, 41:22, 46:3, 49:17, 49:23, 50:5, 55:25, 56:5, 82:21, 87:16, 89:3, 90:20, 91:13, 94:16, 98:3, 105:22, 106:7, 107:15, 127:14
**stood** [3] - 41:7, 47:6, 93:22
**stop** [4] - 5:19, 79:21, 119:16
**stopping** [1] - 88:17
**straightforward** [1] - 103:10
**strap** [2] - 34:8, 82:24
**straps** [4] - 36:6, 83:13, 89:3, 92:12
**Street** [1] - 1:20
**strength** [2] - 95:11, 122:19
**strike** [33] - 10:13, 12:6, 12:23, 15:1, 17:12, 19:22, 26:10,

27:24, 31:24, 34:2, 34:24, 35:16, 36:2, 37:6, 38:6, 42:12, 45:23, 46:8, 47:4, 48:17, 52:13, 55:20, 56:22, 58:13, 74:4, 74:21, 88:16, 89:7, 90:13, 92:5, 93:24, 105:24, 124:25
**struggle** [3] - 33:2, 44:20, 76:9
**struggles** [1] - 120:6
**struggling** [1] - 76:4
**stuff** [1] - 97:2
**subdue** [1] - 30:11
**subdued** [1] - 23:5
**subduing** [1] - 24:6
**subject** [4] - 28:10, 52:10, 83:25, 117:9
**subject's** [1] - 49:12
**subject/arrestee** [1] - 52:9
**subsequent** [1] - 26:19
**subsequently** [1] - 87:1
**sudden** [3] - 28:11, 95:14, 122:24
**Sue** [1] - 86:22
**suffered** [2] - 20:2, 60:14
**suffering** [1] - 87:7
**suggested** [2] - 22:23, 80:25
**suggesting** [1] - 23:20
**suggestion** [3] - 23:10, 24:9, 81:5
**Suite** [5] - 2:3, 2:7, 2:11, 2:16, 2:21
**summarizing** [1] - 23:25
**summary** [1] - 99:14
**superior** [2] - 12:21, 12:22
**superiority** [1] - 42:13
**supervisors** [1] - 55:22
**supporting** [2] - 44:17, 63:19
**supposed** [1] - 8:4
**suspect** [1] - 123:4
**sustained** [1] - 126:15
**sweating** [12] - 17:4, 30:22, 36:24, 43:22, 58:19, 66:13, 77:18, 83:10, 91:23, 95:10, 121:3, 122:19

**sweaty** [1] - 120:20
**sworn** [1] - 4:15
**synopsis** [1] - 57:21
**system** [1] - 13:10

---

**T**

**talks** [1] - 111:22
**tasked** [1] - 60:6
**Tech** [1] - 7:4
**Technical** [1] - 6:23
**temporarily** [1] - 82:16
**ten** [1] - 39:4
**tense** [1] - 78:16
**term** [1] - 47:25
**testified** [13] - 4:16, 57:25, 69:21, 88:8, 107:2, 114:16, 116:2, 116:9, 116:24, 118:18, 119:23, 121:1, 125:2
**testify** [1] - 23:20
**testifying** [2] - 117:1, 119:17
**testimony** [16] - 23:24, 25:3, 33:18, 45:22, 45:23, 61:2, 61:9, 96:13, 104:7, 107:2, 107:8, 111:12, 115:5, 116:12, 119:5, 126:24
**tests** [1] - 99:5
**THE** [73] - 1:1, 1:3, 1:10, 4:2, 15:25, 17:9, 18:24, 19:6, 20:9, 20:14, 21:1, 22:9, 22:19, 22:21, 25:5, 26:7, 28:19, 31:12, 33:8, 34:15, 35:3, 38:10, 38:21, 40:23, 41:25, 42:6, 44:15, 45:4, 46:25, 48:6, 50:8, 51:15, 53:12, 54:9, 55:12, 56:12, 56:17, 57:6, 58:22, 60:25, 61:3, 63:14, 63:23, 65:4, 65:20, 66:25, 69:16, 70:18, 71:4, 77:14, 80:5, 80:22, 82:20, 87:14, 88:23, 92:1, 92:20, 96:8, 98:2, 98:12, 100:7, 100:12, 100:23, 101:5, 102:21, 104:2, 106:2, 107:21, 109:4, 109:18, 110:7, 119:18, 127:8
**themselves** [2] -

54:15, 117:10
**thereto** [1] - 70:21
**they've** [2] - 115:13, 118:16
**third** [2] - 75:19, 75:23
**Thomas** [1] - 2:18
**THOMAS** [2] - 1:8, 2:20
**Thomson** [201] - 4:23, 11:8, 11:11, 12:13, 13:15, 13:17, 13:20, 13:25, 14:6, 14:9, 14:13, 15:7, 15:13, 15:18, 15:21, 16:19, 16:23, 19:22, 19:23, 20:2, 20:5, 21:13, 21:18, 21:24, 23:4, 24:6, 24:16, 25:14, 29:8, 29:11, 30:2, 30:19, 31:8, 31:16, 32:25, 33:4, 33:12, 33:21, 34:5, 34:18, 34:21, 34:24, 36:2, 36:3, 36:5, 36:12, 38:16, 40:11, 40:15, 40:17, 41:4, 41:8, 41:22, 43:3, 43:8, 43:16, 43:18, 44:4, 44:21, 45:2, 45:17, 45:23, 45:24, 46:2, 47:9, 47:16, 49:5, 49:15, 51:16, 53:10, 55:9, 55:25, 56:1, 56:5, 56:14, 56:19, 56:22, 56:25, 57:20, 58:2, 58:5, 58:7, 60:11, 60:18, 60:22, 61:15, 62:21, 62:24, 63:10, 63:19, 64:1, 64:7, 64:10, 65:1, 65:11, 65:15, 65:18, 66:5, 66:20, 66:22, 67:8, 67:10, 69:13, 70:13, 76:4, 76:20, 77:5, 77:10, 78:2, 78:7, 78:11, 78:15, 79:13, 79:16, 79:23, 80:1, 80:17, 81:6, 82:8, 82:11, 83:2, 83:6, 83:13, 83:25, 84:21, 85:3, 85:11, 85:13, 87:3, 87:6, 88:5, 89:2, 89:4, 89:10, 89:14, 89:15, 89:23, 90:21, 90:25, 91:2, 91:6, 91:10, 92:5, 92:7, 92:13, 92:16, 93:8, 94:8, 95:17, 96:14, 97:6,

97:16, 101:19, 101:24, 102:3, 102:5, 103:12, 103:15, 104:15, 105:1, 105:13, 105:23, 105:25, 106:8, 106:10, 106:13, 106:18, 107:4, 107:5, 107:9, 107:15, 107:23, 109:10, 109:14, 112:2, 113:17, 113:22, 113:24, 114:3, 114:8, 114:17, 115:19, 116:11, 116:17, 116:19, 116:22, 117:3, 117:7, 117:8, 118:13, 118:14, 118:24, 119:10, 120:2, 121:1, 124:7, 124:24, 125:4, 127:3
**thomson** [8] - 24:6, 64:20, 70:25, 88:18, 90:22, 96:1, 117:12, 123:8
**THOMSON** [1] - 1:3
**thomson's** [2] - 62:11, 91:17
**Thomson's** [29] - 10:5, 12:7, 29:18, 49:24, 50:5, 50:11, 52:14, 58:9, 58:14, 76:13, 77:25, 78:1, 78:24, 79:1, 79:2, 79:3, 79:5, 80:11, 81:14, 82:14, 86:3, 86:10, 86:16, 87:10, 90:3, 110:24, 113:13, 123:12, 126:25
**thrashing** [1] - 29:23
**threat** [1] - 22:10
**three** [7] - 15:6, 81:22, 81:23, 82:1, 82:6, 112:19
**throughout** [8] - 97:9, 97:15, 98:18, 100:3, 102:2, 103:11, 104:7, 106:14
**thumbnail** [1] - 6:20
**tie** [1] - 118:11
**tightened** [3] - 29:14, 29:16, 34:8
**title** [1] - 72:18
**tkallies@cassiday.com** [1] - 2:22
**today** [7] - 7:11, 7:15, 7:18, 7:25, 8:5, 56:8, 60:3, 75:5, 97:20, 101:22, 127:12
**today's** [1] - 72:22

**Tom** [1] - 4:5
**tone** [1] - 22:2
**took** [15] - 29:21, 30:11, 33:14, 39:3, 42:4, 64:24, 69:24, 70:8, 78:1, 81:17, 85:3, 85:8, 90:13, 98:3, 107:11
**tool** [1] - 97:23
**top** [4] - 39:16, 82:23, 82:24, 125:14
**total** [1] - 28:5
**towards** [2] - 27:18, 49:8
**train** [1] - 19:1
**trained** [14] - 25:19, 25:24, 25:25, 26:7, 26:10, 28:17, 28:21, 28:24, 29:1, 34:11, 34:16, 42:21, 68:17, 108:18
**training** [17] - 19:12, 26:11, 26:16, 26:19, 26:20, 46:22, 47:1, 56:9, 56:12, 69:8, 81:25, 98:12, 111:18, 111:21, 111:24, 112:4
**transferred** [1] - 40:5
**transferring** [2] - 42:1, 55:14
**transport** [2] - 52:16, 115:3
**transportation** [1] - 27:15
**transported** [2] - 33:22, 115:3
**transporting** [10] - 51:9, 51:17, 51:21, 52:2, 52:10, 52:20, 59:16, 90:11, 112:16, 113:17
**transports** [1] - 39:17
**trauma** [1] - 126:16
**treated** [2] - 50:12, 87:3
**treating** [1] - 89:23
**treatment** [3] - 61:20, 65:9, 87:14
**trick** [2] - 67:24, 68:4
**tried** [3] - 16:1, 16:10, 33:15
**trouble** [4] - 21:24, 24:17, 63:6, 97:24
**true** [12] - 18:18, 23:21, 83:4, 95:17, 98:9, 98:25, 99:25, 100:4, 101:8, 101:20, 103:2, 127:5
**trunk** [1] - 66:1

**trunks** [1] - 48:12
**truthful** [1] - 10:2
**try** [5] - 5:12, 65:7, 79:18, 79:20, 97:4
**trying** [13] - 13:18, 14:7, 67:23, 68:3, 68:5, 71:22, 74:7, 78:16, 79:21, 82:10, 82:21, 110:22, 122:15
**turn** [10] - 19:15, 28:7, 28:9, 49:7, 49:8, 49:19, 50:2, 51:4, 68:14, 107:5
**turned** [5] - 50:4, 53:21, 54:10, 69:25, 70:2
**turning** [3] - 39:9, 53:13, 81:8
**Turnover** [3] - 51:6, 51:7, 53:5
**twice** [2] - 45:20, 45:25
**two** [12] - 9:24, 27:12, 31:24, 48:16, 51:4, 59:25, 60:3, 71:15, 71:21, 71:23, 73:10, 118:19
**tyler** [1] - 10:17
**types** [1] - 79:16
**typical** [1] - 59:15

## U

**ubiquitous** [1] - 108:7
**ultimately** [13] - 15:12, 34:24, 38:1, 41:8, 42:9, 42:18, 43:8, 48:3, 51:17, 65:1, 67:5, 70:8, 109:24
**unable** [1] - 14:12
**unattended** [2] - 97:10, 97:11
**uncooperative** [11] - 41:11, 51:23, 53:14, 54:3, 83:25, 84:5, 87:24, 109:19, 110:9, 121:11, 121:17
**Uncooperative** [2] - 112:25, 113:8
**under** [18] - 1:16, 18:18, 19:17, 25:6, 49:10, 51:5, 51:7, 52:8, 53:5, 95:7, 95:14, 112:18, 122:23, 125:14, 126:4, 126:13, 128:7, 128:9
**undergoing** [1] -

102:6
**understood** [3] - 5:3, 51:2, 62:7
**uneventful** [1] - 84:18, 84:21, 84:23
**uninvolved** [3] - 51:17, 51:21, 56:20
**unique** [3] - 101:19, 101:21, 110:8
**unit** [3] - 33:25, 34:3, 93:21
**UNITED** [1] - 1:1
**units** [1] - 77:2
**unless** [1] - 9:12
**unobstructed** [1] - 66:22
**unrestricted** [2] - 83:3, 83:7
**unsecuring** [1] - 41:12
**up** [24] - 13:7, 15:3, 15:5, 29:14, 30:16, 48:21, 54:5, 75:13, 76:25, 77:2, 78:17, 82:9, 82:13, 103:4, 107:1, 116:3, 116:4, 116:9, 116:15, 118:11, 118:19, 119:22, 126:9
**update** [1] - 62:3
**updated** [1] - 90:3
**upper** [1] - 92:13
**ups** [1] - 97:5
**usual** [1] - 101:8

## V

**V-A-U-B-E-L** [1] - 4:21
**Valley** [2] - 6:23, 7:4
**VAUBEL** [4] - 1:6, 1:15, 4:14, 128:7
**Vaubel** [13] - 2:18, 4:21, 75:24, 76:1, 76:2, 76:13, 76:19, 77:25, 83:23, 90:19, 92:12, 93:8
**Vaubel's** [1] - 3:13
**vehicle** [6] - 38:1, 41:9, 47:16, 66:1, 66:6
**vehicles** [1] - 47:20
**verbal** [2] - 5:10, 13:23
**verbalize** [2] - 92:7, 92:17
**verbatim** [2] - 105:5, 105:6
**versus** [1] - 121:10
**via** [1] - 59:9

**Victoria** [1] - 3:2
**video** [1] - 7:13
**Vincent** [16] - 10:23, 12:2, 13:3, 72:21, 76:4, 86:3, 86:21, 87:2, 89:18, 89:19, 102:3, 102:14, 115:14, 115:15, 117:23, 127:11
**vincent's** [1] - 115:18
**violated** [1] - 10:7
**violent** [2] - 95:9, 122:18
**visible** [1] - 98:4
**vital** [3] - 86:11, 86:16, 86:20
**vitals** [2] - 86:4, 100:13
**vs** [1] - 1:5

## W

**waited** [1] - 41:7
**waiting** [2] - 66:3, 69:22
**walk** [3] - 46:13, 46:19, 68:3
**walked** [5] - 12:8, 46:17, 65:6, 94:18, 94:20
**WANISH** [1] - 1:8
**Wanish** [6] - 14:20, 15:17, 16:20, 77:24, 80:1, 80:6
**Warren** [4] - 2:23, 4:6, 123:22, 127:18
**WARREN** [1] - 1:9
**watch** [1] - 112:1
**watched** [1] - 7:13
**Wauwatosa** [3] - 2:3, 2:7, 2:16
**weapons** [2] - 48:13, 85:2
**weight** [3] - 44:18, 63:19, 100:14
**welfare** [7] - 49:12, 49:18, 49:21, 49:25, 50:6, 50:11, 52:1
**WEST** [1] - 1:9
**West** [14] - 2:3, 2:7, 2:13, 2:16, 57:13, 57:18, 59:6, 61:10, 61:23, 69:18, 86:7, 110:15, 111:3
**whatnot** [1] - 55:1
**whatsoever** [1] - 109:20
**whereof** [1] - 128:15
**whole** [1] - 119:19

**willing** [1] - 109:1
**WIRTH** [1] - 2:15
**WISCONSIN** [2] - 1:1, 128:1
**Wisconsin** [11] - 1:18, 1:19, 1:21, 2:3, 2:7, 2:11, 2:16, 2:21, 128:6, 128:17, 128:22
**WITNESS** [69] - 15:25, 17:9, 18:24, 19:6, 20:9, 20:14, 21:1, 22:9, 22:19, 22:21, 25:5, 26:7, 28:19, 31:12, 33:8, 34:15, 35:3, 38:10, 38:21, 40:23, 41:25, 42:6, 44:15, 45:4, 46:25, 48:6, 50:8, 51:15, 53:12, 54:9, 55:12, 56:12, 56:17, 57:6, 58:22, 60:25, 61:3, 63:14, 63:23, 65:4, 65:20, 66:25, 69:16, 70:18, 71:4, 77:14, 80:5, 80:22, 82:20, 87:14, 88:23, 92:1, 92:20, 96:8, 98:2, 98:12, 100:7, 100:12, 100:23, 101:5, 102:21, 104:2, 106:2, 107:21, 109:4, 109:18, 110:7, 119:18, 127:8
**witness** [3] - 4:15, 106:8, 128:15
**witnessed** [3] - 101:24, 103:22, 104:15
**Wojcik** [1] - 3:2
**wondering** [1] - 23:15
**words** [3] - 92:7, 92:17, 103:4
**worry** [1] - 5:14
**wrap** [1] - 28:25
**WRAP** [88] - 15:10, 22:23, 23:10, 24:10, 24:12, 24:16, 24:19, 25:1, 25:7, 25:13, 25:16, 25:20, 25:21, 26:11, 26:13, 26:16, 26:19, 27:16, 27:19, 27:20, 28:8, 28:17, 29:4, 29:6, 29:10, 29:18, 29:24, 29:25, 30:2, 30:6, 30:13, 30:18, 31:8, 31:16, 31:22, 32:25, 33:3, 33:5, 34:6, 34:10, 34:11, 41:11, 45:25,

46:21, 55:20, 55:21, 55:25, 56:5, 56:9, 60:23, 66:2, 80:25, 81:6, 81:13, 81:17, 81:20, 82:17, 82:25, 83:6, 87:12, 87:15, 87:16, 87:21, 89:3, 92:13, 92:22, 92:25, 97:7, 97:8, 97:23, 98:8, 102:11, 107:15, 107:17, 111:10, 111:16, 111:19, 111:23, 112:1, 112:4, 114:9, 114:18, 117:7, 117:8, 124:14, 124:20

**writing** [2] - 75:22, 128:9

**written** [1] - 72:11

## X

**XYZ** [1] - 1:11

## Y

**yelling** [3] - 13:22, 36:17, 78:8

**yourself** [4] - 18:14, 50:16, 54:18, 85:8

## Z

**Zach** [1] - 4:7

**ZACHARY** [1] - 2:10

**zflood@crivellolaw .com** [1] - 2:12