# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF JASON THOMSON,

        Plaintiff,

      v.                                        Case No. 23-C-84

CHRISTOPHER VAUBEL, et al.,

        Defendants.

---

## DECISION AND ORDER

Late in the evening on February 9, 2020, Jason Thomson suffered a seizure at a homeless shelter in Green Bay, Wisconsin. Thomson was transported to a hospital by ambulance, where he received treatment. As he was being discharged, Thomson became loud and combative, and hospital staff contacted the Green Bay Police Department for assistance. Responding officers restrained Thomson in handcuffs, as well as a device that immobilized his lower body, and transported him to the Brown County Jail, formally known as the Brown County Detention Center. Thomson repeatedly complained to officers that he could not breathe, but because he had just been treated and released by hospital staff, had exhibited significant strength in resisting them, and was able to speak with them, the officers did not believe he was having a medical emergency. When officers arrived with Thomson at the jail, however, the officer in charge and the jail nurse determined that Thomson was not medically fit and refused to accept him. As officers prepared to take Thomson back to the hospital for medical clearance, he became unresponsive and pulseless and stopped breathing. The officers, the jail nurse, and first responders attempted to resuscitate Thomson but were unsuccessful.

Thomson's Estate, Plaintiff, filed this action for damages under 42 U.S.C. § 1983 against the police officers that restrained and transported Thomson to the jail, the jail officers that helped carry him from the squad car to the arrest area and then back to the squad car, the jail lieutenant who declined to admit him without medical clearance, and the jail nurse who assessed him, alleging violations of Thomson's constitutional rights. Specifically, Plaintiff alleges that Green Bay Police Officers Ben Harvath, Karen Pineda, Christopher Vaubel, Michael O'Donnell, Alex Wanish, Scott Delsart, and Sergeant Thomas Behn (collectively, the Green Bay Officers) used excessive force against Thomson in violation of the Fourth Amendment. Plaintiff also alleges the Green Bay Officers and Brown County Jail Officers Adam Schartner, Clint Pelischek, Matthew West, Bryce Haines, and Kayla Kuchta (collectively, the BCJ Officers), as well as jail nurse Rebecca Warren failed to provide Thomson adequate medical care in violation of the Fourth Amendment. Lastly, Plaintiff alleges Thomson's death was the result of the City of Green Bay and Brown County's failure to train and supervise their employees. The court has jurisdiction over Plaintiff's § 1983 claims under 28 U.S.C. § 1331. The case is now before the court on Defendants' motions for summary judgment. For the following reasons, summary judgment will be denied as to Nurse Warren. As to all other Defendants, summary judgment will be granted and the claims against them dismissed.

## BACKGROUND[*]

On February 9, 2020, shortly before midnight, Thomson, a homeless male, suffered a seizure at St. John's Homeless Shelter in Green Bay, Wisconsin. Dkt. No. 84 ¶¶ 1, 3. A staff member at St. John's called 911, and the Emergency Medical Services unit of the Green Bay Fire

---

[*] Most of the events that gave rise to this action were captured in video recordings taken by the surveillance cameras at the hospital, the squad car in which Thomson was transported, and the Brown County Jail. For the most part, however, there is no audio recording.

Department transported Thomson to St. Vincent Hospital for treatment. *Id.* ¶¶ 4–6. After treatment was provided, Thomson was discharged, but before his actual release, he accused one of the hospital nurses of rolling her eyes at him and he became agitated. Shortly before 3:00 a.m. on February 10, 2020, St. Vincent staff called the Green Bay Police Department because Thomson was yelling and refusing to cooperate with medical staff. *Id.* ¶¶ 7–9.

Officers Michael O'Donnell and Christopher Vaubel were dispatched to St. Vincent. Dkt. No. 93 ¶ 6. O'Donnell was the first to make contact with Thomson, entering the St. Vincent emergency room via the south hall at 2:43 a.m. *Id.* ¶ 8. Upon entering, O'Donnell observed Thomson facing the opposite direction with his shirt and shoes off, as well as two nurses and two hospital security officers. Dkt. No. 92-36 at 2:11. O'Donnell followed Thomson, who still had his back toward O'Donnell, down the hospital hallway. *Id.* at 2:11–2:21. Roughly 15 seconds after entering the emergency room hallway, O'Donnell made physical contact with Thomson. *Id.* at 2:30. O'Donnell then forced Thomson up against a wall. *Id.* at 2:35. Thomson resisted and ultimately fell to the floor with O'Donnell still grasping his waist and shoulder/neck area. *Id.* at 2:57. As Thomson continued to struggle, O'Donnell maintained control by placing his knee against Thomson's back. *Id.* at 2:57–3:15. At this point, Thomson was on the ground face down and the two hospital security officers began to assist O'Donnell in restraining Thomson. *Id.* at 3:20–3:52.

At 2:45 a.m., Vaubel entered the emergency room hallway and began to assist O'Donnell in restraining Thomson. *Id.* at 3:52–4:19. Upon Vaubel's arrival, the two hospital security officers stopped assisting and backed away. *Id.* at 4:19. While Thomson continued to flail, Vaubel attempted to restrain Thomson's lower body and O'Donnell attempted to restrain Thomson's upper body. *Id.* at 4:20–5:20. Officer Wanish arrived on the scene at 2:47 a.m. and attempted to grab

3

Thomson's left arm. *Id.* at 5:24. Eventually, the three officers were able to move Thomson's arms behind his back and handcuff him. Dkt. No. 87-35 at 4. Sergeant Behn arrived on scene moments later and began assisting. Thomson can be heard complaining that he could not breathe and was going to die on the audio recording device that Sergeant Behn was wearing which transmitted to his squad car. Dkt. No. 92-34 at 4:20–4:32. Officers responded to Thomson, stating "if you can talk, you can breathe" and "you're not going to die." *Id.*

At 2:52 a.m., Officers Scott Delsart, Ben Harvath, and Karen Pineda arrived on scene carrying a restraint device called the WRAP system. Dkt. No. 92-36 at 10:25–10:55. Officer Delsart laid the WRAP on the hospital floor so that the officers could place Thomson in it. *Id.* at 11:00. "Auxiliary restraint devices," like the WRAP, "are intended for use during long-term restraint or transportation." Dkt. No. 92-7 at 2. The Green Bay Police Department's WRAP procedures authorize use of the system "[t]o limit violent/combative subjects from causing injury to themselves or others," as well as for the "transportation of violent/combative subjects." *Id.* at 5. The WRAP immobilizes a person's lower body by placing it in a fabric casing that is held on with shoulder straps, as the illustration below depicts:



Dkt. No. 79 at 7 n.2. Vaubel led in applying the WRAP to Thomson, and Delsart, Wanish, and Behn assisted. Dkt. No. 94 ¶ 54. While the officers applied the WRAP, Thomson continued to

4

claim that he could not breathe. Dkt. No. 93 ¶¶ 29–30. After restraining him in the WRAP, Delsart placed a foam helmet on Thomson's head, though Delsart did not tighten the helmet's chin strap. Dkt. No. 92-21 at 7–8. Officers then carried Thomson, while in the WRAP, down the south hall of the emergency room to Harvath and Pineda's squad car. Dkt. Nos. 92-36 at 13:52–14:06; 93 ¶ 44.

Once outside, officers placed Thomson in the back seat of Harvath and Pineda's squad car. Dkt. No. 92-33 at 10:48–11:41. Thomson's breathing was labored but he was speaking as officers secured him with the car's seat belts. *Id.* at 11:45–12:10. Wanish climbed into the back seat to secure Thomson and heard him say he was going to die. Dkt. No. 92-47 at 7–8. When Thomson was first placed in the squad, the foam helmet was positioned so that his nose and mouth can be seen in the front opening. One of the officers, Officer Wanish, was shown re-positioning the helmet on Thomson's head. The view of Thomson was then obstructed as the officers apparently strapped Thomson into the vehicle. When Officer Wanish steps out of the vehicle, the helmet has been turned 180 degrees so that the chin strap is behind Thomson's neck and the back side of the helmet covers Thomson's eyes, nose, and most of his mouth. Dkt. No. 92-33 at 12:27–12:40. The rear door of the squad was then closed, and Harvath and Pineda left for the Brown County Jail. *Id.* at 14:05.

Before the squad left the hospital, Sergeant Behn submitted a medical clearance form for Thomson to the St. Vincent Hospital staff. Dkt. No. 74 ¶ 79. Notations on the form indicate that Thomson had been seen at the hospital for a seizure and had fought with officers. Dr. Christopher K. Gerwing, the attending ER physician, checked a box next to the statement "Patient Uncooperative. To the best of my knowledge a medical emergency does not exist." Dkt.

5

No. 66-2. Sergeant Behn then signed the form and gave it to Officer Vaubel to provide to the jail. Dkt. No. 74 ¶ 84.

During the eight-to-ten-minute drive, Thomson struggled to twist the loosely-fitted helmet around to expose his nose and mouth for over four minutes, eventually succeeding, Dkt. No. 92-33 at 13:00–17:30, and ultimately removing the helmet completely, *id.* at 20:32. Thomson repeatedly told Harvath and Pineda that he could not breathe during transport but refused to tell the officers why he could not breathe unless they removed the WRAP. Dkt. No. 92-24 at 8. While Officer Pineda drove, Officer Harvath was able to view Thomson both directly and by the backseat video camera that displayed to him on a screen in the front of the squad car. Because there was nothing impeding Thomson's breathing and because he continued talking to them and negotiating over removal of the WRAP, the officers did not believe he was in distress and continued enroute to the jail. Dkt. Nos. 92-24 at 9; 92-31 at 9–10. The officers also knew that the jail had a health services unit.

At 3:10 a.m., Harvath and Pineda arrived at the Brown County Jail and parked in the sally port. Dkt. No. 92-41 at 0:26. Vaubel also arrived in a separate vehicle. *Id.* Dispatch had notified the jail that officers from the Green Bay Police Department would be arriving with "an unhappy individual." Dkt. No. 89 ¶ 8. Thus, eight jail officers met Harvath, Pineda, and Vaubel in the sally port. Dkt. No. 92-41 at 1:20. One of those officers, Corporal Kayla Kuchta, introduced herself to Thomson and asked if he would cooperate with jail officials so they could remove him from the car; Thomson did not respond. Dkt. No. 89 ¶ 31. At 3:14 a.m., Kuchta and Corporal Matthew West accessed the rear passenger door of the squad car and removed Thomson from the vehicle. Dkt. No. 92-41 at 1:50–2:50. The other jail officers then assisted West and Kuchta in carrying Thomson into the jail arrest area—a room with a counter, benches, and floorspace. Dkt. No. 92-

40 at 8:58–9:15. After placing Thomson on the floor of the arrest area next to the counter, West placed his hand in the small of Thomson's back to keep him in an upright sitting position, while Kuchta knelt on Thomson's right side with her hand placed in Thomson's right armpit to keep him upright. Dkt. No. 92-39 at 3:26. West shook Thomson and flicked his ear multiple times to elicit a reaction, but Thomson did not respond. *Id.* at 4:45–4:55. Meanwhile, Officer Bryce Haines and Officer Clint Pelischek, as well as Harvath, Pineda, and Vaubel observed from nearby. *Id.* at 3:25. As part of standard booking procedures, Pelischek retrieved a Portable Breath Test (PBT) to test Thomson's alcohol saturation levels. Dkt. No. 89 ¶¶ 57–58. Instead of blowing, Thomson bit down on the PBT tube. *Id.* ¶ 59. Pelischek, West, and Haines all noted that Thomson's skin color was abnormal. *Id.* ¶¶ 60–62. Pelischek then exited the arrest area and conveyed to Lieutenant Schartner his view that Thomson should not be booked into the jail in his condition. *Id.* ¶ 66. West was also concerned about admitting Thomson in his current medical state, so he directed Haines to call Health Services Unit (HSU) to come assess Thomson. *Id.* ¶¶ 42–43.

At approximately 3:15 a.m., Nurse Rebecca Warren, accompanied by Schartner, entered the arrest area. Dkt. No. 92-40 at 11:39. Upon arrival, Vaubel informed Warren that Thomson had a seizure earlier in the evening, was taken to St. Vincent for treatment, became combative, and was ultimately arrested. Dkt. No. 89 ¶ 70. Vaubel also showed Warren some paperwork, but it was not the usual St. Vincent medical clearance paperwork with which Warren was familiar. *Id.* ¶ 71. Warren observed Thomson was diaphoretic, pale, and drooling, and his head was hunched over such that his chin was touching his chest. Dkt. No. 88 ¶¶ 49, 52. Though Thomson never uttered any complete words, Warren observed Thomson groan, moan, shake his head "yes" and "no," and verbalize "uh-huh." Dkt. No. 87-22 at 21–22. Warren took Thomson's pulse and counted his respirations but was unable to take his blood pressure. Dkt. No. 88 ¶¶ 55–56.

Ultimately, Warren concluded that Thomson needed to be reevaluated at the hospital as his skin was pale, he was lethargic, and the jail did not receive proper discharge paperwork indicating what treatment Thomson received at St. Vincent or what follow-up care was necessary. *Id.* ¶ 58. Schartner agreed, observing that Thomson was drooling, his head was hunched over, and he appeared to need medical care. Dkt. No. 89 ¶ 89. Thus, the jail refused to admit Thomson. Dkt. No. 87-20 at 32–33.

Jail officials then carried Thomson, who was still in the WRAP, out of the arrest area and placed him back in Harvath and Pineda's squad car. Dkt. No. 88 ¶ 63. By 3:22 a.m., all BCJ Defendants had retreated back into the jail arrest area. Dkt. No. 89 ¶ 106. As Harvath and Pineda secured Thomson in the car, Harvath observed Thomson's condition worsen and described his breathing as "more and more shallow." Dkt. Nos. 87-23 at 63; 92-41 at 10:30; 89 ¶ 112. Warren had accompanied the officers to the sally port and could see Thomson through the rear driver-side door opening; she too, observed Thomson's condition worsen. Dkt. No. 92-41 at 10:45–13:40; *see* Dkt. No. 89 ¶ 113. Approximately five minutes after Thomson was placed back into the squad car, officers removed him and placed him on the floor of the sally port. Dkt. No. 92-41 at 15:15. At 3:26 a.m., dispatch was notified that Thomson was not breathing and CPR was in progress. Dkt. No. 88 ¶ 71. The WRAP was removed, Vaubel retrieved an Automated External Defibrillator from his squad car, and Warren began chest compressions. Dkt. No. 92-41 at 16:00–17:50. At 3:27 a.m., Haines told Kuchta, West, and Schartner that CPR had been initiated on Thomson. Dkt. No. 89 ¶ 126. West, Haines, and Schartner exited to the sally port to assess the situation. *Id.* ¶¶ 128–29. Attempts to revive Thomson continued for the next six minutes until Green Bay EMS arrived. Dkt. No. 92-41 at 17:50–23:05. Thereafter, EMS personnel attempted to resuscitate Thomson for 14 minutes before loading him into the ambulance on a stretcher. *Id.* at 23:05–37:40.

8

Thomson was pronounced dead at 4:09 a.m. at Aurora BayCare Medical Center; his cause of death was determined to be "[c]ardiac arrhythmia of an undetermined etiology following police restraint." Dkt. Nos. 87-31 at 2, 6; 88 ¶ 77.

It is over this roughly two-hour stretch, from hospital to jail, that Plaintiff alleges Thomson's constitutional rights were violated. Plaintiff claims that the Green Bay Officers violated the Fourth Amendment by using excessive force in restraining Thomson and that all Defendants violated the same Amendment by failing to provide him medical care. These violations, Plaintiff further contends, were the result of the City of Green Bay's and Brown County's failure to adequately train and supervise the officers.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). This means the court must refrain from making credibility determinations. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). "This principle is particularly relevant where . . . the witness most likely to contradict

9

the officer's testimony—the victim—cannot testify." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322).

Additionally, as relevant here because of the availability of video evidence, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

## ANALYSIS

### A. Excessive Force

Plaintiff does not contest the legality of Thomson's arrest. Instead, Plaintiff claims the Green Bay Officers used excessive force against Thomson in effectuating that arrest and restraining him with the WRAP. Fourth Amendment excessive force claims are assessed under the objective reasonableness test. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The nature and extent of force that may reasonably be used to effectuate an arrest depends on the specific circumstances of the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "Determining whether the force used to effect

10

a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

"Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide." *Phillips v. Cmty Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012) (citing *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)). As the court explained in *Phillips*, "a constitutional tort is not 'an analog of civil negligence.'" *Id.* In a traditional negligence case, the jury determines whether conduct was reasonable under the circumstances. But in an excessive force case, while the jury makes findings of fact, the court "must independently review the jury's interpretation of what is reasonable under the Fourth Amendment." *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 697 (1996) ("A policy of sweeping deference by appellate courts to factfinders' determinations of probable cause would permit . . . the Fourth Amendment's incidence to turn on whether different factfinders draw general conclusions that the facts are sufficient or insufficient to constitute probable cause. Such varied results would be inconsistent with the idea of a unitary system of law." (cleaned up))).

The Green Bay Officers argue that the undisputed evidence demonstrates conclusively that they did not use excessive force in restraining and arresting Thomson at St. Vincent Hospital in the early morning hours of February 10, 2020. They contend that "the undisputed record shows that the manner of restraint was reasonable—if not imperative—to overcome Thomson's resistance, maintain control and remove him from the hospital emergency room." Dkt. No. 79 at 11. Thomson was not punched or struck by any of the officers either before or after he was handcuffed. As far as the video shows, no more force was used than was necessary to subdue and

restrain him when he refused to comply with the directions given him by both the hospital staff and the responding officers. The deposition testimony and declarations confirm what the video depicts.

Plaintiff contends that Thomson was only passively resisting arrest, and therefore was entitled to be free from "significant" force. *See Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014). But that is not true. Thomson was not passive in his resistance—he was active. O'Donnell first grabbed Thomson's wrist as he continued walking away from him. That was reasonable. *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) (holding an officer was not objectively unreasonable in grabbing a fleeing arrestee's shoulder). Thomson did not respond to this initial contact by complying with commands. Instead, the video evidence shows Thomson trying to pull his hand away from O'Donnell's grasp. Dkt. No. 92-36 at 2:24.

Thomson's resistance continued after O'Donnell attempted to gain control by forcing him against the wall. Thomson used his arms and legs to resist O'Donnell and push away from the wall. *Id.* at 2:35–2:52. Then, once on the ground, Thomson continued to roll around requiring O'Donnell to use his knee to control Thomson as two other officers joined in to assist him. *Id.* at 2:55–3:30. Finally, while prone, Thomson kicked and flailed his legs. *Id.* at 3:29, 5:25–5:30. Such behavior is not akin to the "passive resistance" recognized in *Miller*: "lying motionless and spread-eagled on the ground . . . obeying every order except for the order to move his hands behind his back." 761 F.3d at 829. Faced with this resistance, O'Donnell and the other officers were justified in using the amount of force needed to overcome Thomson and gain control of him. *Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013) (compiling cases). O'Donnell was entitled to escalate the amount of force used to the demands of the situation. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (citing *United States v. Montoya de*

*Hernandez*, 473 U.S. 531, 542 (1985)); *see also Fitzgerald*, 761 F.3d at 734 (affirming summary judgment for officers who grabbed detainee by arms, used an arm-bar and wrist-lock technique, and forced her onto a gurney while she screamed, tried to pull her arms away, and tried to fight the officers); *Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011) (affirming summary judgment for officers who forcibly removed a detainee from his car after he failed to respond to the officers' commands); *Turner*, 979 F.3d at 569–70 (affirming summary judgment for an officer who placed a resisting arrestee in a prone position, handcuffed him, placed a knee on his shoulder for control, and hobbled his legs). Further, O'Donnell did not strike or beat Thomson but used "minimally forceful techniques designed to subdue non-complaint subjects and prevent escalation." *Fitzgerald*, 707 F.3d at 734.

In sum, O'Donnell responded to a call requesting assistance in controlling a disorderly male. He arrived at the hospital to find Thomson combative, yelling, and non-complaint. A reasonable officer in O'Donnell's position could have determined that Thomson's resistance posed a threat to hospital staff and its operations, and to O'Donnell himself. The fact that Thomson had not yet hurt anyone is irrelevant. He was walking up and down the hallways of a hospital, yelling at staff, and refusing to calm down and cooperate with staff's efforts to discharge him. Thus, O'Donnell's use of force in the "tense, uncertain, and rapidly evolving" circumstances was objectively reasonable. *Graham*, 490 U.S. at 396–97.

Plaintiff next contends that Vaubel, Behn, Delsart, Wanish, Harvath, and Pineda used excessive force in applying the WRAP after Thomson had already been handcuffed. Vaubel, O'Donnell, and Wanish all testified that the WRAP was applied because Thomson continued to resist after being handcuffed by raising his hips off the ground, trying to stand, and kicking his legs. Dkt. Nos. 92-23 at 20; 92-20 at 6; 92-47 at 4. Plaintiff cites only to the security camera

13

footage in arguing that Thomson was not resisting. But no reasonable juror could view the security camera footage and determine that Thomson was not resisting. Though the footage is blurry, and Thomson's body is often obfuscated by the officers, it is clear that he was refusing to exercise self-control and creating a disturbance in the hospital emergency department both before and after officers arrived. Dkt. No. 92-36 at 10:30–13:30. The deposition testimony and declarations of the officers and hospital staff only confirm what the video shows. Plaintiff has not presented evidence demonstrating a material factual dispute concerning Thomson's resistance. As such, the officers were reasonable in escalating the use of force to meet the needs of the current situation. *Estate of Phillips*, 123 F.3d at 593 (citing another source).

Plaintiff cites *Estate of Sanchez v. County of Stanislaus* as support for its contention that the use of the WRAP constitutes excessive force. No. 1:18-cv-00977-ADA-BAM, 2023 WL 7612399, at *22–*23 (E.D. Cal. Nov. 14, 2023). But that case is inapposite. In *Estate of Sanchez*, the court concluded that the WRAP system constitutes more force than handcuffs alone and that a material dispute existed as to whether the arrestee was resisting. *Id.* Thus, the court could not determine whether use of the WRAP system was reasonable and denied summary judgment for the defendants. *Id.* at *23. Here, however, as just discussed, there is not a material dispute about whether Thomson was resisting after being handcuffed. The undisputed video evidence shows he was. Therefore, even if this court accepts the *Estate of Sanchez* court's finding that the WRAP is a greater use of force than handcuffs, such a finding is not dispositive. The officers here were free to use a greater quantum of force to control Thomson as he was still resisting after being handcuffed. And since he was to be transported to the jail, the use of the WRAP to restrain his lower extremities so as to prevent damage to their squad car was also reasonable.

Based on the undisputed facts of the case, the Green Bay Officers' use of force was objectively reasonable under the circumstances. No reasonable jury could find that the force used to restrain Thomson after he became unruly and refused to comply with the realistic directions of the hospital staff and police was unreasonable. Therefore, the court grants summary judgment in their favor and dismisses Plaintiff's excessive force claim.

## B. Failure to Provide Adequate Medical Care

Plaintiff alleges Thomson's constitutional right to adequate medical care was violated at three junctures: (1) by all individual Green Bay Officers while at St. Vincent Hospital, (2) by Harvath and Pineda while in transport to the Brown County Jail, and (3) by Vaubel, Harvath, Pineda, the BCJ Officers, and Nurse Warren while at the Brown County Jail. After setting forth the standard, the court will address each juncture separately.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"—i.e., provide adequate medical care. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Where law enforcement is tasked with providing adequate medical care, they "will either procure treatment, provide treatment, or both." *Florek v. Vill. of Mundelein*, 649 F.3d 594, 599 (7th Cir. 2011). Thomson was arrested without a warrant and had not yet had a probable cause hearing. Thus, the Fourth Amendment's objectively unreasonable standard governs. *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). In determining whether a defendant's response to medical need was objectively unreasonable, the court considers four factors: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of*

15

*Chicago*, 656 F.3d 523, 530 (7th Cir. 2011) (citing *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)). The plaintiff must also show "the defendant's conduct caused the harm of which she complains." *Id.* (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Under the objective reasonableness standard, the subjective intent or awareness of the officer, or other state actor, is not relevant once it is determined that his or her actions or failure to act were "purposeful, knowing or possibly reckless." *Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 351–54 (7th Cir. 2018). For a claim of failure to provide medical care, a plaintiff need prove, in addition to causation, only "that the defendants did not take reasonable available measures to abate the risk of serious harm to [the plaintiff], even though reasonable officers under the circumstances would have understood the high degree of risk involved, making the consequences of the defendants' conduct obvious." *Pittman by & through Hamilton v. Madison Cnty.*, 108 F.4th 561, 572 (7th Cir. 2024) (*Pittman IV*). "The objective reasonableness of a decision to deny medical care does not consider the defendant's subjective views about risk of harm and necessity of treatment. Instead, the proper inquiry turns on whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care." *Id.* at 570. At the same time, the Court has cautioned that the objective reasonableness standard cannot be applied "mechanically." *Kingsley*, 576 U.S. at 397. Rather, the court must examine the "facts and circumstances of each particular case" through the lens of a reasonable officer and refrain from invoking the "20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396). In other words, the fact that Thomson later died cannot be used as evidence that Defendants' decisions to act or not act were unreasonable at the time they were made. As in most areas, what is objectively reasonable for a law enforcement officer often falls within a range of possible responses to a set of circumstances. *Florek*, 649 F.3d at 600 ("Just

16

as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect." (quoting *Tatum v. City of San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006))).

With these standards in mind, the court will now turn to the three junctures at which Defendants are alleged to have failed to respond to Thomson's medical needs, beginning at the first juncture: St. Vincent Hospital.

### 1. St. Vincent Hospital

Plaintiff alleges that all individual Green Bay Officers involved in taking Thomson into custody at St. Vincent Hospital were objectively unreasonable in failing to provide adequate care given Thomson's physical condition and complaints about breathing while at the hospital. The Green Bay Officers contend that they were not on notice that Thomson was experiencing a serious medical emergency but nonetheless claim they reasonably responded to Thomson's complaints. Upon consideration of all the facts and circumstances of the case, the court agrees.

As to notice, Plaintiff contends that it is undisputed that Thomson expressly stated he could not breathe when the officers were struggling with him in the hospital even before he was placed in the WRAP. He continued to claim he was unable to breathe after he was restrained in the WRAP. Plaintiff notes that there is also evidence that Thomson was breathing heavily and sweating. Dkt. No. 92-23 at 5. In Plaintiff's view, this is more than sufficient to establish that the Green Bay Officers had notice of Thomson's need for medical assistance.

It is true that "[o]fficers can be placed on notice of a serious medical condition either by word or through observation of . . . physical symptoms." *Braun v. Vill. of Palatine*, 56 F.4th 542, 551 (7th Cir. 2022) (quoting *Estate of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017)).

Although Delsart, Pineda, and Harvath dispute ever hearing Thomson complain of an inability to breathe at the hospital, Thomson can be heard complaining that he couldn't breathe on the audio recording from Sergeant Behn's squad car and O'Donnell testified that Thomson complained of an inability to breathe "a few more times" while the officers applied the WRAP. Dkt. No. 83-10 at 6–7; *see also* Dkt. No. 92-34 at 9:25–9:30. While the WRAP was being applied, all seven officers were in the immediate vicinity of Thomson, and therefore, a reasonable jury could conclude that each officer heard Thomson's complaint. Thus, there is evidence from which a jury could find that all of the Green Bay Officers heard Thomson claim he could not breathe.

But while it is true that officers *can* be placed on notice of a serious medical need by the explicit report of an arrestee, it does not follow that officers effecting an arrest of an unruly person must accept as true whatever the person says. If every arrestee was able to avoid being physically restrained for transport to jail and instead be taken to the hospital simply by stating "I can't breathe," law enforcement officers would be tasked with forever transporting them back and forth from the hospital. That would plainly be unreasonable. In this case, the officers did not believe that Thomson was experiencing a medical emergency when he complained about his difficulty breathing. They arrived at this conclusion for a number of reasons.

First, when Thomson first complained that he could not breathe, they were already at the hospital. Police were summoned to the hospital where Thomson had just been treated and released, and they were surrounded by health care professionals. Indeed, it was hospital personnel who called police because Thomson had become unruly and combative as they were going through the process of discharging him. None of the health care workers witnessing the struggle apparently recognized any serious medical need, and the doctor who treated him signed the discharge

certification after the struggle occurred indicating that Thomson was "uncooperative" and "to the best of [the doctor's] knowledge, a medical emergency [did] not exist." Dkt. No. 66-2.

Second, while Thomson's rapid breathing and sweating can be sign of a medical need, it can also be the result of strenuous physical exertion. At the time Thomson first complained that he couldn't breathe, he had just been struggling with police as they attempted to restrain him. It took three or four officers several minutes to gain control of him, indicating a degree of strength that was hardly indicative of a person experiencing a medical emergency. And given Thomson's physical exertion during the struggle, it was not unreasonable to attribute his heavy breathing and sweating to his efforts to resist the officers, as opposed to a medical emergency. This is especially true given the fact that he had just been discharged by the hospital and medical staff had essentially witnessed the same behavior they had seen.

Plaintiff contends that it was objectively unreasonable for the Green Bay Officers to use the WRAP to restrain Thomson under the circumstances of this case. But at the time the officers placed Thomson in the WRAP, he was kicking and flailing his lower extremities. It took two officers to control his upper extremities and he continued kicking even after he was handcuffed. As the photograph above shows, the WRAP system restrains a person's lower torso; it does not cover a person's nose or mouth, compress a person's chest, or otherwise interfere with breathing. It is designed and intended to prevent an unruly person from using his lower extremities to inflict injury upon the officer or damage to a squad car during transport. Given Thomson's behavior at the hospital, it was not unreasonable to use the WRAP to restrain him, especially since it was done in the presence of hospital staff.

Plaintiff argues that the failure to remove the WRAP immediately when Thomson began complaining that he couldn't breathe violated the Green Bay Police Department's Policy 302 on

Handcuffing and Restraints.  The Policy states: "If the restrained complains of or shows signs of breathing distress (shortness of breath, sudden calmness, a change in facial color, etc.), medical attention should be provided immediately."  Dkt. No. 92-7 at 6.  Plaintiff argues that the Green Bay Officers' failure to comply with this policy was objectively unreasonable and thus a violation of Thomson's rights under the Fourth Amendment.  But, again, the Green Bay Officers did not believe Thomson was in distress and, for the reasons set forth above, their belief was reasonable in light of the surrounding facts and circumstances.

As to the severity of the medical need, an inability to breathe is surely serious.  *Evans v. Gallinger*, No. 18-cv-194-wmc, 2021 WL 39608, at *6 (W.D. Wis. Jan. 5, 2021) (collecting cases).  But the Green Bay Officers argue that under these circumstances, it was reasonable to conclude that Thomson's claimed inability to breathe was not due to medical distress.  The Green Bay Officers argue they confirmed Thomson was still breathing—his ability to make verbal complaints confirmed as much—and verified his airways were not restricted.  No nurses or doctors expressed a concern about Thomson's condition even though the ER nurse's station was immediately adjacent to where the altercation took place.  *See generally* Dkt. No. 92-37.  And Dr. Gerwing medically cleared Thomson for transport.  Dkt. No. 66-2 at 1.

The most troublesome aspect of the officers' behavior at the hospital was what appears to have been the rotation of the foam helmet once Thomson was placed in the back seat of the squad so that the chin strap was behind Thomson's neck and the back side of the helmet covered Thomson's eyes, nose, and most of his mouth.  Dkt. No. 92-33 at 12:27–12:40.  The Green Bay Officers offer no explanation for why this was done, but instead seem to deny it was done intentionally or claim it was the result of Thomson's own movements.  Because the loose-fitting helmet did not obstruct his breathing, however, and Thomson was able to move it back to the

proper position and remove it entirely within a relatively short time, it does not appear to have been a cause of Thomson's death, and Plaintiff offers no evidence that it was. For this reason, this fact alone, though troubling, does not preclude entry of summary judgment for the Green Bay Officers involved in restraining Thomson at St. Vincent Hospital.

### 2. Transport

Likewise, the court concludes that the actions of Harvath and Pineda in transporting Thomson from St. Vincent Hospital to the Brown County Jail were objectively reasonable. During the roughly 10-minute car ride, Thomson continued to complain he could not breathe, was going to die, and struggled to remove the foam helmet that covered his nose and mouth. Harvath and Pineda discussed Thomson's complaints and observed him directly and on the front seat video screen but provided no medical care. Plaintiff, relying heavily on departmental policy, argues this was unreasonable. Harvath and Pineda do not dispute they heard Thomson complain he could not breathe but argue they did not believe medical care was required.

Because Harvath and Pineda were present when Thomson was restrained at the hospital and loaded into their squad car, the reasons that led them to such a conclusion were the same as those of the other officers. Thomson had been seen by the medical staff at the hospital and discharged as no longer needing medical care. He became combative with the staff, resulting in a call to police. Three or four police officers overcame his resistance in the emergency room hallway, placed him in the WRAP, and transferred him to their squad car with the hospital staff looking on. Sergeant Behn obtained Dr. Gerwing's signature on the form indicating that, to the best of his knowledge, a medical emergency did not exist.

Harvath and Pineda offered additional reasons why they did not believe that Thomson was having a medical emergency, despite his repeated complaints. Because Pineda was driving,

21

Harvath was the officer most responsible for monitoring Thomson's condition as they drove to the Brown County Jail. Harvath explained that they did not ignore Thomson's complaint, but when he asked Thomson why he couldn't breathe, Thomson responded by in effect saying, "take this off and I will explain it to you." Dkt. No. 66-9 at 40. Harvath explained that "to me, that meant that he was possibly trying to have officers take him out of the restraining device so that he could potentially escape or continue to be combative towards officers." *Id.* Harvath added that Thomson had already been "medically cleared at the hospital" and he was "under the impression that any known medical issues would have been addressed as part of that medical clearance." *Id.* at 40–41.

Pineda offered similar reasons. She noted that Harvath had discussed during her training that people who are uncooperative during arrest will sometimes say untruthful things to law enforcement to have them either pull over and remove restraints or loosen handcuffs. Harvath noted to Pineda that Thomson was "in the back seat talking, his chest was rising up and down, and he was trying to negotiate with us." Dkt. No. 66-8 at 42–43. Based upon her own observations and her conversation with Harvath, Pineda explained that "at that time [she] did not believe that there was a medical emergency." *Id.* at 45. Finally, Harvath and Pineda also argue their actions were reasonable because they were transporting Thomson to a facility with a health services unit where he would receive medical care—the Brown County Jail—and that care would be made available in less than ten minutes. Under these circumstances, the conclusion Pineda and Harvath drew was not unreasonable.

The facts of this case contrast sharply with those of *Estate of Perry v. Wenzel*, 872 F.3d 439 (7th Cir. 2017). Unlike the arrestee in that case, Thomson had exhibited normal health and strength by fighting with the officers when he was taken into custody after having been medically cleared at the hospital. He had no difficulty walking, at least until he was placed in the WRAP,

and was able to talk with the officers and even engage in what they took to be negotiations. Unlike Perry, Thomson did not urinate or defecate in his pants as he was dragged from a squad car to a holding cell where a police lieutenant told him he would be treated "like an animal," he wasn't moaning and drooling, and blood did not ooze from under a spit mask that completely covered his face. *Cf. Estate of Perry*, 872 F.3d at 446–51. In this case, by contrast, Thomson appeared to have been conscious and able to communicate until the squad arrived at the sally port of the Brown County Jail and he was taken into the jail arrest area. In light of these facts, the failure of Officers Pineda and Harvath to return him to the hospital or take other action was objectively reasonable.

### 3. Brown County Jail

Lastly, Plaintiff alleges Vaubel, Harvath, Pineda, the BCJ Officers, and Nurse Warren failed to provide Thomson adequate medical care while at the Brown County Jail. Prior to Harvath and Pineda's arrival, the BCJ Officers were advised Thomson, "an unhappy individual," was in route. Taking the facts in the light most favorable to Plaintiff, Thomson was nonverbal upon arrival. None of the Green Bay Officers told the BCJ Officers the reason for Thomson's hospital visit, nor that he was complaining he could not breathe in the car. Nonetheless, it appears that Thomson's condition had deteriorated, and the BCJ Officers recognized as much. Thomson's skin was pale, he could not form a coherent sentence—supplying only groans and moans, his head was slouched, he was drooling, his legs would shake, and he was sweating. BCJ Officers Pelischek and West were concerned with Thomson's medical state, so Pelischek advised Schartner the jail should not admit Thomson, and West directed Haines to call for a nurse. Nurse Warren arrived, attempted unsuccessfully to take Thomson's blood pressure while he was still in restraints and quickly concluded that Thomson should not be admitted to the jail. She did not ask to have the restraints removed and made no effort to check his blood/oxygen level or conduct a more thorough

23

examination. The officers then carried Thomson back out to the squad car where his breathing became shallower. When Thomson became pulseless and breathless, the WRAP was removed, and an ambulance was called.

In support of their motion for summary judgment, the BCJ Officers argue that Thomson was never in their custody since they refused to admit him. But this argument is foreclosed by *Estate of Perry*, 872 F.3d at 457. There, the court held that, for constitutional purposes, the county's policy of refusing to take custody of prisoners deemed medically unfit did not control over the facts of the case. To hold otherwise "would allow municipalities to easily isolate themselves from liability by enacting policies that have the effect of dictating when their constitutional duties begin." *Id.* Instead, the court considered the fact that "County officers assisted in dragging Perry into the facility and placed him inside the facility, behind a door that could only be opened by a County officer." *Id.* The court also considered the fact that while the jail nurse "examined Perry, two County officers (not City officers) physically restrained him on the bench." *Id.* These and the other surrounding circumstances convinced the court that "no reasonable jury could conclude that Perry was not in the County's custody." *Id.* In this case, the BCJ Officers helped carry Thomson from the squad car in the sally port to the jail arrest area where they placed him on the floor and called upon Warren to examine him. Under these circumstances, it is certainly arguable that he was no more free to leave the jail than Perry was to leave the Criminal Justice Facility, or at least a jury could so find.

The BCJ Officers also argue they were entitled to rely on Nurse Warren's professional judgment and thus their failure to take other action was objectively reasonable. This argument finds strong support in *Perry*. As the court explained in *Perry*, such a rule has long been recognized in this circuit. *Id.* at 458 (collecting cases). Plaintiff nonetheless argues the BCJ Officers' reliance

24

was inappropriate given Thomson's condition. Plaintiff is correct in recognizing that a non-medical defendant cannot rely on professional medical advice when they "had reason to know that the medical staff was failing to treat or inadequately treating an inmate." *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (cleaned up) (quoting *Miranda*, 900 F.3d at 343). But that exception does not apply here. The exception only applies when the non-medical defendant has actual knowledge the medical profession is mistreating or failing to treat an arrestee. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). The BCJ Officers did not have comprehensive medical training and were not capable of assessing whether Nurse Warren's conduct was appropriate. *Id.*

Nor can it be said that the BCJ Officers "ignored" Thomson as Plaintiff suggests after they place him back in the Green Bay Police squad car. Yes, the BCJ Officers returned to the arrest room after the decision was made not to admit Thomson and he was carried out to the squad car, but Warren continued to observe Thomson during and after he was placed back in the squad car. Thus, the BCJ Officers relied on Warren's continued monitoring, which is what the law encouraged them to do. *Cf. McGee v. Macon Cnty. Sheriff's Dep't*, 473 F. Supp. 3d 818, 839 (C.D. Ill. 2020), *rev'd and remanded sub nom. McGee v. Parsano*, 55 F.4th 563 (7th Cir. 2022) (denying summary judgment for officers who carried ill inmate out of medical unit away from jail nurse). Under these circumstances, the actions of the BCJ Officers, as well as those of Green Bay Officers Harvath, Pineda, and Vaubel upon their arrival at the jail, were objectively reasonable.

That leaves the claim against Nurse Warren. Nurse Warren concluded that Thomson was not medically fit to be booked into the jail, yet she did not instruct the WRAP to be removed or call an ambulance. There is evidence from which a jury could conclude she should have done more. She was told that Thomson had come from the hospital where he was seen after suffering a seizure at a homeless shelter. He was pale, lethargic, sweating profusely, drooling on himself, and

25

not responsive to questions. Nurse Warren attempted to obtain vital signs, first trying to measure his blood pressure while his hands were cuffed behind his back. Not surprisingly, she was apparently unable to obtain a measurement. But instead of having the handcuffs and WRAP removed so she could examine him further, she told staff that he should be sent back to the hospital.

Lloyd V. Biggs, a registered nurse with over 21 years of experience in the correctional health setting, has opined that "the intake screening and nursing assessment of Mr. Thomson by Registered Nurse Rebecca Warren was inadequate, causing a detrimental delay in him receiving urgently needed emergency care." Dkt. No. 83-31 at 6. Combined with the other evidence submitted, this is more than enough to defeat Nurse Warren's motion for summary judgment. In *Estate of Perry*, the jail nurses were in a similar position as Nurse Warren. The nurses in that case were advised that Perry had previously been at the hospital for seizures but did not know that he had expressed trouble breathing. 872 F.3d at 450. They did not take Perry's vitals, provide aid, ask that Perry's spit mask be removed, or call for an ambulance. *Id.* Simultaneously, however, one of the nurses determined Perry was not fit for admission to the jail because Perry was seeping blood through his spit mask and had soiled himself. *Id.* The nurse took no action until another nurse removed Perry's spit mask and found him to be pulseless. *Id.* The Seventh Circuit determined there was a factual dispute as to whether the nurses' actions were objectively reasonable.

It is true that, unlike Perry, Thomson was not bleeding from his head, he had not soiled himself, and Nurse Warren was not notified of Thomson's trouble breathing. Warren argues these considerations diminish the seriousness of Thomson's medical need such that she was reasonable in not calling an ambulance, and that checking his vitals and continuing to monitor him was enough. To be sure, these are factors that a jury may consider. But they are not enough for the

court to conclude as a matter of law that Warren's actions were objectively reasonable. Because, at this point in time, Thomson appeared lethargic and limp, the burden of having the restraints removed was not great, nor was calling an ambulance. As such, the severity of Thomson's medical need did not have to be great to trigger such responses. Based on the evidence before the court, including the expert opinion submitted on Plaintiff's behalf, a jury could conclude that Warren was objectively unreasonable for failing to take further action in the face of Thomson's deteriorated condition. Plaintiff's claim against her must go to a jury.

### 4. Causation

Defendants also argue that any alleged constitutional violation did not cause Thomson's harm. In essence Defendants argue that Thomson's cause of death was determined to be cardiac arrhythmia of an unknown source, not asphyxiation. Therefore, any failure to attend to Thomson's inability to breathe could not have been the cause of his death. But this misunderstands the causation inquiry. The harm at issue is not narrowed to death just because Thomson ended up dying. "Where an obviously ill detainee dies in custody and the defendants' failure to provide medical care is challenged, the causation inquiry is quite broad: 'the constitutional violation in question here is the failure to provide adequate medical care in response to a serious medical condition, not causing her death.'" *Ortiz*, 656 F.3d at 535 (quoting *Gayton*, 593 F.3d at 619). Thus, it is not dispositive that Thomson complained of an inability to breathe but ultimately died of cardiac arrhythmia. The only thing Plaintiff needs to show is that Defendants' failure to provide any medical care exacerbated Thomson's medical problems. Plaintiff's expert, Dr. Kenneth Stein, opined:

> Within a reasonable degree of medical probability failure by the police officers and correctional officers to recognize that Mr. Thomson was having respiratory distress, failure to promptly remove The WRAP and failure to promptly call for a medical

emergency or obtain an immediate medical evaluation for Mr. Thomson at a hospital was the major cause of his death.

Dkt. No. 92-44 at 2. Thus, Plaintiff has made an adequate showing here, and a reasonable "jury could conclude that although [Thomson] ultimately died of a heart condition, it was the delay in providing *any* treatment that caused the harm." *Estate of Perry*, 872 F.3d at 459.

### 5. Qualified Immunity

The Green Bay and BCJ Officers argue in the alternative that they are entitled to summary judgment under the doctrine of qualified immunity. Although the court has concluded that these officers did not violate Thomson's Fourth Amendment rights, for completeness it will address this argument as well.

Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)). In short, the doctrine "protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting another source). And qualified immunity is not just a defense to liability—it is an absolute immunity from suit. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). Thus, "it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 201 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The doctrine reflects an accommodation between the public interest in safeguarding constitutional guarantees on the one hand, and on the other, the concern that subjecting government

officials to personal liability and harassing litigation would inhibit them in the performance of their duties. *Kisela*, 584 U.S. at 104. Moreover, as applied to law enforcement officers, the doctrine takes into consideration a unique feature of their job: officers are frequently required "to make split-second decisions in life-or-death situations." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018). Thus, qualified immunity shields those officers who make reasonable, yet ultimately mistaken, decisions in the real-time, rapidly evolving, and often tense line of duty. *Saucier*, 533 U.S. at 205.

Although qualified immunity is available to the defendants in a § 1983 suit, the plaintiff has the burden to overcome the defense. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). Qualified immunity requires the plaintiff to show "(1) conduct violating the plaintiff's constitutional or statutory rights that is (2) clearly established at the time of the violation such that a reasonable official would understand that what he is doing violates that right." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (internal quotation marks omitted). It has been argued that where the substantive constitutional standard is one of objective reasonableness, the qualified immunity analysis becomes duplicative. *See Saucier*, 533 U.S. at 210 (Ginsburg, J., concurring in the judgment) (citing other sources) ("[P]aradigmatically, the determination of police misconduct in excessive force cases and the availability of qualified immunity both hinge on the same question: Taking into account the particular circumstances confronting the defendant officer, could a reasonable officer, identically situated, have believed the force employed was lawful?"). But the majority in *Saucier* squarely rejected this view, noting that the qualified immunity inquiry "has a further dimension." 533 U.S. at 205; *see also Findlay*, 722 F.3d at 900 (citing *Saucier*, 533 U.S. at 200–07).

This "further dimension" exists because the law does not always provide clear guidance as to what will be deemed reasonable—sometimes, the law provides only a "hazy border." *Saucier*, 533 U.S. at 205. This is especially true where the constitutional touchstone is reasonableness: a standard designed to "accommodate limitless factual circumstances." *Id.* And as mentioned above, qualified immunity serves to protect where "reasonable mistakes" are made "as to the legal constraints on particular police conduct." *Id.* Thus, the substantive constitutional analysis considers the reasonableness of the action the officer took. But the qualified immunity analysis considers whether an officer's mistaken belief that their action was lawful was a reasonable mistake to make. That seems to be the essence of the "further dimension."

The qualified immunity analysis effectuates the "further dimension" through notice—the constitutional or statutory right at issue must be clearly established at the time of the violation. *Findlay*, 722 F.3d at 899; *see also Saucier*, 533 U.S. at 206 ("Qualified immunity operates . . . to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."). To show a defendant was on notice, a plaintiff is not required to present a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). A plaintiff can also demonstrate that the violative act was so plainly unreasonable "that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Findlay*, 722 F.3d at 899 (quoting another source).

The second option is not available to Plaintiff here, so it must point to existing precedent. In recent years, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality" and has reversed federal courts in qualified immunity cases where the lower courts "wrongly subject individual officers to liability." *City of San Francisco v.*

*Sheehan*, 575 U.S. 600, 611 & n.3 (2015) (internal quotation marks omitted). The Supreme Court has instructed: "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *Id.* (cleaned up). In short, "[q]ualified immunity attaches unless not even one reasonable officer, placed in the defendants' shoes, would have thought that her conduct was lawful." *Royal v. Norris*, 776 F. App'x 354, 358 (7th Cir. 2019) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

Here, though the court has concluded otherwise, even if it were assumed that the first prong of the qualified immunity analysis is satisfied (i.e., that the defendant officers violated Thomson's constitutional rights), the defendants were not on notice that their actions would be deemed unlawful. Plaintiff asserts it has long been established that arrestees have a right to adequate medical care under the Fourth Amendment. This is undoubtedly true. *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007); *Lopez*, 464 F.3d at 719. Plaintiff continues by citing to *Estate of Perry* for the general proposition that "failure to take any action in light of a serious medical need would violate that standard." 872 F.3d at 460. But as the Defendants officers assert, such a framing of the constitutional right is too general, and *Estate of Perry* is distinguishable.

As to the level-of-generality problem, Plaintiff does not "clearly establish the right in a particularized sense, rather than in an abstract or general sense." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 731 (7th Cir. 2013) (citing other sources). Nothing about an arrestee's general right to adequate medical care would have put the Defendant officers on notice that their actions under these particular facts were unconstitutional. It was not unreasonable for the Green Bay Officers to disbelieve Thomson's claim that he could not breathe when he had just been treated and released

31

by the hospital physician, was acting irrationally, and had actively resisted them to such an extent that it took three or four officers to restrain him.  It was also not unreasonable to attribute his shortness of breath and sweating to the physical exertion he exhibited in resisting the officers.  This is especially true considering the fact that hospital staff witnessed Thomson's complaints and struggle with the officers and did not intervene.  The fact that Thomson was responding to Officer Harvath during the drive from the hospital to the jail and, when asked why he could not breathe, refused to say unless they removed the restraints, confirmed their belief that Thomson was not in immediate need of medical treatment.  It was not until they arrived at the jail that it became apparent that Thomson was having a medical emergency.  At that point, Nurse Warren was called upon to assess him.  As noted above, it was reasonable for the officers to defer to her in deciding how to proceed.

Estate of Perry is also distinguishable.  In Estate of Perry, the defendant officers took *no action* in response to the obvious need for medical care.  872 F.3d at 460 ("And, if by 2010, it was clearly established that an officer or prison nurse's actions were judged by the objectively reasonable standard of the Fourth Amendment, the failure to take any action in light of a serious medical need would violate that standard.").  Here, by contrast, Officer O'Donnell confirmed there was nothing obstructing Thomson's breathing and monitored Thomson's breathing by placing his hand on Thomson's back and felt the rising and falling with every one of Thomson's breaths.  Dkt. No. 94 ¶ 68.  Other officers also visually confirmed that nothing was obstructing Thomson's breathing, and he was able to respond.  Officer Harvath asked Thomson why he could not breathe, and Thomson refused to say unless the restraints were removed.  Thus, "[b]ecause the officers did not 'fail to take any action,' *Estate of Perry* would not have put them on notice that their response to Royal was clearly unconstitutional."  *Royal v. Norris*, 776 F. App'x 354, 358 (7th Cir.  2019).

In sum, Plaintiff has failed to meet its burden of showing the Defendant officers were on notice of violating a clearly established right. "Qualified immunity attaches unless not even one reasonable officer, placed in the defendants' shoes, would have thought that her conduct was lawful." *Id.* For the reasons set forth above, the court concludes that reasonable officers, placed in the shoes of the Defendant officers, would have thought their conduct was lawful. It thus follows that even if the Defendant officers' conduct did violate Thomson's Fourth Amendment rights, they are nevertheless entitled to qualified immunity, and consequently, to summary judgment on this ground as well.

### C. *Monell* Claim for Failure to Train

Plaintiff alleges the City of Green Bay and Brown County failed to properly train their respective officers on use of the WRAP system. A *Monell* claim against Green Bay and Brown County for failure to train cannot survive because "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) (citing other sources). Because the court finds that the Green Bay Officers and the BCJ Officers are entitled to summary judgment, so too are the City of Green Bay and Brown County. Plaintiff's *Monell* claim against both the City and the County are therefore dismissed.

### CONCLUSION

For the reasons set forth above, the motion for summary judgment filed on behalf of Brown County, Bryce Haines, Kayla Kuchta, Clint Pelischek, Adam Schartner, and Matthew West (Dkt. No. 48) is **granted** and Plaintiff's claims against them are dismissed. The motion for summary judgment filed on behalf of the City of Green Bay, Thomas Behn, Scott Delsart, Ben Harvath, Michael O'Donnell, Karen Pineda, Christopher Vaubel, and Alex Wanish (Dkt. No. 65) is also

**granted** and Plaintiff's claims against them are likewise dismissed. Rebecca Warren's motion for summary judgment (Dkt. No. 59), however, is **denied**. All motions addressing the previously scheduled trial (Dkt. Nos. 117, 120, 122, 123, 124) are **denied as moot**. The Clerk is directed to set this matter on the court's calendar for a telephone conference to discuss further proceedings on the remaining claim against Nurse Warren.

      **SO ORDERED** at Green Bay, Wisconsin this <u>26th</u> day of November, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge